KAUFHOLD GASKIN GALLAGHER DLLP
STEVEN S. KAUFHOLD, ESQ. (SBN 157195)
Email: SKaufhold@KaufholdGaskin.com
QUYNH K. VU, ESQ. (SBN 286631)
Email: QVu@KaufholdGaskin.com
388 Market St., Suite 1300
San Francisco, CA 94111
Telephone: 415-445-4620
Facsimile: 415-874-1071

ROSENFELD & KAPLAN LLP
TAB K. ROSENFELD (*pro hac vice* pending)
Email: tab@rosenfeldlaw.com
1180 Avenue of the Americas, Ste 1920
New York, NY 10036
Telephone: 212-682-1400

*Attorneys for Applicants Karam Salah Al Din
Awni Al Sadeq and Stokoe Partnership Solicitors*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re Application of KARAM SALAH AL DIN AWNI AL SADEQ and STOKOE PARTNERSHIP SOLICITORS for an Order Under 28 U.S.C. §1782 to Conduct Discovery for Use in Foreign Proceedings | Case No. 3:20-mc-80224 <br><br> **DECLARATION OF HARALAMBOS TSIATTALOU IN SUPPORT OF *EX PARTE* APPLICATION FOR AN ORDER UNDER 28 U.S.C. § 1782 TO CONDUCT DISCOVERY FOR USE IN FOREIGN PROCEEDINGS** |

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
---------------------------------------------------------------- x

In re Application of KARAM SALAH AL DIN
AWNI AL SADEQ and STOKOE PARTNERSHIP
SOLICITORS for an Order                                    Case No. _____
Under 28 U.S.C. § 1782 to
Conduct Discovery for Use in Foreign Proceedings.          **DECLARATION OF**
                                                           **HARALAMBOS TSIATTALOU**

---------------------------------------------------------------- x

      I, **HARALAMBOS TSIATTALOU**, do hereby declare under penalty of perjury pursuant to

28 U.S.C. § 1746 the following:

**<u>Introduction</u>**

      1.      I am admitted to practice before the Courts of England and Wales, and I am a partner

at the UK-based law firm of Stokoe Partnership Solicitors ("Stokoe") which is the Claimant in civil

proceedings pending in the High Court of Justice of England and Wales, Queen's Bench Division

captioned: <u>Stokoe Partnership Solicitors v. Mr Paul Robinson, Company Documents Limited, and</u>

<u>Mr Oliver Moon</u>, Claim No. QB-2020-002218 (the "Robinson Proceeding") and <u>Stokoe Partnership</u>

<u>Solicitors v. Mr Patrick Tristram Finucane Grayson, Grayson + Co Limited, Mr Stuart Robert Page,</u>

<u>and Page Corporate Investigations Limited</u>, Claim No., QB-2020-002492 (the "Grayson

Proceeding", and together with the Robinson Proceeding, the "Hacking Claims"). I am also the

Solicitor to the applicant Karam Salah Al Din Awni Al Sadeq ("Mr. Al Sadeq") in a civil

proceeding pending in the High Court of Justice of England and Wales, Queen's Bench Division

captioned: <u>Karam Salah Al Din Awni Al Sadeq v. Dechert, LLP, Neil Gerrard, David Hughes, and</u>

<u>Caroline Black,</u> Claim No. QB-2020-000322 (the "Al Sadeq Litigation", and together with the

Hacking Claims, the "Foreign Proceedings").

      2.      I respectfully submit this Declaration in support of Mr. Al Sadeq and Stokoe's

(collectively, the "Applicants") application for an order under 28 U.S.C. § 1782 to conduct

discovery for use in the Foreign Proceedings. As detailed below, the Al Sadeq Litigation is brought

against the UK-based law firm of Dechert LLP ("Dechert UK") and three of its current partners, who it is claimed committed various acts of wrongdoing in breach of UAE civil and criminal laws.

3.     As set forth below, the Hacking Claims are brought against individuals who have engaged in unlawfully obtaining confidential information from Stokoe and others associated with Mr. Al Sadeq's legal representation in the Al Sadeq Litigation through means of a hacking and surveillance campaign.  The discovery sought here, information, documents, and material related to online accounts used in the hacking campaign targeting Stokoe, Detained in Dubai, 4 Stone Buildings, and Maltin Litigation Support Group (collectively, "Mr. Al Sadeq's Legal Team"), will shed further light on the Al Sadeq Litigation defendants' pattern of human rights abuses and their attempts to intervene with Mr. Al Sadeq's legal representation.

**The Al Sadeq Litigation**

4.     The Al Sadeq Litigation concerns misconduct and human rights abuses committed against Mr. Al Sadeq by Neil Gerrard ("Gerrard"), a solicitor and partner in Dechert UK, and the other defendants in connection with their investigation of fraud allegedly perpetrated against the RAK Investment Authority ("RAKIA").  A copy of the claim (hereinafter, the "Al Sadeq Claim"), filed by Mr. Al Sadeq is annexed as Exhibit A hereto.

5.     The nature of the allegations in the Al Sadeq Litigation are detailed in paragraph 9 of the Al Sadeq Claim.  In summary, Mr. Al Sadeq's claims include allegations that the defendants were implicated in:

      a.  The kidnap and extraordinary rendition of Mr. Al Sadeq from Dubai to RAK (see paragraphs 40 to 47 of the Al Sadeq Claim);

      b.  Mr. Al Sadeq's unlawful detention without arrest or charge, including a period of detention in solitary confinement, under a false name, with no access to legal representation (see paragraphs 105 to 109 of the Al Sadeq Claim);

    c.  The interrogation of Mr. Al Sadeq.  In particular, Mr. Al Sadeq contends that during the first of his interrogations by Mr. Gerrard, he was blindfolded with his hands tied behind his back and had no lawyer present (see paragraph 64 of the Al Sadeq Claim);

    d.  Threats and unlawful pressure made to Mr. Al Sadeq, his wife, and children, including a promise by Mr. Gerrard and Ms. Black that Mr. Al Sadeq's prison conditions could be improved if he "cooperated" with them (see paragraphs 65 to 67, 89 to 98, and 120 to 130 of the Al Sadeq Claim); and

    e.  The procurement of false confessions signed by Mr. Al Sadeq, but drafted by Mr. Gerrard and Mr. Hughes, in circumstances where Mr. Al Sadeq was detained in the above conditions, did not have access to legal representation, and had made it clear that the confessions were untrue (see paragraphs 183 to 184 of the Al Sadeq Claim).

6.    The allegations made by Mr. Al Sadeq are of an extremely serious nature.  That is all the more so in circumstances where they are made against senior lawyers and a global law firm of international repute.  As a consequence, the Al Sadeq Litigation has generated a significant degree of publicity in the UK.

7.    Mr. Al Sadeq has also sought the assistance of the UN's Human Rights Council through a petition submitted on his behalf on November 13, 2018.  Preparations are already being made to submit petitions to the Arbitrary Detention Working Group and the Special Rapporteur on Torture.  Through correspondence dated December 21, 2017, Mr. Al Sadeq has also sought the assistance of the Minister of Justice in Abu Dhabi, the Crown Prince of Abu Dhabi, the Emir of Dubai and the Ambassador of Switzerland to the UAE.

**The Involvement of Stokoe Partnership Solicitors in the Al Sadeq Litigation**

8.      Stokoe was first retained to act in the Al Sadeq Litigation in October 2019.  Since that time, there has been a correlation between the progress of the Al Sadeq Litigation and attempts to obtain confidential information from Stokoe and others in relation to those proceedings.

9.      The Claim Form in the Al Sadeq Litigation was issued on January 28, 2020. Although it was not served at that time, the allegations were made public in a press release published by Detained in Dubai on the date of issue.  The Claim Form, which was made available online, was much more detailed than the amended version ultimately served with the Particulars of Claim and contained details of Mr. Al Sadeq's claim and the nature of the allegations made against the Al Sadeq Litigation defendants.  It also, of course, stated that Stokoe was acting on behalf of Mr. Al Sadeq.

10.      Mr. Al Sadeq's Amended Claim Form and Particulars of Claim were served on March 31, 2020 and April 1, 2020.  As set out at paragraph 215 of the Al Sadeq Claim, my firm's ability to take instructions from Mr. Al Sadeq has been impeded in various ways since the Al Sadeq Litigation was issued.

11.      Between February and March 2020, I travelled to Dubai with other members of Mr. Al Sadeq's Legal Team to meet with Dr. Al Haddad, Mr. Al Sadeq's local counsel, to meet with Mr. Al Sadeq in prison. We were not, however, permitted to visit Mr. Al Sadeq on those occasions. During these trips, my colleagues and I were the subject of surveillance activities, including an apparent break-in to my hotel room, the presence of surveillance agents at my hotel (where I attended privileged meetings in relation to the conduct of the Al Sadeq Litigation), and an attempt to follow me to a privileged meeting at a different location.  I believe these matters were also connected to the Al Sadeq litigation and that they were intended to disrupt my ability to obtain instructions (as they in fact did).

4

12.     During one of the visits that took place in March 2020, I was accompanied by Mr. Arthur Maltin of Maltin PR, a legal public relations firm working in connection with the Al Sadeq Litigation, and Alastair Tomson, junior counsel instructed in the Al Sadeq Litigation.  During this visit we were subject to intimidation and surveillance.  The fact of the surveillance was confirmed to me by an obviously frightened hotel employee who told me:

   a.   "You're being followed/watched by security services. They are very serious people. Nobody can stand in their way."

13.     One of the persons I believe conducted this surveillance is Mr. Stuart Page.  Mr. Page has denied this (although he accepts that he was in the same dining area as myself and my party in a particular hotel in Dubai on March 6, 2020).  Mr. Page's evidence was the subject of heavily adverse comment by Mr. Lenon QC in a related proceeding which I detail further below.

**Stokoe Learns It Is the Subject of Attempted Hacking**

14.     In late March 2020, Mr. Oliver Moon, a private investigator, turned whistle-blower, informed Mr. Alexander Sawyer (who works in corporate intelligence via a company called Quaestio), that he had been instructed by a "Source A2", as he was described in the Robinson Proceeding (and who was later revealed to be a Mr. John Gunning), to make attempts to gain access to Stokoe's confidential information.  These instructions continued throughout April 2020 and included hacking Stokoe's bank accounts, including its client account.  It was subsequently discovered that Source A2's instructions had in turn derived from a Mr. Paul Robinson, another private investigator.  Mr. Moon had previously been instructed by Mr. Sawyer to undertake work for Stokoe (although this was unknown to Stokoe), which is presumably why he turned to Mr. Sawyer, motivated no doubt by moral compunction about carrying out what he had been instructed to do.

15.     As he has since confirmed in an affidavit, Mr. Moon was also instructed to procure confidential information—including accessing their bank accounts—about others assisting Mr. Al Sadeq: namely, Maltin PR (a legal public relations and litigation support firm assisting Mr. Al Sadeq) and Ms. Radha Stirling ("Stirling") (who works for the London-based human rights advocacy organization "Detained in Dubai").  The timing and coordination of this hacking demonstrates that it is designed to interfere with the Al Sadeq Litigation, and to undermine the sanctity of the confidential relationship between solicitor and client.  For instance, just after the claim form and Particulars of Claim were served in the Al Sadeq Litigation and a couple of weeks before Dechert's solicitors made enquiries of Stokoe as to who was funding that litigation, Mr. Moon was instructed to obtain Stokoe's banking co-ordinates.

16.     On April 21, 2020, Mr. Gunning was instructed to ascertain my movements "in and out of Dubai—for Feb 2020."  As mentioned above, I was in Dubai in February 2020 obtaining instructions in relation to the Al Sadeq Litigation, and became aware that I was the subject of surveillance and an unlawful break in.

17.      There can be no doubt that the attempted hacking of Stokoe was motivated by, and relates to, its retainer by Mr. Al Sadeq.

**The Azima Litigation**

18.     There were also incidents of hacking in connection with a related litigation captioned: Ras Al Khaimah Investment Authority v Azima (the "Azima Litigation"), in which judgment was handed down by Andrew Lenon QC on May 22, 2020.  A copy of the Judgment in the Azima Litigation is annexed as Exhibit B hereto.

19.     The Azima Litigation concerned claims brought by RAKIA against Mr. Farhad Azima, a US businessman involved in the aviation industry who had been party to a number of business ventures with RAKIA and other RAK entities between 2007 and 2016.

20.     As recorded at paragraphs 2 and 30 of the judgment in the Azima Litigation, part of the factual background to that case involved an investigation conducted by RAKIA from around late 2014 into RAKIA's former Chief Executive Officer, Dr Massaad.  This background overlaps with the investigations that are in issue in the Al Sadeq Litigation.  In particular, the question of whether human rights abuses had been committed against Mr. Al Sadeq also became an issue in the Azima Litigation.  See Ex. B, ¶¶ 201.1-201.8

21.     In the course of the Azima Litigation, it became clear that in January 2015 the Ruler of RAK had engaged a private investigator, Mr. Stuart Page, to investigate the activities of Dr. Massaad.  See Ex. B, ¶¶ 261, 262.  So far as I am aware, Mr. Page has a strong presence in Dubai and also has connections to companies incorporated in the UK.

22.     On March 6, 2020 I personally witnessed Mr. Page whilst staying at the One and Only on the Palm Hotel in Dubai.  I believe that this encounter was connected to acts of surveillance that I describe above.

23.     An issue that arose in the Azima Litigation was whether RAKIA's case against Mr. Azima was based on evidence obtained as a result of hacking Mr. Azima's email account, including by the device of a spear-phishing email.  See Ex. B, ¶ 294.  In particular, Mr. Azima asked the Court to find that RAKIA was responsible for that hacking, and that RAKIA's claim should therefore be struck out as an abuse of process.  See Ex. B, ¶ 384.

24.     During a hearing in the Azima Litigation, Mr. Page testified that in the course of his investigation into collusion between Dr. Massaad and members of the Ruler's family, he utilized the services of Insight, an Israeli company, who "were specialists at obtaining information from confidential sources" engaged in gathering electronic data which included "using the dark web, open source information on the internet."  Ex. B, ¶ 269.

25.     Gerrard testified in the same hearing that the information, which formed the basis of the fraud accusations RAKIA brought against Mr. Azima, was obtained through hacking into Mr. Azima's personal accounts.  A copy of the transcript of Day 5 of the hearing, which took place on January 28, 2020, and is annexed hereto as Exhibit K.  See Ex. L, p. 69-70.

26.     The Judge did not accept Mr. Azima's submission that RAKIA was responsible for the hacking of his emails.  Ex. B, ¶ 381.  Nor did the Judge make any finding of wrongdoing on the part of Mr. Page, although he did make findings as to the world in which Mr. Page operated.  Ex. B, ¶ 369.

27.     In particular, the Judge found that "*These cases highlight the fact that Mr Page operates in a world of covert surveillance in which agents acquire confidential information unlawfully and that Mr Page has dealings  with such agents. It would be a reasonable inference to draw from these incidents that Mr Page has access to agents with the capacity to hack emails . . . these other incidents do not establish that Mr Page ever personally carried out or authorised the unlawful obtaining of confidential information and therefore do not affect my assessment of the likelihood of Mr Page acting unlawfully in this case*."  Ex. B, ¶ 369.

**The Robinson Proceeding**

28.     As mentioned above, in late March 2020, Mr. Moon informed Mr. Sawyer of Quaestio that he had been instructed to obtain confidential information from Stokoe.  Mr. Moon agreed to work with Stoke and Mr. Sawyer to establish the nature and origin of the requests.

29.     I was informed by Quaestio (and Mr. Moon has in an affidavit dated July 2, 2020 confirmed) that, pursuant to the arrangement, Mr. Moon received the following instructions from "Source A2" (an individual Stokoe eventually identified as Mr. John Gunning):

      a.   On April 2, 2020, Mr Moon was instructed to obtain the Stokoe's banking coordinates.

    b.   On April 9, 2020, Mr. Moon was instructed to access Stokoe's trading bank account and transactional data for the business bank account for the last three months. This period broadly coincides with the period that had elapsed since the issue of the Claim Form in the Al Sadeq Litigation.

    c.   On April 22, 2020, Mr. Moon was instructed to provide information relating to Stokoe's client account, including transactional information for the month March 2020.  Mr. Moon was told that it was likely information would also be sought for the period November 2019 to February 2020, a period overlapping almost exactly with the period of Mr. Al Sadeq's retainment of Stokoe.

30.    Mr. Sawyer liaised with Stokoe to provide Mr. Moon with Stokoe's bank account documents in a format which allowed covert tracking, to identify the recipients of those documents. In this way, Quaestio established that Mr. Moon was instructed by Mr. John Gunning, who was in turn instructed by Mr. Paul Robinson.  Quaestio's findings are set out in a report, dated June 27, 2020, which is annexed hereto as Exhibit C.

31.    Based on this information, Stokoe initiated the Robinson Proceeding in the High Court of Justice of England and Wales, Queen's Bench Division seeking, *inter alia*, to enjoin, and to obtain affidavits from, Mr. Moon, Mr. Gunning, and Mr. Robinson.  A copy of the form of claim filed by Stokoe Partnership Solicitors is annexed as Exhibit D hereto.

32.    Proceedings against Mr. Robinson were stayed by a consent order sealed by Justice Chamberlain, (the "Chamberlain Order").  A copy of the Chamberlain Order is annexed as Exhibit E hereto.  Pursuant to the Chamberlain Order, Mr. Robinson undertook to "swear an affidavit stating on oath . . . the identity of any person who has requested" that he "obtain Confidential Information from" Stokoe.  Ex. E, ¶¶ 1, 1.1.  Mr. Robinson swore an affidavit (the "Robinson

Affidavit") wherein he stated that Mr. Patrick Grayson was the source of these instructions. A copy of the Robinson Affidavit is annexed as Exhibit F hereto. Ex. F, ¶ 8.

**The Grayson Proceeding**

33.     Stokoe therefore brought further proceedings against Mr. Grayson (amongst others) by Claim Form dated July 16, 2020. Copies of the form of claim and Particulars of Claim filed by Stokoe are annexed as Exhibit G and Exhibit H hereto. Those proceedings were brought, *inter alia*, to compel Mr. Grayson and Mr. Grayson's associated company, Grayson + Co Ltd, to reveal the source of their instructions, any further wrongdoing, and to obtain injunctive relief to prevent them from further wrongdoing.

34.     The application against Mr. Grayson and Grayson + Co Ltd resulted in a consent order made by Justice Tipples, (the "Tipples Order"). A copy of the Tipples Order is annexed as Exhibit I hereto. Pursuant to the Tipples Order, Mr. Grayson and Grayson+ Co Ltd undertook to "swear an affidavit stating on oath . . . the identity of any person who has requested that he "obtain Confidential Information from" Stokoe. Ex. I, ¶¶ A.4, 4.1.

35.     Mr. Grayson's affidavit (the "Grayson Affidavit") was notably brief. He stated that: "Nobody requested me to obtain Confidential Information from or pertaining to [Stokoe], directly or indirectly." A copy of the Grayson Affidavit is annexed as Exhibit J hereto. Ex. J. ¶ 4.1.

36.     Mr. Grayson's affidavit was in stark contradiction to Mr. Robinson's affidavit which set forth that Mr. Robinson received instructions from Mr. Grayson to obtain confidential information from Stokoe. See Ex. D, ¶ 8.

**Receipt of Phishing Emails**

37.     Since the issue of proceedings in the Al Sadeq Litigation, I, along with others involved in the Al Sadeq Litigation, have received numerous emails and text messages which appear to be targeted attempts to access personal data. I believe that these attempts amount to

10

phishing or spear-phishing; i.e. communications which seek to trick the recipient into clicking on a link to a website which itself contains malicious software which is downloaded onto the recipient's device. Spear-phishing is a more sophisticated form of phishing where the communication contains specific information, targeted at the recipient, which makes it more likely that the recipient will click on the link.

38.     In particular, Stirling, who has published articles about the Al Sadeq Litigation and has aided Mr. Al Sadeq in raising awareness amongst human rights activists and non-governmental organizations about his case, received a phishing email from a Google Inc. ("Google") account, dutrouxjustine@gmail.com. That same email address sent a phishing email containing Android Package files ("APK files") to Detained in Dubai. An analysis conducted of those APK files showed that the APKs communicated with a number of Ngrok server addresses. Stirling was also the subject of approximately four (4) phishing attempts using content hosted on Dropbox Inc. ("Dropbox") sent to her email address radha@radhastirling.com. Approximately twenty-six (26) phishing attempts were sent to the email addresses of Alastair Tomson ("Tomson") of 4 Stone Buildings, Nick Wright ("Wright") of 4 Stone Buildings, and Stirling from domains hosted by Cloudflare Inc. ("Cloudflare"). Google Firebase accounts were used in approximately twenty (20) phishing attempts targeting the email accounts of Tomson, Wright, Stirling, and Tim Maltin, of Maltin Litigation Support Group. In addition, approximately ten (10) phishing attempts were sent to Stirling's, Mr. Maltin's, and my email addresses from accounts utilizing Twilio SendGrid services. It is believed that these hacking attempts were perpetuated by individuals associated with the defendants in the Al Sadeq Litigation as part of an attempt to interfere with Mr. Al Sadeq's legal representation.

**The Discovery Sought**

39.     Stokoe has been operating since 1994.  As a firm, we have never before 2020 been affected by such cyberattacks.  I believe that these various attempts to access Stokoe's confidential information are linked to its representation of Mr. Al Sadeq.  Beyond the confidential information that was sought from Stokoe as described above, in Mr. Robinson's affidavit, he stated that he received the following requests for information:

      a.   Information about Ms. Stirling's whereabouts, telephone numbers, and banking information; and

      b.   Financial records and monthly transactional data from the bank account of Maltin PR.

Ex. F, ¶¶ 12-15.

40.     Mr. Al Sadeq's Legal Team has been, and remains, a target of a complicated and coordinated campaign by unknown perpetrators, within the context of their involvement in the ongoing Al Sadeq Litigation.

41.     Accordingly, upon information and belief, Google, Dropbox, Cloudflare, Ngrok, and Twilio Inc. have information, documents, and material, which would provide evidence necessary to establish the identity of the ultimate perpetrators behind the hacking campaign targeted against Mr. Al Sadeq's Legal Team, and in turn, aid Mr. Al Sadeq in proving the defendants' ongoing pattern of human rights abuses and their efforts to interfere with Mr. Al Sadeq's access to legal representation.

42.     For these reasons, it is respectfully requested that this Court grant the Application in its entirety.

Dated:  December 14, 2020

                                                           _____
                                                       Haralambos Tsiattalou

# EXHIBIT A

Case No: QB-2020-000322

**IN THE HIGH COURT OF JUSTICE**

**QUEEN'S BENCH DIVISION**

**BETWEEN**

**KARAM SALAH AL DIN AWNI AL SADEQ**

<u>**Claimant**</u>

**- and –**

**(1) DECHERT LLP**

**(2) NEIL GERRARD**

**(3) DAVID HUGHES**

**(4) CAROLINE BLACK**

<u>**Defendants**</u>

---

## PARTICULARS OF CLAIM

---

<u>The Parties</u>

1.  The Claimant ("**Mr Al Sadeq**") is a lawyer and Jordanian citizen who is a resident of the United Arab Emirates (the "**UAE**").  For the past six years he has been incarcerated in Ras Al Khaimah ("**RAK**"), one of the constituent Emirates of the UAE, having originally been abducted and unlawfully detained in September 2014 for alleged involvement in fraudulent transactions allegedly committed against his former employer, the RAK Investment Authority ("**RAKIA**"), and having been subsequently convicted by the RAK criminal court after a prolonged period of solitary confinement and other inhumane treatment in breach of UAE law and his human rights under international law.  Mr Al Sadeq denies any involvement in wrongdoing and maintains that the charges against him were politically motivated on the part of the Ruler of RAK in an attempt to conceal the Ruler's own close involvement in RAKIA's activities and that he was convicted on the basis of false confessions obtained from him under duress by the Defendants.

2. This claim is brought expressly without prejudice to any future claims or proceedings (whether in this jurisdiction or any other, and whether by way of court proceedings, arbitration or any other form of action) Mr Al Sadeq may wish to bring against any person in relation to his convictions and / or the circumstances thereof, including the setting aside of those convictions and / or any claims for losses arising as a result thereof to the extent that such losses are not recovered in these proceedings.

3. The First Defendant ("**Dechert**") is a limited liability partnership registered in England & Wales with registration number OC306029, authorised and regulated by the Solicitors Regulation Authority of England and Wales, with its registered address at 160 Queen Victoria Street, London EC4V 4QQ.

4. The Second Defendant ("**Mr Gerrard**") is a solicitor of the Senior Courts of England and Wales, and a Partner in Dechert where he is global co-head of Dechert's white collar and securities litigation practice.

5. The Third Defendant ("**Mr Hughes**") is a solicitor of the Senior Courts of England and Wales, and currently a Partner at Stewarts Law. Prior to joining Stewarts Law in or around June 2017, Mr Hughes was a Partner at Dechert, working closely with Mr Gerrard.

6. The Fourth Defendant ("**Ms. Black**") is a solicitor of the Senior Courts of England and Wales and is a Partner at Dechert specialising in corporate investigations, working closely with Mr Gerrard with whom she joined Dechert from DLA Piper in around 2011.

7. All of Mr Gerrard's, Mr Hughes's and Ms. Black's acts as particularised herein are attributable to Dechert, and Dechert is responsible and liable for all wrongs committed by them or any of them, and the consequences thereof.

Summary of this claim

8. These proceedings concern serious wrongs committed against Mr Al Sadeq by persons including Mr Gerrard, Mr Hughes, Ms. Black and Dechert in relation to an investigation, led by Mr Gerrard, into the affairs of RAKIA and an alleged fraud committed by its former Chief Executive Officer, Dr Khater Massaad ("**Dr Massaad**"), allegedly assisted by *inter alios* Mr Al Sadeq and several other alleged co-conspirators. Dr Massaad had been a close confidant of the current Ruler of RAK, but they fell out between 2010 and 2012.

9. These wrongs, involving breaches of UAE criminal law and procedure, the UAE Constitution and which are in breach of Mr Al Sadeq's human rights as a matter of UAE and international law, give rise to actionable claims under UAE law, as pleaded at paragraphs 220 to 229 below, and include the following:

9.1. Kidnap and extraordinary rendition of Mr Al Sadeq from Dubai to RAK;

9.2. Unlawful detention of Mr Al Sadeq in RAK without arrest or charge;

9.3. Mr Al Sadeq's detention in solitary confinement for around 560 days between September 2014 and April 2016, first at the General Headquarters of State Security in RAK (the "**GHQ**") and subsequently in a camp run by the Ruler of RAK's private militia, under a false name, without any or any proper due process, no access to legal representation, in unsanitary and inhumane conditions, and without adequate medical attention, exercise or access to his family, who were refused information as to his whereabouts.

9.4. Interrogation of Mr Al Sadeq by Mr Gerrard and Ms. Black during the period he was detained in solitary confinement in the GHQ and by Mr Gerrard, Mr Hughes and Ms. Black during the period he was detained in solitary confinement in the said militia camp. Mr Gerrard and Mr Hughes made it apparent by their words and actions that they had the power to improve his inhumane conditions if he gave them sufficient "cooperation".

9.5. Threats by Mr Gerrard and Mr Hughes to Mr Al Sadeq against him, his wife and children at various times as more specifically particularised herein to force him to "cooperate" in building a case against Dr Massaad, Mr Jihad Quzmar, (the former Legal Advisor to the Ruler, and an advisor of long standing) ("**Mr Quzmar**"), Mr Farhad Azima (a US-Iranian businessman who had dealings with RAKIA) ("**Mr Azima**"), and Mr Gela Mikadze (former General Manager of RAKIA's Georgia operations) ("**Mr Mikadze**") and other alleged co-conspirators by giving false evidence, including threats that Mr Al Sadeq's wife would be arrested and imprisoned and that neither of them would ever see their children again.

9.6. Pressure applied by Mr Gerrard and Ms. Black and Mr Hughes at various times as more specifically particularised herein to Mr Al Sadeq's wife to persuade Mr Al Sadeq to "cooperate" by giving false evidence, including by threatening her directly with imprisonment and by telling her that if Mr Al Sadeq told them what they wanted he would be released from detention and the inhumane conditions in which he was being kept.

9.7. Forcing Mr Al Sadeq to make knowingly false confessions prepared by Mr Gerrard and Mr Hughes containing evidence which Mr Al Sadeq told them was untrue, in return for promises, subsequently reneged upon, said to have been given by the Ruler of RAK, that he would be released and pardoned if he made the false confessions.

10. In summary, it is Mr Al Sadeq's case that Mr Gerrard and Mr Hughes and Ms. Black and Dechert were prepared to, and did, violate Mr Al Sadeq's rights, including by using threats and / or mistreatment and / or unlawful methods to force Mr Al Sadeq to give evidence and / or false evidence, as more specifically particularised below, in an attempt to build a case against Dr Massaad and his alleged co-conspirators at the behest of the ruler of RAK. In doing so, and thereby directing and/or being complicit in Mr Al Sadeq's ill treatment and / or torture, they caused Mr Al Sadeq physical, emotional, psychological, moral and financial harm, loss and damage for which compensation is sought in these proceedings.

RAK, RAKIA and Dr Massaad

11. From the 1980s Dr Massaad established and managed businesses in RAK including RAK Ceramics, of which both he and the current Ruler of RAK, Sheikh Saud Bin Saqr Al-Qasimi (the "**Ruler**"), were founders and significant shareholders.

12. In around August 2003 Dr Massaad was officially appointed adviser to the Ruler, who at that time had recently been appointed the Crown Prince and Deputy Ruler of RAK. From that point (at the latest) until around late 2010 Dr Massaad was the Ruler's close friend and confidant, in his presence on a daily, or almost daily, basis.

13. As a result of Dr Massaad's management, by 2010 RAK Ceramics was the world's largest ceramics manufacturer. The export success of RAK Ceramics provided RAK, a country with no oil or gas industry, with its most significant source of foreign exchange income. The Ruler obtained significant private wealth through his shareholding in RAK Ceramics.

14. RAKIA was established in 2005 by Emirati Decree No. (2)/2005 in order to promote investment in RAK and to promote various economic sectors in the Emirate.

15. From its establishment in 2005 until around 2012, RAKIA's Chief Executive Officer was Dr Massaad. Dr Massaad was in control of all day to day management of RAKIA, but at all material times worked closely with the Ruler, developing investment strategies and taking investment decisions with the knowledge, approval, and instructions of the Ruler.

16. Dr Massaad developed RAKIA, and the RAK Free Zone, using his financial and business expertise and borrowing, without any significant capital investment from the RAK state itself. By 2011 RAKIA made a net profit of 300 million UAE Dirhams ("**AED**") and was worth more than one billion AED.

17. In addition to promoting investment in RAK generally, by around 2010 RAKIA had, with the full knowledge and approval of the Ruler, very significant investment interests outside RAK, particularly in Georgia (developed after a visit of the Georgian Prime Minister to

RAK in 2006). The Georgian investments included shares in Poti Sea Port, the Sheraton Metechi Palace Hotel and Poti Port Free Industrial Zone, and a property development company called Rakeen Developments.

18. The background to these investments is that, prior to his succession in late 2010, the Ruler had been keen to build up RAKIA's investments outside RAK, and had directed that this be done, because he was concerned about his half-brother Sheikh Khaled bin Saqr Al Qasimi ("**Sheikh Khaled**") succeeding in any succession dispute which might arise upon the death of his father, the previous ruler of RAK, the late Sheikh Saqr Bin Muhammad Al Qasimi (the "**Late Sheikh**"). Hence, he wished to have considerable assets which he could control for his own benefit, with the assistance of Dr Massaad, outside RAK, should he not become the next Ruler, rather than holding assets within RAK / the UAE and which would therefore be within the direct reach of a future government of RAK with his brother Sheikh Khaled as Ruler.

19. In this regard, Sheikh Khaled was the Crown Prince and Deputy Ruler between around 1958 until around June 2003 when the Late Sheikh removed him and replaced him with the Ruler. This was an unpopular move in some quarters leading to street protests in favour of Sheikh Khaled in RAK, and he retained significant support in the Emirate to succeed the Late Sheikh.  Subsequently, Sheikh Khaled claimed to have been reinstated by an Emiri Decree, said to have been made by the Late Sheikh in 2004, although this was disputed by the government of RAK and the UAE. Upon being made Crown Prince, the Ruler promised that when he succeeded the Late Sheikh he would make his brother Sheikh Faisal the Crown Prince, and his other brother Sheikh Taleb would be made Deputy Ruler.

20. Sheikh Khaled continued to challenge the Ruler's legitimacy as Crown Prince and his entitlement to succeed the Late Sheikh. As a result, the Ruler was concerned that when his father passed away Abu Dhabi, the most powerful of the Emirates, might favour Sheikh Khaled and allow him to succeed to the throne of RAK in his place.

21. From around 2008 in the face of continued lobbying through the media by Sheikh Khaled complaining about the Ruler's policy of making overseas investment through RAKIA, which the Ruler was concerned might undermine his prospects of succeeding his father in due course, the Ruler directed that RAKIA should change the policy of foreign investment set in place by Dr Massaad, that he had previously approved and directed, and instead divest itself of its foreign investments, and invest the proceeds within RAK. Dr Massaad disagreed with this change of policy, but the Ruler overruled him. The sudden change of policy led

to the rushed sale of assets in Georgia at a premature stage with a detrimental effect on the return obtained from them.

22. In the event, when the Late Sheikh passed away in October 2010, the Ruler ultimately received the backing of Abu Dhabi over Sheikh Khaled and succeeded his father as Emir of RAK.

23. Upon his succession in October 2010, the Ruler appointed his son, Sheikh Mohammed, as Crown Prince instead of Sheikh Faisal, and abolished the role of Deputy Ruler meaning Sheikh Taleb could not take it up. In doing so he broke the promise he had made to each of them in 2003, causing animosity. At about the same time Sheikh Faisal was also removed from his role as Chairman of the Ras Al Khaimah Free Zone Authority and replaced by another of the Ruler's brothers, Sheikh Ahmed, who was considered more loyal to the Ruler.

24. As Crown Prince, Sheikh Mohammed wanted to become the Ruler's closest advisor in place of Dr Massaad, to take control of RAKIA, and to reduce Dr Massaad's influence in RAK. Ultimately Sheikh Mohammed succeeded in driving a wedge between the Ruler and Dr Massaad whose relationship soured, and the Ruler turned against Dr Massaad. Furthermore, with the RAK economy suffering as a result of the global financial crisis, and in circumstances where the Arab Spring movement was growing between 2010 and 2012, the Ruler continued to be concerned about domestic criticism and potential civil unrest in relation to RAKIA's investments outside RAK, initially, as pleaded at paragraphs 15 to 21 above, made at his direction for his own potential personal financial and / or political benefit.

25. In a process which took place from around 2008 until 2012, RAKIA divested itself of its key overseas assets. Dr Massaad was side-lined from RAK Ceramics and other RAK businesses during this period, although he continued to work practically full-time for RAKIA until he left RAK in around June 2012, on good terms and without any suggestion of wrongdoing. He returned to the UAE on several occasions thereafter until August 2014, including for meetings with the Ruler.

26. In 2012, Dr Massaad founded a business in Lebanon with around six investors, one of whom was Sheikh Faisal. As pleaded above, the Ruler had removed Sheikh Faisal as Crown Prince in 2012 and replaced him with Sheikh Mohammed, causing animosity between them.

27. The Ruler came to learn of Dr Massaad's business relationship with Sheikh Faisal in around 2014. As a result, the Ruler became concerned that Dr Massaad was working with Sheikh

Faisal and / or  Sheikh Khaled in order to destabilise the Ruler, and that Sheikh Faisal and / or Sheikh Khaled were plotting to remove the Ruler with the assistance of Abu Dhabi.

28. Since finding out about Dr Massaad's business relationship with Sheikh Faisal in 2014 and following on from the fall-out between Dr Massaad and the Ruler, and the Ruler's concerns about Dr Massaad's involvement in suspected moves to oust him by Sheikh Khaled and Sheikh Faisal, the Ruler with the assistance of the Defendants has pursued a vendetta against Dr Massaad and alleged co-conspirators such as Mr Quzmar, Mr Mikadze, and Mr Azima (including by recent proceedings in the English High Court).

29. The background set out above at paragraphs 11 to 28 is the context in which wrongs have been committed against the Claimant who has become collateral damage in the vendetta pursued by the Ruler against Dr Massaad, against whom RAKIA allegedly seeks to recover over USD 2 billion. The Ruler's motive in pursuing his vendetta is both to punish Dr Massaad for his supposed disloyalty by destroying his reputation and discrediting him, and also to attempt to conceal the Ruler's own personal knowledge and direction of RAKIA's foreign investments for his own personal and political benefit in the years before his accession. In this regard, it is a matter of public record that Mr Gerrard was appointed by the Ruler in order to investigate and pursue Dr Massaad;  and Mr Al Sadeq and his wife were told both by Mr Gerrard and Mr Hughes that the "Big Bastard" Dr Massaad, and his alleged co-conspirators, were the people they were really after, and that they merely wanted Mr Al Sadeq's "cooperation" to help them build that case. Despite several criminal sentences having been pronounced against Dr Massaad by the RAK courts *in absentia*, Dr Massaad maintains his innocence and presently lives and works in Saudi Arabia, an Interpol notice which had been lodged against him by RAK now having been removed, and an extradition request from RAK having been dismissed by the Saudi court.

 Human rights abuses in RAK

30. RAK is regarded by international observers as having a record of human rights abuses including arbitrary detention, forced confessions, unfair trials, and mistreatment in detention.

31. A report by Amnesty International in 2014 (the "**2014 Amnesty Report**") gave several examples of abuse in Ras-Al-Khaimah. As to this:

31.1.    Saleh Mohammed al-Dhufairi was detained at the palace of the Ruler for 133 days: "*He was charged in connection with his activities on Twitter but released on bail after two weeks in custody. He was at liberty only briefly. On 29 April 2012, plain-*

*clothed security officers arrested him without producing a judicial warrant and took him to the palace of Sheikh Saud Bin Saqr al-Qassimi, the Ruler of Ras al-Khaimah. He remained there without charge under armed guard for some 133 days. During this period, he was permitted visits from his family but they were prevented from discussing his whereabouts with anyone outside their immediate family. The authorities did not inform Saleh Mohammed al-Dhufairi of the reason for his detention, and under what law he was held, or whether they intended to bring charges against him. He was not allowed to meet with a lawyer or taken before any judge or court during this time. On 9 September 2012, the security authorities moved him to a new place of detention, whose location they did not disclose to his family, where they held him in solitary confinement in a freezing cold cell that they kept permanently lit, causing him extreme discomfort and making it difficult for him to sleep.*" (page 18).

31.2.    Sheikh Dr Sultan Kayed Mohammed al-Qassimi, a member of the Ruler's own family, was subjected to arbitrary detention in the Ruler's palace, then moved to a secret detention facility, and was denied access to legal representation and his family: "*Sheikh Dr Sultan Kayed Mohammed al-Qassimi, a senior member of the ruling family in Ras al-Khaimah emirate who helped found Ittihad University in the UAE and headed the board of directors of al-Islah, was arrested on 20 April 2012 by armed State Security officers who raided his home and failed to produce a judicial warrant for his arrest. They took him to the palace of Sheikh Saud Bin Saqr al-Qassimi, the Ruler of Ras al Khaimah, and then held him there without charge or trial for five months during which the authorities denied to his family that they were holding him there and refused to disclose any information as to his whereabouts. A victim of enforced disappearance, he was kept in solitary confinement in a locked room and watched over by armed guards. In September 2012, the security authorities moved him to a secret detention facility, where he remained until he went on trial as one of the UAE 94 defendants. Throughout his detention, the authorities denied him access to a lawyer and contact with his family.*"

31.3.    Dr Mohammed al-Mansoori, until 2009 the legal advisor to the Late Sheikh, was held in solitary confinement for 8 months, and at his trial a confession was produced which he denied signing:  *"Dr Mohammed al-Mansoori, a prominent lawyer and former head of the UAE's Jurists' Association, was detained by a group of State Security officers whose faces were concealed by balaclavas on 16 July 2012 near his*

8

*home in Ras al-Khaimah emirate. The officers took him first to his home, which they searched for six hours, and then to an undisclosed location where they detained him incommunicado and in solitary confinement for eight months. At his trial as one of the UAE 94, the prosecution submitted a "confession" that they said he had signed while he was held in incommunicado detention as evidence against him; he told the court that it was untrue that he had signed the statement and testified that he had not signed any documents when he was in pre-trial detention. The court took no steps to order an expert examination of the signature to verify it but accepted the confession as evidence. It then returned a guilty verdict against Dr Mohammed al-Mansoori and sentenced him to 10 years imprisonment, followed by three years' probation. He stood trial again with nine other UAE nationals and 20 Egyptian nationals and was convicted in January 2014, receiving an additional 15-month prison sentence, which he is to serve after his initial 10-year sentence is complete. In the second mass trial, he had refused, along with many of the other defendants, to attend a number of the court proceedings, in protest at not being allowed access to his case documents."*

31.4.    An expert panel appointed by the UN High Commissioner for Human Rights stated the following in relation to Dr Mansoor's treatment by RAK:

"*According to reports at our disposal, throughout his deprivation of liberty, Mr Mansoor has been kept in solitary confinement, and in conditions of detention that violate basic international human rights standards and which risk taking an irrevocable toll on Mr Mansoor's health," the experts said. "We implore the authorities of the United Arab Emirates to immediately grant him access to vital and consented medical care and to ensure that his conditions of detention conform to the United Nations' Standard Minimum Rules for the Treatment of Prisoners.*"

"*We are also alarmed at repeated and consistent reports that Mr Mansoor has not received a fair trial and call on the authorities to ensure his retrial in accordance with the fundamental judicial guarantees provided for in international human rights law, or his immediate release.*".

32. The 2014 Amnesty Report is damning in its assessment of the "confession culture" which prevails in the UAE:

"*By allowing the State Security to detain suspects indefinitely, in undisclosed detention facilities and in isolation from the outside world, UAE law effectively facilitates torture*

*and other ill-treatment and creates a "confession culture" whereby State Security investigators seek to obtain "confessions" and other incriminating statements from those in their custody as a basis for securing their conviction at trial. There is no independent oversight of the conditions in which the State Security holds detainees, often for many months, or the methods they use in seeking and obtaining "confessions."*"

33. As pleaded below, Mr Al Sadeq's treatment follows a similar pattern to the examples given above in that, *inter alia*, he was kidnapped, arbitrarily detained for over five years, subjected to torture and inhumane treatment while incarcerated in solitary confinement for around 560 days, denied access to legal representation, only occasionally allowed to see his family, his family was denied information about his whereabouts at all material times until April 2016, his family was threatened and he was forced to sign false confessions under duress which were used in order to convict him and to implicate others including Dr Massaad. The Defendants were aware of the abuse to which Mr Al Sadeq was subjected, which in the premises pleaded below was orchestrated by Mr Gerrard with the assistance of the other Defendants, at the behest of the Ruler.

Mr Al Sadeq

34. Mr Al Sadeq is a Jordanian national and Jordanian-qualified lawyer who was born in Dubai to Jordanian parents on 2 February 1980. Mr Al Sadeq studied law at Amman University, from where he graduated in 2001. He then became a member of the Jordanian Bar, and in 2003 obtained a Master's Degree in Law from the University of Western Sydney. Mr Al Sadeq subsequently completed a training contract with a Jordanian law firm before, in 2007, joining the in-house legal team at a Jordanian property development company.

35. Between November 2008 and 2012 Mr Al Sadeq was employed by RAKIA. His initial role was as a legal adviser. In around 2010 Mr Al Sadeq was promoted to Group Legal Director, reporting directly to Dr Massaad. In June 2011, Dr Massaad appointed Mr Al Sadeq as Deputy Chief Executive Officer of RAKIA, reporting directly to Dr Massaad.

36. During his work for RAKIA Mr Al Sadeq also had regular interactions with the Ruler and was well known to him. He would regularly visit the Ruler at his palace; and would speak to him on a very regular basis by telephone, often late into the evening.

37. While working for RAKIA, Mr Al Sadeq's responsibility was mainly to finalise deals to sell assets in order to return monies that had been invested outside of RAK to the Emirate, pursuant to the revised strategy required by the Ruler from around 2008 onwards as pleaded

at paragraphs 21 and 25 above. At all material times Mr Al Sadeq acted on instructions from Dr Massaad which to the best of his knowledge, in all significant respects, were known to and had been approved or given by the Ruler himself.

38. In late 2012 Mr Al Sadeq tendered his resignation from RAKIA in circumstances where it had been made clear to him that the role of CEO of RAKIA, which he had hoped would be his next career step (already being Deputy CEO) was going to be significantly reduced in scope.  RAKIA accepted his resignation, and he was given a severance package of UAE Dirhams 1 million and allowed to retain his medical insurance and UAE residency sponsorship on condition that he remain as an unpaid adviser to the Board of Directors for a six month "handover" period.

39. Mr Al Sadeq and his family thereafter moved to Dubai in around December 2012. At the time Mr and Mrs Al Sadeq had a 6 month old daughter and were expecting a son who was born in February 2013 in Dubai. Once in Dubai, after a period on sabbatical, Mr Al Sadeq started an investment business which quickly became successful.

Kidnap and rendition of Mr Al Sadeq from Dubai – 5 September 2014

40. Under Articles 5, 6, 7, 19, 23, 24, 26 and 29 of the UAE Federal Law No. 11 of 1973 regarding the regulation of the judicial relationships between the Emirates that are members of the Union ("**Federal Law No. 11**") any constituent Emirate wishing to question a person in relation to an offence who is not present in that Emirate must make a request to the authorities in the Emirate where that person is present for their arrest by the authorities in that Emirate, prior to extradition to the Emirate which made the request.

41. On 4 September 2014 Mr Al Sadeq and his wife Dima Al Sadeq ("**Mrs Al Sadeq**") returned to Dubai with their children after a vacation seeing family in Jordan. On their arrival back to their home in the Arabian Ranches area they noticed that somebody appeared to have attempted forced entry while they were away. However, nothing in the property appeared to have been disturbed, and they left soon afterwards for a social engagement in Dubai without reporting the matter to the police, leaving their children asleep with their nanny.

42. That evening when they returned home at around 1am on 5 September from their social engagement, Mr Al Sadeq and Mrs Al Sadeq found a vehicle very close to the entrance to the family home.

43. The occupants of the vehicle approached Mr Al Sadeq's side of the car and pulled him from the vehicle. One of the men showed Mr Al Sadeq an identity card stating he was from RAK State Security Investigations. Mr Al Sadeq challenged the said men and told them that they

had no authority within Dubai, and that they were infringing on the jurisdiction of Dubai. One of the men responded that Mr Al Sadeq could not lecture them about the law, and that they were going to take him to their headquarters in RAK.

44. Mr Al Sadeq was then forcibly restrained by these men and manhandled into their vehicle in front of Mrs Al Sadeq, who was screaming for help and telling the men she would not let them take her husband.  When Mrs Al Sadeq attempted to exit the family vehicle, she was shouted at by one of the men and told to go inside "*or else*".

45. Mr Al Sadeq was driven out of Dubai to the GHQ in RAK. During the journey he was allowed to call Mrs Al Sadeq and explained he had been told that the Ruler wished to speak with him.

46. No request had been made to the UAE federal or Dubai authorities by the RAK authorities for the arrest or extradition of Mr Al Sadeq pursuant to Federal Law No. 11, and he was taken against his will.  Accordingly, the kidnap of Mr Al Sadeq and his rendition to RAK and detention in the GHQ was unlawful under UAE law.

47. For the reasons pleaded at paragraphs 61 - 214 below, Mr Gerrard assisted by the other Defendants, showed repeatedly by their words and conduct that they were responsible for what subsequently happened to Mr Al Sadeq following his kidnapping. In the premises it is therefore to be inferred that the kidnapping of Mr Al Sadeq had been orchestrated by and / or was known about by Mr Gerrard (and therefore Dechert). Given their roles and conduct in the subsequent interrogation of Mr Al Sadeq it is likely that it was also done with the knowledge, contemporaneous or subsequent, of Mr Hughes and Ms. Black.

48. On arrival at the GHQ, Mr Al Sadeq was placed in custody in solitary confinement in a small, damp cell, without adequate ventilation or sanitation. He was not arrested and was not told what (if any) charges or allegations were being laid against him.

49. Mr Al Sadeq was kept in the same small cell that he had been placed in initially, in solitary confinement, between 5 September 2014 and 10 September 2014 without being presented to the prosecutorial authorities for questioning or investigation. This was in violation of UAE law: section 47 of the UAE Law of Criminal Procedure (as amended) (the "**Criminal Procedure Law**") provides that the police are obliged to interrogate the accused with 24 hours of apprehension and either to arrest or to order the release of the subject; and must present a suspect to the public prosecution service within 48 hours of apprehension.

50. In breach of his rights under UAE law as further particularised in paragraphs 230 to 293 below Mr Al Sadeq was held for the entire period of around 4 weeks at the GHQ in a cell in solitary confinement, without being permitted to contact a lawyer (despite his repeated

requests), and he was arrested only when he was presented to the public prosecutor on or around 10 September 2014.

51. During this initial period of detention immediately after his kidnap from Dubai and rendition to RAK, as pleaded below, he was questioned by, *inter alios*, Mr Gerrard, in an aggressive fashion and it was made clear to him that the objective of the interrogation was for him to "cooperate" by giving information falsely to implicate, in particular, Dr Massaad, Mr Quzmar, Mr Mikadze, Mr Azima and their alleged co-conspirators.  He was not allowed to change his clothes or clean his teeth during the approximately 28 days during which his was held at GHQ.

Interrogation without arrest or legal representation

52. The day after his kidnapping, Commander Hamad Al Awadhi, a security/police attaché from the Ruler's court, visited Mr Al Sadeq in the GHQ and told him he was representing the Ruler.

53. Commander Al Awadhi warned Mr Al Sadeq that, "*the Ruler and the Ruler's Court are sending you a message that either you cooperate with us or you will never see the light of day again*" (or words to this effect). He told Mr Al Sadeq that he was being accused of bribery, embezzlement, corruption, taking advantage of his position, fraud and forgery in connection with RAKIA.

54. Commander Al Awadhi then explained that the expected "cooperation" was that he provide evidence and testify against Dr Massaad and Mr Quzmar.

55. Mr Al Sadeq told him that if there were any specific questions about the individuals he mentioned which he could answer he would do so immediately, as he had nothing to hide or of which to be afraid.  However, he said that he would not speak falsely about them. In response to this, Commander Al Awadhi told Mr Al Sadeq that if that was the case Mr Al Sadeq would be staying with them for a long time.

56. The clear implication was, and as Mr Al Sadeq understood, that he would be detained unless and until he agreed to give whatever evidence he was told to give, true or false, in order to build the case against Dr Massaad and Mr Quzmar.

57. Commander Al Awadhi further indicated that Mr Al Sadeq should be glad to be alive and that by contrast, Dr Massaad, would be killed.

58. During this initial interrogation Mr Al Sadeq was forcibly pushed while his hands were tied behind his back, he was denied water, and he was verbally insulted.  Afterwards Mr Al

13

Sadeq was returned to a cell and continued to be held in solitary confinement at the GHQ: he ultimately remained in that cell, in solitary confinement, for around 28 days.

Attempts by Mrs Al Sadeq to find out her husband's whereabouts

59. The day after Mr Al Sadeq had been kidnapped, Mrs Al Sadeq went to the GHQ to enquire after her husband. She was told (incorrectly) that there was no one there by that name. Eventually she was sent home and told to expect a call.

60. Mrs Al Sadeq then received a telephone call from someone who introduced himself as Commander Hamad Al Awadhi (who was previously unknown to her). He told her that Mr Al Sadeq was with him and she should not panic because they would let him go soon; that her husband was being dealt with under the authority of the Ruler outside the judicial system; that there would be no criminal case against Mr Al Sadeq so long as he "cooperated" and told them what they wanted to know. Commander Al Awadhi also, as he, the Defendants, and the Ruler would repeatedly do, warned Mrs Al Sadeq not to involve the press or lawyers in relation to Mr Al Sadeq's situation.

First contact with Mr Gerrard – 8 September 2014

61. On around 8 September 2014, in the middle of the night, Mr Al Sadeq was interrogated by Mr Gerrard and Ms. Black in GHQ in the presence of the General Abdullah Munakhas, the Head of the Investigations Department in RAK. Mr Al Sadeq's request for legal representation was refused. At this point he had still not been arrested.

62. Mr Al Sadeq was not on this occasion (or ever) asked to consent to being interviewed by Mr Gerrard or the other Defendants, and no agreement could be sought from Mr Al Sadeq's lawyer because he had been denied access to a lawyer (and, as pleaded at paragraphs 60, 72, 89 and 101 hereof, Mrs Al Sadeq had been warned not to involve lawyers, although she in fact subsequently engaged a lawyer on her husband's behalf on 11 September 2014). Evidence given to the court by Mr Gerrard in cross examination on 28 January 2020 during the course of a trial between Mr Azima and RAKIA (High Court, Business and Property Courts (ChD) Claim No. HC-2016-002798) that detainees in RAK were only ever interviewed by him "*with their agreement and the agreement of their lawyers*", and that he had only conducted one interview himself with Mr Al Sadeq, is therefore untrue, and perjurious.

14

63. Mr Al Sadeq was blindfolded and his hands were tied behind his back at this interrogation. Mr Gerrard began by telling Mr Al Sadeq that "*we know more about you than you know about yourself"* and told Mr Al Sadeq that he needed to cooperate with them.

64. When Mr Al Sadeq asked him what right he had to interrogate him, and in what role, Mr Gerrard responded that he was in control of Mr Al Sadeq's fate, and that he was the one with whom Mr Al Sadeq should cooperate at that stage. Mr Gerrard made clear that if Mr Al Sadeq did not do so he would never be released and said that he was "*the law*" in RAK, or words to that effect. From these statements Mr Al Sadeq concluded that Mr Gerrard had been behind his kidnap and illegal rendition and was the person ultimately in charge of his detention and overall fate, alongside the Ruler.

65. During this initial interrogation Mr Gerrard threatened to have Mrs Al Sadeq arrested unless Mr Al Sadeq "cooperated" with them and made false claims that she was on the board of directors of a Lebanese airline (which she has never been: her career to that point was in media production and management) and had embezzled monies (which she has never done). Mr Al Sadeq denied this and said that his wife had never been on the board of a Lebanese airline and that it must be someone with the same name. In response, Mr Gerrard smiled and said "*no matter, we will arrest her until we figure out if it is the same name or not*" thereby indicating to Mr Al Sadeq that he was in control of the police and justice system in RAK.

66. Mr Gerrard conducted further interrogations of Mr Al Sadeq, accompanied by Ms. Black, while he was detained in the GHQ.

67. From this point on Mr Gerrard was the central figure in the interrogation and prosecution of Mr Al Sadeq, generally assisted and accompanied by Ms Black, with his then-colleague at Dechert Mr Hughes taking over from him at times. Mr Gerrard's indications that he was "*the law*" in RAK, which were borne out by the pivotal role he took in the treatment of Mr Al Sadeq and his wife and the degree of control over Mr Al Sadeq's treatment which he repeatedly demonstrated, give rise to the inference that he orchestrated the unlawful and abusive treatment of Mr Al Sadeq in order to pursue the Ruler's vendetta against Sheikh Faisal, Dr Massaad and Mr Quzmar, in addition to Mr Mikadze, Mr Azima and other alleged co-conspirators.  This treatment included making threats against Mr Al Sadeq and his wife.

Presentation to public prosecutor – 10 September 2014

15

68. On around 10 September 2014 Mr Al Sadeq, having been held unlawfully (as pleaded at paragraph 49 above) in detention for some 5 days, was formally arrested for the first time. He was taken to the public prosecutor, Mr Ahmad Zakhi ("**Mr Zakhi**"), in the middle of the night with his head covered with a black bag, and shackled by the wrists and ankles, on accusations related to his alleged involvement in an alleged fraud on RAKIA allegedly committed by *inter alios* Dr Massaad (albeit that he was not told at this stage what the specific charges were, and was not formally charged for many months).

69. Mr Al Sadeq was then interrogated by Mr Zakhi, for several hours about Dr Massaad, Jihad Quzmar and other alleged co-conspirators.

70. Despite his repeated requests Mr Al Sadeq was again prevented from contacting or being represented by a lawyer at this hearing. After the hearing he was returned to solitary confinement in the RAK General Police headquarters, where he was held, at all times in a solitary confinement cell until around early October 2014.

<u>Mrs Al Sadeq summoned to the Hilton Hotel in RAK to meet Mr Gerrard and Ms. Black</u>

71. On around 10 September 2014 Mrs Al Sadeq received a telephone call from Commander Al Awadhi, telling her to meet him at the Hilton Hotel in RAK, but giving her no detail as to the purpose of this meeting except to suggest that she might be able to see her husband. Accordingly, Mrs Al Sadeq packed a bag of clothes and toiletries for her husband, thinking that she would be able to see him and hand them to him.

72. Commander Al Awadhi met Mrs Al Sadeq in the lobby of the hotel and led her to a meeting room. As he was leading her to the room, Commander Al Awadhi warned Mrs Al Sadeq that she should not tell anybody what was happening to her husband, and again that she should not contact lawyers or the press (he specifically mentioned Al Jazeera the Qatari based broadcaster, for whom Mrs Al Sadeq had previously worked as a producer in Jordan and the UK), saying "*If you open your mouth you know that it will not end well for you*" (or words to that effect).

73. Inside the room were around ten people seated around a large table including (as she later learned) Mr Gerrard and two people who (she later learned) were his colleagues from Dechert, one of whom is believed to have been Ms. Black, and various individuals from RAKIA including Radina Amin ("**Ms. Amin**"), its internal legal counsel.

74. Nobody in the room introduced themselves (although Mrs Al Sadeq later came to learn that they were representatives of *inter alia* Dechert, local law firm Al Tamimi, and RAKIA.) Instead, Mr Gerrard (although she did not know his name at the time) slammed a large pile

of papers down on the table in front of her and started aggressively shouting at her, telling her that they had a lot of cases and a lot of evidence against her husband and that if she did not cooperate she would never see her husband again. He told Mrs Al Sadeq that she "*had the key*" to solving the whole issue, which she understood to mean that she should try to persuade her husband to do whatever was asked of him.

75. Mr Gerrard told her that it was not a question of going to court, that it was for Mr Gerrard and the Ruler to decide whether she would ever see her husband; and he repeatedly told her that if Mr Al Sadeq did not cooperate she would never see Mr Al Sadeq again. It was apparent to Mrs Al Sadeq that Mr Gerrard was in control of the meeting and that nobody spoke without his say-so, and she understood from his words and conduct that Mr Al Sadeq's fate, and her own, was in Mr Gerrard's hands.

76. Mr Gerrard then explained to Mrs Al Sadeq that it was not in fact Mr Al Sadeq that they were interested in pursuing, but that their target was Dr Massaad, to whom he referred as the "Big Fish", and Mr Al Sadeq's "cooperation" was sought in relation to building a case against Dr Massaad.

77. Ms. Amin accused Mrs Al Sadeq of owning property in Lebanon which was relevant to the allegations of fraud (which was untrue: Mrs Al Sadeq is Palestinian, and unable to own property in Lebanon, and has never owned property in Lebanon), and made allegations that she had been involved in wrongdoing (which was also untrue).

78. Throughout the meeting, Mr Gerrard was aggressive, intimidating and demeaning towards Mrs Al Sadeq, and shouted her down whenever she tried to challenge what Mr Gerrard said, and repeatedly told her that she might never see her husband again.

79. At one point Mrs Al Sadeq asked Commander Al Awadhi for details about her husband's whereabouts and well-being. Commander Al Awadhi deferred to Mr Gerrard, who refused to give Mrs Al Sadeq any information at all about the whereabouts or well-being of Mr Al Sadeq.

80. During this meeting, neither Mr Gerrard nor anyone else introduced themselves to Mrs Al Sadeq who only discovered Mr Gerrard's identity in November 2014 as a result of it being drawn to her attention by Mr Azima's U.S. lawyer, Mr Kirby Behre.

81. The meeting lasted around 20 minutes, and Mrs Al Sadeq left shaken and in tears. She left the bag she had packed for Mr Al Sadeq and was much later informed by Mr Al Sadeq that he was shown the bag and told his wife had sent it, and that it had then been placed in sight but out of reach for him during part of his incarceration, presumably in order to torment him.

Search of Mr and Mrs Al Sadeq's home residence in Dubai

82. On or around 17 September 2014 Mr Al Sadeq was taken out of the GHQ, accompanied by Ms. Black and two of her other colleagues from Dechert, and taken to his office and his home in Dubai. Both these locations were searched by a large team of around 50 investigators wearing forensic clothing in his presence with Dubai police also in attendance. Ms. Black was in charge of the search of both properties and was directing the investigators what to take. Indeed, so closely involved was Ms. Black in the search of Mr Al Sadeq's home that she would tell the investigators "*I want this*" pointing to items.

83. The searches undertaken were indiscriminate. Under the direction of Ms. Black, all possessions from Mr Al Sadeq's office and many from his home were taken (including papers relating to his business, clothing, jewellery belonging to his wife and children, and items of sentimental value such as Mr and Mrs Al Sadeq's honeymoon photographs) and have never been returned. During the search of Mr Al Sadeq's family home all electronic items were taken, even those belonging to his children. Mr Al Sadeq later learned that they had been taken to London to be analysed by a company called Control Risks.

84. Mrs Al Sadeq and her children were present during the search of their home and saw Mr Al Sadeq briefly. This was the first time that they had seen him since his kidnap on 5 September 2014 and Mrs Al Sadeq did not see Mr Al Sadeq again (or have any contact with him) until she saw him, along with his mother, in the Attorney General's office on 2 December 2014, as explained at paragraph 113.2 below.

85. After the searchers left Mr Al Sadeq's home, Mrs Al Sadeq received a telephone call informing her that they were now at Mr Al Sadeq's office and asking where his laptop was which had not been found in the office. Mrs Al Sadeq explained that she had given it to her brother for safekeeping. She was then told to retrieve it and bring it to Mr Al Sadeq's office. She met her brother on the way to Mr Al Sadeq's office who gave her the laptop, and she then took it to the office.

86. Upon Mrs Al Sadeq returning the laptop to the office, Ms. Black shouted at Mrs Al Sadeq angrily, claiming (wrongly) that she was obstructing a criminal investigation. In fact, Mrs Al Sadeq had committed no crime in giving her husband's laptop to her brother for safekeeping and there was no proper basis for this allegation, as Ms. Black must have known. Ms. Black then instructed the RAK police to hand Mrs Al Sadeq over to the Dubai

police for questioning, thereby showing her and the other Defendants' degree of control over the legal authorities of RAK. Mrs Al Sadeq was thereafter taken to a police station in Dubai and only released (without any charge) at 3am the following morning.

87. As with all the other items taken during the search, the laptop has never been returned.

88. In all the circumstances the search was carried out in breach of Article 55 of the Criminal Procedure Law, as further pleaded at paragraph 248 below.

Interrogation of Mrs Al Sadeq

89. On 23 September 2014, a few days after the search of her home, Mrs Al Sadeq was summoned by a telephone call from Commander Al Awadhi to be interrogated by Mr Gerrard and Commander Al Awadhi at the GHQ.  On this call, or another call at around the same time, Commander Al Awadhi repeated to Mrs Al Sadeq the warning he had given to her at the Hilton, that she should not involve lawyers or the press, otherwise things would get "*complicated*"; he also told her, untruthfully, that Mr Al Sadeq did not want to speak to a lawyer. He told Mrs Al Sadeq that her husband would merely be briefly interrogated and that they were just using him to get to Dr Massaad, and so long as he cooperated fully he would be released.

90. On arrival at GHQ Mrs Al Sadeq was taken to a small room with only Mr Gerrard and Commander Al Awadhi present. She was told to sit on a stool, and Mr Gerrard then took the lead in speaking to her.

91.  Mr Gerrard's manner was again aggressive and threatening.  He accused Mrs Al Sadeq of owning a company which was implicated in thefts in which he alleged that Mr Al Sadeq had been involved and told Mrs Al Sadeq that she was therefore a partner in the thefts and was under suspicion. These allegations, as with the allegations made by Ms. Amin at the meeting at the Hilton referred to at paragraph 77 above, were incorrect, and Mrs Al Sadeq had never had any interest or involvement in the company alleged, or in any wrongdoing.

92. When Mrs Al Sadeq told Mr Gerrard that she did not know anything about any wrongdoing by Mr Al Sadeq, Mr Gerrard said: "*You are still insistent on not helping your husband. Tell us everything about him, his work, his foreign accounts.*" Mrs Al Sadeq responded that it was for Mr Gerrard to ask her proper questions. In reply Mr Gerrard threatened Mrs Al Sadeq, saying "*You and your husband's stubbornness will not get you anywhere, except increasing his punishment and you will be put in prison also and you will not see your children ever again.*" (or words to that effect). Mr Gerrard told Mrs Al Sadeq that he personally had the power to put her behind bars for 25 years, even without any formal case

being brought against her, and that all he had to do was to call the Ruler to make that happen, thereby again showing his control over everything which happened to Mr Al Sadeq and his power to harm Mrs Al Sadeq as well if he so chose.

93. Mr Gerrard then started laughing with Commander Al Awadhi, telling Mrs Al Sadeq that she would never see the daylight again and would never see her children again unless she and Mr Al Sadeq fully "cooperated" and did whatever they were asked to do.

94. Mr Gerrard told Mrs Al Sadeq  that she could be imprisoned for obstructing an investigation because she had given Mr Al Sadeq's laptop to her brother for safekeeping. In fact, Mrs Al Sadeq had committed no crime, and there was no proper lawful basis for such threat.

95. When Mrs Al Sadeq pointed this out to Mr Gerrard he shouted at her "*do you think this is funny? I will have you jailed for 25 years, if I advise the Sheikh to do so, and you will never see your kids.*"

96. Mr Gerrard's questions to Mrs Al Sadeq at this interrogation concerned primarily Dr Massaad and Mr Quzmar, rather than Mr Al Sadeq himself or his own actions. He repeated several times that if she and Mr Al Sadeq did not "cooperate" by providing evidence about these individuals then he would never be released, and she would be imprisoned for 25 years.

97. During the interrogation Mrs Al Sadeq was told by Mr Gerrard that a travel ban would be imposed upon her, and that all the assets held in either her name or Mr Al Sadeq's name were frozen and she could not deal with them.  These threats subsequently proved to be correct. As to this:

97.1.    Mrs Al Sadeq and her children were prevented from leaving the UAE until 10 July 2016;

97.2.    During the period from September 2014 to her exit from the UAE in July 2016 Mrs Al Sadeq had serious difficulties in making ends meet financially or in accessing education, medical care or other public services for her or her children because their residency permits in Dubai had expired and Mrs Al Sadeq was prevented from taking the necessary steps to renew the residency permits in Dubai via her employer, but was made to transfer her residency to the RAK authorities under the name of an investor so as to remain at the mercy of RAK, and to prevent her from earning a living to support her children.

98. This appears to have been part of a concerted effort (which ultimately succeeded in early 2016), orchestrated by the Defendants, and Mr Gerrard in particular, to put Mr Al Sadeq under duress in order to force him to "cooperate" by signing false confessions implicating

himself and Dr Massaad and alleged co-conspirators in corrupt activities, and to put pressure on Mrs Al Sadeq to persuade him so to do.

99. Commander Al Awadhi also told Mrs Al Sadeq words to the effect that Mr Al Sadeq used to cheat on her "every day" with other women (which was also untrue) and that he did not understand why Mrs Al Sadeq was trying to save him.

100. Mrs Al Sadeq was upset, shocked, and taken aback by the claims made by Commander Al Awadhi about her husband and by Mr Gerrard's threats.

101. At this interrogation, Mr Gerrard asked whether Mrs Al Sadeq had contacted a lawyer or the press in relation to Mr Al Sadeq's situation. Commander Al Awadhi indicated that he had already advised her not to and Mr Gerrard confirmed this, telling Mrs Al Sadeq that it would not be in her interests to instruct a lawyer on Mr Al Sadeq's behalf.

102. Mrs Al Sadeq left the interrogation in tears and badly shaken.

103. After this interrogation, cars started regularly to circle around the Al Sadeq family home in Arabian Ranches where Mrs Al Sadeq continued to reside with her children, and men would loiter in the streets apparently watching the property. On one occasion on 10 October 2015, Mrs Al Sadeq complained to Commander Al Awadhi, who did not deny that these were agents from RAK but arranged for a female police officer to attend the property with a box of chocolates. Given that Mr Gerrard had indicated by his words and actions to Mr Al Sadeq that he was orchestrating everything happening to him and had told Mrs Al Sadeq he had the power to have her put behind bars even without any charges being laid against her, it is to be inferred that Mr Gerrard and/or the other Defendants were responsible, directly or indirectly, for these attempts to intimidate Mrs Al Sadeq.

104. Further, as a result of Mr Gerrard's participation in this and subsequent interrogations of Mrs Al Sadeq between 23 September 2014 and about July 2016 as detailed below, Mr Gerrard's evidence given under cross-examination in the proceedings pursued by RAKIA against Mr Azima referred to at paragraph 62 above that he and Dechert did not interview Mrs Al Sadeq was untrue and perjurious.

Transfer to Al Barirat Camp

105. In around early October, during the middle of the night, Mr Al Sadeq was transferred to a place he much later came to know was the Al Barirat Camp in Al Ashqar in RAK ("**Al Barirat**"). This is a camp for the Ruler's private militia and is not an official prison within the RAK criminal justice system.

21

106.    During his transfer from the GHQ to Al Barirat, Mr Al Sadeq was blindfolded with a hood over his head, and the vehicle transporting him drove in circles so that he was disorientated and unable to tell where he was travelling to and from, presumably in an attempt to ensure that he was not able to guess the location of where he was being held. This tactic would be repeated frequently during Mr Al Sadeq's journeys to and from Al Barirat.

107.    He was placed in a cell attached to the camp, once again in solitary confinement. The cell was empty, measuring about 2 metres by 2.5 metres, and although it had a window this had been covered so that no natural sunlight entered. Mr Al Sadeq was detained in this cell for around 560 days. The only time he left his cell was for interrogation, ablutions when permitted, or court visits.

108.    During his time in Al Barirat, Mr Al Sadeq was kept under a false name, and his health reports were also kept under a false name.

109.    When he complained about being held in Al Barirat, Mr Al Sadeq was told by the Defendants, and in particular Mr Gerrard, that he should be thankful for the Ruler's mercy, and that he was being held in Al Barirat for his own protection because of the terrible conditions in the RAK Central Prison which was full of murderers and rapists

Conditions in Al Barirat

110.    During the first part of Mr Al Sadeq's detention in Al Barirat he was kept in particularly inhumane and unsanitary conditions. For example:

110.1.    He was not allowed clean clothes.

110.2.    He was permitted to wash only rarely.

110.3.    His cell was not cleaned regularly.

110.4.    He was initially not allowed to leave his cell to use the toilet and was forced to relieve himself in his cell; later, when he was allowed out of his cell to use the toilet, he was made to do so with his hands tied and accompanied by 4 or 5 guards.

110.5.    During the first 7 months of his detention at Al Barirat, he was prevented from walking, exercise or seeing the sun. After refusing to eat for 5 days he was permitted to walk outside, albeit only for short periods and only a couple of times per week.

110.6.    He was repeatedly denied access to medical attention to treat conditions caused by the circumstances of his detention including constipation, back pain and skin conditions caused by lack of sun. After around 13 months in detention the skin on his legs began to rot and it was only after multiple requests were refused over a period of

several months that he was finally allowed medical attention. He was taken to hospital under a false identity and treated by a dermatologist who persuaded the authorities to allow him to spend one hour per day in the sun, which was then permitted to him.

111.    Conditions for Mr Al Sadeq in Al Barirat only improved meaningfully just before a human rights expert from Scotland, Dr Alan Mitchell, came to Al Barirat in around late 2015 or early 2016. Shortly before Dr Mitchell's visit, the Al Barirat authorities engaged *inter alia* in cleaning his cell. It is to be inferred from the fact that the conditions improved immediately before Dr Mitchell's visit that Dechert, who as set out at paragraph 112 had engaged him, and the Defendants exercised control over the conditions of Mr Al Sadeq's detention (as both Mr Gerrard and Mr Hughes implied to him on various occasions) and/or that they were aware of them.

112.    Dr Mitchell had been engaged by Dechert to produce a report stating that the conditions in the Al Barirat Camp were adequate and did not breach detainees' human rights. However, after reviewing the conditions in which Mr Al Sadeq was being kept, and after speaking to Mr Al Sadeq and informing him that conditions at Al Barirat were unsuitable, Dr Mitchell refused to write the report which Dechert had commissioned from him.

113.    At all material times Mr Al Sadeq was denied any visitation rights from his family, despite, as the Defendants knew, him going on hunger strike in an attempt to persuade those in charge of Al Barirat to allow him the right to see them following which he was promised that things would change soon, which they did not. Further as to this:

113.1.    Mr Al Sadeq's family were not told where he was being detained for the whole period of his detention in Al Barirat.

113.2.    It was not until 2 December 2014, when Mrs Al Sadeq and her mother in law were briefly allowed to see Mr Al Sadeq in the office of the Attorney General of RAK, Hassan Saeed Muhammed Al Habsi ("**Mr Al Habsi**"), that she was able to see him, and even then they were accompanied by several officials and told that the meeting would end immediately if Mr Al Sadeq said anything about the circumstances of his detention.

113.3.    Mr Al Habsi, who had known Mr Al Sadeq in a personal capacity when he worked at RAKIA, appeared (at that stage) sympathetic to Mr Al Sadeq's plight, made contact with Mrs Al Sadeq through his secretary, Saif, and was able to arrange for Mrs Al Sadeq to meet briefly with Mr Al Sadeq on a small number of occasions in his office, although Mr and Mrs Al Sadeq were never left alone together.   Mr Al Habsi told Mr and Mrs Al Sadeq on several occasions that Mr Al Sadeq's detention and

treatment were ultimately in the hands of the Ruler and Dechert outside the formal criminal justice system and were not under his control.

114.   Mr Gerrard, Mr Hughes and Ms. Black were fully aware of the atrocious and abusive conditions in which Mr Al Sadeq was being kept at Al Barirat. Furthermore, Mr Gerrard and Mr Hughes repeatedly made it apparent to Mr Al Sadeq during interrogation that they had the power to ensure that the conditions of his detention improved, if only he were to give them what they wanted. They would, for example, allow him to shower more frequently or change his clothes if they considered he had "cooperated", which was all part of their attempt to force him to confess to matters that were repeatedly put to him, and to implicate Dr. Massaad and his alleged co-conspirators in wrongdoing.

Mr Al Sadeq's lawyer denied access or information

115.   After her meeting at the Hilton with Mr Gerrard and others, on 11 September 2014 Mrs Al Sadeq engaged a lawyer on behalf of Mr Al Sadeq, Dr Ali Al Shamsi, although his brother and associate at the same firm, Dr Jamal Al Shamsi ("**Dr Al Shamsi**"), deputised for him in relation to Mr Al Sadeq's case. Dr Al Shamsi repeatedly tried to gain access to Mr Al Sadeq but was  refused. He was told by the Prosecutor that Mr Al Sadeq was being dealt with outside the criminal justice system in secret and in private sessions; that there were no formal criminal proceedings against him; and that he would not be entitled to any documents relating to the reason for Mr Al Sadeq's detention. Dr Al Shamsi told Mrs Al Sadeq that the manner in which her husband was being held and the process being followed was unlawful, and that he had been told the outcome of Mr Al Sadeq's case would be decided entirely by the influence of the advisers at Dechert and Al Tamimi (RAK's local lawyers who acted on the instructions of Dechert at all material times).

116.   Dr Al Shamsi was never allowed any proper access to Mr Al Sadeq at any stage during the period he was instructed from 11 September 2014 until around August 2015.  Although, after long and unnecessary delay he was finally given power of attorney over Mr Al Sadeq's affairs in April 2015, he was never allowed to receive any instructions from Mr Al Sadeq.

117.   The only time Dr Al Shamsi met Mr Al Sadeq was during his court appearances, and even then, he was prevented from talking to him alone, or in any effective or adequate manner as between a lawyer and his client. He was also not permitted to see any of the papers pertaining to any of the cases brought against Mr Al Sadeq at any time. He was therefore unable effectively to represent Mr Al Sadeq at any of the court hearings which he attended and ultimately ceased to act for this reason.

Interrogations while in Al Barirat from October 2014

118.  During the interrogations conducted in Al Barirat, Mr Gerrard, accompanied on most occasions by Ms. Black, made threats against Mr Al Sadeq, his wife and family about what would happen to them if Mr Al Sadeq did not give him the information he required to implicate Dr Massaad, Sheikh Faisal, Mr Quzmar, Mr Mikadze, Mr Azima and other alleged co-conspirators. Mr Hughes on occasion deputised for Mr Gerrard and made similar threats.

119.  These threats included Mr Gerrard repeatedly telling Mr Al Sadeq that they were "*taking it easy*" on Mrs Al Sadeq but that they could ensure that his wife was arrested and imprisoned, which he claimed to have the power to procure, and their children left without parents.

120.  By way of further example, Mr Gerrard liked to project the image of being a hard, uncompromising, interrogator. On one occasion he arrived to interrogate Mr Al Sadeq with his leg in a plaster cast. Mr Al Sadeq remarked that Mr Gerrard's leg injury was karma for the way in which he had been mistreating him, to which Mr Gerrard replied that the reason his leg was in a cast was because he had "*shoved it up so many arses*".

121.  Mr Gerrard further told Mr Al Sadeq that he needed to "*wake up and smell the coffee*" because he was not American or Canadian so the only way he would ever be released would be if he "cooperated".

122.  As to Mr Hughes, he generally adopted an aggressive manner during his interrogations of Mr Al Sadeq and would habitually shout and swear at Mr Al Sadeq, for example regularly shouting "*fuck you*" at Mr Al Sadeq if he felt Mr Al Sadeq was not being "cooperative".

123.  Furthermore, when he was present Mr Hughes would closely control the notetaking process during the interrogations in order to try to maintain the charade that the interrogations were being conducted lawfully, and would direct the associate / assistant present in the room not to record certain things that Mr Al Sadeq said, or to record them in ways which did not accurately reflect what he and Mr Al Sadeq had said. For example, Mr Hughes would ask Mr Al Sadeq to confess to wrongdoing, and would tell him "*If you say this we will grant you bail*", but the associate present was not permitted to record the words used by Mr Hughes. On various occasions the associate / assistant protested to Mr Hughes in front of Mr Al Sadeq about the way he was conducting the interrogation, saying that "*we have to stop this*", or words to that effect.

124.    Mr Gerrard and Mr Hughes would refer to Dr Massaad as the "Big Bastard", Mr Azima as the "Shark" and the Ruler as the "Boss".

125.    In relation to Mr Azima, Mr Gerrard asked Mr Al Sadeq to give false evidence that he was an international arms dealer which Mr Al Sadeq made clear was not true and that he had in fact met Mr Azima via the Ruler not via Dr Massaad. For example:

125.1.    Mr Al Sadeq was asked to give false evidence that Mr Azima was manipulating an aviation firm in RAK called RAK HeavyLift in order to use it a gun-running vehicle.

125.2.    Mr Gerrard asked Mr Al Sadeq to give false evidence stating that Dr Massaad, Mr Mikadze and Mr Azima had embezzled money from the Poti Port project and a shopping centre project in Georgia, as a cover to hide the fact that the embezzlement had been carried out by persons known to, and with the knowledge and approval of, the Ruler (and not  by Dr Massaad, Mr Mikadze and Mr Azima at all).

126.    Mr Gerrard and Mr Hughes consistently put pressure on Mr Al Sadeq to provide further "cooperation" during interrogations, even after he had made clear to them that he had truthfully told them everything he knew. Mr Al Sadeq understood this further "cooperation" to mean, and Mr Gerrard and Mr Hughes made clear that it did mean, that Mr Al Sadeq was to provide evidence against Dr Massaad, Mr Quzmar, Mr Mikadze, Mr Azima, and other alleged co-conspirators which was not true in order to help them build their case against them, and in return for more favourable treatment and / or release from incarceration and / or for not carrying out threats to incarcerate Mrs Al Sadeq.

127.    In this regard, they would make it plain to Mr Al Sadeq that unless he provided such "cooperation" they would ensure he would remain in the inhumane conditions of Al Barirat.

128.    For example, on one occasion Mr Gerrard or Mr Hughes (who were together at the time) said to Mr Al Sadeq that his refusal to provide the necessary "cooperation" meant that "*Things will be prolonged for more years, now we have to go back* [to the UK] *for Christmas and New Year and this will only leave you in this shit place you are in for another two months, maybe you will be forbidden from taking a shower. Or maybe we will ask them to show you the sun for a bit.*" (or words to that effect) and thereby showed their complete control, subject to the Ruler, over Mr Al Sadeq's circumstances and treatment at Al Barirat amounting to torture. Mr Al Sadeq was not allowed to have any legal representation during these interrogations and was not allowed to contact or to be visited by a lawyer at any time during the period he was detained at Al Barirat, despite repeated requests to the Defendants.

129.    However, in order to conceal the fact that he was being denied any or adequate legal representation, Mr Al Sadeq was required to sign documents presented to him by Mr

Gerrard and Mr Hughes stating that he had waived his right to have a lawyer present during interrogations. When Mr Al Sadeq protested and said he wanted a lawyer Mr Gerrard and Mr Hughes on different occasions would respond with statements such as (by way of example) "*We don't have time for this. We have just come all the way from London, we are tired, we don't want these games of yours, just sign the fucking document so that we can finish our business and go back*" (or words to that effect) and threaten to withdraw what few rights he had at Al Barirat such as to shower on occasion.

130.    By contrast, when Mr Al Sadeq did cooperate with the Defendants he would be rewarded. By way of example, upon attending one interrogation with Mr Gerrard, Mr Al Sadeq was told "*see, you cooperated last time, so I allowed them to let you shower*" (or words to that effect).

131.    Dr Al Shamsi, made repeated attempts to obtain information from the office of the public prosecutor about Mr Al Sadeq's whereabouts. On each occasion and at all material times he was told until around mid-2015 (when criminal cases were finally brought against him) that there was no case registered against Mr Al Sadeq, and he was not under the responsibility of the public prosecutor but was being dealt with by the Ruler.

132.    It is to be inferred that Mr Al Sadeq's treatment in Al Barirat, where he was left in solitary confinement in appalling conditions, save for the interrogations to which he was subjected, was intended by the Defendants  on behalf of the Ruler to weaken his resolve to the point where he would agree to "cooperate" by saying, and putting his name to, anything the Defendants and the Ruler wanted him to say to assist them in building a case against Dr Massaad, Mr Quzmar, Mr Mikadze, Mr Azima and other alleged co-conspirators.

Mr and Mrs Al Sadeq's meetings and Mrs Al Sadeq's initial meetings with the Ruler

133.    On 8 December 2014 Mrs Al Sadeq met the Ruler together with Mr Al Sadeq's mother. The Ruler was kind to Mrs Al Sadeq at this first meeting, which lasted for approximately 45 minutes, telling her that while he would not immediately be released she would be happy in the end and should not worry about Mr Al Sadeq. The Ruler further discussed how he had been chosen from amongst his brothers to rule and how Dr Massaad and Mr Quzmar had betrayed his trust but said that Karam was his son and he would keep him safe.

134.    When it was suggested by Mr Al Sadeq's mother that Mr Al Sadeq's continued detention was in the Ruler's power and that he could choose to release him, the Ruler replied that this would happen very soon. As a result, having believed the Ruler's promises,

Mrs Al Sadeq left the meeting overjoyed and optimistic that Mr Al Sadeq would soon be released.

135.    Thereafter, on 1 February 2015 Mr Al Habsi managed to arrange for Mr Al Sadeq to be brought from solitary confinement in Al Barirat to meet with Mrs Al Sadeq at his office. Mr Al Habsi was present at the meeting. The purpose of the meeting was to discuss how Mrs Al Sadeq should approach an audience she had been granted with the Ruler the following day to discuss her husband's case since both Mr Al Sadeq and Mr Al Habsi were very familiar with him whilst Mrs Al Sadeq had only met him once before.

136.    Mr Al Sadeq seemed tired and in a poor physical and psychological state to Mrs Al Sadeq.  However, he still appeared to have some hope about his situation, and said he believed that the Ruler would ensure his release and exoneration before long.

137.    Mr Al Habsi told Mrs Al Sadeq that she should make the Ruler aware of the very difficult position she and her children were in and hope that this would cause him to  be sympathetic.

138.    At this meeting Mr Al Sadeq told Mrs Al Sadeq to try to get the Ruler's side of the story; to ask the Ruler what he wanted from him; and to see whether the Ruler would be prepared to sanction a settlement or agreement leading to his release if he were to give in to the pressure which had been placed on him to make a false confession implicating Dr Massaad and his alleged co-conspirators. Mr Al Sadeq said to Mr Al Habsi in front of Mrs Al Sadeq about the suggestion that he and / or Dr Al Massaad had been involved in wrongdoing: "*Come on you know that he* [the Ruler] *knew about everything and gave his consent, he approved every move of it.*" (or words to that effect).

139.    On 2 February Mrs Al Sadeq met with the Ruler again at his palace and was accompanied by Mr Al Sadeq's mother again. The Ruler repeated to  Mrs Al Sadeq that his argument was not with Mr Al Sadeq, but with Dr Massaad and Mr Quzmar who he said had betrayed him. He asked Mrs Al Sadeq if Mr Al Sadeq had been involved in legal proceedings brought by Shahab Izadpanah against the Ruler in Abu Dhabi, and she confirmed that he had not been.  Regardless, he told her that Mr Al Sadeq had chosen the "wrong side" by being loyal to Dr Massaad, and promised Mrs Al Sadeq and her mother in law that as long as Mr Al Sadeq "cooperated" with his legal advisers, Dechert, in investigating and building a case against Dr Massaad, Mr Quzmar, and any other alleged co-conspirators, and in particular by providing written confessions, the case against Mr Al Sadeq would be settled.  The Ruler said that he would consult with his lawyers, by which Mrs Al Sadeq understood him to mean Dechert, about whether this could happen.

140.     On 3 February Mr Al Habsi facilitated a further meeting between Mr and Mrs Al Sadeq at his office, at which Mrs Al Sadeq updated Mr Al Sadeq about what the Ruler had said. Mr Al Habsi told Mr and Mrs Al Sadeq that unfortunately he had little or no influence on the situation since it was "*all in the hands of the foreigners*" (by whom he meant the Defendants, and Mr Gerrard in particular) or words to that effect. Mr Al Sadeq told Mr Al Habsi that he had already told them everything he knew in writing, and he did not have anything more to give unless he lied. Mr Al Habsi however indicated that Mr Al Sadeq needed to confess still more, which Mr and Mrs Al Sadeq understood to mean that Mr Al Sadeq would be required to give false confessions, untruthfully implicating others and himself in wrongdoing.

Mrs Al Sadeq's further appeals directly to the Ruler and Mrs Al Sadeq's contacts with the Guardian newspaper

141.     After her second meeting with the Ruler on 2 February 2015 until around July 2016 Mrs Al Sadeq made a number of further direct appeals to the Ruler to intervene in Mr Al Sadeq's case. In doing so, she had several face to face meetings with him, and also corresponded by email and letter. On one of those occasions Mr Al Sadeq's father also attended with her.

142.     Further as to this:

142.1.     On 24 February 2015 Mrs Al Sadeq emailed a letter to the Ruler (via his assistant, Jan) asking for his assistance, reminding him that her husband had been in solitary confinement for 6 months by that point, was in poor physical and mental health; had been cooperating with the requests made of him in the hope of securing his release; and referred to the Ruler's promise that the cases against her husband would be settled.

142.2.     On 4 March 2015 Mrs Al Sadeq emailed a letter to the Ruler, copying her email to Ms Black, confirming that she would not cooperate with a journalist from the Guardian newspaper, Simon Goodley by whom she had been contacted. She stated that "*I hope us continuing to help you will finally put an end to this situation we are living*". The background to this email is that the Ruler's assistant, Jan, and then subsequently Ms. Black, had called Mrs Al Sadeq shortly beforehand asking questions about her contacts with the press, and told her that the Ruler already knew that she had been assisting a journalist. It was apparent to Mrs Al Sadeq from her conversation with Ms. Black that Dechert and / or the Ruler might have had access to emails which had passed

29

between her and Mr Goodley, and she concluded that her email account had been hacked by or on behalf of the Defendants.

142.3.     On 5 March 2015 Ms. Black emailed Mrs Al Sadeq to arrange a meeting with the Ruler on 11 March 2015. She explained that she and Mr Gerrard would also be at that meeting and "*hope to be able to provide you with some positive information regarding the ongoing process in respect of*" Mr Al Sadeq. In the event, this meeting was cancelled because the Ruler came to learn that Mrs Al Sadeq had not in fact broken off all contact with Mr Goodley, a fact that Mrs Al Sadeq considered Dechert and the Ruler could only have known had they had access to her emails, confirming her suspicions. Instead, Mrs Al Sadeq and her father in law met with Khaled Yousef, an advisor to the Ruler, who told them that if Karam showed complete "cooperation" he would be released.

142.4.     On 6 April 2015 Mrs Al Sadeq again emailed a letter to the Ruler complaining *inter alia,* as Mr Al Sadeq had told her at a recent meeting which had taken place in the office of the Attorney General in around March 2015, that he was being pressured by Mr Gerrard to agree to pay the fees owing to Dechert by RAK, and to make a false confession, stating as follows:

> "*In the last meeting with Karam, my husband informed us of the suggested settlement by the law firm represented by "Neil", which suggested to my husband that he pay huge sums that he would not be able to pay even if he wanted to.*
>
> *The settlement stated a payment of 4 years of salary with interest **and paying all of the amounts due by the government of RAK to the law firm Dechert** and a forged confession of taking bribes, amongst a number of other conditions.*
>
> *Your Highness, **we are absolutely certain that you do not accept the above, and you would not be content with a defendant being pressured to offer false testimony. Considering that they threatened him by saying wake up and smell the coffee with the meaning that if he does not accept their requests he shall stay indefinitely.***
>
> *Considering that they threatened to imprison me for 25 years in my second meeting with them, saying "if he wanted, the Sheikh could imprison you for 25 years, he could, without anyone questioning it"*
>
> *Your Highness, after my meeting with you, I learned, full well, that these people do not represent you in what they say and you would not be pleased by this threat and intimidation of a wife who has done nothing wrong but try various ways to cooperate, and a husband who has expressed that he is completely prepared to consider any demand you deem appropriate and*

> *repeatedly reject the requests of his family to approach any other party. We*
> *hope for justice and mercy, which you are best able to perform.*
> (emphasis supplied, literally translated from the original Arabic)

142.5.    On 15 April 2015 Mrs Al Sadeq emailed the Ruler to ask for the travel ban
against her to be lifted so that she could travel to visit her family in Palestine on 23
April 2015. That request was refused, it was not until July 2016 that Mrs Al Sadeq was
finally allowed to leave the UAE.

142.6.    On 15 May 2015 Mrs Al Sadeq emailed a letter to the Ruler pleading again for
his assistance in relation to Mr Al Sadeq.

142.7.    On 4 June 2015 Mrs Al Sadeq emailed a letter to the Ruler asking for his help,
having the previous day attended a court hearing in Mr Al Sadeq's criminal case which
by this point had formally been commenced. She referred back to the Ruler's promise
to her that Mr Al Sadeq would be released with a settlement:

> *I am still holding on to your promise to me, sir, that my husband will be*
> *released soon by a settlement. I did not want to attend the past court hearings*
> *because I was living on the promise and refused to believe [the situation], but*
> *yesterday was the first time I attended a hearing, and I cannot deny that I am*
> *gradually losing hope.*
>
> *We wanted to see you again with Karam's father, and we sat for hours in front*
> *of the doors of your palace to be able to see you, to remind you of your words*
> *that my husband was and still is cooperating to the fullest extent.*
>
> *My husband has not ceased his repeated willingness to use all possible means*
> *to cooperating with the demands of the investigators and lawyers, in terms of*
> *money, information and additional assistance upon his release. Sir, I ask you:*
> *What more can a person do?* (literally translated from the original Arabic).

142.8.    On 16 June 2015 Mrs Al Sadeq emailed a letter to the Ruler explaining the
plight she and her children were facing, and protesting that her husband had cooperated
fully:

> "*My youngest child is ill and I tried to take him to the national hospitals,*
> *however, to open a file I need a property rental contract which is one of the*
> *documents taken by the court upon their summoning of all of the documents.*
>
> *My youngest daughter needs to start school at the start of next year, i.e. in 2*
> *months, and I cannot register her without our money. Even if I was able to get*
> *the money I would not be able to conduct any official procedures without the*
> *sponsor (their father).*

*Our residency visa in the country will expire in a number of months and I have not been able to renew it under the present circumstances.*

*I expect at any moment to be evicted from our house due to the cases raised against Karam for failing to satisfy the house contract and many other issues arising from the cases related to his last work in Dubai.*

*Please help us, your Highness, for it is in your hands to change the circumstances or we cannot continue.*

*Is it possible that my husband has any other information with the full knowledge of the suffering that we are experiencing in our day to day lives, considering that he has not seen his children for more than 5 months and he has not changed his statements from the first day.*

*He has lost his life, his present and his future and I threatened him that he would lose me and the children if we found out that he is hiding something, but he is not concealing any other information.*

*Is it possible for him to be covering up for a person like Khater Massaad who let him and his family down and has not even contacted them to check up on them, considering that we knew Khater did not want to cooperate with the Authority's lawyers recently when they went to him and my husband knows this too.*

*Is it possible that a person like Khater would entrust with his secrets, a young man who had not even reached thirty years old.*

*Sir, you yourselves said that Karam has not stopped cooperating with you, please sir, just consider the possibility that my husband does not know more than what he said and that he is willing to atone for what he did with the money and time he spent in solitary confinement for up to nearly a year and two months from now.* (literally translated from the original Arabic)

142.9.    On 29 July 2015 Mrs Al Sadeq forwarded to the Ruler a letter from Mr Al Sadeq's father asking for a further meeting following one which had taken place on 24 July, prior to the expiry of his visa (which necessitated his return to Jordan). At this meeting with Mr Al Sadeq's father, the Ruler had adopted a noticeably more aggressive tone than in his meetings with Mrs Al Sadeq, accusing Mr Al Sadeq's father of not knowing how to raise him such that it was now "*their job*" and telling him that he could not believe that Mrs Al Sadeq had permitted Mr Al Sadeq to become "*such a thief*".

142.10.    Mrs Al Sadeq then met with the Ruler again on 4 August 2015. At this meeting, the Ruler repeated that Karam would be pardoned.

Introduction of Mrs Al Sadeq to Mr Buchanan

143.    On 20 May  2015 Mrs Al Sadeq went to the Ruler's palace with Mr Al Sadeq's sisters in an attempt to meet the Ruler. After waiting for several hours on the pavement outside the palace they were told that the Ruler would not see them.  However, one of the Ruler's courtiers gave them the telephone number of a Mr James Buchanan ("**Mr Buchanan**"). Mr Buchanan was the Chief Executive Officer of Ras Al Khaimah Development LLC, an adviser to the Ruler, a spokesman for the RAK Government, and is a close associate, and a neighbour in Sussex, of Mr Gerrard.

144.    Mrs Al Sadeq called Mr Buchanan and he invited her to meet with him at the Waldorf Hotel in RAK, which she did a few days later. At this meeting, at which a notetaker from Dechert or Al Tamimi was also present, Mrs Al Sadeq explained the history of her husband's kidnap and incarceration to Mr Buchanan who in turn told Mrs Al Sadeq that he was part of the investigation into RAKIA and claimed that wrongdoing had been found on the part of Dr Massaad but that Mr Al Sadeq's conduct was still under investigation.

145.    Mrs Al Sadeq told Mr Buchanan that even if Mr Al Sadeq was guilty then this did not justify his treatment. Mr Buchanan responded by telling Mrs Al Sadeq that her husband needed to "cooperate", and that he would attempt to use his influence with the Ruler to assist Mr Al Sadeq. He further stated that if Mr Al Sadeq "cooperated" he would be released within two months. If he did not, and refused to help develop a case against, and testify against, Dr Massaad and other alleged co-conspirators, he would be prosecuted through the RAK Courts.

146.    From that point Mrs Al Sadeq was in regular contact with Mr Buchanan by telephone and SMS, and met him on around ten occasions in person, sometimes with Mr Al Sadeq also present.

147.    During one of these meetings which took place at the courthouse in RAK, Mr Buchanan admitted to Mrs Al Sadeq that he hoped her husband would be released because he knew what was happening to him was wrong.

Pressure on Mrs Al Sadeq used to try to persuade Mr Al Sadeq to agree to sign confessions

148.    While Mr Al Sadeq was in Al Barirat, Mr Gerrard and Mr Hughes were also, in addition to Mr Buchanan after 20 May 2015, in regular contact with Mrs Al Sadeq in order to put

pressure on her to try persuade Mr Al Sadeq to confess that he had been involved in a fraud on RAKIA and to cooperate in building a case against Dr Massaad, Mr Quzmar, Mr Mikadze, Mr Azima and other alleged co-conspirators, in return for his release. While Mr Al Sadeq had given his assistance to Dechert in their investigation, he was refusing at this stage to sign a false confession that he had been involved in wrongdoing, and was refusing to give false evidence that Dr Massaad, Mr Quzmar, Mr Mikadze, Mr Azima or any of their alleged co-conspirators had been involved in wrongdoing. He maintained (and continues to this day to maintain notwithstanding eventually being forced into signing the false confessions to this effect described at paragraph 183 below) that he was innocent of any wrongdoing. Everything Mr Al Sadeq did whilst working at RAKIA was on the instructions and/or with the knowledge of the Ruler via Dr Massaad.

149.     Mr Gerrard, assisted by Ms. Black, Mr Hughes and Mr Buchanan would each tell Mrs Al Sadeq that if she persuaded Mr Al Sadeq to tell them what they wanted, and to "cooperate" by signing a confession,  he would be released and pardoned, and they could get on with their lives; but that if no confession was forthcoming Mr Al Sadeq would remain in prison, and Mrs Al Sadeq was also at risk of being imprisoned and of losing her children as a result.

150.    This pressure was applied to Mrs Al Sadeq in circumstances where, as pleaded at paragraphs 110 to 114 above, and as apparent from the letter she sent to the Ruler referred to at paragraph 142.8  above, her husband was incarcerated in terrible conditions and his mental and physical health was deteriorating; she and her children were prevented from travelling outside the UAE; she was in dire financial circumstances as a result of her and Mr Al Sadeq's accounts being frozen; and she was not able to renew her or her children's residency, meaning that she was not able to work and they were not entitled to avail themselves of public services, such as healthcare or education, in Dubai.

151.    Against this background, on several occasions between 2015 and April 2016 Mrs Al Sadeq was asked by Mr Gerrard to attend the RAK court to where Mr Al Sadeq would be brought, and she would be allowed to spend a few minutes in a room with Mr Al Sadeq, generally in the presence of Mr Hughes but also, once he had become known to her, Mr Buchanan.

152.    During these meetings, Mrs Al Sadeq was instructed by them to persuade Mr Al Sadeq to sign false confessions (which the Defendants knew to be false) incriminating himself, Dr Massaad and his alleged co-conspirators as part of an overall settlement of the charges being made against him, so as to secure his release and pardon.

153.    By way of example of these meetings, on 15 June 2015, Mrs Al Sadeq met Mr Buchanan and Mr Gerrard who informed her that unless Mr Al Sadeq came up with new information to incriminate, *inter alios*, Dr Massaad and Mr Quzmar, which was to their liking, they would not recommend to the Ruler that Mr Al Sadeq be given a settlement and released, and instead he would be prosecuted through the RAK courts.

154.    Thereafter, the meetings continued and as a result of the treatment, threats and pressure being applied to him and Mrs Al Sadeq, and as a result of the promises he would be released and pardoned if he cooperated, Mr Al Sadeq had finally agreed in principle by about the third quarter of 2015 that he would "cooperate" by making a false confession and giving false evidence against Dr Massaad and his alleged co-conspirators including Mr Quzmar, Mr Mikadze and Mr Azima so long as he had sufficient binding assurances, in writing, that he would be released and pardoned, and that his family would be allowed to continue their lives as before if he did so.

155.    Mr Al Sadeq had at this time come to accept, as he had been repeatedly told by Mr Gerrard and Mr Hughes, that the only possibility for his release and the safety of his family was to provide them with the "cooperation" they sought by making false confessions and giving the evidence the Defendants wanted him to give.  It was his intention, once he was released, however, to reveal how he had been treated and forced to confess, and to clear his name.

156.    Once Mr Al Sadeq had indicated he would be prepared to sign false confessions the focus of discussions with Mr Gerrard, Mr Hughes, Ms Black, Mr Osama Daneshyar ("**Mr Daneshyar**") and Mr Khalid Al Hamrani ("**Mr Al Hamrani**") of Al Tamimi and (once he became involved) Mr Buchanan turned to the terms on which he would agree to sign false statements and give evidence against Dr. Massaad, Mr Quzmar, Mr Mikadze, Mr Azima and other alleged co-conspirators. These discussions extended to Mrs Al Sadeq who was seen as key to persuading her husband to agree to "cooperate" in this way.

157.    On 10 August 2015 Ms. Black emailed Mrs Al Sadeq to try to organise a meeting between Mr Al Sadeq, Mrs Al Sadeq and Dr Al Shamsi, who was reluctant to attend. Ms. Black explained that Mr Gerrard would be happy to meet with Mrs Al Sadeq separately the following day.

158.    On 11 August 2015 Mr Gerrard emailed Mr Daneshyar from Al Tamimi saying that Mrs Al Sadeq had called him after speaking with her husband, and that Mr Al Sadeq had instructed, Dr Al Shamsi, to attend a settlement meeting with Mr Gerrard and Al Tamimi on 12 August 2015.

158.1.      In relation to the suggestion that Dr Al Shamsi was reluctant to attend the meeting, Dr Al Shamsi had been asked to attend several previous meetings which had been cancelled with no notice, causing him a number of wasted trips to RAK; he was frustrated by the lack of access to Mr Al Sadeq which meant he was not in a position properly to take instructions or to advise his client; he was concerned about the treatment of Mr Al Sadeq in general, and the impropriety of the pressure that was being applied to him to make a false confession with the promise of release and a pardon if he did so; and was concerned at the reluctance of Dechert and / or the Ruler to commit any settlement or proposed settlement to writing. Shortly afterwards, at a meeting with Mrs Al Sadeq and Mr Al Sadeq's father, Dr Al Shamsi informed Mrs Al Sadeq that it was impossible for him to assist or advise Mr Al Sadeq in the circumstances of his detention, lack of access to him or to information about the proceedings against him, and he therefore ceased to act for Mr Al Sadeq.

158.2.      Dr Al Shamsi did however attend the meeting on 12 August 2015 which took place at the Waldorf hotel in RAK where settlement terms were discussed for securing Mr Al Sadeq's release.

159.    On 13 August 2015, Mr Gerrard emailed Mrs Al Sadeq and asked her to call him as soon as possible. Mrs Al Sadeq called him as requested, and he told her that, as discussed at the meeting the previous day, Mr Al Sadeq would be  released within the following week prior to any judgements in the criminal cases already pending against him, and the settlement of current and future cases in return for: (i) his full "cooperation";  (ii) agreement that he, Mrs Al Sadeq and their children would surrender their passports and remain in the UAE for the period needed to complete Dechert's investigation so that he could continue to "cooperate".  In addition, Mr Al Sadeq had been told that he would be required to give a UAE 5 million guarantee that he would keep the terms of his release and pardon confidential (although this was not mentioned to Mrs Al Sadeq by Mr Gerrard).

160.    However, by 23 August Mr Al Sadeq had not been released. On that date Al Tamimi contacted Mr Al Sadeq's lawyer, Dr Al Shamsi, to say that the UAE 5 million Dirhams guarantee was not sufficient, because if someone (such as Dr Massaad) offered Mr Al Sadeq more than UAE 5 million Dirhams he would have no reason not to breach confidentiality.

161.    Mrs Al Sadeq emailed Mr Gerrard the same day, saying (*inter alia*):

> "*...we can't envisage anything more than barring our family of leaving UAE and /or confiscating our passports, or a reasonable financial guarantee.*

> *And we are sure that once you receive all the necessary information from Karam under oath, the need for such extreme measures and guarantees shall cease its importance .*
> *I would like to remind you that Karam's cooperation was confirmed during my meetings by HRH, and by your good self, and this cooperation was for the purpose of not ending up with a conviction that will ruin Karam's career path and our family forever.*
> *I would appreciate your reply knowing that we are ready to accept any guarantee you see suitable to help end this situation helping you in your investigation and helping our family survive.*"

162.    On 30 August 2015,  three or four days prior to Mr Al Sadeq's next scheduled court hearing, Mrs Al Sadeq emailed Mr Gerrard again, having been contacted by Ms. Black a few days previously to say Mr Gerrard would be in contact but Mr Gerrard not having made contact:

> "*I was expecting your call, a few days back when Caroline informed me. Please feel free to call me at your convenience.*
> *Furthermore, I was informed that you would like to meet this Wednesday the 2nd of September, I would like to know if that is still on your schedule.*
> *I think you know that Karam's hearing is tomorrow, hoping that there won't be any sentence tomorrow which will effect Karams* [sic] *negotiated settlement.*"

163.    Following this email, Mr Gerrard called Mrs Al Sadeq to inform her that in fact Mr Al Sadeq would not be released. Contrary to the terms evidenced by Mrs Al Sadeq's emails to him on 23 and 30 August, in particular that Mr Al Sadeq would not be sentenced by the RAK court under the terms of the settlement agreed, or purportedly agreed with Mr Gerrard, Mr Gerrard now told Mrs Al Sadeq that Mr Al Sadeq would be convicted by the RAK Court and, for reasons of UAE law, only then could he be released and pardoned. He went on to  explain that Mr Buchanan would also need to meet with Mrs Al Sadeq in order to convey this news officially.

164.    On 31 August 2015, despite Mr Gerrard's promises in relation to Mr Al Sadeq's imminent release, Mrs Al Sadeq was denied permission to see Mr Al Sadeq.

165.    Mr Buchanan then contacted Mrs Al Sadeq and told her that the Ruler had agreed that Mr Al Sadeq would be released and pardoned, subject to Mr Al Sadeq agreeing to "cooperate". He told her, however, that the agreement would only be available orally and could not be put in writing. In an effort to reassure her, he informed her that she and Mr Al Sadeq could trust the Ruler and that in any event Mr Buchanan was "*a man of his word*" and if the Ruler broke his word then they could sue Mr Buchanan, wherever he was.

166.    With regard to the lack of a written agreement, Mr and Mrs Al Sadeq had made repeated requests for any settlement agreement to be committed to writing (which had also been made by Dr Al Shamsi when he was still instructed). This request was refused because, they were told on various occasions by Mr Buchanan and Mr Gerrard that the Ruler and Dechert were concerned that Mr Al Sadeq could subsequently use any written agreement against the Ruler, including to demonstrate that his confessions were false and had been improperly obtained. Mr Al Sadeq had agreed various solutions to those concerns, such as that he give a financial guarantee (as pleaded at paragraph 159 above) and had proposed that the written confirmation of any agreement could be kept in escrow and used only if the Ruler did not keep to his side of the agreement. These solutions had all ultimately been rejected.

Discussions about settlement in return for a false confession

167.    Thereafter, on 2 September 2015 Mrs Al Sadeq met Mr Al Sadeq with Mr Buchanan also present (the "**2 September 2015 Meeting**"). Mr Al Sadeq was brought to this meeting at the court house in handcuffs and shackled, looking broken, and unable even to look at Mrs Al Sadeq. Upon seeing this, Mr Gerrard, who was waiting with Mrs Al Sadeq and Mr Buchanan by the reception turned to Mrs Al Sadeq immediately after Mr Al Sadeq had been brought past and, laughing, remarked to Mrs Al Sadeq in a tone which suggested both amusement and menace "*this is how they do things here*" or words to that effect. He also told Mrs Al Sadeq that it was up to her to convince Mr Al Sadeq to agree to the offer that was to be conveyed from the Ruler by Mr Buchanan.  He then remained outside the small room in which the 2 September 2015 Meeting took place whilst Mr Al Sadeq, Mrs Al Sadeq and Mr Buchanan went in, telling Mrs Al Sadeq that it would not be appropriate for him to witness what Mr Buchanan was going to say.

168.    At this meeting, Mr Buchanan, appearing to read from a piece of paper which neither Mr nor Mrs Al Sadeq were permitted to see, set out the terms for settlement which he said came from the Ruler. These were that if Mr Al Sadeq "cooperated" in whatever ways Dechert required to their satisfaction and signed confession statements, he would be released from prison on bail to a house in RAK in due course, his family being obliged to surrender their passports, although he would not be permitted to leave the country until after he had finished assisting with trials at which point he would be granted a pardon and permitted to leave RAK.

169.    Mr Buchanan informed Mr and Mrs Al Sadeq that all these terms, including the Ruler's promise that Mr Al Sadeq would be released and pardoned, had been authorised by the Ruler himself at a meeting attended by Mr Buchanan, the Attorney General Mr Al Habsi, and Dechert.

170.    As a result of the refusal to put any settlement agreement in writing, Mr and Mrs Al Sadeq were concerned that even if Mr Al Sadeq agreed to the terms put forward by the Defendants, they would not be honoured.

171.    Following the 2 September Meeting and as a result of these concerns on the part of Mr and Mrs Al Sadeq, on 4 September Mr Buchanan called Mrs Al Sadeq to encourage her to convince Mr Al Sadeq to agree to the proposed oral settlement agreement as soon as possible because it was "*the best you can get*". This echoed the previous statement made by the Defendants and Mr Buchanan in relation to Mr Al Sadeq's concerns about the lack of a written agreement, telling him that he was the one in solitary confinement and was only wasting time.

172.    As a result of her and Mr Al Sadeq's continuing reservations about entering into a purely oral settlement agreement, on 21 September 2015, Mrs Al Sadeq wrote directly to the Ruler, appealing to him to grant them written assurances if Mr Al Sadeq would cooperate stating, *inter alia*:

> "...[W]e have tried to reach a settlement with the RAK Investment Authority's lawyer and other concerned parties, but in the end the lawyers withdrew from submitting a written settlement and offered my husband an oral settlement which did not guarantee anything such as releasing him on bail, dropping the charges, a written pardon or a non-conviction certificate to save his professional future and therefore his children's future neither of which are older than four years old.
>
> My husband, Karam Al Sadeq, agreed to cooperate in every way possible, from giving information in his possession to giving up any money requested and remaining in RAK until you find it appropriate, and he did not fail to provide solutions to any obstacle for his conditional release.
>
> We seek empathy from Your Highness by directing the lawyers, if it pleases you, to grant my husband some guarantees as he has shown his full willingness to cooperate, and to reconsider the possibility of granting him a settlement or a written promise guaranteeing what was promised in the settlement discussions. (literally translated from the original Arabic)

173.    Over the following weeks however, Mr Al Sadeq began to "cooperate" with the Defendants, even in the absence of anything in writing, in the (ultimately vain) hope that

he would be released if he did so. Mr Al Sadeq, considering that his life was in danger if he remained at Al Barirat, felt that he had been left with no other choice and was no longer able to endure the torments and torture heaped upon him, directly or indirectly, by or on the instructions of the Defendants, and Mr Gerrard in particular.  In substance, he therefore agreed to the proposal made by Mr Buchanan at the 2 September 2015 Meeting, thereby concluding an agreement on those terms (the "**False Confession Agreement**") with the Ruler via Mr Buchanan. In doing so Mr Al Sadeq relied upon the promise made by the Ruler and the Defendants  and Mr Buchanan *inter alia* that he would be released and pardoned.

174.    Despite his "cooperation" with the Defendants in producing false confessions, criminal court proceedings against Mr Al Sadeq continued, as Mr Gerrard had said they would. On around 12 October, around two weeks prior to a sentencing hearing, Mr Hughes told Mrs Al Sadeq while she was at the RAK court trying to prepare a bail application for her husband, that Mr Al Sadeq's sentence would be 8 years.  When she asked him how he knew this he responded: "*Because I know*", or words to that effect.  He separately told Mr Al Sadeq a similar thing.

175.    On 28 October 2015 the RAK Court of First Instance passed of a sentence of 8 years imprisonment against Mr Al Sadeq. In the same case, Dr Massaad received a sentence of 30 years *in absentia*, and Mr Quzmar was also sentenced to 30 years in prison.

176.     The fact that the RAK Court of First Instance handed down this sentence as had been correctly foretold by Mr Hughes some two weeks earlier, as pleaded at paragraph 174 above, appeared to Mr Al Sadeq and Mrs Al Sadeq to confirm the Ruler's and Dechert's control over the sentences which had been passed and the proceedings, just as they were seemingly in control of all other parts of the justice system in RAK. It further confirmed that they controlled Mr Al Sadeq's fate, thereby necessitating his continued cooperation in providing the Defendants with false confessions implicating Dr Massaad, Mr Mikadze and other alleged co-conspirators.

177.    The announcement of the RAK Court's sentences several weeks before they were delivered was not Mrs Al Sadeq's only direct interaction with Mr Hughes whether alone, or together with Mr Al Sadeq. As to this:

177.1.    At the same meeting on 12 October 2015 in a room in the Court in RAK at which Mr Hughes told Mrs Al Sadeq what Mr Al Sadeq's sentence would be, he also told them that the result of Mr Al Sadeq's agreement to make a false confession and to implicate Dr Massaad and others, he (Mr Hughes) had the Ruler's agreement to

release Mr Al Sadeq on bail, but that in order to guarantee that he did not try to leave the UAE Mrs Al Sadeq would be required to give her and her children's passports to Mr Hughes.  Mrs Al Sadeq met with Mr Hughes a few days later at the RAK court and gave him the passports as requested, but he then told her that bail would not be granted at that point, but he was still working on it.

177.2.    In about November 2015 Mr Hughes called Mrs Al Sadeq late one evening and told her to come to the Ritz Carlton in the Dubai International Financial Centre immediately.  Mrs Al Sadeq did as she had been instructed, and found Mr Hughes there having dinner and drinking wine, he told her to join him at his table. She did not eat or drink, although Mr Hughes insisted on pouring her a glass of wine despite her having refused it, which Mrs Al Sadeq perceived as Mr Hughes being disrespectful towards her, given the circumstances. Mr Hughes told Mrs Al Sadeq, adopting a triumphal manner, that what was happening to her husband was political, but told her that so long as he "cooperated" he would be released by December 2015 provided that Mrs Al Sadeq did not involve the press or take steps through lawyers to challenge her travel ban. He also threatened her again with imprisonment leading to the loss of her children. He told her "*this is how things work in the modern world*" and made disparaging comments about the position and role of women in Middle Eastern society.

The failure to honour the False Confession Agreement

178.    As pleaded above Mr Al Sadeq had at all times during his detention done his best truthfully to assist Dechert with their investigation and had initially resisted the pressure being put upon him to make a false confession as to any criminality on his own part,  and to implicate Dr Massaad and / or his alleged co-conspirators falsely.

179.    Pursuant to the False Confession Agreement, Mr Al Sadeq was however required to assist Dechert with their enquiries on an ongoing basis, in particular by giving false evidence, which evidence the Defendants knew to be false, against Dr Massaad, Mr Quzmar, Mr Mikadze, Mr Azima and alleged co-conspirators and wrongly distancing the Ruler from any knowledge about RAKIA's offshore investment activities, which had always been done with his knowledge or on his instructions, and ultimately for his personal benefit in the years before and after his accession.

180.    Under the terms of the False Confession Agreement, and as was made clear at all material times by the Defendants and Mr Buchanan, Mr Al Sadeq's bail was contingent upon Dechert being satisfied with the assistance he was giving them. Consequently, for

some time after the False Confession Agreement, Mr Al Sadeq continued to be held at Al Barirat in appalling conditions and interrogated by the Defendants much as before.

181.    In the light of this lack of change in Mr Al Sadeq's circumstances despite his agreement to the False Confession Agreement and the sentence passed against him on 28 October 2015 together with a subsequent application made by the prosecutor for it to be increased, Mrs Al Sadeq made a further plea to the Ruler, sending a letter by email on 16 November 2015 to which she attached photographs of Mr Al Sadeq's children and father. She explained as follows:

> "*Today, after a year and three months of our attempts in various ways to contain the crisis and reunite my family, we learned that the battle continues strongly, and that my husband will appear again before the judges at the request of the Public Prosecution on an appeal to increase the severity of his punishment.*
>
> *We have no more hope left, after the continuous promises and Karam's continued cooperation, we have only been left worse off.*
>
> *Karam was sentenced in the first case to 8 years with deportation, and now he is forced to appeal without a lawyer due to us not being able to pay for a lawyer.*
>
> *Karam will stand before the judges representing himself against the army of lawyers and investigators.*
>
> *We have many times and repeatedly pleaded for you to be compassionate with us and my husband after what has happened until now. We no longer have the energy for this war, knowing that its main parties are hiding behind the largest law firms in Switzerland and elsewhere, and my simple husband is the one who suffers the blows.*
>
> *My husband is nothing to you but a number, and the months and years are merely numbers, for us Karam has broken our backs, every day for me away from my husband is a new survival battle to secure my children financially, and a psychological battle to find solutions to the endless problems from residency visas to setting up health insurance to being forbidden from visiting my sick father in Palestine who hasn't seen his grandchildren in two years.*
>
> *I was forbidden from travelling for reasons I do not know, I was forbidden from working, mine and my children's residency visas are about to expire in January 2016. We have been suffering mentally continuously since 2014, we are living on sedatives, we have tried in various ways to make you end the tragedy on our family, and you have all of the information you wanted, but we have seen no avail.*

> *In the end, we were all offered to go to prison with Karam, and live in a prison composed of one floor with soldiers and police officers living in the same house.*

> *Your Royal Highness, my pleadings are not to be united with Karam in a large prison but rather to release him to raise his children so that he can try to save their and his future.* (literally translated from the original Arabic).

182.   Despite this appeal, and as described at paragraphs 185 to 190 below, Mr Al Sadeq remained incarcerated at Al Barirat until 20 April 2016.

<u>The False Confession Statements</u>

183.   Pursuant to the False Confession Agreement, and following several further months of being pressurised by the Defendants for false testimony and without the benefit of legal advice, Mr Al Sadeq eventually signed statements confessing to his involvement in alleged fraud concerning Pioneer Cement Industries LLC, a company part-owned by RAKIA, and Poti Port in Georgia (respectively the "**False Confession Statements**"), and incriminating, *inter alios*, Dr Massaad and Mr Mikadze. Those statements had been drafted by Mr Hughes and approved by Mr Gerrard. Mr Al Sadeq was not given, or allowed to read, the statements in their entirety at any point, but parts of the statement were read out to him by Mr Hughes. Additionally, he was asked to sign at least ten blank sheets of paper which, it is to be inferred, was so that those unique signatures could be falsely applied to additional statements and / or documents.

184.   Mr Al Sadeq signed the False Confession Statements under duress, despite them being untrue in important respects which incriminate himself, Dr Massaad and Mr Mikadze.  Mr Al Sadeq had also made clear to, *inter alios*, Mr Gerrard, Ms. Black, Mr Hughes and Mr Buchanan that the contents of those statements were substantially untrue. As to this, for example, each of the Confession Statements states:

184.1.   that Mr Al Sadeq had had the benefit of legal advice in relation to the statement. That was untrue and the Defendants knew it to be untrue because they had refused to allow Mr Al Sadeq's lawyer, Dr Al Shamsi, to read the False Confession Statements and had refused him any access to Mr Al Sadeq in relation to the False Confession Statements; and they had also at various times forced Mr Al Sadeq against his will to sign statements waiving the right to legal representation at interrogations as described at paragraph 129 above; and on one occasion had forced Mr Al Sadeq to call Dr Al Shamsi and tell him that he did not require him to attend court or represent him, even

though by that stage Dr Al Shamsi had ceased to act, or in reality to attempt to act, for Mr Al Sadeq.

184.2.    that the Ruler was unaware of the arrangements and transactions said to constitute wrongdoing on the part of Dr Massaad and Mr Al Sadeq.  This was untrue, as Mr Al Sadeq had told Mr Gerrard, Ms Black, Mr Hughes and Mr Buchanan repeatedly.  The Ruler had had contemporaneous knowledge of all the relevant aspects of the transactions about which complaint was made and had approved and/or directed them. That fact would have provided Mr Al Sadeq (and Dr Massaad) with a defence to the claims brought against them which, it is to be inferred, is why it was important to the Ruler and the Defendants that Mr Al Sadeq give false evidence in this respect.

Mr Al Sadeq's continued detention at Al Barirat

185.    During the period between agreeing to the False Confession Agreement and signing the False Confession Statements, Mr Al Sadeq remained incarcerated at Al Barirat.

186.    On 30 December 2015 however, Mrs Al Sadeq was allowed to see Mr Al Sadeq, taking with her their two children. This was due to be the first time that Mr Al Sadeq had been allowed to see his children since March 2015 when Mr Al Habsi had allowed them to meet in his office. However, Mr Al Sadeq was not produced, and the meeting did not take place.

187.    On 28 January 2016 Mrs Al Sadeq emailed the Ruler, explaining about the cancelled meeting with their children on 30 December, and the three hearings at which Mr Al Sadeq was not in attendance and, in any event, unable to afford legal representation.

188.    On around 13 January 2016 an appeal hearing took place in the RAK court  to consider Mr Al Sadeq's appeal.  This appeal had been adjourned on two previous occasions, 19 December and 30 December 2015, because Mr Al Sadeq had not been informed of the hearings and had not been produced.

189.    In or around February 2016, Mrs Al Sadeq met with the Ruler, Sheikh Ahmed (the Ruler's son), and Mr Buchanan to discuss Mr Al Sadeq's release now that he had complied with his side of the False Confession Agreement.  The Ruler asked if a satisfactory house had been found, and Mrs Al Sadeq explained that she did not care about the house, she just wanted her husband to be released now that he had provided the requested "cooperation". The Ruler confirmed to Mrs Al Sadeq that he would abide by the False Confession Agreement and that as soon as the house to which he was to be moved was ready, Mr Al Sadeq would be granted bail and released from Al Barirat. The Ruler then told Mr

Buchanan to take Mrs Al Sadeq to see the house so that she would believe what she was being told, although in the event Mrs Al Sadeq said this was not necessary.

190.    At this meeting, the Ruler also raised Dr Massaad's and Mr Quzmar's disloyalty in plotting with Sheikh Faisal against him.

Transfer from Al Barirat to the Villa Prison in Al Hamrah

191.    By around mid-March 2016 Mr Al Sadeq was still in Al Barirat in solitary confinement. Mrs Al Sadeq had been told by Mr Buchanan and Commander Al Awadhi that the reason for this delay in releasing Mr Al Sadeq to the house was only because the security at the house was not ready.

192.    Nevertheless, in early April 2016 Mr Al Sadeq was still being held in Al Barirat in solitary confinement. As a protest against the fact that in breach of the False Confession Agreement he had not been released on bail to a house as promised, despite signing the False Confession Statements, Mr Al Sadeq commenced a hunger strike on or around 4 April 2016.

193.    On 10 April 2016, as a result of this, his second hunger strike whilst detained at Al Barirat, he was taken before Mr Al Habsi, the Attorney General of RAK, who told him that a case had been filed against him for attempted suicide and that they would continue with the prosecution if he did not desist.  He also told Mr Al Sadeq that the house to which he was to be released on bail was almost ready. However, he claimed not to be aware of the promise which had been relayed to Mr Al Sadeq by Mr Buchanan on 2 September 2015 that he would be pardoned if he signed the False Confession Statements: Mr Al Sadeq believed this claim to be false because Mr Buchanan had told him that the Attorney General had been present when the Ruler had made the said promise.  This caused Mr Al Sadeq concern that the Ruler no longer intended to abide by the False Confession Agreement.

194.    The Attorney General told Mr Al Sadeq that if he was not satisfied then he would be moved to the RAK Central Prison, and described the terrible conditions there, telling Mr Al Sadeq that there were no beds, no food, and that prisoners were raped there.

195.    Mr Al Sadeq was returned to Al Barirat after this meeting.  A few days thereafter Mr Al Sadeq was transferred to the RAK Central Prison. His records were backdated so that it appeared he had been held in the RAK Central Prison since the date of his kidnap in September 2014 in order to hide the fact that he had actually been held, unlawfully, in solitary confinement at Al Barirat from October 2014 to around mid-April 2016.

196.   On 10 April 2016, Mrs Al Sadeq sent an SMS to Mr Buchanan complaining at the way Mr Al Sadeq was being treated, as follows:

> "*Dear James, hope this finds you well. Karam went on a hunger strike and he* [sic] *taken to the prosecutor today to meet Hassan and Khalid. He called to tell me the deal we agree on with you is not on the table anymore and he will suffer more if he doesn't obey. It's shocking how they treat ppl who cooperate. How do you expect others to cooperate when they see and hear about what's happening to Karam.*"

197.   Mr Buchanan was in New York but agreed to meet Mrs Al Sadeq in order to try to assist upon his return, and they met on 17 April 2016, together with Mr Al Sadeq's mother, at the Waldorf Hotel in RAK.  Mr Buchanan said he would do what he could to help Mr Al Sadeq. Mr Buchanan also promised to help Mrs Al Sadeq travel outside the UAE (which she had been prevented from doing since September 2014), including procuring a visa for her.

198.   On 19 April 2016 Mr Buchanan messaged Mrs Al Sadeq to confirm that Mr Al Sadeq would be moved to a house the following day, Wednesday, 20 April.

199.   As Mr Buchanan had informed Mrs Al Sadeq, on 20 April 2016 Mr Al Sadeq was transferred to the second floor of a two-storey villa in Al Hamrah village in RAK (the "**Villa Prison**"), where he was detained until around August 2016. The Villa Prison was secured with bars on the windows and a security door, and Mr Al Sadeq was not allowed to leave the Prison Villa.

200.   During his time in the Villa Prison Mr Al Sadeq was allowed the use of the upstairs, and four guards were constantly present downstairs.  Mrs Al Sadeq was allowed to stay for weekends and her children to visit. However, the circumstances of those visits were degrading and humiliating. On each occasion Mrs Al Sadeq was subjected to a strip search and body search in front of her children; and her children were subjected to intrusive searches which included searches inside their underwear by the guards.  Any toys they brought with them were also searched, and on at least one occasion one of the children's cuddly toys was torn open in front of them and the stuffing pulled out as part of a purported search.

201.   Despite the previous delay in implementing the False Confession Agreement, and the doubts raised by what Mr Al Sadeq had been told by the prosecutor, Mr and Mrs Al Sadeq were initially hoping that the move to the Villa Prison would be a precursor to the release of Mr Al Sadeq, as agreed in the False Confession Agreement.

<u>Mrs Al Sadeq and her children allowed to leave the UAE</u>

202.    Mrs Al Sadeq and her children did not visit or stay with Mr Al Sadeq in the Prison Villa after 16 June 2016.  On the last occasion she was with Mr Al Sadeq in the Prison Villa Mrs Al Sadeq suffered an injury to her finger which ultimately required an operation. Despite requesting help while bleeding heavily she was denied any medical assistance and had to drive one handed from RAK to Dubai, with her two children in the car, to seek help.  After that incident she was too fearful to return to RAK again.

203.    On 10 July 2016, with the assistance of Mr Buchanan and after a last direct appeal to the Ruler, Mrs Al Sadeq's UAE-wide travel ban was finally revoked (after previous broken promises which had seen her and her children turned back on attempting to leave the UAE), and she left the UAE to travel to Jordan with her two children, where she has remained ever since. She has not seen Mr Al Sadeq, and he has not seen his young children, since June 2016 because she is afraid for them to return to the UAE.

<u>Publication of the False Confession Statements</u>

204.    On around 29 July 2016 the False Confession Statements were published on the internet on a website with the URL www.khatermassaad.com (the "**Anti-Massaad Website**"). The Anti-Massaad website contained serious allegations made against Dr Massaad, which it claimed were corroborated by the False Confession Statements.

205.    The Anti-Massaad Website had been created by a UK company, Digitalis Reputation Limited, at the direction of the Ruler and Dechert through Mr Buchanan and the now-disgraced public relations firm Bell Pottinger, as propaganda supporting the Ruler's continuing vendetta against Dr Massaad and efforts to distance himself from the investment activities of RAKIA in the years during which Dr Massaad was its CEO despite his own intimate involvement in these.

206.    The Anti-Massaad Website ceased to be accessible on the internet on around 11 August 2016.

<u>August 2016 meeting – Mr Buchanan's denial that the Ruler made any promise to release Mr Al Sadeq</u>

207.    When Mr Al Sadeq discovered that the False Confession Statements had been published on the Anti-Massaad Website he called Mr Buchanan and asked him why the False Confession Statements had been publicised and to assist in making the Ruler comply with his promise to release Mr Al Sadeq.  Mr Buchanan told Mr Al Sadeq that he was only the

messenger of the Ruler, and that he was not the one who had lied to him (implying, thereby, that the Ruler had lied to Mr Al Sadeq).

208.    In response to this unsatisfactory response Mr Al Sadeq requested a meeting between himself, his recently instructed lawyer Mr Ali Sultan Al Haddad ("**Mr Al Haddad**"), Mr Buchanan and Mr Gerrard.  That meeting took place on or around 16 August 2016 in a basement room at the Court jail in RAK. Mr Al Sadeq had not been allowed to meet with Mr Al Haddad prior to the meeting, and Mr Al Haddad had been denied access to the papers concerning any of the cases brought against his client.

209.    Mr Al Sadeq complained repeatedly to Mr Buchanan about the fact that he had not been released from the Prison Villa and pardoned, saying "*You said sign the papers, I'll take you out, sign the papers, no harm will come to your wife or to your friends.*" (or words to that effect).

210.    Mr Buchanan responded, saying "*Yes we promised you, but this is not in my hands, this is in the Ruler's hands.*" (or words to that effect).

211.    At this, Mr Gerrard abruptly halted the meeting, and told Mr Buchanan to follow him outside.  Mr Al Haddad and Mr Al Sadeq heard Mr Gerrard shouting aggressively at Mr Buchanan. When Mr Gerrard and Mr Buchanan returned to the room Mr Buchanan was red-faced and denied that he knew anything about any promise to release Mr Al Sadeq by the Ruler and said that the Ruler had merely said he would consider it. The meeting, which lasted about 15 minutes, then concluded.

Mr Al Sadeq removed from the Prison Villa and returned to RAK Central Prison

212.    On his return to the Prison Villa after this meeting Mr Al Sadeq sent a letter to the Ruler in which he accused the Ruler of lying to him in relation to the False Confession Agreement.

213.    Within around an hour of sending this letter to the Ruler Mr Al Sadeq was returned to RAK Central Prison, where he has remained ever since.  Shortly before being removed from the Prison Villa he was able to call Mrs Al Sadeq in a state of panic, saying "*those bastards they are coming to take me to jail, I do not know where they are taking me.*"

214.    Since August 2016 Mr Al Sadeq's access to legal representation has been severely restricted, and he has only been allowed to meet with Mr Al Haddad on a handful of occasions. He remains in the RAK Central Prison as of the date of these Particulars of Claim.

<u>Attempts to hamper the preparation of these legal proceedings</u>

215.    The RAK authorities have attempted to prevent the taking of instructions by Mr Al Sadeq's UK legal team in relation to these proceedings. As to this:

215.1.    The Claim Form was issued on 28 January 2020. The following day, Mr Al Sadeq's papers were confiscated and he was placed in solitary confinement in RAK Central Prison.

215.2.    Mr Al Haddad's attempts in February and March 2020 to be appointed as Mr Al Sadeq's legal guardian were impeded as was his access to court documents; and he was prevented from meeting Mr Al Sadeq in prison.

215.3.    Mr Al Sadeq's UK solicitor, Mr Tsiattalou, was present in Dubai on several occasions between January and March 2020 in order to try to visit Mr Sadeq in the RAK Central Prison. All requests to the RAK authorities for permission to visit Mr Al Sadeq (which were made via Mr Al Haddad) were refused.

215.4.    During a stay in Dubai between 18 and 22 February 2020, Mr Tsiattalou returned to his hotel room in Dubai to find that the balcony doors (which had been locked from the inside when he left the room) were open; and it appeared to Mr Tsiattalou that papers relating to these proceedings, and his laptop computer, had been disturbed.

215.5.    During the first week of March 2020 Mr Al Sadeq's UK-based legal team were present in Dubai. During this time, they were denied access to Mr Al Sadeq in RAK Central Prison, despite attempts to obtain visitation rights.

215.6.    In the course of their stay in Dubai Mr Al Sadeq's UK legal team became aware that they were under surveillance by a number of intimidating individuals from RAK security and by the UAE-based surveillance firm, Page Security, run by a Mr Stuart Page. Mr Page's involvement is telling, because he admitted under cross examination in High Court proceedings in London between Mr Azima and RAKIA on 29 January 2020 that he had been engaged by the Ruler in January 2015 to investigate possible cooperation between Dr Massaad and members of the Ruler's own family: in his oral evidence to the court he stated that the reason for this investigation was that the Ruler believed that they were "*working together for the purposes of destabilising or causing harm to His Highness to the detriment of the Ruler*".

215.7.    The threatening manner in which this surveillance was conducted, including cars following Mr Al Sadeq's legal team and the fact that Mr Page personally attended

Mr Al Sadeq's UK-based legal team's hotel and made his presence obvious to them, can only have been an attempt to intimidate those representing Mr Al Sadeq in these proceedings, presumably made at the behest of the Defendants and the Ruler.

215.8.     In the circumstances pleaded above, it is to be inferred that Mr Tsiattalou's room was entered and searched during the week of 18 to 22 February 2020 by RAK security and / or Page Security in order to obtain information on behalf of the Ruler and / or the Defendants about the preparation of these proceedings.

215.9.     After a telephone conference call, on 12 March 2020 which Mr Al Sadeq had been allowed to make to his UAE and UK legal team his telephone privileges were revoked with no, or no adequate, explanation.

215.10.    On 25 March 2020 Mr Al Sadeq managed to get a message to his lawyers from prison saying that: (a) the prison management had removed the telephone number of Mr Al Sadeq's UK solicitor, Mr Tsiattalou,  from the list of the authorized numbers to be contacted on the orders of RAK State Security; and (b) in the event of any further conference calls made to his UK lawyers Mr Al Sadeq would be sentenced to solitary confinement and prevented from using the phone for a month.

216.   It is apparent that all of the steps taken against Mr Al Sadeq as pleaded at paragraph 215 were taken in order to impede the preparation of this claim against, and (it is to be inferred) with the knowledge and / or at the request of the Defendants.

Effect on Mr Al Sadeq's personal and business assets

217.   After his kidnap from Dubai to RAK Mr Al Sadeq's bank accounts were (and remain) frozen.

218.   In relation his other assets and business interests:

218.1.     Mr Al Sadeq's businesses, Tamad Properties, LS Holdings and Maya 4 in the RAK Free Zone (the "**Property Businesses**") owned properties in the Marina and Emaar Boulevard. The Property Businesses owned 14 two/three bedroom apartments in the Marina, and one apartment on Emaar Boulevard. There is an average yearly service charge of approximately AED 25,000 on each apartment, as well as a total annual rent for all properties of at least AED 3,000,000. After Mr Al Sadeq's detention he was refused permission to appoint anybody to manage the Property Businesses in his stead. As a result, no rent has been received for any of the properties which form part of the Property Business. Over the six years of Mr Al Sade's detention he estimates that the total income of which Mr Al Sadeq has been deprived via the Property

Businesses is approximately AED 25 million. Further, the Property Businesses have also been fined for delays in payments, licence renewals and other business expenses while his assets have been frozen. These costs are estimated to be approximately AED 3,000,000.

218.2.　　Mr Al Sadeq owns a further business, Elegant Businessman Services (the "**Investment Business**"), which owns offices at 404 in Emaar Square, which is the investment business he established in around 2012 once he had relocated from  RAK to Dubai. As a result of Mr Al Sadeq's detention since September 2014 this business has failed.  Had it not been for Mr Al Sadeq's detention and / or the loss of reputation, this would not have occurred, and it would now be a successful business.

218.3.　　Mr Al Sadeq also individually owns a villa in Arabian Ranches in Alvorada 4 (the "**Villa**"). He has been deprived of the use of the Villa.

219.　　The total value of Mr Al Sadeq's assets was in excess of AED 75,000,000 when he was detained.  He has been deprived of the use and the benefit of these assets since September 2014.

Causes of action under UAE law

220.　　Section 282 of the Federal Civil Transactions Law No. (5) of 1985 (as amended) (the "**Civil Code**") ("**Section 282**") provides that: "*Any harm done to another shall render the doer thereof, even though not a person of full capacity, liable to make good the damage.*"

*Breaches of Article 282*

221.　　Under Article 282 the Defendants and each of them owed a duty to Mr Al Sadeq not to cause him harm; and if they did cause him harm to make good any damage caused thereby.

222.　　In the premises pleaded herein, the Defendants and each of them have caused  harm to Mr Al Sadeq.

223.　　The harm done to Mr Al Sadeq as pleaded herein, which arises from the conduct and / or unlawful and / or criminal acts of the Defendants and each of them, includes (*inter alia*):

223.1.　　Abduction from Dubai and extraordinary rendition to RAK;

223.2.　　Detention in degrading and inhumane conditions in solitary confinement in Al Barirat;

223.3.　　Forcing Mr Al Sadeq to make false confessions in return for broken promises of release and pardon;

223.4.　　Deprivation of contact with his family.

224.    The Defendants and each of them have committed and / or orchestrated and / or led and / or acquiesced in all of the wrongdoing generally and / or the criminal acts under the Penal Code committed against Mr Al Sadeq which are pleaded herein.

225.    The Defendants and each of them are liable to make good the harm caused to Mr Al Sadeq as a result of the wrongs committed against him as pleaded herein.

*Abuse of right*

226.    Article 106 of the Civil Code, provides as follows:

> *"(1) A person shall be held liable for an unlawful exercise of his rights.*
>  *(2) The exercise of a right shall be unlawful :*
> > *(a) if there is an intentional trespass [infringement of another's right]*
> > *(b) if the interests which such exercise of right is designed to bring about are contrary to the rules of the Islamic Shari'a, the law, public order or morals;*
> > *(c) if the interests desired are disproportionate to the herm that will be suffered by others; or*
> > *(d) if it exceeds the bounds of custom and practice"* .

227.    In all the premises pleaded herein, the Defendants and each of them have used the rights accorded to them by RAKIA and / or the government of RAK and / or the RAK public prosecution service and / or the Ruler unlawfully within the meaning of Article 106 in order to commit the harms complained of by Mr Al Sadeq herein.

228.    As a result of the aforesaid unlawful use of rights Mr Al Sadeq has suffered loss and damage for which the Defendants and each of them are required to compensate Mr Al Sadeq pursuant to Article 106(1) of the Civil Code.

229.    The provisions of UAE law and the UAE constitution and the breaches thereof pleaded at paragraphs 230 to 293 below are material to the consideration of the liability of the Defendants and each of them pursuant to Articles 282 and 106 of the Civil Code.

Relevant breaches of the UAE Constitution and UAE law

230.    In all the circumstances set out above, the treatment of Mr Al Sadeq and the manner in which he was kidnapped, detained, threatened, mistreated and forced to confess as a consequence of that treatment since September 2014 is in breach of the law applicable in the UAE and the Defendants themselves have committed crimes and unlawful acts under the laws of the UAE.

*The UAE's international human rights obligations*

231.    The UAE has ratified the Convention against Torture and Other Cruel Inhuman or Degrading Treatment or Punishment (the "**Convention against Torture**") and the Arab Charter on Human Rights (the "**Arab HR Charter**"), the latter of which prohibits arbitrary detention as well as inhuman and degrading treatment.

232.    As a matter of customary international law, the 1948 Universal Declaration of Human Rights (the "**UDHR**") is binding on the UAE and provides additional rights and protections to persons in the UAE which are enforceable as a matter of international law. These include the right not to be subjected to inhuman treatment, arbitrary detention, and the right to have a fair trial (which includes the right not to be forced into a confession).

233.    In all of the circumstances pleaded herein the treatment of Mr Al Sadeq since his kidnap on 5 September 2014 has amounted *inter alia* to illegal rendition, arbitrary detention, subjection to torture and inhuman treatment, and denial of the right to a fair trial contrary to international law. Further, all these denials of his fundamental rights are contrary to his rights and / or the UAE's obligations under the Convention against Torture, the Arab HR Charter and the UDHR, each of which forms part of domestic UAE law.

234.    Insofar as the Defendants have acted as agents of the RAK state, they have participated in the UAE's denial of Mr Al Sadeq's fundamental rights under the aforesaid conventions.

*Breaches of the UAE Constitution*

235.    The UAE Constitution of 1971 (as amended)  (the "**Constitution**") prohibits torture and degrading treatment of detainees and protects a person's rights to legal due process when accused of a crime.  As pleaded at paragraphs 236 to 241 below, Mr Al Sadeq's rights under Articles 26, 28 and 40 of the Constitution have been violated by the treatment of him by RAK since 5 September 2014 which treatment has been orchestrated and / or led by and / or acquiesced in by the Defendants and each of them.

236.    Article 26 of the Constitution provides that "*Personal liberty is guaranteed to all citizens. A person may not be arrested, searched, detained or imprisoned except in accordance with the provisions of the law. A person may not be subjected to torture or to degrading treatment.*"

237.    In the circumstances pleaded herein, Mr Al Sadeq's rights under Article 26 have been violated: he has been deprived of his liberty unlawfully; he has been detained and imprisoned outside the RAK criminal justice system at the whim of the Defendants and the

Ruler; and he has been subjected to torture and degrading treatment including (without prejudice to all of the relevant matters pleaded herein):

237.1.    Kidnap from Dubai and rendition to RAK, without arrest as pleaded at paragraphs 40 to 70 hereof;

237.2.    Detention without charge, as pleaded at paragraphs 48 to 70 hereof;

237.3.    Detention in solitary confinement in inhumane and degrading conditions under an assumed name, as pleaded at paragraphs 48 to 201 hereof;

237.4.    Threats and pressure applied against him and his family to force him to "cooperate" and to give false evidence as pleaded at paragraphs 40 to 214 hereof.

238.    Article 28 of the Constitution provides that:

"*Penalty is personal. An accused is presumed innocent until proved guilty in a legal and fair trial. An accused person has the right to appoint as his/her attorney at law anyone who is capable to defend him/her in trial.  The law specifies the cases where a counsel for defense must represent an accused person. An accused person may not be physically or morally harmed.*"

239.    In the circumstances pleaded herein, Article 28 of the Constitution has been violated in that, as pleaded at paragraphs 40 to 214 above, at all material times Mr Al Sadeq:

239.1.    was presumed guilty;

239.2.    was not permitted a legal or fair trial in respect of the charges against him;

239.3.    was deprived of the right, in any substantive sense, to appoint a lawyer capable of defending him at trial;

239.4.    was caused physical harm as a result of the circumstances of his detention in Al Barirat necessitating hospital treatment;

239.5.    has suffered moral harm from the conditions of his detention.

240.    Pursuant to Article 40 of the Constitution "*Foreigners in the UAE enjoy the rights and freedoms stipulated in the applicable international instruments or in the treaties and conventions to which the UAE is a party, and have to perform the duties which correspond to those rights and freedoms.*"

241.    In the circumstances pleaded herein Article 40 of the Constitution has been breached in that Mr Al Sadeq has not been permitted to enjoy the rights and freedoms stipulated in the Convention against Torture, the Arab HR Charter and the UDHR.

*Breaches of the UAE Criminal Procedure Law*

242.    The UAE Criminal Procedural Law 1992 (as amended) sets out the procedures which must be applied in relation to persons accused of committing criminal acts in the UAE. Mr Al Sadeq's treatment by RAK since 5 September 2014 as pleaded herein amounts to multiple breaches of the Criminal Procedure Law, which breaches have been orchestrated and / or led by and / or acquiesced in by the Defendants and each of them.

243.    Article 2 of the Criminal Procedure Law provides as follows:

"*No criminal sanction may be adjudicated against any person unless he is proved guilty according to this Law.*
*No person may, as well, be arrested, searched, detained or imprisoned except in the cases and under the conditions provided for in this Law. Detention and imprisonment may not occur except in the places specially reserved for each and for the period specified in the order issued by the competent authority.*
*It is forbidden to cause bodily or moral harm to the accused or subject any person to torture or degrading treatment.*"

244.    In breach of Article 2 of the Criminal Procedure Law Mr Al Sadeq:

244.1.    was detained and imprisoned other than under the conditions provided for in the Criminal Procedure Law in the respects pleaded at paragraphs 245 to 270 below.

244.2.    was detained and imprisoned at Al Barirat, Al Barirat not being a place specially reserved for detention or imprisonment in RAK but rather being a camp for the Ruler's personal militia; and his detention and imprisonment were not the subject of any (or any proper) order issued by any competent authority given that (at least) he was held under an assumed name and not his real name. Further in this regard, requests by Mr Al Sadeq's lawyers for documents including orders relating to his detention have at all material times been refused.

244.3.    has been caused bodily and / or moral harm and / or has been subjected to torture and / or degrading and inhumane treatment.

245.    Article 47 of the Criminal Procedure Law provides as follows:

"*The judicial police officer must hear the deposition of the accused immediately upon his arrest, apprehension and arraignment and if he does not submit proof of his innocence, he shall be sent, within forty-eight hours to the competent public prosecution.*
*The public prosecution shall interrogate the accused within twenty-four hours then it shall order either his arrest or his release.*"

246.    Contrary to Article 47 of the Criminal Procedure Law:

246.1.    No judicial police officer heard Mr Al Sadeq's deposition immediately upon his apprehension and kidnap from Dubai to RAK on 5 September 2014 (Mr Al Sadeq not

having been arrested or arraigned); and he was not sent within 48 hours to the competent public prosecution.

246.2.      Mr Al Sadeq was not interrogated by the public prosecution within 24 hours of being abducted from Dubai as pleaded at paragraphs 48 to 70 hereof.

246.3.      It was only in fact on 10 September 2014 that Mr Al Sadeq was arrested, although charges were not brought against him until around mid-2015.

247.    Article 55 of the Criminal Procedure Law provides as follows:

'The dwelling of the accused may not be inspected except for the search of the things related to the crime, for which evidence is collected, or constitute the object of investigation. Nevertheless, if during the inspection, some objects are incidentally discovered which possession constitutes per se a crime or which may lead to revealing the truth in another crime, the judicial police officer shall proceed with their seizure."

248.    In breach of Article 55 of the Criminal Procedure Law, as pleaded at paragraph 82 to 88 above the searches conducted at Mr Al Sadeq's home and office in September 2014, in respect of which Ms. Black was in charge, were indiscriminate, and led to the removal of property which could not possibly have been relevant to any crime by Mr Al Sadeq, even were there any *bona fide* suspicions or accusations against him.

249.    Article 65 of the Criminal Procedure Law provides as follows:

"*The public prosecution shall by itself proceed with the investigation in felonies and in misdemeanours, where deemed necessary.*"

250.    In breach of Article 65 of the Criminal Procedure Law, at all material times the Defendants, at the behest of the Ruler, were permitted to and did pursue the investigation in the stead of the public prosecution.

251.    Article 68 of the Criminal Procedure Law provides as follows:

"*The member of the public prosecution may assign to one of the judicial police officers one or more task of the investigation, except the interrogation of the accused. He may also, if required to take any of the measures outside his jurisdiction, to delegate for its performance a member of the public prosecution or a judicial police officer within this area of performance and, in all cases, the delegated person shall, for the investigation, all powers that the principal may have in order to carry out, in his jurisdiction, the investigation.*"

252.    In breach of Article 68 of the Criminal Procedure Law, as pleaded at paragraphs 61 to 214 Mr Gerrard, Ms. Black, and Mr Hughes carried out extensive and repeated interrogations of Mr Al Sadeq despite neither of them being a member of the public prosecution or judicial police officers (albeit that as pleaded at paragraphs 271 to 274 hereof they were Public Servants within the meaning of Article 5 of the Penal Code).

253.    Article 72 of the Criminal Procedure Law provides as follows:

"*The member of the public prosecution shall search the dwelling of the accused upon a charge imputed to him of perpetrating a crime or by acting as an accomplice in it. He may, in this respect search any place and seize any papers, arms and all what may likely be used in the perpetration of the crime or resulting therefrom, as well as anything that may help in revealing the truth.*"

254.    In breach of Article 72 of the Criminal Procedure Law, as pleaded at paragraphs 82 and 88 hereof, Ms. Black was permitted to direct the search of Mr Al Sadeq's home and office, and exceeding the power provided in the Article, seized property which was not likely to have been used in the perpetration of any crime by Mr Al Sadeq, and which did not result therefrom.

255.    Article 80 of the Criminal Procedure Law provides as follows:

"*Objects seized in the course of the investigation, even before the judgment, may be restituted unless they are necessary for the action process or under confiscation.*"

256.    In breach of Article 80 of the Criminal Procedure Law, as pleaded at paragraphs 83 and 87 hereof, none of the items seized from Mr Al Sadeq's home or office have ever been returned.

257.    Article 100 of the Criminal Procedure Law provides as follows:

"*The attorney for the accused must be enabled to attend the investigation with him and take knowledge of the investigation papers, unless otherwise decided by the member of the public prosecution in the interest of the investigation.*"

258.    In breach of Article 100 of the Criminal Procedure Law Mr Al Sadeq's lawyers have, at the instigation and /or with the involvement of the Defendants, continuously and consistently been denied the right to attend the investigation carried out against him and have been denied access to or knowledge of the relevant investigation papers, without any proper justification.

259.    Article 104 of the Criminal Procedure Law provides as follows:

"*The public prosecution member must immediately interrogate the arrested person or, if this be impossible, he should be put in one of the specialized places of detention until his interrogation. The period of detention must not exceed twenty-four hours after which the administrator of this place has to send the detained person to the public prosecution which must instantly interrogate him, otherwise order his release.*"

260.    In breach of Article 104 of the Criminal Procedure Law Mr Al Sadeq was detained for more than 24 hours in the GHQ without interrogation by the public prosecution; and he was then detained at Al Barirat outside the criminal justice system entirely.

261. Article 105 of the Criminal Procedure Law provides as follows:

"*With due observance of the provisions of the Federal Law No. (11) of 1973, Organizing the Relations between the Emirates Members of the Federation, if the accused is arrested outside the scope of jurisdiction of the court where the interrogation takes place, he shall immediately be sent to the public prosecution of the place of his arrest which shall verify all information concerning the identity of this person, then refer him to the public prosecution of the court where he is interrogated through the public authority which has to deliver him there as quickly as possible.*
*In case the accused objects to his moving or if his condition does not allow his transport, the public prosecution member shall inform the investigator of this matter who shall forthwith order what should be followed.*"

262. In the premises pleaded at paragraphs 40 to 70 above, Article 105 of the Criminal Procedure Law was not observed in relation Mr Al Sadeq's kidnap from Dubai and rendition to RAK, and Federal Law No. 11 was not complied with.

263. Article 106 of the Criminal Procedure Law provides as follows:

"*With due observance of the provisions provided in the Law on Juvenile Delinquents and Homeless Persons, the public prosecution member may, after interrogating the accused, order his provisional detention if there is enough evidence and if the act constitutes a felony or a misdemeanour sanctioned by other than the fine penalty.*"

264. Mr Al Sadeq's transfer to and detention in Al Barirat was not pursuant to Article 106 because he was dealt without outside the criminal justice system, Al Barirat not being an official detention centre, but a camp controlled by the Ruler's private militia.

265. Article 107 of the Criminal Procedure Law provides as follows:

"*In addition to the information stated in clause 2 of Article (101), the order of detention must include an instruction to the person in charge of the administration of the place of detention to accept the accused and place him therein. The order should mention the law provision applicable to the case and shall be governed by the law provisions provide for by the last paragraph of Article (108).*"

266. Article 108 of the Criminal Procedure Law provides as follows:

"*When confining the accused in the place of detention, a copy of the order of detention must be delivered to the person in charge of the administration of the place after securing his signature on the original stating that he received the copy thereof.*
*The administrator of the place of detention may not allow any member of the public authority to have any contact with the person under provisional detention inside the place except by a written authorization from the public prosecution and, if this be the case, he must write down in the book kept for the purpose, the name of the person giving the authorization, the time of the visit and the date and contents of the authorization.*"

267. As pleaded at paragraph 115, during Mr Al Sadeq's detention in GHQ the lawyer engaged by Mrs Al Sadeq, Dr Al Shamsi, was told that he was being detained outside the criminal justice system, so it necessarily follows that Articles 107 and 108 of the Criminal

Procedure Law were not complied with in Mr Al Sadeq's case while he was detained in GHQ.

268.     Further, given that Al Barirat was not an official detention centre but a camp for the Ruler's private militia, it necessarily follows that Articles 107 and 108 of the Criminal Procedure Law were not complied with in Mr Al Sadeq's case whilst he was detained  in Al Barirat.

269.     Article 109 of the Criminal Procedure Law provides as follows:

"*Should the investigation procedures so necessitate, the public prosecution member shall issue an order forbidding any contact between the provisionally detained accused and the other detained and any visits by any person whatsoever, without prejudice to the right of the accused to permanently contact in private his attorney.*"

270.     In any event, in breach of Article 109 of the Criminal Procedure Law Mr Al Sadeq was deprived of the right to permanent contact (or any adequate contact) with his attorney at any stage whilst detained in GHQ, Al Barirat or the Prison Villa.

*Crimes committed under the UAE Penal Code*

271.     Under Article 5(5) of the UAE Penal Code 1987 (as amended) (the "**Penal Code**") a Public Servant is defined as including "*Any person assigned to a certain task by a public authority, to the extent of the delegated task.*"

272.     Mr Gerrard, Mr Hughes and Ms. Black, and each of them, were engaged by RAKIA and / or the government of RAK and / or the RAK public prosecution service and / or the Ruler and assigned to a certain task by a public authority for the purposes of the Penal Code. They therefore fall within the definition of Public Servants

273.     Further or in the alternative, the final paragraph of Article 5 of the Penal Code provides that:

"*Shall be deemed the same as a public servant in the present Law, any person who is not included within the categories set forth in preceding Clauses, and who is engaged in a work of public service as assigned to him by a public servant in charge under laws or regulations with respect to the assigned task.*"

274.     Mr Gerrard, Mr Hughes and Ms. Black, and each of them, were engaged by RAKIA and / or the government of RAK and / or the RAK public prosecution service and / or the Ruler (each falling with the definition of Public Servant in Article 5), in a work of Public Service (being the carrying out of an investigation in relation to purported allegations of a criminal nature against Mr Al Sadeq, Dr Massaad, Mr Quzmar, Mr Mikadze, Mr Azima and other alleged co-conspirators), and are therefore to be deemed to be Public Servants

for the purposes of the Penal Code under the said final paragraph of Article 5 of the Penal Code.

275.   Article 240 of the Penal Code provides as follows:

   "*Shall be sentenced to detention, every public servant or person in charge of a public service arresting a person, detaining or confining a person in cases other than those provided for by Law.*"

276.   In the premises pleaded at paragraphs 40 to 214 above, Mr Gerrard, Ms. Black and Mr Hughes orchestrated and / or acquiesced in the unlawful detention and / or confinement of Mr Al Sadeq in GHQ and / or in Al Barirat. Accordingly, as Public Servants for the purposes of the Criminal Procedure Law, Mr Gerrard, Ms. Black and Mr Hughes committed a crime in relation to the treatment of Mr Al Sadeq pursuant to article 240 of the Penal Code.

277.   Article 241 of the Penal Code provides as follows:

278.   "*Any public servant or person entrusted with a public service who searches a person, a house or establishment in other than the cases prescribed by Law or contrary to the rules indicated in such Law, with his knowledge of such fact, shall be subject to a jail sentence*".

279.   In the premises pleaded at paragraphs 82 to 88, 248 and 254 above, Ms. Black led the search of Mr Al Sadeq's home and office, and that search was unlawful. Accordingly, as a Public Servant for the purposes of the Criminal Procedure Law, Ms. Black committed a crime in relation to the search of Mr Al Sadeq's home and office pursuant to article 241 of the Penal Code.

280.   Article 242 of the Penal Code provides as follows:

   "*Shall be sentenced to term imprisonment, every public servant using, in person or through others, torture, force or threat with the accused, a witness or an expert in order to have him confess a crime, make a statement or give information concerning it to withhold any relevant matter*."

281.   In the premises pleaded at paragraphs 40 to 214 above, Mr Gerrard, Ms. Black and Mr Hughes used in person, and or through others, and or acquiesced in and / or orchestrated the use of, torture and / or force and / or threats to Mr Al Sadeq in order to cause him to confess to crimes and / or to make statements and / or to give information in relation to crimes of which Mr Al Sadeq and / or Dr Massaad and / or Mr Quzmar and / or Mr Mikadze and / or Mr Azima and / or other alleged co-conspirators were accused. Accordingly, as Public Servants for the purposes of the Penal Code, Mr Gerrard, Ms. Black and Mr Hughes committed a crime in relation to the treatment of Mr Al Sadeq pursuant to article 242 of the Penal Code.

282.   Article 245 of the Penal Code provides as follows:

   "*Shall be sentenced to detention for a minimum term of one year and/or to a minimum fine of ten thousands dirham, every public servant, or person in charge of a public service, using force on a person, basing himself in the power granted to him by virtue of his office, dishonouring or causing him bodily pain.*"

283.   In the premises pleaded at paragraphs 40 to 214 above, Mr Gerrard, Ms. Black, and Mr Hughes used, and or acquiesced in and / or orchestrated the use of, force on Mr Al Sadeq which dishonoured Mr Al Sadeq and / or caused him bodily pain. Accordingly, as Public Servants for the purposes of the Penal Code, Mr Gerrard, Ms. Black and Mr Hughes committed a crime in relation to the treatment of Mr Al Sadeq pursuant to article 245 of the Penal Code.

284.   Article 259 of the Penal Code provides as follows:

   "*Without prejudice to the provision of Article 242 of the present Law, any person who uses torture, force or threat against another person, or who offers a gift or a benefit of any kind, or makes a promise of the same to induce another person to conceal a matter or to declare false statements or information or to hide away evidence from a judicial authority, shall be punished by jail sentence and a fine*".

285.   In the premises pleaded at paragraphs 40 to 214 above, Mr Gerrard, Ms. Black and Mr Hughes used, and or acquiesced in and / or orchestrated the use of, torture and / or force and / or threats to Mr Al Sadeq in order to cause him to give untrue statements or information before the RAK court in relation to crimes of which Mr Al Sadeq and / or Dr Massaad and / or Mr Quzmar and / or Mr Mikadze and / or Mr Azima and / or other alleged co-conspirators were accused. Accordingly, as Public Servants for the purposes of the Penal Code, Mr Gerrard, Ms. Black and Mr Hughes committed a crime in relation to the treatment of Mr Al Sadeq pursuant to article 259 of the Penal Code.

286.   Article 344 of the Penal Code provides as follows:

   "*Shall be sentenced to imprisonment, whoever illegally kidnaps, arrests, detains or deprives from freedom, a person by any means whatsoever and whether by himself or through the intermediary of others. The penalty shall be life imprisonment in the following instances:*
      *1. If the act takes place by impersonating a public capacity, pretending the performance or assignment of a public service or to contact under a false representation.*
      *2. In case the act is performed by use of subterfuge or accompanied by use of force, threat of killing, inflicting severe body harm or by acts of physical or psychological torture.*
      *3. If the act is perpetrated by two or more armed persons.*
      *4. If the period of kidnapping, arresting, detaining or depriving from freedom exceeds one month.*

*5. In case the victim is of female sex, a juvenile, an insane or imbecile person.*
*6. In case the purpose of the act is to draw profit, revenge, rape of the victim, disgrace him, injure him or have him perpetrate a crime.*
*7. If the act is perpetrated against a public servant during, or because of, the discharge of his duties.*
*Should the act lead to the death of the victim, the sanction shall be the death penalty or life imprisonment. Shall be sanctioned to the same penalty prescribed for the principal perpetrator, any of the intermediaries in the perpetration of any of the crimes provided for in this Article (as well as whoever knowingly hides a kidnapped person.*"

287.   In the premises pleaded at paragraphs 40 to 214  above Mr Gerrard and Mr Hughes and Ms Black orchestrated and / or acquiesced in the illegal kidnap and / or detention and / or deprivation from freedom of and / or hiding of Mr Al Sadeq and therefore committed a crime in relation to the treatment of Mr Al Sadeq pursuant to Article 344 of the Penal Code.

288.   Article 348 of the Penal Code provides as follows:

"*Shall be sentenced to detention and/or to a fine, whoever deliberately perpetrates an act that exposes the life, health, security or freedom of human beings to danger. Without prejudice to a prejudice any more severe penalty prescribed by law, the penalty shall be detention in case the act results in a prejudice of any kind.*"

289.   In the premises pleaded at paragraphs 40 to 214  above Mr Gerrard, Ms .Black and Mr Hughes orchestrated and / or acquiesced in the perpetration of acts which exposed the life and / or health and / or security and / or freedom of Mr Al Sadeq to danger, and therefore committed a crime in relation to the treatment of Mr Al Sadeq pursuant to Article 344 of the Penal Code.

290.   Article 351 of the Penal Code provides as follows:

"*Shall be sentenced to imprisonment for term not exceeding seven years, whoever threats another person, in writing or verbally, to perpetrate a felony against his person or property or against the person or property of others, or by attributing or divulging dishonouring matters, where all these are accompanied by a demand, instructions to do or abstain from doing something or if so intended.*"

291.   Article 352 of the Penal Code provides as follows:

"*Shall be sentenced to detention, whoever threatens another to perpetrate a felony on his person or property or on the person or property of others, by attributing or divulging dishonouring or disrespectful matters a instances other than those stated in the preceding article.*"

292.   Article 353 of the Penal Code provides as follows:

"*Whoever threatens another by words, acts or signs, in writing or verbally or through another person and in instances other than those stated in the two preceding articles, shall be sentenced to detention for a term not exceeding one year or to a fine not in excess of ten thousands dirham.*"

293. In the premises pleaded at paragraphs 40 to 214 above, Mr Gerrard and Mr Hughes, in the presence of and with the involvement and acquiescence of Ms. Black, made threats towards Mr Al Sadeq to perpetrate felonies against Mr Al Sadeq and / or Mrs Al Sadeq accompanied by demands and / or instructions to give information and / or evidence and / or false testimony, and Mr Gerrard, Mr Hughes and Ms. Black therefore committed a crime in relation to the treatment of Mr Al Sadeq pursuant to Articles 351 and / or 352 and / or 353 of the Penal Code.

Loss and damage

294. As a result of the aforementioned harms and / or breaches and / or torts by the Defendants and each of them Mr Al Sadeq has suffered loss and damage.

*Physical and psychological harm*

295. Mr Al Sadeq has suffered severe psychological and physical harm, pain and suffering as a result of his incarceration and the circumstances thereof and seeks and is entitled to compensation in respect thereof.

*Financial loss*

296. Mr Al Sadeq intends to provide fuller particulars of financial loss and expert evidence in respect of the quantum thereof in due course. However, his losses include (at least):

296.1. Loss of profits and / or value in relation to the Property Businesses which, but for Mr Al Sadeq's abduction and incarceration since September 2014, would have generated aggregate profits of in excess of AED 25 million had he been able to continue to manage them. Furthermore, this profit would have been reinvested over time thus increasing the value of the Property Businesses and Mr Al Sadeq's ongoing return therefrom.

296.2. Loss of profits and / or value in relation to the Investment Business which but for Mr Al Sadeq's abduction and incarceration since September 2014 would have generated very significant profits had he been able to continue to manage and grow the business; and his interest therein would have been significantly valuable.

296.3. Loss of assets including the Villa.

297. The net value of assets lost for which Mr Al Sadeq seeks compensation is in excess of AED 75 million.

*Moral damage*

298.    Furthermore, Mr Al Sadeq  has suffered moral damage as a result of the wrongs committed against him, including (*inter alia*) damage to his reputation (*inter alia*, by the fact of his detention and prosecution, and as a result of the publication of the False Confession Statements on the Anti-Massaad Website) for which he also seeks and is entitled to compensation.

Interest

299.    Mr Al Sadeq also seeks interest pursuant to section 35A of the Senior Courts Act 1981 at such rate and for such period as the court shall see fit.


**AND THE CLAIMANT CLAIMS:**

i.     Damages for breach of Article 282 of the UAE Civil Code;

ii.     Damages for abuse of right under Article 106 of the UAE Civil Code;

iii.     Such accounts or enquiries as the Court may see fit;

iv.     Further or other relief;

v.     Interest;

vi.     Costs.

**EDWARD FITZGERALD QC**

**JOHN BRISBY QC**

**ALASTAIR TOMSON**

**NICHOLAS WRIGHT**

**31 March 2020**

**STATEMENT OF TRUTH**

The Claimant believes the facts stated in this Particulars of Claim are true. I am duly authorised by the Claimant to sign this statement.

**Full name:**    Bambos Tsiattalou

**Signed:**       ……………………………….

                 Claimant's legal representative

**Dated:**        31 March 2020

# EXHIBIT B

Neutral Citation Number: [2020] EWHC 1327 (Ch)

**IN THE HIGH COURT OF JUSTICE**                 Case No. HC-2016-002798
**BUSINESS AND PROPERTY COURTS**
**OF ENGLAND AND WALES**
**BUSINESS LIST (ChD)**

<u>Royal Courts of Justice</u>
<u>Rolls Building, Fetter Lane, London EC4A 1NL</u>

<u>Date: 22 May 2020</u>

**Before**:

**ANDREW LENON Q.C. (sitting as a Deputy Judge of the Chancery Division)**


**BETWEEN:-**


**RAS AL KHAIMAH INVESTMENT AUTHORITY**
<u>Claimant</u>

**- and -**

**FARHAD AZIMA**
<u>Defendant</u>

_____

**APPROVED JUDGMENT**
_____

**Hugh Tomlinson Q.C. and Edward Craven (instructed by Stewarts Law LLP) for the Claimant**
**Tim Lord Q.C. and Hugo Leith (instructed by Burlingtons LLP) for the Defendant**

**Hearing dates: 22nd - 24th January, 27th - 31st January, 3rd - 5th February, 12th - 14th February 2020**
-
Date: 22 May 2020


I direct that pursuant to CPR PD 39A para 6.1 no official shorthand note shall be taken of this Judgment and that copies of this version as handed down may be treated as authentic.

Covid-19 Protocol: This judgment was handed down by the judge remotely by circulation to the parties' representatives by email and release to Bailii. The date and time for hand-down is deemed to be 14.00 am on 22 May 2020.

**Contents**

Introduction ................................................................................................................. 3

Factual background ..................................................................................................... 5

The witnesses .............................................................................................................. 13

Documentary evidence ................................................................................................ 15

The HeavyLift Investment Misrepresentation Claim .................................................. 16

    (1)    Was the quantification in 2008 of HeavyLift's contribution to the joint venture fair and honest? ................................................................................................................ 17

    (2)    What was the content of the representations to RAKIA in 2013 to 2015? ............. 24

    (3)    Which party made the representations? ................................................................. 32

    (4)    Was the HeavyLift Investment Representation false? ........................................... 34

    (5)    Was Mr Azima aware that the HeavyLift Investment Representation was false? .... 35

    (6)    Did RAKIA rely on the HeavyLift Investment Representation? ............................. 36

    (7)    Loss ..................................................................................................................... 39

    Conclusion on the HeavyLift Misrepresentation Claim ....................................... 39

The Good Faith Misrepresentation Claim ................................................................... 39

    (1)    Does Clause 3.2 of the Settlement Agreement constitute a representation? ........... 40

    (2)    Has RAKIA proved the alleged wrongful conduct of Mr Azima? ........................... 41

        (a)    Did Mr Azima falsely represent to RAKIA that he had introduced the prospective purchasers of the Hotel to RAKIA? ........................................................................ 42

        (b)    Was the Referral Agreement a sham? ............................................................... 47

        (c)    Was the payment of $500,000 made by Mr Azima to Dr Massaad a bribe? ......... 53

        (d)    Did Mr Azima wrongfully fail to disclose to RAKIA an intended interest in the Hotel? ................................................................................................................... 58

        (e)    Did Mr Azima orchestrate a malicious campaign to damage the reputation, standing and internal stability of the Government of RAK? ........................................... 61

        (f)    Did Mr Azima make representations relating to the Proposed ISR JV? ............... 65

    (3)    Was the Good Faith Representation false? ............................................................. 77

    (4)    Did RAKIA rely on the Good Faith Representation? ............................................. 79

    (5)    Loss ..................................................................................................................... 79

The Unlawful Means Conspiracy Claim ..................................................................... 80

Mr Azima's Hacking Claim ......................................................................................... 80

The Facts .................................................................................................................... 86

    (1)    Mr Page and the Project Update ........................................................................... 86

    (2)    The April and July 2015 emails ............................................................................. 91

    (3)    The spear-phishing emails ..................................................................................... 94

    (4)    The View from the Window document .................................................................. 96

(5)  The Settlement Agreement ...................................................................99

(6)  The engagement of Digitalis ...............................................................101

(7)  The July 2016 meeting ........................................................................102

(8)  The Massaad websites, the blogging websites and the BitTorrents ......105

(9)  RAKIA's alleged discovery of the hacked material ...............................106

(10)  RAKIA's deployment of the hacked data ............................................117

(11)  The inability of RAKIA's IT expert to download data …………………….....120

(12)  "Deliberately withheld documents"…………………………………………….........120

(13)  Mr Page's "track record"...................................................................121

(14)  Allegations against Mr Gerrard ........................................................122

(15)  RAKIA's conduct of other litigation...................................................122

Conclusions on the hacking claim .....................................................................124

Overall conclusion ............................................................................................127

## Introduction

1.  The Claimant, the Ras Al Khaimah Investment Authority ("RAKIA"), is the investment authority of Ras Al Khaimah ("RAK"), one of the seven Emirates making up the United Arab Emirates ("the UAE"). The Defendant, Farhad Azima, is a US businessman based in Kansas City, Missouri who has been involved in the aviation industry for many years.

2.  RAKIA was represented at the trial by Hugh Tomlinson Q.C. and Edward Craven. Mr Azima was represented by Tim Lord Q.C. and Hugo Leith.

3.  Between 2007 and 2016, Mr Azima became involved in various actual and proposed commercial joint ventures with RAKIA and other RAK entities. They included a joint venture between his company HeavyLift International Airlines FZC ("HeavyLift") and RAK Airways for the establishment of a pilot training academy in RAK, the intended sale of a luxury hotel in Georgia owned by one of RAKIA's subsidiaries and a proposed joint venture involving the provision to RAK of aerial intelligence, surveillance and reconnaissance services.

4.  On 2 March 2016 Mr Azima and HeavyLift entered into a settlement agreement with RAKIA in respect of claims made by Mr Azima and HeavyLift against RAKIA in connection with the pilot training academy joint venture ("the Settlement Agreement"). Pursuant to the Settlement Agreement RAKIA paid Mr Azima the sum of $2.6 million.

5. RAKIA advances three claims against Mr Azima in these proceedings. The first is that Mr Azima fraudulently misrepresented the amount of HeavyLift's investment in the training academy joint venture and that this misrepresentation induced RAKIA to enter into the Settlement Agreement and pay Mr Azima $2.6 million ("the HeavyLift Investment Misrepresentation Claim"). RAKIA is claiming part of this sum by way of damages under this head.

6. RAKIA's second claim is a further claim for fraudulent misrepresentation inducing the Settlement Agreement. It is based on a provision in the Settlement Agreement by which Mr Azima warranted and confirmed that he had at all times acted in good faith and with the utmost professional integrity towards RAKIA, RAK Airways and any other RAK entity and would continue to do so. RAKIA alleges that this provision ("the Good Faith Clause") constituted a representation which Mr Azima knew was false because of his wrongful conduct in connection with various episodes occurring between 2011 and 2015 (the "Good Faith Misrepresentation Claim").

7. RAKIA is claiming by way of damages for the Good Faith Misrepresentation Claim the whole of the sum of $2.6 million which it paid to Mr Azima under the Settlement Agreement.

8. RAKIA's third claim is for $1,562,500 by way of damages for an unlawful means conspiracy arising in connection with the intended sale of the luxury hotel in Georgia in 2011 - 2012.

9. A fourth pleaded claim, for damages for breach of warranty based on the Good Faith Clause in the Settlement Agreement, was not pursued by RAKIA in its closing submissions, RAKIA recognising that, even if breach of warranty were proved, it would only have a claim for nominal damages.

10. Mr Azima challenges RAKIA's three remaining claims on two main grounds. First, he contends that the claims should be struck out or dismissed on the ground that, in bringing the claims, RAKIA is relying on confidential emails that RAKIA obtained through its unlawful hacking of his email accounts. Mr Azima has brought a counterclaim for damages resulting from what he alleges was RAKIA's hacking of his emails. That counterclaim has been stayed pending the trial of RAKIA's claims against Mr Azima.

11. Second, Mr Azima denies the claims made against him on their merits. He denies making the alleged representations, denies fraud and denies any reliance by RAKIA on the representations. He contends that the litigation is politically motivated, the culmination of a targeted attack on him, pursued because of his refusal to take RAKIA's side in a bitter fight with Dr Khater Massaad, a former senior government official who RAKIA alleges was guilty of large scale embezzlement.

12. RAKIA does not dispute that, in bringing the claims, it is relying on hacked emails but it contends that it came across the hacked material innocently on publicly accessible websites where it had been put by anonymous hackers. It contends that, in any event, the hacking allegations provide no defence to RAKIA's claims in this action and that, even if the Court found that the RAKIA was responsible for the hacking, the public

4

interest in the Court reaching the correct decision on the basis of all the available evidence should prevail.

**Factual background**

**(1)    Dr Massaad**

13.    Dr Massaad was from 2005 until 2012 RAKIA's chief executive officer. Dr Massaad was one of the most senior public officials in RAK and was entrusted with the management and control of RAK's national and international investments. As RAKIA's chief executive officer Dr Massaad had effective control over all of RAKIA's affairs, operations, assets and funds and he was directly involved in certain of the transactions which have given rise to RAKIA's claims in these proceedings. Dr Massaad and Mr Azima were friends.

14.    RAKIA claims that in around late 2012 it discovered that Dr Massaad had perpetrated systematic and wide-ranging frauds against RAKIA and other RAK entities. Subsequent investigations undertaken by the Government of RAK are said to have established that between around 2005 and 2012 Dr Massaad and his associates engaged in an unlawful conspiracy to misappropriate monies and otherwise cause losses exceeding $2 billion. Dr Massaad fled the UAE in 2012 and was subsequently tried and convicted in absentia of an array of fraud, bribery and embezzlement offences.

15.    In 2015 and 2016, Mr Azima acted as Dr Massaad's representative in without prejudice settlement discussions with RAKIA concerning the return of misappropriated assets. Those discussions ultimately came to nothing and no agreement was reached between RAKIA and Dr Massaad.

**(2)    The Training Academy Joint Venture**

16.    Mr Azima first met Dr Massaad in around 2006 or 2007 in order to discuss the expansion of RAK's aviation activities. Mr Azima was introduced to RAK Airways. Dr Massaad and Mr Azima had a shared interested in aviation and they became friends. Mr Azima was also introduced to Sheikh Saud, the current ruler of RAK ("the Ruler") who was at that time the Crown Prince. There is a peripheral issue as to the closeness of the relationship between the Ruler and Mr Azima. Mr Azima contends that they were friends, a contention denied by the Ruler. Mr Azima exhibits an email exchange of New Year good wishes. From time to time, Mr Azima gave assistance to the Ruler in the form of effecting introductions to various contacts of his. My impression is that their relationship was one of mutual convenience rather than friendship.

17.    Dr Massaad introduced Mr Azima to the management of RAK Airways, the national airline of RAK and discussions ensued about the possibility of establishing a training academy for pilots in RAK. These discussions led in 2007 to the establishment of a joint venture between HeavyLift, an aviation company established and owned by Mr Azima, and RAK Airways for the creation and operation of a pilot training academy at RAK International Airport (the "Training Academy JV").

5

18.   The parties agreed, amongst other things, that HeavyLift would provide and maintain a working DC-8 flight simulator and that RAK Airways would construct an appropriate facility at RAK International Airport to house the simulator. A RAK Free Zone company, RAK-HeavyLift Training Academy FZ-LLC, was incorporated on 11 April 2007 for the purpose of implementing and running the Training Academy JV. The directors of the company were Dr Massaad and Mr Azima.

19.   The Training Academy JV was not a success. Although the simulator was eventually certified by several civil aviation authorities and was therefore able to provide some commercial training services, the partners to the joint venture were in conflict on various issues from an early stage.

20.   Mr Azima's evidence was that RAK Airways failed to arrange to provide an adequate electrical power supply or air-conditioning (which was necessary for the operation of the simulator), a suitable building with the structural capacity and height needed to accommodate the additional simulators that had been contemplated and that it had made an unwarranted demand for rent which HeavyLift had no option but to pay. The Training Academy JV ceased operations in 2010.

21.   The failure of the Training Academy JV later gave rise to the claim for compensation which was the subject of the Settlement Agreement. Mr Azima's evidence was that the Training Academy JV's failure was attributable to RAK Airways. This was not admitted by RAKIA.


**(3)    The Hotel**

22.   A Georgian subsidiary of RAKIA, Ras Al Khaimah Investment Authority Georgia LLC ("RAKIA Georgia"), owned a luxury hotel, the Sheraton Metechi Palace Hotel in Tbilisi, Georgia (the "Hotel"). In 2011, RAKIA decided to sell the Hotel. The intended sale transaction is one of the episodes relied on by RAKIA in support of its claim that Mr Azima was guilty of wrongful conduct contrary to the Good Faith Clause in the Settlement Agreement.

23.   Mr Azima received two payments of $400,000 and $1,162,500 on 25 October 2011 and 18 January 2012 respectively and, on the day that he received the latter of those payments, Mr Azima made a payment of $500,000 to Dr Massaad. Mr Azima's case is that he was entitled to both payments under a referral agreement with RAKIA ("the Referral Agreement") as commission for introducing to RAKIA three Iranians who were potential buyers of the Hotel ("the Potential Buyers") and that the payment to Dr Massaad was in return for a share in an aircraft owned by Dr Massaad. This version of events is disputed by RAKIA which contends that the Referral Agreement is a sham, that Mr Azima did not introduce the Potential Buyers, that the two payments which he received were misappropriations and that his payment to Dr Massaad was a bribe.

24.   There is a further dispute concerning an agreement between the Potential Buyers and

Mr Azima under which he was to receive a 10% interest in the Hotel in exchange for a nominal payment of $10 "and other good and valuable consideration". Mr Azima claims that RAKIA and the Ruler were aware of and approved this arrangement. This is disputed by the Ruler and RAKIA.

25. Following the signing of the Memorandum of Understanding between RAKIA Georgia and Eurasia Hotel Holdings Limited (a company beneficially owned by the Potential Buyers), the sale of the Hotel proceeded to a different company owned by them but was never completed. Mr Azima ceased to be involved in the sale transaction. The timing of, and reasons for, Mr Azima's withdrawal are disputed.

**(4)   HeavyLift's compensation claim**

26. HeavyLift's claim for compensation from RAKIA arising out of the Training Academy JV was first made on 2 September 2013 when Ray Adams acting on behalf of Mr Azima sent a letter to the then Chief Executive Officer of RAKIA, Jim Stewart, concerning "unresolved" matters regarding the Training Academy JV.

27. A few months before the claims were first made, Mr Azima and Mr Adams arranged for the drafting of what purported to be a copy of a Joint Venture Agreement dated 12 April 2007 (the "Joint Venture Agreement") including RAKIA as a guarantor of RAK Airways' obligations. The circumstances in which the Joint Venture Agreement was produced is considered further at paragraphs 123 – 128 below.

28. HeavyLift's claim for compensation was not dealt with in 2013 and Mr Azima did not press the matter for the next 22 months. The claim was resurrected in July 2015. Between July 2015 and March 2016 there were correspondence and discussions regarding potential claims that HeavyLift had against RAKIA arising from the Training Academy JV. During the course of those discussions, it was represented that HeavyLift had invested $2.6m in the assets of the Training Academy JV including expenditure of $1,726,000 on the simulator. This representation is alleged to have been made fraudulently and has given rise to the HeavyLift Investment Misrepresentation Claim. The alleged misrepresentation is also relied on by RAKIA as wrongful conduct on the part of Mr Azima contrary to the Good Faith Clause in the Settlement Agreement.

**(5)   The planned media and PR campaign**

29. In late 2014 and 2015 plans were made by consultants acting for Dr Massaad to organise a media and public relations campaign which was intended to damage the reputation of RAKIA, RAK and other RAK entities. RAKIA contends that Mr Azima played a leading role in the planned campaign and that the campaign was malicious and intended to spread false stories about human rights violations in RAK. This episode is relied on by RAKIA as giving rise to further wrongful conduct on the part of Mr Azima, contrary to the Good Faith Clause; RAKIA's allegations are disputed by Mr Azima.

**(6)    The Project Update and its aftermath**

30.    By late 2014 investigations were under way within RAK into the actions of Dr Massaad and his associates.

31.    In January 2015 Stuart Page, a private investigator, was engaged by the Ruler to investigate what the Ruler feared was a plot between a member of his family and Dr Massaad aimed at destabilising his rulership.

32.    In March 2015 Mr Page provided the Ruler with a report entitled RAK Project Update ("the Project Update") which was mainly concerned with Dr Massaad's activities but which also described how Mr Azima was managing a team of advisers in the US, hired by Dr Massaad, who were planning to spread allegations about human rights issues in RAK; their campaign had not yet been made public. Mr Page's agents who compiled the report said that they would be able to gather intelligence on the campaign team in order to monitor their progress and "attempt to contain or ruin their plans".

33.    In around April 2015, the Ruler told Mr Buchanan that he wanted Mr Buchanan and other assistants to "target" Mr Azima. The Ruler directed his associates to bring charges against Mr Azima. The Ruler's associates discussed meeting to "coordinate our attack" on Mr Azima and Dr Massaad but persuaded the Ruler not to pursue this plan at that time.

34.    In or around July 2015, the Ruler instructed another of his assistants, Naser Al Bustami, to "go after" Mr Azima. Mr Azima's case is that, just as Henry II's question "Will no one rid me of this turbulent priest?" led to the murder of Thomas Becket, so the Ruler's directions to "go after" Mr Azima led in due course to the hacking of Mr Azima's emails, whether or not this was the Ruler's express instruction.

**(7)    The hacking of Mr Azima's emails**

35.    A 'phishing' email is an email that seeks to trick the recipient into clicking on a hyperlink taking the user to a webpage that the criminal controls, or into downloading malicious software. A 'spear-phishing' email is a more targeted and sophisticated form of a 'phishing' email which indicates that the sender has purposely targeted the deception at that individual (as shown by the fact that the email has been constructed to include material pertinent to the recipient, or otherwise to be of more interest to them). The fact that the spear-phishing email contains material of particular interest to the targeted recipient makes it more likely to be effective in that the recipient is more likely to open the deceptive email and any further links it may contain.

36.    It is common ground that in October 2015 Mr Azima received a number of spear-phishing emails. Mr Azima's case is that these spear-phishing emails led at the time to the hacking of his confidential email accounts, that the hacking was organised by agents acting on behalf of RAKIA and that consequently by late 2015 RAKIA had accessed his confidential emails and the evidence which it now relies on in support of its claims. RAKIA denies that it had anything to do with the spear-phishing emails and does not admit that the spear-phishing emails led to the hacking of Mr Azima's email accounts.

37.   On 29 December 2015 a document called the "View from the Window" was drawn up by Andrew Frank, an employee of Karv Communications, a PR firm engaged by RAK. The document referred to Mr Azima as "having orchestrated, if not fully participated in numerous fraudulent activities" and to "companies being set up with Iranian nationals". Mr Azima contends that this document shows that RAKIA had by this stage obtained access to Mr Azima's confidential emails and data. This is disputed by RAKIA.

**(8)   The Settlement Agreement**

38.   On 2 March 2016 RAKIA, HeavyLift and Mr Azima entered into the Settlement Agreement. The Recitals to the Settlement Agreement read as follows:

> "(A) By an agreement dated 12 April 2007, HeavyLift and RAK Airways PJSC ("RAK Airways") entered into a joint venture (the "Joint Venture Agreement") to establish an Aircraft Simulator and Training Facility at Ras Al Khaimah International Airport, located in Ras Al Khaimah, UAE ("RAK");
> (B) RAKIA guaranteed the performance of RAK Airways under the Joint Venture Agreement;
> (C) HeavyLift, acting through Mr Azima, has asserted that RAK Airways owes HeavyLift for investments HeavyLift made in the joint venture pursuant to the Joint Venture Agreement;
> (D) RAKIA does not agree that there is any legal basis for any such claim;
> (E) Mr. Azima has recently provided negotiation assistance to RAKIA on an informal basis which RAKIA recognises and appreciates;
> (F) Each Party has the greatest of respect for the other Parties, and wishes to resolve all outstanding issues relating to the Joint Venture Agreement."

39.   Clause 1.1 required RAKIA to pay the sum of $2.6 million in settlement of any claims that Mr Azima or HeavyLift might have had against RAKIA or another RAK entity:

> "RAKIA will pay HeavyLift the sum of $2,600,000 to resolve all claims which Mr Azima or HeavyLift may have against it or any other RAK Entity as further detailed in paragraph 3.1."

40.   RAKIA's case is that it was deceived into entering the Settlement Agreement by fraudulent misrepresentations made by and on behalf of Mr Azima regarding the amount of HeavyLift's investment, that the settlement sum of $2.6m was intended to reflect the amount spent by HeavyLift in making its contribution to the Training Academy JV and that the true amount of HeavyLift's investment was significantly smaller than this.

41.   In exchange for the payment of $2.6m, Mr Azima and HeavyLift agreed to relinquish

any claims they had against RAKIA or any other RAK entity. Clause 3.1 of the Settlement Agreement stated as follows:

> "This Settlement Agreement is in full and final settlement of all claims, in any jurisdiction, whether or not presently known to them or to the law that Mr Azima or HeavyLift or any of its owners has had, shall or may have against RAKIA, RAK Airways or any other RAK Entity."

42.  Clause 3.2 of the Settlement Agreement, the Good Faith Clause, provided as follows:

> "Mr Azima and HeavyLift each expressly and separately warrants and confirms to RAKIA that he/it (respectively) has at all times acted in good faith and with the utmost professional integrity and will continue in the future to act in good faith and with the utmost professional integrity towards RAKIA, RAK Airways and any other RAK Entity.
>
> The payment made to HeavyLift pursuant to this Settlement Agreement is made in reliance on this express warranty and confirmation.
>
> For the purposes of this Sub-clause, "acted in good faith" and "act in good faith" each means (1) participating in conduct which meets the standard expected of reasonable business persons in the context and includes acting in ways which were or are, or are likely to be, non-detrimental to the interests of RAKIA or any other RAK Entity, and (2) not encouraging others to participate in the conduct which fails to meet the standard expected of reasonable business persons in the context or acting in ways which were or are likely to be detrimental to the interests of RAKIA or any other RAK Entity and (3) not participating in any illegal activity.
>
> In this Agreement "RAK Entity" shall mean any entity in which RAKIA or the Government of RAK has a shareholding interest (irrespective of where that entity may be incorporated)."

43.  Clause 4 provided that the Settlement Agreement did not constitute an admission of liability or wrongdoing by either party. Clause 7 was a governing law and jurisdiction clause:

> "This Settlement Agreement and any dispute or claim arising out of, or in connection with, it or its subject matter or formation (including, without limitation, any contractual or non-contractual disputes, claims or obligations) is governed by and shall be construed in accordance with English law and the Parties submit to the exclusive jurisdiction of the courts of England and Wales."

44.    Mr Azima's case is that the Settlement Agreement was a device cynically entered into by RAKIA which insisted on the inclusion of the Good Faith Clause and an English jurisdiction clause, while at the same time harbouring a conviction, informed by surveillance and other covert sources, that he was not acting in good faith. He states that in doing so, RAKIA sought to use Mr Azima in its dispute with Dr Massaad: it believed the Settlement Agreement gave it leverage over Mr Azima, insurance to recover the funds paid (which were modest compared to the $2 billion it was seeking to recover from Dr Massaad), and possibly the means of turning Mr Azima against Dr Massaad.

45.    Pursuant to the terms of the Settlement Agreement, on 7 April 2016, RAKIA paid the settlement sum of $2.6m to Mr Azima.

**(9)    The proposed ISR Joint Venture**

46.    Alongside the negotiations concerning the Settlement Agreement, in late 2015 and early 2016 RAKIA was also engaged in discussions with Mr Azima and other individuals with whom he was collaborating regarding a proposed joint venture for the provision of aerial intelligence, surveillance and reconnaissance services ("ISR services") ("the Proposed ISR JV"). RAKIA relies on alleged wrongful conduct in connection with the Proposed ISR JV in support of its Good Faith Misrepresentation Claim.

47.    The proposed partners for the Proposed ISR JV were RAKIA and Global Defence Services Corporation ("GDS"), a company of which Mr Azima was a director and shareholder. RAKIA alleges that Mr Azima made misrepresentations to RAKIA in the course of the negotiations and failed to correct other false representations made by the individuals with whom he was collaborating. This is disputed by Mr Azima.

48.    The negotiations concerning the Proposed ISR JV ultimately came to an end around June 2016 and it did not proceed.

**(10)    The July 2016 meeting**

49.    Between the autumn of 2015 and July 2016 Mr Azima represented Dr Massaad in negotiations with RAKIA concerning RAKIA's entitlement to redress. During the course of those negotiations, Mr Azima attended meetings (which took place on a without prejudice basis) with Mr Buchanan and (in some instances) RAKIA's legal representatives at Dechert LLP (including Mr Neil Gerrard) on various dates in 2015 and 2016.

50.    On 16 July 2016, a without prejudice meeting took place between Mr Buchanan, Mr Gerrard and Mr Azima. This meeting took an acrimonious turn. There is an issue as to precisely what was said. According to Mr Azima, Mr Gerrard threatened him that if Dr Massaad could not be made to agree to a settlement, then RAKIA would pursue Dr Massaad, and Mr Azima would be rendered "collateral damage". This is disputed by RAKIA.

**(11)**   **The downloading of the hacked material**

51.   The dispute with Dr Massaad was not resolved. RAKIA admits to creating websites attacking Dr Massaad a few days after the July 2016 meeting and shortly after those sites were created, in early August 2016, blogging websites began appearing denigrating Mr Azima as a "fraud" and a "scammer" and linking to websites containing Mr Azima's confidential emails which appeared at around the same time.

52.   There is an issue as to how these blogging web sites came to the attention of RAKIA. RAKIA's case is that they were discovered by a journalist, Majdi Halabi, who drew them to the attention of Mr Page, by whom Mr Halabi had been allegedly asked to look out for references to Mr Azima on the internet. Mr Page is alleged to have communicated the information to Mr Gerrard and Mr Buchanan. Mr Azima contends that this version of events is fictitious, that Mr Halabi played no part in the discovery of the blogging web sites and that RAKIA's account of the discovery of the blogging websites is designed to conceal RAKIA's role in the hacking.

53.   RAKIA subsequently instructed an independent third party, Northern Technology Inc. ("NTi") to download the material from these links and others which were subsequently discovered and which RAKIA contends had been posted by unknown hackers. The material was downloaded by NTi in August and September 2016.

54.   RAKIA's case is that the subsequent analysis of the internet data established that, contrary to the Good Faith Clause, Mr Azima had in fact committed multiple acts of serious wrongdoing towards RAKIA and other RAK entities and that, as a result of that discovery, the present action was commenced on 30 September 2016.

55.   On Mr Azima's case, RAKIA already had access to the hacked data by late 2015 so that the downloading process in August/September 2016 was a charade.

56.   On the same day as these proceedings were commenced (30 September 2016) Mr Azima brought proceedings against RAKIA in the US District Court for the District of Columbia alleging that RAKIA had hacked his computers. RAKIA challenged the proceedings on jurisdictional grounds. Its challenge failed in the US District Court but on 18 June 2019 the US Court of Appeals allowed RAKIA's appeal and dismissed the US proceedings.

57.   Mr Azima amended his defence in these proceedings on 18 July 2018 to allege that RAKIA was responsible for hacking his computers and emails and publishing their contents on the Internet and on 8 August 2019 was given permission to add a Counterclaim for damages and other relief arising out of the alleged hacking which was stayed pending final judgment on RAKIA's claim.

**The witnesses**

58.   RAKIA served witness statements from twelve witnesses, nine of whom gave oral evidence. The evidence of two of the witnesses, Richard Garcia and Jessica Gray, who were involved in the downloading of data from the BitTorrent sites, was uncontroversial and admitted by Mr Azima without cross-examination.

59.   The Ruler of RAK, Sheikh Saud bin Saqr Al Qasimi, provided a witness statement responding to Mr Azima's first witness statement but did not attend the hearing. RAKIA submitted that for the Ruler to attend the hearing or appear by video link would be incompatible with this constitutional role and status as sovereign ruler. It is regrettable that the Ruler chose not to attend the hearing or give evidence by video link as there were a number of issues on which he could have given relevant evidence. As the Ruler's witness statement was not tested by cross-examination, I do not propose to attach significant weight to it.

60.   Jamie Buchanan was RAKIA's main witness. Between September 2014 and December 2019 when he took retirement, Mr Buchanan was the chief executive of Ras Al Khaimah Development LLC ("RAK Dev") which holds the assets and liabilities that were previously owned by RAKIA.

61.   Counsel for Mr Azima submitted that Mr Buchanan gave dishonest evidence on a number of issues relating to Mr Azima's hacking clam. In relation to one matter, namely Mr Buchanan's claim to have been mistaken, until shortly before the trial, as to the authorship of the Project Update, which I address at paragraph 266 below, I consider that Mr Buchanan's evidence was disingenuous. I was not persuaded that Mr Buchanan's evidence was dishonest in other respects. He struck me as a generally reliable witness who gave his evidence in a measured way and was prepared to concede a number of points adverse to RAKIA's case that were put to him in cross examination.

62.   Neil Gerrard is a former policeman and a partner in the firm of Dechert LLP which was instructed to assist with the investigation into Dr Massaad's alleged fraudulent activities which it has continued to work on to the present time. His witness statement dealt with his engagement by RAK, the meeting he had with Mr Azima in July 2016 and the events in August 2016 surrounding the downloading of the hacked material. He was cross-examined about his involvement with the questioning of detainees within RAK, in particular Karam Al Sadeq and Shahab Izadpanah. Allegations that Mr Gerrard had attempted, on behalf of RAK, to extort money from Mr Izadpanah and had offered Mr Izadpanah and Mr Al Sadeq to drop all charges against them if they confessed to charges implicating Dr Massaad were put to Mr Gerrard who denied them in forthright terms. On the basis of the material before me, I am not in a position to make any findings in relation to those allegations or other allegations of misconduct extraneous to the events in issue in these proceedings that were put to Mr Gerrard.

63.   Counsel for Mr Azima submitted that Mr Gerrard gave dishonest evidence on key issues. He was also criticised for not referring to Mr Page and the Project Update in his witness statement.  In my view, Mr Gerrard's witness statement should have dealt

with the Project Update which was a clearly relevant document and one which, as he accepted in cross-examination, was of concern to him when it was produced because it referred to the threat of a press campaign to smear RAK and its Ruler with human rights allegations. I do not, however, regard the omission to deal with the Project Update, or the other criticisms made of his evidence, as leading to the conclusion that I should treat Mr Gerrard as dishonest.

64.   Stuart Page, also a former policeman and now the Chairman and majority shareholder of a business providing security and surveillance services, dealt in his witness statement with his engagement in RAK to assist with the investigations into Dr Massaad and the discovery of the hacked material. Counsel for Mr Azima submitted that Mr Page was a dishonest witness who lied about a number of matters. I consider that Mr Page was an unsatisfactory and unreliable witness. As set out in greater detail in the context of the hacking claim, his witness statement was misleading in relation to two significant matters. First, his witness statement implied that he did not produce written reports for the Ruler on his investigations whereas in fact he did so on a regular basis. Second, his witness statement said that he first came across the name of Mr Azima in early 2016 whereas in it was in fact a year earlier. His evidence in connection with the discovery of the hacked material was both internally inconsistent and at odds with the contemporary documents. I have concluded that it would be unsafe to rely on any evidence from Mr Page that was not corroborated by some other source.

65.   Amir Ali Handjani is on the board of RAK Petroleum and was involved in discussions with Mr Buchanan and Mr Bustami regarding both the money that Mr Azima said was owed to him and matters involving Dr Massaad. Mr Azima criticised him as an evasive witness giving further dishonest evidence. Mr Handjani was criticised for his contention that the Ruler's instruction to "go after" Mr Azima was in part prompted by a demand for payment of $8 million by Mr Azima. I do not regard the evidence on this point to be so clear cut as to justify the inference that he gave deliberately false evidence on it.

66.   Naser Al Bustami sits on the boards of a number of companies owned by the government of RAK and is one of the Ruler's advisers. He was criticised for an email proposing that the Government of Georgia be enlisted to support RAKIA's claims against Dr Massaad. It is not clear from the email what assistance Mr Bustami had in mind and his oral evidence was that the assistance sought would be subject to Dr Massaad being convicted in a fair trial in a court of law. Even accepting that the email was improper, I do not consider that it supports the inference that Mr Bustami was a dishonest witness.

67.   Majdi Halabi gave evidence in relation to the discovery of the hacked material. As set out later in this judgment, I came to the conclusion that his evidence was inherently implausible and not credible.

68.   Stuart Leach ran the specialist litigation division at the public relations agency Bell Pottinger at the relevant time. Dave King is the Chief Executive of Digitalis, an online reputation and digital risk management firm, who were engaged by Bell Pottinger. I consider that they were both reliable witnesses who were seeking to assist the court.

69.   Nicholas del Rosso gave evidence as to his involvement in retaining NTi to download the Hacked Material from the BitTorrent sites. His evidence was uncontroversial.

70.   For Mr Azima, there were three witnesses. First there was Mr Azima himself. Second there was Mr Adams, a close friend and confidant of Mr Azima who deals with the accounts and paperwork for Mr Azima's business, who provided a short witness statement expressing agreement with Mr Azima's first witness statement. Finally there was Professor Donald Fowler, a friend of Mr Azima, who did not appear at the trial but provided an unchallenged witness statement describing an assignment that he had carried out for the Ruler at Mr Azima's request.

71.   Mr Azima is a businessman with more than forty years' experience in all aspects of aviation, the airline industry and logistics. He has served as chairman of various airlines in different parts of the world. I am told that he has never before faced an allegation of fraud. RAKIA submitted that Mr Azima and Mr Adams were dishonest witnesses. After hearing evidence from Mr Azima and Mr Adams, I reached the conclusion that their evidence in opposition to RAKIA's claims was frequently inconsistent with the contemporaneous documents and inherently implausible. One example was their evidence concerning the retrospective drafting of the Joint Venture Agreement, which I deal with at paragraphs 123 to 128 below. I consider that Mr Azima and Mr Adams, in giving evidence, were more concerned to support Mr Azima's case than to assist the court with an honest recollection of the true facts.

72.   The two expert witnesses, in the field of Computer Forensics and Investigations, were Christopher Tarbell (for Mr Azima) who is Director of Cyber Security and Investigations in the New York office of BRG, a global consulting firm, and Winston Krone (for RAKIA), who is Global Managing director in the Amsterdam office of Kivu Consulting Inc, a global technology firm. The experts each produced an expert report and together a joint report. The parties agreed that the experts, between whom there was a large measure of agreement, would not be called to give oral evidence.

**Documentary evidence**

73.   Mr Azima made wide ranging criticisms of RAKIA's documentary evidence and invited me to draw inferences against RAKIA on the ground that it had destroyed relevant documents.

74.   Mr Buchanan's disclosure statement referred to an incident at the Covent Garden Apple store on 16 October 2016 when a substantial number of emails had been inadvertently deleted from his iPhone by an Apple employee. In witness statements filed for the purposes of an interim application before HHJ McCahill QC, it was explained that Mr Buchanan had attended the Apple store because of a problem in sending emails from his phone. On 22 October 2016, six days later, Mr Buchanan was informed of the need to preserve documents, whereupon he informed Dechert of the possible deletion of emails. Steps were then taken to address the situation by restoring the deleted emails but these were only partially successful.

75.   It was submitted for Mr Azima that it was "very likely" that Mr Buchanan deliberately

15

destroyed emails. It was said that Mr Buchanan's account of the loss of his emails was inherently implausible, given that an employee would not have worked on his iPhone without first ensuring that there was a back-up of data. My attention was also drawn to the absence of corroborative evidence from the witness who Mr Buchanan said for the first time in cross-examination was with him at the time of the incident. Furthermore, according to Mr Buchanan's evidence, there were no deletions as a result of the incident on 16 October 2016 from his inbox or its sub folders. It was said that this could not be reconciled with the number of emails (more than 20%) that had disappeared from his inbox. Practically all of Mr Buchanan's "sent" items are unavailable.

76. Mr Buchanan was cross-examined about the emails missing from his inbox as well as about correspondence with his solicitors in August 2017 when he was asked about his emails and failed to mention the Apple shop episode. Mr Buchanan was adamant that he had not used the Apple shop episode as cover for prior deletions of potentially damaging material. I accept Mr Buchanan's evidence on this point and conclude that he had not deliberately destroyed any emails.

77. It was submitted on behalf of Mr Azima that there were other "huge gaps" in the documentary evidence. I have addressed certain specific criticisms of RAKIA's documentation later in this Judgment. I was not persuaded that RAKIA had adopted a policy of deliberately destroying documents or withholding documents that should have been disclosed.

## The HeavyLift Investment Misrepresentation Claim

78. RAKIA's case, shortly stated, is as follows.

78.1 In order to induce RAKIA to pay him compensation, Mr Azima repeatedly represented that HeavyLift had spent a total of $2,685,000 in making its contribution to the Training Academy JV, including expenditure of approximately $1,726,000 in respect of the flight simulator ("the HeavyLift Investment Representation").

78.2 This was untrue. HeavyLift's actual expenditure on the Training Academy JV was very much less – between $850,000 and $1.2 million.

78.3 Mr Azima knew that the HeavyLift Investment Representation was untrue and that the amount invested by HeavyLift was substantially lower than the sum represented.

78.4 RAKIA suffered loss as a result of entering into the Settlement Agreement.

79. Mr Azima's response to this claim was, in summary, as follows.

79.1 In 2008 HeavyLift quantified the contribution it had made to the joint venture on a fair and honest basis that was well understood both by its joint venture partner and its auditors. The same figures were presented in 2013. This is incompatible with RAKIA's fraud case.

79.2   Read in context, the representations in 2013 and 2015 complained of by RAKIA do not have the meaning attributed to them. The communications identified the estimated value of the land and building at the airport which RAK Airways was obliged to contribute to the joint venture (title to which it failed to transfer) and the value of the investments contributed by HeavyLift to the joint venture, which included the value of the flight simulator, once installed and in operation, as well as other assets on which HeavyLift incurred costs.

79.3   The representations were made by HeavyLift, not by Mr Azima personally.

79.4   RAKIA has failed to prove that the representations were false, i.e. that the out of pocket costs actually incurred by HeavyLift on the simulator and training aids were less than represented.

79.5   There was no fraudulent intent.

79.6   There was no reliance by RAKIA.

79.7   RAKIA is only entitled to damages representing the difference between the costs actually incurred by HeavyLift and the level of costs that the Court finds were represented as having been incurred.

80.   RAKIA's claim therefore gives rise to the following main issues:

80.1   Was the quantification in 2008 of HeavyLift's contribution to the joint venture fair and honest?

80.2   What was the content of the representations to RAKIA in 2013 to 2015?

80.3   Which party made the representations?

80.4   Was the HeavyLift Investment Representation false?

80.5   Was Mr Azima aware that the HeavyLift Investment Representation was false?

80.6   Did RAKIA rely on the HeavyLift Investment Representation?

80.7   What loss has been suffered?

**(1)   Was the quantification in 2008 of HeavyLift's contribution to the joint venture fair and honest?**

**The HeavyLift management accounts**

81.   From early 2008, HeavyLift had sought to prepare a set of joint financial accounts with RAK Airways, for submission to HeavyLift's auditors, PriceWaterhouseCoopers ('PwC'), and informed RAK Airways of this. In February 2008 it submitted to RAK Airways a proposed balance sheet contained in preliminary management accounts,

showing HeavyLift's contribution.

82. The balance sheet showed total assets contributed by HeavyLift of $2,281,883 including an amount of $1,725,959 in respect of "Simulator (includes delivery, installation & certification)" and an entry for $450,000 in respect of "Training Aids".

83. At around the same time, a more detailed spreadsheet was prepared by Mr Adams. That spreadsheet (which was not sent to RAKIA or RAK Airways) contained a tab (entitled "Simulator") in respect of the costs associated with the acquisition, storage, installation and certification of the simulator. This showed how the entry of $1,725,959 in the preliminary balance sheet had been calculated. According to the spreadsheet:

83.1 HeavyLift had spent a total of $725,959 in respect of "Simulator Freight & Storage Charges" and "Simulator Installation Cost" (which included "Outside Contractors", "Salaries & Benefits", "Travel & Accommodation Charges", "Legal & Administration Charges", "License & Permits", "Parts & Supplies" and "Supervision"). This total included $186,445 in respect of "Administration Charges HL".

83.2 The "Simulator Cost" was recorded as $1 million. This comprised the actual purchase price of $167,500 paid by HeavyLift to MK Airlines plus a further unspecified "Investment" by HeavyLift of $832,500. No further details regarding the nature of that "Investment" were recorded, although it is clear from the spreadsheet that it did not relate to the costs of storing, installing and certifying the simulator (which costs were in the $725,959 described above).

84. Mr Azima and Mr Adams gave differing and unsatisfactory explanations regarding the "Investment" of $832,500. Mr Azima stated that it represented "time, material, equipment, money." When it was pointed out to him that all of those expenses were recorded separately elsewhere in the spreadsheet, Mr Azima said that he could not address the numbers and that the numbers were produced under the supervision of Mr Adams. Mr Adams initially stated that the investment reflected the fact that Mr Azima had issued an invoice for this amount:

"Q. So what does it mean by "investment"?
A. It means that Mr Azima owned 100% of HeavyLift and he contributed that value to HeavyLift.
Q. In what sense did he contribute it, Mr Adams?
A. He wrote a bill of sale, he gave an invoice."

85. When it was pointed out to Mr Adams that at this point in time Mr Azima had not produced any invoice for the simulator, he asserted that the $832,500 was an "agreed value".

**The alleged $1m agreed valuation**

86. Mr Azima's evidence was that a $1 million valuation of the simulator had been discussed and agreed between HeavyLift and Dr Massaad on behalf of RAKIA, after the

simulator was purchased but before it was installed.

87. There are no contemporaneous documents that support the existence of this alleged agreement. There are no references to such an agreement in any of the communications between HeavyLift and RAK Airways during the lifetime of the Training Academy JV, including communications specifically concerning the value of the simulator. There was no reference to the alleged agreement in the discussions with RAKIA in 2015 culminating in the conclusion of the Settlement Agreement. The only document to contain any reference to this alleged agreement is a draft letter to Dr Massaad dated 24 January 2008 but there is no evidence that this letter was ever actually signed by Mr Azima and no documentary evidence that it was actually sent to Dr Massaad or to any other employee of RAK Airways or RAKIA.

88. When asked during cross-examination why none of the contemporaneous communications with RAK Airways contained any mention of an agreement that the simulator would be valued at $1 million for the purposes of valuing HeavyLift's contribution, Mr Azima claimed that Dr Massaad had told him "don't discuss that with anybody" and had said that "if there's a problem, come and see me". Mr Azima also claimed that, "There's an email to that effect" although no such email had been disclosed. Mr Azima did not explain why Dr Massaad would have instructed him not to talk to anyone at RAK Airways about what was (on Mr Azima's case) a perfectly valid and straightforward agreement between the two joint venture partners.

89. Taking this evidence into account, I am not persuaded that there was any agreement with RAK Airways or RAKIA that the simulator would be valued at $1 million. I consider that the draft letter was probably created by Mr Adams to support the entry in the accounts but which did not accord with the true position.

**Backdated documents**

90. Following Mr Adams' submission of the preliminary balance sheet, on 19 March 2008 Mr P.B. Hegde, an employee in the Finance Department of RAK Airways, emailed Mr Adams requesting the provision of further documents concerning HeavyLift's investment in the training academy, including "Copy of the Agreement and Invoice for the purchase of Simulator from MK Airlines" and "Copy of the Agreement and Invoice for the purchase of Training Aids".

91. Mr Adams forwarded Mr Hegde's email to Mr Azima and stated: "Here is the email from Hegde. We need to have a clear strategy on this."

92. This request for documents prompted Mr Adams and Mr Azima to produce a number of backdated documents designed to provide support for the figures shown in the balance sheet in respect of the simulator and the training aids.

92.1 On 27 February 2008, Mr Adams sent an email to Mr Azima attaching several backdated documents. Mr Adams stated that the documents "requir[e] your signature" and he requested "color scans of each" once Mr Azima had signed them. The email made it clear that the documents were intended to be

backdated.

92.2    The backdated documents which Mr Azima was requested to sign included a "Bill of Sale from you to HeavyLift for the DC8 Training Aids." Mr Adams asked Mr Azima to "Please date this 31 December 2007 when you execute it". The "Bill of Sale" purported to show that Mr Azima had sold "DC8 training aids" to HeavyLift for "$10 and other good and valuable consideration" on 31 December 2007. In fact Mr Azima had not sold any training aids to HeavyLift on 31 December 2007.

92.3    On 27 February 2008, Mr Adams also drafted a letter from Mr Azima to Amir Anway (HeavyLift's Financial Controller) which was backdated to 31 October 2007 and which stated:

>   "I hereby confirm that additional consideration totalling $832,500 from me was part of the total consideration for the acquisition of the Singer Link DC8 Simulator from MK Airlines."

92.4    Mr Adams asked Mr Azima to sign and return the backdated letter. Two weeks later, on 11 March 2008, Mr Adams re-sent the letter to Mr Azima stating: "You may have already signed this but I did not get a copy of it. Hegde has asked to review all of the costs we have booked and I really don't want to be without some basis for booking the sim at $1,000,000 when he goes through the books. Please sign and give the original to Amir and send me a copy."

93.    I accept RAKIA's contention that the backdated letter was a misleading document. It was not written (or sent) on the date shown on its face and Mr Azima did not provide "additional consideration" of $832,500 (or any additional consideration) for the purchase of the simulator. Mr Adams accepted during cross-examination that this letter was backdated although he insisted that the document was not misleading, on the basis that it was perfectly acceptable to backdate accounting documents for an audit. Mr Azima made a similar statement in his evidence.

94.    Mr Adams was asked to explain why, if Mr Azima and RAK Airways had agreed that the simulator would be valued at $1 million, Mr Adams did not simply inform RAK Airways of this, rather than creating a backdated letter regarding the payment of "additional consideration". Mr Adams could not answer this, merely stating, "I don't know".

95.    Also on 22 March 2008, Mr Adams produced a backdated invoice which purported to show that Mr Azima had "SOLD" the simulator to HeavyLift on 31 October 2007 for a "UNIT PRICE" of $1 million and that HeavyLift had "advanced" the amount of $167,500 to Mr Azima with the result that HeavyLift owed $832,500 to Mr Azima. None of this information was true.

96.    Although none of these points are disputed by Mr Azima, he nevertheless asserts that the invoice was not misleading. In his witness statement, Mr Azima says that there "was nothing improper about this invoice" which "was intended to reflect the substantial value that had been added to the simulator (which was not operational at the

time it was acquired) by HeavyLift, my wholly owned company". It was submitted on behalf of Mr Azima that it was legitimate for Mr Azima to produce the invoice and book the $1 million value as this reflected the work and expertise contributed by Mr Azima.

97.    I disagree. If it was true that HeavyLift had done work which enhanced the simulator's value, the honest way of reflecting that increase in value would not involve the creation of a backdated invoice purporting to record a sale of the simulator from Mr Azima to HeavyLift that never took place.

## The valuation report

98.    On 3 March 2008 Mr Adams sent an email to Mr Azima stating: "I think we will get our $1MM capital value on the DC8 sim approved by the auditors but we will need a desktop valuation from Jeremy to confirm. Please can you arrange." Jeremy Leggett was an old friend of Mr Azima. Mr Azima replied a short while later copying in Mr Leggett, the owner of Aerospace Management Capital Limited ("AMCL") and stating: "Dear Jeremy, In your court!". Mr Leggett replied seven minutes later stating: "Fine just have ray advice [sic] what he needs exactly".

99.    Two days after that initial exchange, Mr Adams emailed Mr Leggett stating, "I think the installed and certified value should be in the $1.75MM-$2.0MM range. Need ASAP." Mr Leggett responded by copying in his son, Rupert Leggett, and asking him to "go on the internet and find out something about the simulator" because "we need to do a valuation for him and I need some story line".

100.   On 10 March 2008, Mr Adams emailed Mr Azima stressing that, "The valuation on the sim is going to be critical for the audit and also to give us fuel with Hegde. I am not sure he is our friend". Mr Adams' evidence was that the "fuel with Hegde" meant "To give him a basis on which we booked it".

101.   On 18 March 2008, Rupert Leggett emailed Mr Adams asking "what the revenues are like" for the simulator and adding that he hoped "to draw up something to a level which you are satisfied with". Mr Adams responded by providing revenue projections which bore no relation to the revenue actually generated by the simulator. On 19 March 2008, numerous alternative drafts of the simulator valuation were sent to Mr Azima and Mr Adams. The final valuation stated that the "Total Asset Value" of the simulator was $1,475,000.

102.   Mr Hegde's reaction was that the AMCL valuation was "quite unreasonable considering the age (exactly 40 years old) of the simulator, its condition and utilization in the next 6 years, Current market value of the same should not be more than $100,000 to $150,000, provided it is in a good condition, serviceable for another 6 years. Therefore, we would like to get this simulator re-assessed by some professional and reputable firms."

103.   It was submitted on behalf of Mr Azima that the appraisal provided by AMCL was independent and reliable, on the basis that:

103.1   The valuation given ($1.475 million) was materially lower than the range of values ($1.75-$2 million) that had been tentatively suggested by Mr Adams, confirming that the valuer exercised an independent judgment.

103.2   The valuer had regard to information provided about the simulator and to information on demand factors, including the substantial worldwide fleet of DC-8 aircraft.

103.3   It is unremarkable for a value to be estimated through an exchange of information between the valuer and the customer. As Mr Adams explained, appraisals of this nature are very common in the aviation industry.

103.4   The document on its face described itself as a "desktop valuation" so RAKIA's protracted cross-examination to the effect that there was something clandestine and suspicious about such an assessment was misconceived.

103.5   RAKIA has adduced no valuation evidence of its own to support a contention that a valuation of $1 million is exaggerated or unreasonable, still less that it was so artificial as to be a badge of fraud.

104.   Mr Adams relied on the valuation as the basis for a statement to PwC that the "simulator transferred during the year to the subsidiary in the revalued amount of USD 1,000,000 is valid and supported by the valuation report done by an independent assessor".

105.   In my judgment, the AMCL valuation was not independent or a reliable appraisal of the simulator's value. Jeremy Leggett was a friend and AMCL unquestioningly adopted Mr Adams' projections regarding the projected revenues and costs of the simulator. Mr Azima and Mr Adams were extensively involved in reviewing and proposing changes to drafts of the valuation.


**Training Aids Invoices**

106.   In support of the entry for $450,000 in respect of "Training Aids" in the 2008 accounts, Mr Adams produced a further backdated invoice which purported to show that Mr Azima had sold DC8 Training Aids to HeavyLift on 31 December 2007 for that amount.

107.   Mr Adams sent the draft invoice to Mr Azima, who responded with various suggested changes which appear to have been intended to make the invoice look as authentic and plausible as possible. Mr Adams made the requested changes later the same day.

108.   Mr Adams also created third party invoices which purported to show that HeavyLift had paid $450,000 to purchase training aids from Blosser Consulting on 31 December 2007. On 24 March 2008, Mr Adams sent an email to George Blosser stating: "Per your discussion with Farhad, here are 2 more invoices that he would like from you in order to clarify things. Please send marked "Paid" at your earliest convenience."

109.  Mr Azima and Mr Adams did not refer to the training aid invoices in their witness statement. In his oral evidence Mr Azima admitted that, contrary to the terms of the backdated invoices, neither he nor HeavyLift had made a specific payment of $450,000 to acquire training aids from Blosser Consulting but he claimed for the first time that training aids had been acquired as part of a larger transaction or package and that an unidentified person had evaluated the package and come up with a number which they inputted. When pressed on whom the alleged "package" had been purchased from, Mr Azima said that he could not remember but shortly afterwards, he claimed that he could now recall that the transaction was with Mr Blosser.

110.  Mr Azima acknowledged that on 31 March 2008 he drafted an email to a Mr Lopez enquiring about the possibility of purchasing training aids for the Training Academy JV. He was unable to explain why he had done this in circumstances where (on his case) HeavyLift had already purchased training aids from Blosser Consulting some three months earlier.

111.  Mr Adams, for his part, stated that, he knew nothing about an independent valuation of the training aids. Instead, he said that the figure of $450,000 "came off the invoice from George Blosser" i.e. the invoice that Mr Adams had requested Mr Blosser to produce and approve. In the light of this, Mr Adams was forced to concede that, insofar as HeavyLift's audited accounts were based on the representation that the training aids had been independently valued at $450,000, the accounts were based on a false premise.

112.  It was submitted on behalf of Mr Azima that Blosser's allocation of $450,000 was fair and reasonable and that RAKIA has failed to adduce any evidence to show that the training aids did not have a value of some $450,000 so it cannot make out a case based on the difference between cost and value.

113.  I do not accept that submission. RAKIA's case was that the accounts were misleading in so far as they represented that HeavyLift had actually paid $450,000 for the training aids when they had not in fact done so. It was not necessary for RAKIA to go on to establish that the value of the training aids was less than the represented cost.

114.  Following his request in the email of 24 March 2008 for a re-assessment of the value of the simulator by a professional and reputable firm, and further details of the training aids, to which there had been no response, Mr Hegde sent a further email as follows:

> "In the absence of any response to my below e-mail, we believe, you have no further clarification to our queries. This matter was referred to our Managing Director - Dr. Khater Massaad and he was apprised of the present condition of the Simulator. In view of the above, we do not wish to continue our partnership in this simulator."

**The PwC audit**

115.  There is an issue between the parties as to whether PwC audited the Training Academy JV as well as HeavyLift. An email dated 2 July 2015 from Ms Afsaneh Azadeh, a

longstanding close associate and senior employee of Mr Azima, records that, according to HeavyLift's auditor Mr Kadiri, there was no record of an audit of the joint venture ever having been carried out. However the audit document produced by PwC states in terms that the audit was conducted of the Training Academy JV for the year ended 31 December 2008, as well as of HeavyLift. I proceed on the basis that there was an audit of the Training Academy JV.

116.   It was contended on behalf of Mr Azima that PwC were made aware of, and were content with, the basis on which it was alleged that the simulator and the training aids had been supplied to the joint venture; that is, at a value that was agreed and then reflected in invoices rather than at the value of an acquisition cost paid out to third parties in arms' length transactions. This was said to be obvious from the fact that the PwC audit booked the value of the simulator and the training aids as arising from related party transactions.

117.   I do not accept this submission.  The fact that PwC booked the value of the simulator and training aids in the consolidated accounts for the year ended 31 December 2008 as arising from related party transactions does not mean that PwC was aware or agreed that those assets would be valued on a false basis. I am not satisfied that there was any agreement on the part of RAKIA or RAK Airways that the simulator would be valued at $1 million. The way in which Mr Azima and Mr Adams produced invoices for the simulator and training aids, which did not reflect the terms of an actual transaction, and the way in which the valuation report was presented as an independent report were not fair or reasonable, in my view.

118.   The fact that Mr Azima and Mr Adams had not behaved honestly towards RAK Airways and PwC is further confirmed by an exchange of emails concerning certain entries in the management accounts for the Training Academy JV. Mr Adams informed Mr Azima that paying $250,000 for generator rent and diesel was "a reasonable compromise if all of our financial engineering on the academy is accepted which it appears to have been". Mr Azima replied that he had no recollection of agreeing to this, to which Mr Adams responded: "We will agree to disagree. When you start believing our financial engineering we are in trouble. I think you need to change writers."

119.   In my view, RAKIA are justified in treating this exchange as an acknowledgment that Mr Azima and Mr Adams had presented false and misleading financial information about the Training Academy to RAK Airways.

**Conclusion**

120.   I consider that the way in which Mr Adams and Mr Azima accounted for HeavyLift's contribution to the joint venture, including the cost of the simulator and the training aids, in 2008 was not reasonable or honest.

**(2)      What was the content of the representations to RAKIA in 2013 to 2015?**

24

121.   RAKIA's case is that, through communications sent to RAKIA between September 2013 and November 2015, Mr Azima repeatedly represented that HeavyLift had invested a total of $2,685,000 into the Training Academy JV, which included expenditure of approximately $1,726,000 in respect of the flight simulator as described in the documents provided to RAKIA.

122.   It was submitted for Mr Azima as follows.

122.1   The interpretation of an alleged misrepresentation will depend on the context in which the statement is made. In *IFE Fund v Goldman Sachs International* [2006] 2 CLC 1043, Toulson J held (para 50): "In determining whether there has been an express representation, and to what effect, the court has to consider what a reasonable person would have understood from the words used in the context in which they were used. In determining what, if any, implied representation has been made, the court has to perform a similar task, except that it has to consider what a reasonable person would have inferred was being implicitly represented by the representor's words and conduct in their context."

122.2   The communications relied on by RAKIA set out the basis on which it was said that HeavyLift was entitled to be compensated for the termination of the Training Academy JV which had two aspects. The first aspect was RAK Airways' breaches of the Joint Venture Agreement. The second was HeavyLift's contributions to the joint venture which were not limited to the particular sums outlaid but reflected the total value of the various assets making up the training academy once installed and commissioned, including certain costs, and were understood as such at the time.

122.3   In the particular context of this negotiation, it would make no commercial sense for HeavyLift to limit its claim only to the amounts actually spent in relation to the JV. A party in HeavyLift's position would seek to be compensated for the value it had created and of which it had been wrongfully deprived by the other JV partner's breach, not simply for the amounts it had actually outlaid. This is particularly so given that RAKIA indicated that it would be too complicated to provide HeavyLift with its half share of the land and buildings that RAK Airways failed to contribute (Mr Buchanan's email of 14 November 2015).

122.4   The May 2015 Statement of Account enclosed with Mr Azima's email of 11 November 2015 referred to various items contributed by HeavyLift including the simulator, training aids, and other assets under the heading "Fixed Asset Investment". By contrast, other parts of HeavyLift's claim were explicitly labelled in this document as costs: "Staff & Related Costs from US Company".

122.5   Mr Buchanan understood the communications as referring to this concept of "value", not restricted to specific expenditures or costs as made clear in his email to Mr Azima of 14 November 2015. Moreover, it was clear to RAKIA from the communications in question that a substantial portion of the value attributed to the simulator and the training aids arose from related party transactions, as made clear in the HeavyLift accounts.

25

**The backdating of the Joint Venture Agreement**

123. Before considering the correspondence, it is necessary to refer to the production in 2013 by Mr Adams and Mr Azima of the backdated Joint Venture Agreement, shortly before HeavyLift launched its compensation claim. RAKIA does not contend that this document misstated the parties' legal obligations (including RAKIA's guarantee of RAK Airways' obligations). I infer that RAKIA has not been able to find an original joint venture agreement. RAKIA nevertheless submits that the fact that Mr Azima and Mr Adams created the document more than 6 years later and then gave untrue evidence about its genesis is relevant to an assessment of their credibility as witnesses.

124. The sequence of events was as follows:

124.1 On 23 May 2013 Mr Adams emailed Mr Azima an unsigned version of the Joint Venture Agreement which did not contain any reference to RAKIA having guaranteed RAK Airways' obligations. This was followed by two further versions emailed by Mr Adams on 27 May 2013 which likewise did not contain any reference to a guarantee. The third version was described by Mr Adams as the "Final clean copy" of the agreement.

124.2 On 10 June 2013, Mr Adams sent a revised (unsigned) version of the Joint Venture Agreement to Burlingtons LLP (Mr Azima's current solicitors) stating that Mr Azima "will call you…to discuss". This version of the Joint Venture Agreement did include a sentence that RAKIA consented to and guaranteed RAK Airways' performance.

124.3 On 14 July 2013, Mr Adams sent an email to Mr Azima attaching the version of the Training Academy Joint Venture Agreement which included the RAKIA guarantee.

124.4 On 24 August 2013, Mr Azima emailed Mr Adams: "Please email me RAK HL contract. My friend is here to……" . Dr Massaad, who by this time was no longer employed by RAKIA, was visiting Mr Azima's yacht in the South of France at the time.

124.5 On the following day Mr Adams re-sent the email of 14 July 2013 (and attachments) to Mr Azima.

124.6 Later that day, Mr Adams received an email from Kris Sabev, the Captain of Mr Azima's yacht, stating: "Dear Ray, attached is the Joint Venture Agreement signed by both sides." Attached to the email was a copy of the Training Academy JVA which contained the signatures of Mr Azima and Dr Massaad (who purportedly signed the document both on behalf of RAK Airways and on behalf of RAKIA).

125. In cross-examination Mr Azima and Mr Adams denied retrospectively drafting, amending and backdating the Joint Venture Agreement in 2013. Instead, they

26

claimed that Mr Azima was always in possession of a copy of the agreement that was signed on 12 April 2007, and that between May and August 2013 he had been asking Mr Adams to send him a series of drafts of the agreement so that he could make sure that what he had was consistent with this, in order to ensure that the signed copy he had was "the same one and there's no others in existence".

126.   According to Mr Adams, the revisions sent in 2013 had all occurred in 2007, rather than in 2013. He claimed that he was only in possession of "drafts" of the agreement, and that Mr Azima had asked him to send the drafts. He was unable to explain what conceivable purpose Mr Azima would have had in asking him to send several non-final and superseded drafts of an agreement of which (according to both men) Mr Azima already had a signed final version. When asked why he had described the version sent on 27 May as the "final clean copy" but had subsequently sent Mr Azima further amended versions of the agreement several weeks later (all of which Mr Adams claimed had been produced in 2007) Mr Adams replied unconvincingly that: "I was obviously in error".

127.   I consider that the explanations given by Mr Azima and Mr Adams of these communications made no sense and were untruthful. If Mr Azima had simply asked Mr Adams to send him "all" previous drafts of the agreement in his possession (as Mr Adams claimed), which is inherently unlikely, they would not have been sent over a period of nearly two months in an evolving sequence. Moreover if the drafts were really prepared in 2007 one would also expect to see them and emails exchanging them in 2007 in Mr Azima's disclosure. None of these documents were disclosed other than as attachments to emails in 2013.

128.   I agree with RAKIA's submission that the overwhelming inference from the documentary evidence is that Mr Azima and Mr Adams retrospectively drafted the Joint Venture Agreement in the summer of 2013. Mr Azima and Dr Massaad (who by then had no authority to enter agreements on behalf of RAKIA) then signed that retrospectively drafted and backdated document on board Mr Azima's yacht on 25 August 2013 and thereafter misrepresented to RAKIA that this document was the original document that had been signed on 12 April 2007.

**The correspondence**

129.   The relevant correspondence concerning HeavyLift's claim for compensation is as follows:

129.1   On 2 September 2013, Mr Adams sent a letter to RAKIA's then chief executive, Jim Stewart, claiming that RAKIA was contractually obligated to reimburse the substantial expenses that HeavyLift had incurred in performing its obligations in relation to the joint venture. Mr Adams stated as follows:

"A substantial investment was undertaken by HeavyLift on behalf of the joint venture. That investment includes, among other things:

1. Cash, training materials, and equipment of approximately $2,260,000 USD.
2. Staff and management time and related costs contributed by our US

company. [...]

… [D]ue to the failure of RAK Airways to provide its share of the joint venture investment, the amount HeavyLift has already disbursed needs to be repaid."

129.2   Mr Stewart replied the same day explaining that he was "not familiar with the agreement" and asking, "when the agreement was originally signed". Mr Adams replied by attaching a copy of what he claimed was "a copy of the 2007 Joint Venture Agreement" which had been produced and signed the previous week.

129.3   On 2 October 2013, Mr Azima sent an email to the Ruler concerning the Training Academy JV. The email began: "I am not sure how to bring an unresolved business matter to your Highness as I never have before". This statement contradicts Mr Azima's claim that he spoke with the Ruler about the joint venture in 2010 and supports the Ruler's denial that any such conversation took place. The email made no reference to an alleged agreement with RAK Airways regarding the value of HeavyLift's investment in the Training Academy joint venture.

129.4   In June 2015 Mr Azima introduced Ms Azadeh to RAKIA to present his position on HeavyLift's claim for compensation. On 13 June 2015, Mr Buchanan met with Ms Azadeh and made it clear that RAKIA was willing to investigate HeavyLift's claim to ensure a fair outcome.

129.5   According to Mr Adams' witness statement, following that meeting, he was asked by Mr. Azima to provide additional information and documentation requested by Mr. Buchanan on behalf of RAKIA to assist them with quantifying the amount which they would be "reimbursing" HeavyLift for its involvement in the joint venture.

129.6   By an email sent on 14 June 2015, Mr Buchanan requested detailed information and records concerning the project including various "Financial records, asset register and reports". In particular, he requested amongst other things (a) "financial records that back up the Statement of Account and show all investments made by HeavyLift into or on behalf of the JV, including date, account details etc"; and (b) "details of the assets owned or held/used by the Training Academy JV to the extent not already forming part of the financial data". Mr Buchanan also asked: "More generally, what (if any) information can you provide about RAK's actual contribution [to] the joint venture in financial terms?".

129.7   On 6 July 2015, Ms Azadeh sent a letter from Mr Adams to Mr Buchanan which stated that prior to the termination of the Training Academy JV "HeavyLift had already invested $2.5 million." The letter further stated that while hard copies of the Training Academy JV's audited accounts for 2007 and 2008 were not available, an extract from the "Director's Report and Balance Sheet Signature page" showed that as of 31 December 2008 the "Total Investment by

HeavyLift" in the Training Academy Joint Venture was\$2,582,881, which included a "Capital Contribution" of \$1,000,000, "Share Capital" of \$40,000 plus a further investment of \$1,542,881 "Due to Related Parties ".

129.8 The letter enclosed HeavyLift's audited accounts for 2008. The notes to the accounts explained in relation to "Property, plant and equipment" that: "Property, plant and equipment are stated at cost less accumulated depreciation. The cost of property, plant and equipment represents the purchase cost together with any incidental expenses of acquisition". The notes also stated that a total of \$1,282,500 attributable to the value of the simulator and the training aids arose from related party transactions on prices agreed between the parties.

129.9 On 9 August 2015, Mr Buchanan sent an email to Ms Azadeh which explained that, "we need to identify relevant records, such as emails, documents and financial information" in order to "consider your points properly". He added that it would be helpful "if you set out your claims against RAK Airways in greater detail and provided evidence to support those claims".

129.10 On 9 October 2015, Mr Azima sent an email to Mr Buchanan (copied to Ms Azadeh) regarding HeavyLift's claim. In that email he stated, "Our costs were \$2.6MM which we have documented for RAK more than once".

129.11 On 21 and 27 October 2015, Mr Buchanan sent further emails to Ms Azadeh in which he explained that he was compiling various "questions" regarding HeavyLift's contribution to the Training Academy JV which were intended to identify "what may be due" and to "assess the value of amounts owing, if any" to HeavyLift arising from the termination of the Training Academy JV.

129.12 On 29 October 2015, Mr Buchanan sent an email to Mr Azima which contained a timeline of events concerning the Training Academy JV and referred to Mr Azima's previous statements that HeavyLift was entitled to approximately \$2.5m. Mr Buchanan asked Mr Azima to identify the basis of the claims with reference to the Joint Venture Agreement, including details of the particular provisions of the Joint Venture Agreement which were said to have been breached and the losses caused by those breaches.

129.13 On 10 November 2015, Mr Buchanan emailed Mr Azima seeking clarification of "the basis on which you calculate the compensation due to you". He added:

"It might be easier for me to work on a compensation package if I had details of the monies actually spent by HeavyLift Airline on the training academy project. This would need to be evidenced so that our lawyers/ internal audit could look at it (apologies for that - you know what lawyers are like!). If that is not too inconvenient perhaps you could let me know."

129.14 On the same day (10 November 2015), Mr Azima forwarded to Mr Buchanan an email from Mr Adams attaching a number of documents referring to an investment of \$2,260,000 by HeavyLift under the Joint Venture Agreement and attaching various documents purportedly evidencing that investment

including a statement of account dated 31 May 2015 to the effect that HeavyLift had made a total fixed asset investment of $2,260,000 of which $1,726,000 had been paid in respect of "Simulator (including installation & certification)", training aids in the sum of $450,000 and a further investment of $425,000 in the form of "Staff & Related Costs from US Company".

129.15   On 11 November 2015, Mr Azima sent an email to Mr Buchanan which contained several references to the amount of money that HeavyLift had invested in the Training Academy JV. The email stated: "Total Loss per Statement of Account = $2,260,000 + $425,000 = $2,685,000". A number of documents were attached to the email purportedly supporting these figures.

129.16   On 14 November 2015, Mr Buchanan emailed Mr Azima again in the following terms, stating that he had reviewed Mr Adams' email and was authorised to verify the various valuations referred to in the email. "My team is working on this as a matter of priority, but it would help me greatly if you could confirm what you believe to be the $ value of HLI's claim. This will ensure I am targeting the right number In relation to valuations, and given your extensive experience in the aviation sector, I would be grateful for your thoughts on the current value of the simulator. I understand this was the largest single asset that HLI contributed to the training academy. Is there a market for these simulators? If so, we would like to enlist your help in finding a suitable buyer."

129.17   Mr Buchanan went on to address the claim for compensation for loss of the Academy building. He noted that he was having difficulty justifying this claim internally, adding that any failure to contribute the land was the basis for considering compensation to HeavyLift for the amounts it contributed to the joint venture, including the additional management time cost/expense noted in Mr Adams' email but that including the building would introduce additional complexity and delay and there was no material to support the $5 million value attributed to the building by Mr Adams.

129.18   Mr Azima replied the same day expressing his disappointment at Mr Buchanan's email. Later that day Mr Buchanan replied by email explaining that his objective was to seek a settlement of this matter after reviewing the legal and moral position and then quantifying the claim:

> "I am sure you appreciate that I need to be able to formally justify the value which you place on your claims? It will assist me greatly if you can place a $ value on your claim, let me know how you arrive at your figure and provide the evidence and justification for it. I need your estimate of loss - what you have suffered. Without this how can I know I am targeting the right number? This should not be a time consuming process. I am looking to progress the matter in a timely manner and in the spirit we discussed but will need your help."

129.19   On 15 November 2015 Mr Azima sent an email stating as follows:

> "I couldn't help but laugh when I read your last sentence! Timely matter!

You set the deadline in September. 53 days later the optimism lives on! I have stated clearly, this is not a legal issue to be disputed, facts are sitting at RAK airport. The claim in 2 parts, first is based on what has been spend to create the training academy. Second the unfulfilled commitment of RAK. First part is clear, you have the records. The Building, it is there.... We can talk about it."

129.20   On the same date, Mr Adams sent an email to Mr Buchanan which stated that the clam was in two parts, as follows:

"1. Part 1 of the claim is for 50% of the value of the land and building at the airport. We have estimated the value because we do not know the cost or the current market value.

2. Part 2 is for our net investment in the assets of the Academy due to the failed performance on the part of RAK Airways. We have not added on any intangibles such as loss of profit. We have previously provided documentation for this portion of the claim totalling USD $2,685,000."

**Conclusion**

130.   The central issue is whether the communications sent to RAKIA in the period 2013 to 2015 concerning HeavyLift's claim for compensation are to be construed as representations as to the amounts actually expended by HeavyLift or whether they should be construed more loosely as referring to valuations of HeavyLift's contribution to the joint venture.

131.   I have come to the conclusion that the communications did amount to a representation that HeavyLift had actually spent a total of $2.685 million in making its contribution to the Training Academy, including expenditure of approximately $1.726 million in respect of the flight simulator.

132.   This is for the following reasons:

132.1   The communications from Mr Azima, Ms Azadeh and Mr Adams consistently refer to investments by HeavyLift in the sense of money actually spent by HeavyLift. For example:

(a)   The first letter in the sequence dated 2 September 2013 stated that HeavyLift was seeking to be compensated for its "investment" including $2,260,000 on cash training materials and equipment. The ordinary meaning of "investment" in an asset is the spending of money to purchase the asset. This construction is reinforced by the later reference to the need to repay the amount "disbursed" by HeavyLift.

(b)   Similarly the letter dated 6 July 2015 from Ms Asadeh refers to an "investment" by HeavyLift of $2.5 million in the Training Academy.

31

The enclosed audited accounts for 2008 stated that the property, plant and equipment were stated at cost less accumulated depreciation. The explanation in the notes about related party transactions made clear that the prices were agreed. It did not suggest that the prices had not been paid.

(c)   Mr Azima's email of 9 October 2015 referring to "our costs of $2.6 million" is a clear representation that the sum of $2.6 million had been spent by HeavyLift.

(d)   Mr Azima's email of 15 November 2015 referring to the claim in respect of the amounts "spent" on the Training Academy JV.

(e)   Mr Adams' email of the same date referring to HeavyLift's "net investment" in the assets of the Training Academy JV "totalling USD $2,685,000."

132.2   The fact that the May 2015 Statement of Account enclosed with Mr Azima's email of 11 November 2015 referred to various items contributed by HeavyLift including the simulator, training aids, and other assets under the heading "Fixed Asset Investment", in contrast to another head of claim being "Staff & Related Costs from US Company" does not assist Mr Azima. The reference to "costs" does not displace the ordinary meaning of "investment".

132.3   Mr Buchanan's emails read as a whole make clear that RAKIA was interested in determining the amount actually spent by HeavyLift, for example his email of 10 November 2015 in which he asked for details of the "monies actually spent". The references by Mr Buchanan to "value" or "valuation" do not affect this conclusion. Whilst a claim for compensation could have been advanced on the basis of value, that was not how the claim was in fact advanced or how it was requested.

132.4   The fact that the compensation claim was advanced on two fronts (by reference to compensation for wrongful termination as well as in respect of HeavyLift's outlay or investment) did not entitle HeavyLift to misstate the amount of its investment or to displace the clear meaning of the statements as to the amount invested.

133.   In short, the relevant statements expressly referred to the amount of HeavyLift's "investment", "substantial investment", "total investment" and "net investment" in terms that were clearly a representation about the total costs that HeavyLift had incurred through its contribution to the Training Academy JV, not the value of its contribution.

**(3)      Which party made the representations?**

134.   RAKIA's case is that the HeavyLift Investment Representation was made by Mr Azima (and individuals acting on his behalf). Although only one of the communications pleaded by RAKIA was actually sent by Mr Azima (namely, the

email dated 10 November 2015 referred to at paragraph 129.14 above) RAKIA contends that the pleaded communications collectively constituted a single representation made by Mr Azima. In support of this case, RAKIA contends as follows:

134.1 Mr Adams and Ms Azadeh are longstanding close associates of Mr Azima who were clearly acting on his behalf at the relevant time. In particular Mr Adams confirms in his witness statement that following the meeting on 13 June 2015, "I was asked by Mr Azima to provide additional information and documents requested by Mr Buchanan" and that he subsequently did so "[i]n accordance with this request."

134.2 During the course of the exchanges summarised above, Ms Azadeh and Mr Adams sent emails from their personal and/or Aviation Leasing Group email addresses, rather than from HeavyLift email addresses.

134.3 The communications were made in the course of settlement negotiations with RAKIA that were intended to, and which did in fact, result in the conclusion of a Settlement Agreement expressly recording that HeavyLift's claim was advanced "through Mr Azima", which resolved "all claims which Mr Azima" may have against RAKIA or any other RAK Entity, contained an express warranty and representation concerning Mr Azima's conduct towards RAKIA and which was signed by Mr Azima both on behalf of HeavyLift and on his own behalf as a party.

135. In response, Mr Azima contends as follows:

135.1 RAKIA's case that the communications were sent "on behalf of" Mr Azima is at odds with the content of the communications themselves which indicate that they were sent on behalf of HeavyLift. All the communications (including the one sent by Mr Azima) concern a claim by HeavyLift not Mr Azima. The claim relates to a joint venture to which HeavyLift (and not Mr Azima) was a party and the Settlement Agreement entailed a payment by RAKIA which was described by the Settlement Agreement as being a payment to HeavyLift (not to Mr Azima).

135.2 The communications which initiated the claim were not sent by Mr Azima and were explicitly made on behalf of HeavyLift, not Mr Azima:

(a) The first communication is a September 2013 letter on HeavyLift letterhead, signed by Mr Adams in his capacity as the CFO of HeavyLift over his HeavyLift email address. It refers to HeavyLift's investment and HeavyLift's conduct during the Joint Venture. That letter also makes clear that the claim was being made in light of the need to wind up HeavyLift's affairs.

(b) The second communication is, again, a letter of July 2015 on HeavyLift letterhead (emailed by Ms Azadeh), signed again by Mr Adams as the former CFO of HeavyLift, describing HeavyLift's investments.

(c)   The remaining communications then continued in the same vein.

135.3   Whether Mr Adams and Ms Azadeh were associates of Mr Azima is beside the point. Their communications were on their face sent by and for HeavyLift, for which both those individuals worked.

135.4   Reference to the range of corporate and personal email addresses used does not establish that either individual was acting for Mr Azima. Moreover, Mr Adams also used his HeavyLift email address in the first communication, and his title as HeavyLift's CFO in both of the letters he sent.

135.5   The identity of the parties to the ultimate Settlement Agreement does not bear on the identity of the party on whose behalf the communications were sent. HeavyLift was in any event also a party to the Settlement Agreement.

135.6   Mr Buchanan, with whom the negotiations were conducted, rightly characterised the representations made to him as being by and on behalf of HeavyLift, not Mr Azima.

136.   In my judgment, Mr Azima's contention that the HeavyLift Investment Representation was made by HeavyLift and not by him personally is artificial and lacking in substance.

136.1   It is clear that Mr Azima was the driving force behind the claim for compensation. The communications made by Mr Adams and Ms Azadeh were made with his knowledge, authorisation and approval.

136.2   The Settlement Agreement itself records that the claim that RAK Airways was liable to pay compensation was advanced "through Mr Azima", thereby underscoring Mr Azima's responsibility for the communications made in connection with the compensation claim and reflecting his role as its proponent. The original draft of the Settlement Agreement did not even include HeavyLift as a party since, as Mr Buchanan explained in his evidence, HeavyLift no longer existed, having been struck off the register of Sharjah free zone companies in April 2013.

136.3   Mr Azima's evidence was that HeavyLift ceased operations in 2011 and it was an uncontested fact that HeavyLift was struck off the register of Sharjah free zone companies in April 2013. In a later email dated 29 October 2015, Mr Adams was asked what effect, if any, HeavyLift being non-operational had on the claim. Mr Adams' replied on 5 November 2015 that Mr Azima was entitled to claim compensation under clause 6 of the Joint Venture Agreement on the basis that he was a shareholder, successor or assignee of HeavyLift. This answer is inconsistent with Mr Azima's case that the representation was made by HeavyLift, rather than him.

136.4   Mr Azima had been the sole shareholder of HeavyLift. During his oral evidence Mr Azima emphasised that he and HeavyLift were effectively synonymous for

34

the purposes of dealings with the Training Academy JV, ("It's said by HeavyLift, but I am HeavyLift").

137. I conclude that the HeavyLift Investment Representation was made on behalf of Mr Azima.

### (4)   Was the HeavyLift Investment Representation false?

138. RAKIA's case is that, contrary to Mr Azima's representations to RAKIA in 2015 that the simulator had cost HeavyLift upwards of $1 million, HeavyLift in fact acquired the flight simulator in 2006 for just $167,500 as evidenced by the signed sale agreement with MK Airlines dated 7 August 2006 and the email from amir@HeavyLift.com to Mr Azima dated 10 June 2007 which contained a table stating that the "Cost of DC8 Simulator (MK Airlines)" was "[$]167,500".

139. Mr Azima contends that it would then be necessary for RAKIA also to prove that the out of pocket costs actually incurred by HeavyLift on the simulator and training aids were less than represented.

140. I disagree. The communications regarding the simulator were clearly referring to the cost of the simulator itself, rather than the costs of the simulator plus ancillary services or equipment. In any event, the costs in respect of equipment and services provided in connection with the installation of the flight simulator fail to support a claim that the costs of acquiring and installing the simulator were more than $1.7 million. For example, according to an email sent to Mr Azima on 10 June 2007, in addition to the "Cost of DC8 Simulator (MK Airlines)" of "$167,500.00" HeavyLift had incurred total costs (including the cost of acquiring the simulator) in the sum of $291,788.78. In contrast, according to HeavyLift's preliminary accounts for the year ended 31 December 2007, HeavyLift had spent a total of $725,959 in respect of all simulator freight and storage charges, outside contractors, salaries and benefits, travel and accommodation charges, legal and administrative charges (more than $185,000 of which was charged by HeavyLift itself in respect of its management time), licences and permits, simulator parts and supplies and supervision. On this basis, HeavyLift spent a maximum of $893,459 on the simulator, about half the amount represented to RAKIA.

141. Accordingly, even taking into account the costs of ancillary services and equipment, the total costs incurred in relation to the installation of the flight simulator were nowhere near the amount represented to RAKIA by Mr Azima.

142. Furthermore, it is now common ground that HeavyLift did not make a payment of $450,000 in respect of training aids. There is in fact no evidence that HeavyLift incurred any expenditure on this.

### (5)   Was Mr Azima aware that the HeavyLift Investment Representation was false?

35

143. Mr Azima must have been aware that the HeavyLift Investment Representation was false. Mr Azima had at all material times been a director of both HeavyLift and RAK-HeavyLift Training Academy FZ-LLC. In his evidence he confirmed that throughout the operation of the Training Academy "Mr Adams…always…sen[t] me a copy of everything". As a result, he knew what expenditure HeavyLift had incurred through its investment in the Training Academy JV. Mr Azima therefore knew that HeavyLift's expenditure on the joint venture was nothing like the amounts represented to RAKIA in 2015 and 2016.

144. Mr Azima knew in particular that the simulator had been purchased by HeavyLift from MK Airlines for just $167,500 and that he had not personally paid anything towards the cost of its acquisition. He therefore knew that the simulator had not cost $1 million to acquire and was aware that the total costs of acquiring, installing and certifying the simulator were nowhere near $1.726 million.

145. Third, Mr Azima knew that the invoices from him in the sum of $1 million for the simulator and $450,000 for the training aids had been backdated and did not reflect actual purchases. It is noteworthy that none of these invoices were supplied to RAKIA during the 2015 negotiations.


**(6)      Did RAKIA rely on the HeavyLift Investment Representation?**

146. In order to succeed with its claim for misrepresentation, RAKIA must establish that it relied on the relevant representation.

147. RAKIA's case on reliance is as follows:

147.1   It agreed to pay $2.6 million to HeavyLift on the basis that RAKIA had an obligation to compensate Mr Azima and HeavyLift for the amount of money they had spent in contributing to the Training Academy JV.

147.2   As a result of the representations made by and on behalf of Mr Azima, Mr Buchanan believed HeavyLift's financial statements to be true and that it had spent a total of approximately $2.6 million on its contribution to the Training Academy JV. As a result, he formed the view that RAKIA should enter the Settlement Agreement and pay the settlement sum in that amount. Mr Buchanan confirms that, "in making the payment to HeavyLift, RAKIA was seeking to compensate HeavyLift for the amount RAKIA understood had actually been spent on the Training Academy JV".

147.3   RAKIA's reliance on the truth of the information provided by Mr Azima regarding the amount of HeavyLift's investment in the Training Academy JV was also reflected in the contemporaneous correspondence. For example:

(a)   In an email to Ms Azadeh dated 14 June 2015, Mr Buchanan explained that, "our understanding of the arrangements for the RAK- HeavyLift Training Academy is limited to information provided by you during yesterday's meeting, including a letter dated 2 September 2013 from Ray

Adams to Jim Stewart. None of those involved in the original arrangements remain in RAK, and some of the RAK companies that appear to have been involved have been restructured".

(b) On 9 August 2015, Mr Buchanan sent an email to Ms Azadeh which explained that there were significant "difficulties in identifying and assessing information that might enable us to respond properly to the issues you have raised". Given the difficulty in locating relevant records, Mr Buchanan therefore requested Ms Azadeh to "set out your claims against RAK Airways in greater detail and provide evidence to support those claims".

147.4 Mr Azima's assertions that the inducement requirement is not made out because RAKIA entered into the Settlement Agreement "for purposes unconnected to the settlement of the claim" and because it had reached an "internal evaluation…that Mr Azima was acting against RAKIA, and fraudulently" is incorrect.

147.5 If a misrepresentation is of such a nature that it would be likely to play a part in the decision of a reasonable person to enter into a transaction it will be presumed that it did so unless the representor satisfies the court to the contrary; *Dadourian v Simms* [2009] EWCA Civ 169.

148. Mr Azima denies that RAKIA has established reliance. He submits as follows:

148.1 The evidence at trial established that the decision to enter the Settlement Agreement was taken by the Ruler, not by Mr Buchanan or the board of RAK Dev or the board of RAKIA. Mr Buchanan's evidence established that his function was to make a "recommendation" and the actual power to decide rested with the Ruler. His oral evidence confirmed clearly that entry into the Settlement Agreement was the Ruler's personal decision:

"Q. And it's right, isn't it, that the decision to enter into the settlement agreement was taken on behalf of RAKIA by the Ruler? A. That is correct. Q. It wasn't taken by you, was it? A. That is correct."

148.2 Mr Gerrard's evidence was similarly that the Ruler was the "ultimate authority in RAK" and "if RAKIA was to undertake a course of events that he didn't approve of" it "wouldn't necessarily happen."

148.3 Mr Buchanan also confirmed that he did not know the Ruler's reasons for entering into the Settlement Agreement:

"Q. Thank you. You are not in a position, are you, Mr Buchanan, to give evidence as to what the Ruler may have -- what may have influenced the Ruler into entering into the settlement agreement in March 2016? A. No, I'm not."

148.4 There is no evidence that the Ruler had regard to or relied on the alleged representation by Mr Azima as to the contribution made by HeavyLift into the Training Academy. Nor does the Ruler suggest that he relied on Mr

Buchanan's consideration of that alleged representation.

148.5   There is no evidence that the Ruler placed any reliance on the alleged representation that HeavyLift had spent certain amounts on the joint venture. There is no reference to this in the Ruler's witness statement and the letter seeking the Ruler's approval also makes no reference to the alleged representations by Mr Azima as to the amount of HeavyLift's investment in the joint venture.

148.6   Neither RAK Development nor RAKIA itself approved entry into the Settlement Agreement through a decision of the board of either company.

148.7   RAKIA entered the Settlement Agreement for ulterior motives and in bad faith in order to use it to keep Mr Azima onside in its negotiations with Dr Massaad.

**Conclusion on reliance**

149.   In order for RAKIA to succeed with its claim for damages for misrepresentation, it must establish a causal link between the representation and the decision to enter the Settlement Agreement. It is not necessary to prove that the misrepresentation was the sole or even predominant cause of the decision to enter the contract but it is necessary to show that misrepresentation contributed to the decision to contract; *Edgington v Fitzmaurice* (1885) 29 Ch D.

150.   The evidence establishes that Mr Buchanan relied on the HeavyLift Investment Representation in deciding that RAKIA should enter the Settlement Agreement. The payment of $2.6 million to resolve all claims which Mr Azima or HeavyLift may have against it or any other RAK entity was calculated by him as the amount of HeavyLift's total investment in the Training Academy JV, as represented by Mr Azima. Mr Buchanan was unable independently to verify what, if anything, was properly owing to Mr Azima, "The fact that Mr Azima was willing to stand behind the figures on which he was basing the claim was reassuring". As a result, Mr Buchanan "believed this payment [of $2.6 million] would fully reimburse HeavyLift and Mr Azima for the amount they had put into the Training Academy JV".

151.   Mr Buchanan then recommended to the Ruler that RAKIA should enter the Settlement Agreement. It is a reasonable inference, in my judgment, that in deciding to enter the Settlement Agreement the Ruler was acting on the basis of Mr Buchanan's recommendation. The fact that, as stated in his witness statement, the Ruler wished to enter the Settlement Agreement in order to settle the claims brought by Mr Azima and to obtain assurance from him that he had acted in good faith towards RAKIA and RAK does not mean that he was not also acting on the basis of the recommendation.

152.   The fact that the Ruler was not personally aware of the HeavyLift Investment Representation does not negate the reliance placed on the representations by RAKIA via Mr Buchanan. If a misrepresentation is made to an agent who relies on it to make a recommendation to the decision-making principal but does not pass the representation on, the principal will nevertheless be entitled to relief for misrepresentation; see *Chitty on Contracts* 33rd Edition, paragraph 7-032; *Brown v InnovatorOne Plc* [2012] EWHC

1321 at paragraph 885; *OMV Petrom v Glencore International AG* [2015] EWHC 666 at paragraph 139.

153.   For reasons set out below in relation to the hacking claim, I was not persuaded that RAKIA entered into the Settlement Agreement for ulterior motives, negating reliance on the HeavyLift Investment Representation.

154.   In short, the evidence establishes that RAKIA did rely on the HeavyLift Investment Representation.

**(7)   Loss**

155.   Mr Azima contends that, to the extent that RAKIA's contention of a misrepresentation is upheld, the damages to which it is entitled should be limited to the difference between the costs that the Court finds HeavyLift did incur, and the level of costs that the Court finds were represented as having been incurred.

156.   The victim of a fraudulent misrepresentation is entitled to be put in the position it would have been in had the misrepresentation not been made (*Doyle v Olby (Ironmongers) Limited* [1969] 2 QB 158). On this footing, I consider that RAKIA would be entitled to total damages of $2.6 million. This is on the basis that, had Mr Azima not fraudulently misrepresented the total cost of HeavyLift's investment in the Training Academy JV then RAKIA would not have entered into the Settlement Agreement and paid the sum of $2.6 million to Mr Azima in the erroneous belief that this equated to the costs actually incurred by HeavyLift in making that investment. Even assuming in Mr Azima's favour that damages should be calculated on the different basis he contends for, Mr Azima failed to establish what the actual incurred costs were. However, in its closing submissions RAKIA limited its damages claim to what it says it would have been prepared to pay, had the true position with regard to HeavyLift's expenditure been explained and that it would therefore give credit for the sums of $700,000 and $167,000 in respect of that expenditure. On the basis of this concession, the damages payable are $1,733,000 ($2.6 million less $867,000).

**Conclusion on the HeavyLift Misrepresentation Claim**

157.   It was submitted on behalf of Mr Azima that RAKIA had failed to adduce cogent evidence commensurate with the seriousness of the allegation of fraudulent misrepresentation and that, in seeking to prove its case, RAKIA should not be permitted to take advantage of deficiencies in documentation as it failed to ensure that the joint venture's records, which were left at the premises of RAK after the termination of the joint venture, were properly maintained.

158.   I am satisfied that the evidence relied on by RAKIA in support of its fraud claim is sufficiently cogent and that RAKIA did not take unfair advantage of a failure to maintain the joint venture's records (assuming in Mr Azima's favour that RAKIA was under a duty to so) in advancing the claim.

159.   I therefore conclude that Mr Azima is liable to RAKIA in the sum of $1,733,000 by way of damages for fraudulent misrepresentation in respect of the HeavyLift Investment Misrepresentation.

## The Good Faith Misrepresentation Claim

160.   RAKIA submitted as follows.

    160.1   By agreeing to Clause 3.2 of the Settlement Agreement Mr Azima represented to RAKIA, in order to induce it to enter into the Settlement Agreement, that he had at all times acted in good faith and with the utmost professional integrity in his dealings with RAKIA or other RAK Entities ("the Good Faith Representation");

    160.2   In entering into the Settlement Agreement, and in paying the settlement sum of $2.6 million to HeavyLift, RAKIA expressly relied upon the Good Faith Representation;

    160.3   In fact, by reason of Mr Azima's wrongful conduct, the Good Faith Representation was false;

    160.4   The Good Faith Representation was made by Mr Azima knowing that it was false;

    160.5   As a result of Mr Azima's fraudulent misrepresentation, RAKIA has suffered loss.

161.   Mr Azima's response is, in summary, as follows.

    161.1   Clause 3.2 of the Settlement Agreement does not constitute a representation;

    161.2   The allegations of wrongdoing are denied;

    161.3   Mr Azima's conduct was not contrary to the Good Faith Representation;

    161.4   RAKIA did not rely on the Good Faith Representation and so did not suffer loss.

162.   The Good Faith Misrepresentation Claim therefore gives rise to the following main issues:

    162.1   Does Clause 3.2 of the Settlement Agreement constitute a representation?

    162.2   Are the allegations of wrongdoing established?

    162.3   Was the alleged wrongdoing contrary to the Good Faith Representation?

    162.4   Did RAKIA rely on the Good Faith Representation?

**(1)    Does Clause 3.2 of the Settlement Agreement constitute a representation?**

163.   Mr Azima denies that Clause 3.2 is a representation. In particular, he contends that:

163.1   Clause 3.2 of the Settlement Agreement "does not use the words "representation", "represents" etc, which would have been used if it had been intended to constitute a representation".

163.2   Clause 3.2 "purports to apply to Mr Azima's and HeavyLift's future actions, yet a person cannot validly or sensibly make a non-contractual representation about matters which have not yet occurred".

164.   I reject this submission. There is no requirement for a factual statement to expressly utilise the terminology of "representation", "represents" etc. in order to constitute a representation for the purposes of the law of misrepresentation. Clause 3.2 of the Settlement Agreement stated that Mr Azima "expressly…warrants and confirms" and that the payment to HeavyLift was made "in reliance on this express warranty and confirmation".

165.   I accept RAKIA's submission that the addition of the words "and confirms" and "and confirmation" after "warrants" and "warranty" makes it clear that in addition to providing a contractual warranty, Mr Azima was also making a representation of fact regarding his past conduct and his current intention with respect to his future conduct. The existence of a representation is also demonstrated by the statement that the payment to HeavyLift "is made in reliance on" the "warranty and confirmation". If there were only a warranty and no representation, then the words "made in reliance on" would make no sense since "reliance" is relevant only to tortious, rather than contractual, liability. The reference to "reliance" suggests that that Mr Azima had made a representation as well as a contractual warranty.

**(2)    Has RAKIA proved the alleged wrongful conduct of Mr Azima?**

166.   The wrongful conduct alleged by RAKIA is that Mr Azima:

166.1   falsely claimed to have introduced the buyers of the Hotel to RAKIA;

166.2   fraudulently procured RAKIA to pay the sum of $1,562,500 in purported consideration for non-existent referral services by Mr Azima in connection with the sale of the Hotel, and fraudulently created a sham Referral Agreement intended to conceal that misappropriation and the payment of a bribe of half a million dollars to Dr Massaad, in connection with the sale of the Hotel;

166.3   entered into a dishonest secret commission arrangement, which would have enabled Mr Azima to obtain an interest in the Hotel worth more than $6 million in exchange for a nominal payment of ten dollars;

166.4   played a central role in a planned media campaign aimed at maliciously

41

denigrating the Ruler and other entities and persons in RAK;

166.5 made and/or failed to correct various fraudulent misrepresentations in the course of negotiations concerning the Proposed ISR JV, which were designed to enable Mr Azima and his associates to misappropriate approximately $20m from RAKIA;

166.6 made fraudulent misrepresentations regarding the total costs that HeavyLift had incurred through its contribution to the Training Academy JV, which were designed to induce RAKIA to pay a far larger amount in respect of those costs than HeavyLift had actually incurred.

167. I have already addressed the sixth allegation. The remaining five allegations are addressed in turn below.

**(a)  Did Mr Azima falsely represent to RAKIA that he had introduced the prospective purchasers of the Hotel to RAKIA?**

168. Mr Azima's account in his witness statement of how he came to introduce the Potential Buyers to the Hotel transaction was as follows:

"79. In or around 2010, after Sheikh Saud became ruler of RAK, Dr Massaad told me that the Sheikh was under pressure to liquidate foreign assets and to invest in RAK to improve RAK's economic situation. This was later confirmed to me by Sheikh Saud himself at a subsequent meeting. Dr Massaad asked if I could assist with the sale of a number of overseas assets owned by RAK, including the Sheraton Metachi Palace Hotel in Tbilisi ("the Hotel") and the Poti Free Zone. I understood this to be the implementation of the Sheikh's wishes.

80. I was told the minimum price that would be accepted for the Hotel ($50,000,000) and asked to introduce potential buyers. Dr Massaad said I would receive a 5% commission from the gross sale price plus 50% of any amount in excess of US $50,000,000.

81. 1 had previously met with three individuals (Houshang Hosseinpour, Pourya Nayebi and Amir Farsoodeh) in Istanbul, Turkey in around August 2011 to discuss the possibility of helping them to establish an airline in Georgia. They had approached me to assist in this regard because of my expertise and reputation in the airline industry. However, this venture did not ultimately proceed because terms could not be agreed.

82. Mr Hosseinpour subsequently contacted me in September 2011 and asked if HeavyLift was for sale. It was around this time that he also introduced me to Houshang Farsoodeh, Amir Farsoodeh's brother. Ultimately, Mr Hosseinpour signed a contract to purchase a portion of RAK Trans Holding FZ LLZ's shares in HeavyLift. However, he defaulted on the share sale agreement and the shares were therefore not transferred.

83. After I was asked to help find buyers for the Hotel, I thought of Mr Hosseinpour, Houshang Farsoodeh and Mr Nayebi ("the Potential Buyers") as candidates. I met with Houshang Farsoodeh and Mr Hosseinpour in Dubai (I met with Mr Nayebi later on as he lived in Georgia). I suggested that they consider buying the Hotel as it would allow natural vertical integration with their intended airline business. They confirmed to me that they were interested. We had several follow-up meetings to discuss various aspects of the sale.

84. I subsequently introduced Mr. Hosseinpour and Houshang Farsoodeh to Dr Massaad in RAK. I then accompanied them on a trip to Tbilisi, Georgia to show them the Hotel and introduce them to various people there, including Gela `ZaZa' Mikadze, the CEO of Ras Al Khaimah Investment Authority Georgia LLC ("RAKIA Georgia"), the company through which RAKIA owned the Hotel. Mr Mikadze showed us the Hotel and provided the Potential Buyers with financial information in relation to it. Mr Hosseinpour, Houshang Farsoodeh and I stayed at the Hotel for two or three days. Mr Nayebi had a home of his own in Georgia, where he stayed during our trip.

85. After the trip to Georgia, I returned to Dubai with the Potential Buyers. I then went to RAK and met with Dr Massaad. I told Dr Massaad that the Potential Buyers were interested and that I thought that we could move forward with the transaction. He asked me to proceed and said the Sheikh wanted to complete the sale quickly. We also discussed my commission. Dr Massaad said that he would discuss this with the Sheikh and would have his lawyers send me a written agreement.

86. Dr Massaad suggested that we meet the Potential Buyers the following day for lunch. Accordingly, Mr Hosseinpour and Mr Farsoodeh came to RAK the next day.

87. We discussed the final details of the sale over lunch and reached a tentative agreement. Dr Massaad then suggested that I take Mr Hosseinpour and Houshang Farsoodeh to see the Sheikh that afternoon at the palace. I then called the Sheikh and he invited us for tea that afternoon. I accompanied Mr Hosseinpour and Houshang Farsoodeh to the palace, where the Sheikh received us warmly and we discussed the proposed terms of the transaction. Sheikh Saud was pleased with the proposed terms of the sale, and he encouraged the parties to move forward with a speedy purchase process. We also discussed other possible transactions, including the sale of the Poti Free Zone. The Sheikh thanked me for my role."

169. Mr Azima exhibited photographs taken of a meeting in Istanbul, the metadata for which indicates that four of them were taken on 26 August 2011, and one of them on 28 August 2011.

170. Mr Azima relied on a number of contemporaneous documents which it was submitted supported his case that he had referred the Potential Buyers to RAKIA, in particular

the following:

170.1   An email on 2 October 2011 showed that a meeting was convened between Mr Azima (accompanied by a Mr Mahallati) on 3 October 2011 with two of the Potential Buyers. Mr Mahallati then wrote to the third of the Potential Buyers, Mr Nayebi, to report on the meeting between him, Mr Azima and the "two Hs" (which was a reference to the other Potential Buyers, namely Houshang Hosseinpur and Houshang Farsoodeh): "Just wanted to confirm we had a great meeting with the two H's. Based on what we agreed we are moving forward."

170.2   Emails showing that in the days before the Memorandum of Understanding (the "MOU") was signed (which appears to have taken place on 10 October 2011), Mr Azima obtained passenger information from the Potential Buyers and provided it to RAKIA which used it to create a passenger list for the purposes of travelling with Mr Azima and Dr Massaad on one of RAKIA's private jets.

170.3   Emails sent after the MoU was signed in which the Potential Buyers repeatedly wrote to Mr Azima to stress their appreciation for his work and services and to keep him informed of their meetings regarding both the Hotel, and the possible acquisition of an interest in the Poti free zone, owned by RAKIA Georgia: On 19 October 2011, Mr Hosseinpour wrote as follows: "Hi dear farhad. Ru ok? Where are you? Thanks for your management. Tonight me and houshang with our team traveling to Tbilisi. My team will go poti port directly from airport. for visiting. and they have meeting there with raki a group." On 19 October 2011, Mr Hosseinpour wrote again: "Hi dear farhad. Pls try ur best for our team. U r a part of our life. We are like a puzzle. team working. what is the best for us .we will do that. Take care." On 25 November 2011, Mr Hosseinpour wrote: "We will be in Tbilisi next Thursday closing deal 2nd dec.we push sayed also. We need more information. …You will be for ever our big brother. You have more power. conection. experience but we are business men. young. And your student." It was submitted on Mr Azima's behalf that the Potential Buyers would not express their appreciation for Mr Azima's efforts, and describe him in these terms, unless he had assisted in bringing the parties together and brokering the deal.

170.4   Other emails showed the Potential Buyers keeping Mr Azima informed about their contacts with RAKIA. For example, Mr Farsoodeh shared information with Mr Azima about the Hotel's occupancy and room classifications received from the Hotel's auditors and Mr Hosseinpour emailed Mr Azima to provide him with a copy of the cheques made out by them to RAKIA as a down-payment.  It was submitted that these communications would make little sense unless the Potential Buyers understood Mr Azima to play an important role in the transaction.

170.5   After the arrangement between Mr Azima and the Potential Buyers fell through, Mr Azima emailed them on 7 December 2011 to wish them success, and referred to the time spent in seeking to close the deal: "I am sorry that I

was not able to stay and see the finish line! For the past nearly 3 month we lived and hoped for the day that the contract gets signed and transaction completed." It was submitted that this contemporaneous email confirmed that Mr Azima had been working with the Potential Buyers on the Hotel transaction since September 2011 which was consistent with Mr Azima's evidence that he was in contact with the Potential Buyers regarding the Hotel from September 2011.

170.6 There were also communications from RAKIA's own lawyers at the time which it was said supported the position that Mr Azima had made the referral. On 11 October 2011 (shortly after the MoU was signed), Mr Renwick of Dewey & Leboeuf emailed Mr Al Sadeq of RAKIA: "I will forward to you separate emails relating to (1) BVI counsel's fee estimate; and (ii) a draft referral agreement in respect of the referral to RAKIA of the proposed transaction." And later on the same day "As referred to in my earlier email, please find attached a very simple form of referral agreement which may be useful as a basis for your agreement with the individual responsible for referring the proposed transaction to RAKIA. It is a short form, generic document and may require a little tailoring to suit your precise requirements."

170.7 Mr Azima prepared invoices shortly after these events (in January 2012) which referred to his role in the referral and introduction of the Potential Buyers. These invoices spelled out the work done by Mr Azima in terms, and sought payment of his commission. The invoices were addressed to the attention of Mr Al Sadeq, the deputy CEO of RAKIA, and were also sent to Dr Massaad.

171. Mr Azima submitted as follows:

171.1 He and Mr Adams were integral to the deal from the very beginning. Mr Adams drafted the MoU. He and Mr Adams took on the task of undertaking the steps needed to complete the deal and acted as an interface between the Potential Buyers and RAKIA and RAKIA's lawyers, Dewey & Leboeuf; this was entirely consistent with Mr Azima having made the introduction and being involved in the deal; it was entirely inconsistent with RAKIA's theory that Mr Azima was some kind of interloper seeking to take credit for the deal long after the fact.

171.2 RAKIA's external lawyers would have a file on the transaction and the individual lawyers would also be in a position to explain the way they understood the transaction to have come about and the fact that RAKIA had chosen not to call them or give any such disclosure supports the inference that this evidence would not have supported its case.

171.3 RAKIA had offered no counter-narrative to identify the other person or means by which the Potential Buyers were introduced to RAKIA. This is despite the fact that other individuals on RAKIA's side were also involved in the transaction, beyond Dr Massaad, Mr Al Sadeq and Mr Mikadze, including Sayed Al- Khawaja, an employee of RAKEEN Development, Georgia, and the manager of the Hotel.

45

172.   In support of its case that Mr Azima did not introduce the Potential Buyers, RAKIA relied essentially on the contents of a memorandum dated 1 March 2016 drafted by Mr Adams ("the Adams Memorandum") which reads as follows (emphasis added).

"Dear Mr. Azima,

As you will recall, during the summer of 2011, we made a number of trips to Poti and Tbilisi, Georgia to explore new business opportunities. We looked at the Port in Poti, the Airport in Poti, the Free Zone in Poti, the Airport in Tbilisi, the Tbilisi Mall, and a number of existing and prospective hotel properties.

Among the hotel properties we reviewed was the Sheraton Metechi Palace (SMP") in Tbilisi. **We were informed that a group of businessmen from Dubai were already negotiating the purchase of the SMP [the Hotel] and were introduced to them**. Mr. Houshang Hosseinpour, who represented the purchasing group, offered you a minority position in the purchasing group and indicated that an offer needed to be made quickly. I instructed our agents to form a BVI company called Eurasia Hotel Holdings Limited for the purposes of making such an offer and the company was organized on the 11th of October, 2011.

You, Mr. Hosseinpour, and Rd. Hater Massaad (who represented the Sellers of the SMP) were to act as initial directors of EHHL. However, before any activities were undertaken by the company, we determined during our due diligence that Mr. Housseinpour, and his partners, fell below our standards for doing business. Accordingly, we terminated our discussions with them and they proceeded to purchase the SMP without your involvement.

During the same time, we had formed a Georgian airline and had negotiated the purchase of an aircraft to start the airline operations. Since we had initially formed EHHL, the directors were changed, and we had the company renamed as Eurasia Aviation Holdings Limited, specifically to hold the aircraft, and the name change was recorded on the 17th of February."

173.   RAKIA further relied on:

173.1   the absence of contemporaneous evidence supporting Mr Azima's claim to have introduced the prospective buyers;

173.2   the inherent improbability of Mr Azima's account of his dealings with the Potential Buyers, according to which the Potential Buyers went from a first introduction to the transaction in September 2011 to signing up to the MOU on 8 October 2011; it was more likely that the Potential Buyers had been introduced to the purchase at an earlier stage;

173.3   the evidence of Sheikh Saud who denied that he ever told Dr Massaad or anyone else to play any role in the sale of the Hotel or any other assets owned

by any RAK entity.

**Conclusion**

174.   Discerning the role of Mr Azima in relation to the intended Hotel transaction is not straightforward. There were no independent witnesses. None of RAKIA's witnesses was in a position to give first-hand evidence of the relevant events apart from the Ruler, who did not attend the trial and whose evidence therefore carries limited weight. RAKIA did not produce any contemporaneous documents relating to the planned sale of the Hotel and the documents relied on by Mr Azima were inconclusive. The photographs and the emails showed that that Mr Azima certainly had meetings with the Potential Buyers and was actively involved in facilitating the possible purchase. But they fall short of establishing that Mr Azima was instrumental in actually introducing the Potential Buyers to the transaction. The fact that RAKIA's lawyers appear to have been under the impression that there was an introduction is also inconclusive as they may have been misinformed.

175.   Contrary to RAKIA's case, the short interval between the date of the alleged introduction and the signing of the MoU does not, in my judgment, preclude the possibility that Mr Azima's effected the introduction.

176.   In my judgment, however, the Adams Memorandum fatally undermines Mr Azima's case that he introduced the Potential Buyers. The Adams Memorandum was evidently intended to constitute a formal and accurate record of events for likely future use by Mr Azima's lawyers concerning Mr Azima's involvement in the intended sale of the Hotel. The Adams Memorandum was a short document (just four paragraphs running to one page). It was sent to Mr Azima on 1 March 2016. Mr Azima never requested any corrections or changes to be made to the Adams document (as he frequently did in respect of other documents produced by Mr Adams). Mr Adams struck me as a careful draftsman who would not have described the circumstances of Mr Azima's involvement with the Potential Buyers without the instructions and approval of Mr Azima.

177.   I do not consider that the explanations for what was, on Mr Azima's case, a glaring error in the Adams Memorandum, namely the time lag between the events in question and the preparation of the memorandum and the irrelevance of the introduction to the purpose for which the memorandum are convincing. In my view, the memorandum is more reliable evidence than the self-serving evidence of Mr Azima and Mr Adams. I therefore conclude that, whilst Mr Azima was involved in the transaction and may well have had some expectation of a fee for his services, he did not effect the introduction of the Potential Purchasers.

**(b)   Was the Referral Agreement a sham?**

178.   Mr Azima's case concerning the Referral Agreement and the payment which he contends was made pursuant to the Referral Agreement was, in summary, as follows:

178.1   He initially agreed with Dr Massaad to introduce buyers to the Hotel

47

transaction in return for a commission of 5% from the gross sale price plus 50% of any amount in excess of $50 million;

178.2 After the signing of the MoU, he received a telephone call from the US Embassy in Georgia during which he was "advised that I should not do business with the Potential Buyers [and] told…that the Potential Buyers were not 'clean' and that they were acting as a front for undesirable elements in Iran".

178.3 As a result of this call, Mr Azima became concerned about the Potential Buyers' true intent in establishing a presence in Georgia, and the possible contravention of US sanctions against Iran and accordingly, changed his mind about acquiring an interest in the Hotel and declined to participate further in the transaction.

178.4 A short while later he informed Dr Massaad and the Ruler that he felt that the Potential Buyers had another agenda; he mentioned his concerns about the potential contravention of US sanctions and advised them not to go ahead with the sale.

178.5 Dr Massaad told him after that conversation that the Ruler and Dr Massaad wanted him to step out of the purchase process and accept a 2.5% commission instead of the 5% originally agreed, and to forego his entitlement to 50% of the excess above $50 million.

178.6 On 25 October 2011 he received $400,000 from RAKIA. In January 2012 he received a further $1,162,000 making a total of $1,562,000 which was 2.5% of the purchase price of $62,500,000.

179.   It was further submitted on behalf of Mr Azima as follows:

179.1 RAKIA's case concerning the allegedly fraudulent commission agreement should be dismissed *in limine* on the basis that RAKIA failed to challenge Mr Azima in cross examination with regard to the assertion that the Ruler was aware that Mr Azima was to be paid commission and approved him receiving it.

179.2 RAKIA had also failed to put elements of its case to Mr Adams in cross-examination, even though RAKIA's case is that Mr Azima was a party to a conspiracy with Mr Adams, Mr Al Sadeq and Dr Massaad to "obtain from RAKIA substantial payments to which Mr Azima was not entitled". Moreover, RAKIA did not challenge Mr Adams' evidence that the Referral Agreement he created was, "a written version of the agreement that had already been reached in relation to the payment of Mr Azima's commission." His evidence to that effect should therefore be accepted by the Court.

179.3 RAKIA's case that the document was a sham for services that were not actually provided cannot be reconciled with the evidence of Mr Azima's active role in connection with the transaction, the recognition shown to him by the

Potential Buyers, the understanding of the external lawyers that a referral had been made and Mr Azima's invoicing for his work at the time.

179.4   There was a clear commercial basis for the payment of a commission to Mr Azima in that the Potential Buyers went on to conclude an agreement with RAKIA and paid a $20 million deposit, which RAKIA retained despite failing to transfer the Hotel to them.

179.5   Mr Azima did not seek to have Dr Massaad (or anyone else on RAKIA's side) sign the Referral Agreement document. It was only signed by Mr Azima. If RAKIA's case of conspiracy was correct, it would be expected that Dr Massaad or Mr Al Sadeq would also have signed the document, purporting to do so on behalf of RAKIA.

179.6   The Referral Agreement was prepared well after Mr Azima had already received the referral fee in full (and long after RAKIA had entered into its advantageous contract with the Potential Buyers). The document was not used to make a claim for any payment. It therefore cannot sensibly be said that Mr Azima created the document in order to procure payment.

179.7   The Referral Agreement included a commission of 5% which was the amount of commission that had in fact been agreed at that stage, as reflected in the invoice initially sent to RAKIA on 11 January 2012. The amount of the commission was then reduced to 2.5%. However, when submitting the document to RAKIA in August 2012, Mr Azima made no suggestion that he was owed the difference. The intention was simply to provide a document summarising the understanding that had been reached in October 2011.

179.8   The emailing of the document to Mr Al Sadeq at his non-work Gmail address is not evidence of impropriety. Mr Adams had already earlier emailed a version of the Referral Agreement (also providing for a 5% commission) to Mr Al Sadeq at his RAKIA email address. This is inconsistent with the case put by RAKIA in cross-examination that Mr Adams "wanted to make sure that this document didn't go into the RAKIA system until it was finalised".

179.9   As Mr Adams and Mr Azima explained, the document was sent to Mr Al Sadeq at his Gmail address because Mr Al Sadeq was at that time (mid-August) on holiday in Europe and so was away from work. Other RAKIA individuals (including Mr Buchanan and Mr Bustami) have also on occasion used private non-RAK/RAKIA email accounts for their work, as well as RAK email accounts at other times.

180.   RAKIA contends that the Referral Agreement was a sham. In support of this case it submits as follows:

180.1   The terms of the original Referral Agreement for which Mr Azima contends, namely that in return for introducing potential buyers he would receive a 5% commission from the gross sale price plus 50% of any amount in excess of US $50,000,000, are implausibly generous, given that, on Mr Azima's own case,

the Ruler was under pressure to liquidate foreign assets and to invest in RAK to improve RAK's economic situation. Had such an agreement existed, Mr Azima would have been entitled to total commission of $9,375,000 on a sale of the Hotel for $62,500,000.

180.2    The terms of this alleged agreement were not recorded in any written contract. Nor were they referenced in any contemporaneous email or document or referred to anywhere in Mr Azima's pleaded case.

180.3    On Mr Azima's case, he was told to forego that entitlement to more than $9.3 million, and instead to accept a payment of just $1.56 million, despite having fully performed his side of the agreement. Mr Azima claims that he accepted that huge reduction for the sake of his relationship with the Ruler. This case is inherently implausible and unsupported by documentary evidence.

180.4    Mr Azima's evidence concerning his alleged withdrawal from the sale is internally contradictory. If (as Mr Azima claims) he had told Dr Massaad and the Ruler that he was withdrawing from the transaction and urged them not to proceed with the sale, then there would be no reason for Dr Massaad to subsequently tell him to "step out of the purchase process" since by definition Mr Azima had already "stepped out" of the transaction of his own accord and had already informed Dr Massaad and the Ruler about this.

180.5    The contemporaneous documents show that any concern Mr Azima had regarding possible breaches of US sanctions resulted in him attempting to conceal the Iranian nationality of the Potential Buyers, rather than withdrawing from the transaction. For example, the documents show that in October and November 2011 Mr Azima helped Mr Farsoodeh apply for St Kitts citizenship.

180.6    The documents demonstrate that Mr Azima did not withdraw from the Hotel transaction as he claims. On the contrary, he and Mr Adams remained actively involved in the transaction all the way through to (and indeed beyond) the closing of the sale to the Potential Buyers. For example, on 8 December 2011 he signed the Share Purchase Agreement as witness for Merchant Savings and Loan Limited, another company owned by the Potential Buyers.

180.7    On 19 November 2012, Mr Azima sent an email to Mr Stewart, RAKIA's then CEO, in which he stated: "I was requested to assist in sale of certain RAKIA assets in Georgia. Including Sheraton Hotel and Poti Free Zone. However, I was sidelined! Up on signing the SPA contract and my help "no longer was required"". The content of this email is inconsistent with Mr Azima's claim that he withdrew from the transaction of his own accord well before the SPA was signed.

180.8    The process by which the Referral Agreement was drafted was suspicious. That process (which is not disputed) began with Mr Al Sadeq sending an unsigned template "commission agreement" to Mr Azima on 16 November 2011. Almost eight months later on 9 July 2012, Mr Al Sadeq sent an email to

Mr Adams requesting a copy of the "master agreement for the commission made against the Sheraton sales". In response Mr Adams emailed an amended version of the template to Mr Azima with various changes including a provision for payment of a "referral fee" of 5% of the gross proceeds of sale of the Hotel, a statement that Mr Azima had referred the Potential Buyers, a statement that RAKIA was liable for Mr Azima's past and future expenses in relation to the sale of the Hotel (including first class air travel and hotel accommodation) and for Mr Adams' business class air travel and hotel accommodation and a $600 daily charge.

180.9   A further amended version was produced by Mr Adams and forwarded with attachments to Mr Al Sadeq's private email address, stating: "as discussed, please note the invoice and the master agreement has been modified…If it is OK, I will send it to your RAK email. Any news on American Bank payment?" On the same day, Mr Adams also sent an amended draft of the template to Mr Al Sadeq's private email address.

180.10  On 15 August 2012, Mr Azima emailed Mr Adams confirming that there were no further changes to the draft of the Referral Agreement and stating, "please send it". Mr Adams replied: "To his RAK email?" A short while later, Mr Adams sent the amended draft to Mr Al Sadeq's private email address stating: "Please advise if I should now send these to your RAK email address?"

180.11  Mr Azima's contention that the Referral Agreement was produced because RAKIA wanted "an executed version of the agreement" which was "to record the terms of the agreement already reached" was untenable. The Referral Agreement did not contain any reference to Eurasia Hotel Holdings Limited (which was the proposed buyer of the Hotel as at 25 October 2011 when the Referral Agreement was allegedly made). The Referral Agreement referred instead to Merchant Savings and Loan Limited as one of the parties introduced by Mr Azima which did not become a proposed buyer until 29 November 2011, more than a month after the date when the Referral Agreement purportedly came into effect.

180.12  The fact that extensive changes were made to the content of the draft Referral Agreement between November 2011 and October 2012 is inconsistent with Mr Azima's claim that the Referral Agreement was merely intended to enshrine in writing an agreement which had already been concluded by the parties in October 2011 and which had been fully consummated by early January 2012. For example, the Referral Agreement provided that RAKIA was liable for Mr Adams' expenses. In cross-examination, Mr Adams conceded that there was no agreement in October 2011 that RAKIA would reimburse his expenses. He also conceded that the expenses which he invoiced RAKIA for in October 2012 pursuant to the backdated Referral Agreement were the same as the expenses he had previously invoiced the Potential Buyers for in December 2011.

180.13  The Referral Agreement stated that Mr Azima was entitled to commission at the rate of 5% of the gross sale price of the Hotel. However even on Mr

Azima's case he was never entitled to commission at this level. The alleged initial agreement was that he would receive 5% of the sale value plus 50% of everything over $50 million, and the later agreement was that he would receive just 2.5% of the sale price. On his evidence, there was no "intermediate" agreement between these two positions.

180.14 The use of Mr Al Sadeq's private Gmail address was not adequately explained by Mr Azima and Mr Adams. Their explanation that Mr Al Sadeq was "travelling with his family" and they "wanted to make sure" that he received the documents was not mentioned in any of the emails. When pressed on how he would have known that Mr Al Sadeq was abroad, Mr Adams claimed (for the first time) that, "I saw him on the boat…Mr Azima's boat". When asked when this alleged undocumented meeting on Mr Azima's boat occurred, he suffered a convenient memory lapse.

180.15 Neither Mr Azima nor Mr Adams sought to explain why, nine months after the agreement was supposedly entered into, there was suddenly such an urgent need for an "executed" copy of that agreement to be produced that it was necessary for them to repeatedly email Mr Al Sadeq about it during his family holiday.

180.16 Mr Adams was also unable credibly to explain why he had sent documents to Mr Al Sadeq's Gmail address together with a message asking: "Please advise if I should now send these to your RAK email address". In particular, it was pointed out to Mr Adams that there was no need for Mr Adams to ask this question, since Mr Al Sadeq was clearly capable of forwarding any documents he received at his Gmail address to his RAK email address. When this was put to Mr Adams, he merely responded: "you can speculate however you want".

180.17 Mr Adams also claimed that he could not recall why he had changed draft invoices to RAKIA by removing references to services provided for the buyers instead inserting a reference to "services requested by K Massaad". In the circumstances, the clear inference is that Mr Adams made these changes in order to give the deliberately false impression that the services he was invoicing RAKIA for (and for which he had previously invoiced the Potential Buyers) were provided at the request of Dr Massaad.

**Conclusion**

181. I have concluded that the Referral Agreement did not reflect a genuine agreement with RAKIA and that it was a sham intended to conceal misappropriation of funds by Mr Azima. I reach this conclusion for the following reasons.

181.1 I accept RAKIA's submission that the undocumented agreement with RAKIA alleged by Mr Azima according to which he was to be paid 5% of the gross sale price plus 50% of any amount in excess of US $50,000,000 is implausibly generous. I do not believe that any such agreement was entered into.

181.2 I consider that the alleged revised agreement, also undocumented, whereby Mr Azima's commission was to be cut by 50%, even though he had, on his case, performed his side of the bargain, is also wholly implausible and was not in fact entered into.

181.3 For reasons set out elsewhere in this Judgment, I believe that Mr Azima did not effect any introduction of the Potential Buyers and that he was therefore not entitled to any commission. The fact that Mr Azima was actively involved in the sale process is explicable on the basis that he hoped to be rewarded by the Potential Buyers.

181.4 Mr Azima's case that the Referral Agreement enshrined an agreement that had been made in October 2011 is not sustainable. For example, in cross-examination, Mr Adams conceded that there was no agreement in October 2011 that RAKIA would reimburse his expenses. Mr Adams also conceded that the expenses which he invoiced RAKIA for in October 2012 pursuant to the backdated Referral Agreement were the same as the expenses he had previously invoiced the Potential Buyers for in December 2011.

181.5 The way in which the Referral Agreement was drafted was also suspicious. The use of Mr Al Sadeq's private gmail address and the request for permission to use the RAKIA email address indicates that Mr Azima and Mr Adams wanted to conceal the Referral Agreement from RAKIA. I do not accept that there was any plausible explanation for the use of the private gmail address. There is no contemporaneous evidence that Mr Al Sadeq was on holiday. Even if he was, there was no need to ask for permission to use Mr Al Sadeq's usual work address.

181.6 The omission on the part of RAKIA's Counsel to challenge Mr Azima in relation to the alleged agreement of the Ruler to the payment of commission and to put certain elements of RAKIA's case to Mr Adams does not require me to reject that case. It was put to Mr Azima in cross examination that he was not entitled to any commission and that the Referral Agreement was a sham. Mr Adams had the opportunity to respond to RAKIA's case in his witness statement.

(c)     **Was the payment of $500,000 made by Mr Azima to Dr Massaad a bribe?**

182.   The bribery allegation forms part of RAKIA's case that the Referral Agreement was a sham.

183.   It is common ground that on 18 January 2012 (the same day as the payment of $1,162,500 referred to at paragraph 23 above) Mr Azima made a payment of $500,000 to Dr Massaad. RAKIA contends that this payment was a bribe. Mr Azima denies this. He claims the payment was for the attempted acquisition of a 25% interest in an aircraft owned by Dr Massaad.

184.   In support of its case that the payment was a bribe, RAKIA advances the following

contentions.

184.1   Contrary to Mr Azima's claims that Dr Massaad had a 50% interest in a
Hawker 800A aircraft, the contemporaneous documents show that the Hawker
800A was wholly owned by the Ruler. None of the contemporaneous
documents contains any suggestion that Dr Massaad had any legal or
beneficial interest in the aircraft. For example:

  (a)   The UAE General Civil Aviation Authority Certificate of Registration
dated 25 March 2005 lists the Ruler as the owner of the aircraft and
identifies the sole operator of the aircraft as Dana Executive Jets LLC
("Dana Jets").

  (b)   A Certificate of Insurance/Reinsurance dated 14 January 2011 (which was
sent by Dr Massaad to Mr Azima on 7 March 2012) shows that the Hawker
800A aircraft was insured in favour of the Ruler, Dana Jets, RAK Airways
and the Government of RAK. The certificate contains no reference at all
to Dr Massaad.

  (c)   A detailed schedule of Dr Massaad's assets attached to an email from Mr
Adams to Mr Azima dated 29 November 2013 contains no reference to Dr
Massaad owning any interest in a Hawker 800A aircraft.

184.2   Mr Azima conceded in cross-examination that he does not recall seeing
documentation showing that the Ruler was the legal owner of the aircraft, but
claims that he "would have assumed that Dr Massaad's 50% interest was a
beneficial interest". On Mr Azima's own case therefore, he paid half a million
dollars for an interest in an aircraft without knowing the nature of the interest he
was acquiring and without having seen any documentary proof of the existence
of that interest.

184.3   Mr Azima has adduced no evidence to support his claim that, the hull value of
the Hawker 800A was approximately $2,000,000. When asked in cross-
examination whether he had taken any steps to have the alleged beneficial
interest valued before paying $500,000 to Dr Massaad for it, Mr Azima claimed
that: "I took his word for face value". This was implausible.

184.4   There are no documents evidencing any planned or attempted transfer of an
interest in a Hawker 800A aircraft from Dr Massaad to Mr Azima. Mr Azima's
claim that he paid the purchase price to Dr Massaad in the expectation that the
paperwork for the sale would be dealt with "later on" is both inherently
implausible and inconsistent with how Mr Azima conducted his aviation
business.

184.5   The Hawker 800A was included as a "company asset" in a "Sale of Company
Agreement" between Dana Executive Air and Captain Joachim Bergunde under
which Dana Jets was to be sold for a total price of $50 million The "Sale of
Company Agreement" was apparently signed by Dr Massaad on behalf of Dana
Executive Air on 15 December 2011 and by Capt. Bergunde on 17 December

2011, more than a month before Mr Azima made the payment of $500,000 to Dr Massaad. It is unlikely that Dr Massaad would have entered an agreement with Mr Azima to sell a share in an aircraft in circumstances where he was aware that the aircraft was likely to be sold to a third party as part of a sale of Dana Jets.

184.6   Five days after Mr Azima paid the $500,000 to Dr Massaad, he sent an email to Dr Massaad discussing arrangements for a lease of that aircraft. The email did not contain any reference to Mr Azima owning a share of the aircraft as would be expected if he had become a 25% owner less than a week earlier.

184.7   Two days later, Mr Adams emailed Mr Azima stating that: "He said he can't firmly commit before next week as they are selling Dana and the Hawker is supposed to be part of the sale". As to this:

(1)   Mr Azima was unable to provide a credible explanation of why he would be seeking to negotiate a lease in respect of an aircraft of which he had just become a joint owner.

(2)   Neither Mr Azima nor Mr Adams expressed any surprise or concern upon learning that an aircraft of which (on their case) Mr Azima had bought a quarter share was about to be sold to a third party.

184.8   The timing of the payment to Dr Massaad, on the same day that $1,162,500 was paid by RAKIA to Mr Azima, strongly suggests that the payment to Dr Massaad was linked to that payment to Mr Azima, rather than an entirely unrelated (and undocumented) aircraft transaction.

184.9   In late February 2012 Eurasia Aviation Holdings Limited ("Eurasia Aviation") signed an agreement to purchase a Hawker 400XP aircraft for $1.625 million. A total of $750,000 of the purchase price was to be paid by Mr Azima and Dr Massaad (who each owned 50% of the shares in Eurasia Aviation) while the remainder was funded by way of a bank loan. According to Mr Azima, by this date Dr Massaad was obliged to reimburse the $500,000 that Mr Azima had paid to him on 18 January 2012. In those circumstances, it was to be expected that Dr Massaad would pay Mr Azima's $375,000 share of the Hawker 400XP purchase price in partial discharge of the $500,000 debt he owed to Mr Azima. However that is not what happened. Instead, Mr Azima and Dr Massaad each paid $375,000 in cash towards the purchase of the Hawker 400XP. Mr Azima and Mr Adams were unable to provide a convincing explanation for this anomaly.

184.10   Mr Azima claims that, "Soon after, on or around 30 November 2012, Dr Massaad repaid me the $500,000". However, the bank records show that Dr Massaad made two payments totalling a different amount, approximately $575,000, on 30 November and 3 December 2012.

184.11   These payments relate to a share purchase agreement ("SPA") dated 5 November 2012 whereby Mr Azima agreed to sell a 40% shareholding in

Eurasia Aviation to Dr Massaad for total consideration of $525,000. Accordingly, rather than reimbursing the payment made by Mr Azima on 18 January 2012, the payments by Dr Massaad in late November and early December were for the purpose of acquiring an entirely different shareholding from Mr Azima.

184.12   Mr Azima denies that the payment of $575,000 related to the SPA on the basis that the payments were not made to the payee account specified in in the SPA. However, that explanation ignores the fact that, as evidenced by the contemporaneous email correspondence, Dr Massaad attempted unsuccessfully to make a payment of $450,000 pursuant to the SPA to the specified account after which he made a replacement payment of that amount to Mr Azima's personal account, followed by a payment of a further $125,000 to the same account a few days later. It follows that the payment of $450,000 (and, logically, the payment of $125,000 made by Dr Massaad to the same account several days later) were made pursuant to the SPA between Mr Azima and Dr Massaad. In other words, those payments did not "reimburse" Mr Azima anything. Rather, they were made in exchange for Mr Azima's shares in Eurasia Aviation.

184.13   It is common ground that in early 2012 Eurasia purchased a Hawker 400XP for approximately $1.63 million. The Eurasia cash flow spreadsheet shows that as at January 2013, Dr Massaad had paid a total of $1,100,866 into Eurasia Aviation. In addition, according to a letter dated 21 January 2020 from Mr Azima's solicitors, between April 2013 and April 2014, Dr Massaad made payments totalling approximately $530,000 to Eurasia Aviation. It follows that by April 2014 (1) Dr Massaad had paid a total of approximately $1.63m into Eurasia Aviation; (2) Eurasia Aviation owned a Hawker 400XP aircraft worth approximately $1.63 million; and (3) Dr Massaad owned all of the shares in Eurasia Aviation. Accordingly, those payments did not have the effect of reimbursing Mr Azima the sum of $500,000.

185.   Mr Azima contends that RAKIA's case is flawed for the following main reasons.

185.1   RAKIA's case rests on the premise that Mr Azima had no legitimate basis to receive the referral fee whereas Mr Azima was entitled to a fee as payment for his introduction of the Potential Buyers.

185.2   RAKIA's case presupposes that Mr Azima paid a bribe after the amount of his commission had been halved and to the very person who reduced the commission, which is not credible.

185.3   In any event, the funds paid to Dr Massaad were not a bribe at all, but rather a payment made towards the acquisition of a share in an aircraft. The money was later repaid after that transaction did not proceed and Mr Azima and Dr Massaad purchased a different aircraft.

185.4   The contemporaneous correspondence shows that in 2011 Mr Azima had been undertaking a search for executive jets, including Hawker aircraft.

56

185.5  Mr Azima was considering acquiring an interest in a Hawker 800A operated by Dana Jets in which he understood Dr Massaad to have an interest. He agreed with Dr Massaad to acquire half of Dr Massaad's 50% share,  for $500,000, since this was 25% of the hull value of $2,000,000. In parallel, Mr Azima and Mr Adams prepared proposals for the aircraft to be leased to Mr Azima's executive charter airline in Georgia. The purpose of the proposed purchase and lease arrangements was to allow the aircraft to be operated in Georgia.

185.6  Mr Azima recorded the $500,000 payment against Dr Massaad's name in a list (of 28 January 2012) of payments made and received. It would be odd for a person who had paid a bribe to record it in that way.

185.7  Ultimately, the proposals for purchasing the Hawker 800A were not pursued as RAKIA found a buyer interested in purchasing Dana outright. Mr Adams advised Mr Azima on 25 January 2012: "Dear Farhad, Had a very good meeting. He said he can't firmly commit before next week as they are selling Dana and the Hawker is supposed to be part [sic] of the sale."

185.8  As a result, he and Dr Massaad instead acquired a Hawker 400XP. The aircraft was to be held by Eurasia Aviation of which Mr Azima would be the sole shareholder. It was subsequently decided that the shares in Eurasia Aviation were to be allocated 50/50 between Mr Azima and Dr Massaad so Mr Adams shared the specifications for the aircraft with Dr Massaad: "Dear Dr. Massaad, Farhad asked that I forward the attached regarding the Hawker 400: Draft purchase contract, specs, and photos of the Hawker 400 aircraft. The aircraft will be purchased by the BVI company and Farhad has already made the down payment."

185.9  A contract for purchase of the Hawker 400XP by Eurasia Aviation for a price of $1,625,000 was signed on 23 February 2012 and the purchase completed in April 2012. Ultimately, the $500,000 paid by Mr Azima to Dr Massaad was repaid as a result of these transactions. A total of $575,000 was paid by Dr Massaad to Mr Azima in November 2012. That figure is the sum of the $500,000 advanced to Dr Massaad in January 2012 and a further $75,000, to balance out the contributions that had been made towards the purchase of the Hawker 400XP by Dr Massaad and Mr Azima. As an email exchange between them in October 2012 set out, Mr Azima had contributed $150,000 more towards the purchase than Dr Massaad had done. Dr Massaad's payment of $75,000 to Mr Azima therefore left the position square between them.

185.10 Mr Adams explained that various payments were made by Dr Massaad to Mr Azima over this period, for different purposes. There were, as he put it, funds in three buckets, or "pockets" that were owed by Dr Massaad: $375,000 for his share in the Hawker 400XP; $500,000 for the return of the money that was put on the Hawker 800A; and $525,000 pursuant to the SPA. These three amounts were paid appropriately.

185.11 RAKIA's case that the payments made by Dr Massaad, totalling $1.63m,

represented the cost of the Hawker 400XP Aircraft acquired by Eurasia of which he was the sole shareholder, and did not entail any reimbursement to Mr Azima the sum of $500,000, is misconceived since it ignores the fact that the purchase of the Hawker 400XP (which was purchased for $1.625 million) had been funded by a loan of $1,000,000. As at 31 July 2012, the amount outstanding was recorded as around $1.101 million. RAKIA's theory that Dr Massaad's payments to Mr Azima were made in order to acquire 90% ownership of the aircraft therefore makes no sense. Mr Azima only owned half of a minority of the equity in the aircraft; if RAKIA's theory were right, the payments made to Mr Azima would result in him being grossly overpaid and Dr Massaad being left out of pocket.

185.12 Thus, RAKIA's late attempt to rebut Mr Azima's evidence that the $500,000 payment was legitimate and was repaid in any event is simply confused and should be rejected.

## Conclusion

186.    RAKIA's case that the payment of the $500,000 was a bribe paid to Dr Massaad rests essentially on the inference to be drawn from the fact that the payment was made on the date Mr Azima received a fee authorised by Dr Massaad to which he had no entitlement and the absence of any convincing alternative explanation for the payment.

187.    In my judgment, the explanation put forward by Mr Azima that the payment was in exchange for a 25% interest in the Hawker 800A aircraft does not stand up to scrutiny in the absence of any documentary evidence showing that Dr Massaad had any interest in the aircraft or documentary evidence of the proposed purchase transaction.

188.    The reasons for the various payments subsequently made by Dr Massaad to Mr Azima are unclear. Dr Massaad at no stage made a repayment of the sum of $500,000. He made a payment of $575,000 in November 2012 but again there is no documentary evidence to link this payment with the $500,000 paid by Mr Azima some ten months earlier. On the other hand, RAKIA's attempt to explain the various payments made by Dr Massaad as referable to the acquisition of the Hawk 400XP breaks down because it fails to account for the loan finance of $1 million, as submitted by Mr Azima.

189.    The lack of any clear explanation for the subsequent payments made by Dr Massaad does not, however, displace the inference to be drawn from the unexplained payment of $500,000 by Mr Azima which I conclude was a bribe.

## (c)    Did Mr Azima wrongfully fail to disclose to RAKIA an intended interest in the Hotel?

190.    RAKIA's case is as follows:

190.1  Prior to entering into the purported Referral Agreement, Mr Azima had reached an agreement with Mr Hosseinpour that, upon completion of the sale

58

of the Hotel to Eurasia Hotel Holdings Limited he would receive a 10% interest in the Hotel in exchange for a nominal payment of $10 (the "Transfer Agreement").

190.2 If (contrary to RAKIA's primary case) the Referral Agreement was not, in fact, a sham document, but rather (as Mr Azima alleges) a valid agreement, then Mr Azima's actions in entering the Transfer Agreement, and the assistance that he provided to the Potential Buyers, breached Mr Azima's obligations under the Referral Agreement, in particular the obligations of loyalty owed by Mr Azima as RAKIA's agent, reflected in Clause 1, which provided as follows:

"DUTIES OF AZIMA AZIMA warrants that he has: (a) provided to RAKIA all relevant information to date in his possession which relates to the Hotel Transaction…; and (b) acted in good faith and with the utmost professional integrity and in the best interests of RAKIA in any transaction with third parties relating to the Hotel Transaction…".

190.3 Mr Azima's conduct in relation to the Transfer Agreement was inconsistent with that duty. In particular,

(a) the existence of the Transfer Agreement was clearly "relevant information" which relates to the Hotel Transaction which Mr Azima should have disclosed;

(b) by entering into the "Transfer Agreement", Mr Azima deliberately put himself in a position where he was likely to profit significantly from the sale of the Hotel despite owing a fiduciary duty to RAKIA in respect of that sale. He therefore knowingly breached his fiduciary duty to RAKIA under Clause 1 of the Referral Agreement.

190.4 Mr Azima claims that the Ruler knew and approved of the proposal that Mr Azima would acquire a 10% interest in the Hotel. This claim is not corroborated by any documentary evidence and is directly contradicted by the Ruler's witness evidence.

190.5 Mr Azima's claim that Dr Massaad and Gela Mikadze (CEO of RAK Georgia) also knew and approved of his intended 10% interest in the Hotel is similarly unsupported by any documentary evidence. In any event, since both Dr Massaad and Mr Mikadze were engaged in an unlawful conspiracy to defraud RAKIA, even if they knew and approved of this arrangement, their knowledge and approval would not be imputable to RAKIA.

191. Mr Azima's response is, in summary, as follows:

191.1 RAKIA contends that the Transfer Agreement document referring to the 10% share provides only for the payment of nominal consideration whereas it refers to the payment of "other good and valuable

consideration". The $10 simply represented an intended contribution to the company's formation capital of $100. If the sale had gone ahead, all shareholders would have made further contributions proportionate to their shareholding and the final, total purchase price. RAKIA did not challenge Mr Azima's position on this point.

191.2    Contemporaneous documents show that Mr Azima's proposed interest was known by various officials at RAKIA (including but not limited to Mr Mikadze, Dr Massaad, and Mr Khawaja), RAKIA's external lawyers and third parties.

**Conclusion**

192.    Given my finding that the Referral Agreement was not a genuine agreement, the question of whether Mr Azima's conduct was in breach of that agreement does not arise.

193.    Had the Referral Agreement been genuine, it would have been necessary to determine whether Mr Azima had provided to RAKIA all relevant information relating to the terms on which he was to acquire an interest in Eurasia Hotel Holdings Limited and acted in good faith and with the utmost professional integrity and in the best interests of RAKIA in any transaction with third parties relating to the Hotel transaction.

194.    The unsigned Transfer Agreement indicates that it was envisaged by Mr Azima and the Potential Buyers that he would acquire a 10% interest in Eurasia Hotel Holdings Limited in return for a nominal payment of $10 together with "other good and valuable consideration". It is unclear what that additional consideration means although emails between Mr Azima and Mr Hosseinpour on 25 November 2011 indicate that the consideration would be funded as to half by cash and half by finance from the other Potential Buyers.

195.    Mr Azima referred to email correspondence with RAKIA's in-house and external counsel in which it was recognised that Mr Azima was to be a principal on the buyers' side. However, there is no evidence of any express disclosure of his intended 10% stake in Eurasia Hotel Holdings Limited or of the terms on which that stake would be acquired. In the absence of documentary evidence, I do not accept Mr Azima's evidence that the Ruler knew and approved of the proposal that Mr Azima would acquire a 10% interest in the Hotel.

196.    In short, if I had found that the Referral Agreement was a genuine agreement, I would have concluded that the failure by Mr Azima to give full disclosure to RAKIA of his intended interest in the Hotel was in breach of Clause 1 of the Referral Agreement.

**(d)**   **Did Mr Azima orchestrate a malicious campaing to damage the reputation, standing and internal stability of the Governmetn of RAK?**

197.   RAKIA's pleaded case is that Mr Azima played a central role in "instigating and coordinating a wide-ranging media and public relations campaign which sought to denigrate the reputation of the Ruler and the governing authorities in RAK, including by deceiving institutions and companies in RAK into entering commercial transactions and entities with individuals involved in serious criminality."

198.   The alleged misconduct was then said in RAKIA's response to a Part 18 request to have the following aspects:

198.1   the planning and implementation, in 2014 and 2015, of "Project Clay", a coordinated programme designed to frustrate RAKIA's attempts to pursue legal remedies against Dr Massaad by procuring and promoting the widespread publication of damaging false stories in the international media;

198.2   the procuring of the publication of such stories, alleging that individuals were being unlawfully detained in a "Dungeon" operated by the Ruler of RAK and RAKIA's lawyers (Dechert LLP) and that the Ruler of RAK had improperly abdicated judicial, prosecutorial and governmental functions to unlicensed UK lawyers, who were overseeing the operation of a secret prison in RAK; and

198.3   the preparation and, it is to be inferred, implementation of the "Security Assessment" (which is explained further below).

199.   Mr Azima submitted that the "campaign claim" is hopeless for, amongst others, the following reasons:

199.1   RAKIA failed to prove the falsity of the stories that were said to have been procured and promoted by Mr Azima;

199.2   There was no evidence of any media stories having been published;

199.3   The Security Assessment was not implemented and it was not procured by Mr Azima.

200.   RAKIA's case therefore gives rise to the following issues:

200.1   Has RAKIA established that the stories that were allegedly planned and promoted by Mr Azima were false?

200.2   What was Mr Azima's role in relation to the Security Assessment and was it implemented?

**Were the stories false?**

201.   Mr Azima submits that:

201.1   RAKIA failed to adduce any evidence in its witness statements that the stories said to have been procured and promoted by Mr Azima were in fact false;

201.2   RAKIA attempted to fill this gap through a series of leading questions to Mr Gerrard in re-examination in which Mr Gerrard denied that he had been involved in illegal detentions in RAK or had taken on prosecutorial or judicial roles. Mr Gerrard's answers, elucidated in this way at the end of his evidence, were simply not a sufficient basis for this Court to find that the "falsity" of any alleged media stories is established.

201.3   This is particularly so in circumstances where there was evidence showing that concern at detentions in RAK was well-founded, and there was also evidence of Mr Gerrard's and/or Dechert's role in those detentions giving rise to legitimate concerns. It was incumbent on RAKIA to address these issues with evidence, which it has not even attempted to do.

201.4   Mr Azima referred to a November 2014 Amnesty International report referring to several cases in which individuals had in fact been detained for long periods in the Ruler's palace or in other undisclosed locations. None of RAKIA's witnesses were in a position to refute its findings.

201.5   Reports had been provided to Mr Azima about Mr Gerrard conducting (on behalf of the Ruler and/or RAKIA) highly aggressive and unlawful interrogations of prisoners including Mr Al Sadeq; and aggressively threatening Mr Al Sadeq's wife and threatening one of RAKIA's opponents (Mr Izadpanah) with prison unless he agreed to pay $7.5 million to RAK, and offering clemency in exchange.

201.6   Under cross-examination, Mr Gerrard accepted that he had in fact interviewed Mr Al Sadeq and other individuals while in prison in RAK. He also admitted investigating and interviewing Mr Izadpanah in RAK.

201.7   If RAKIA was to sustain its case that complaints about these practices in RAK were false, disclosure should have been given of these incidents including of the records of interview that Mr Gerrard said would exist. This is particularly so given that Mr Gerrard's own account of Mr Al Sadeq's interview in detention itself raised concerns. Mr Gerrard claimed that the interview had been conducted strictly pursuant to the standards in the Police and Criminal Evidence Act 1984 although it became clear in Mr Gerrard's evidence that this was not true. No audio recording of the interview was made and he was unsure whether a record of the interview had been provided to Mr Al Sadeq's lawyers. Mr Al Sadeq was detained in RAK without charge for at least a year. Mr Gerrard accepted that he interviewed Mr Al Sadeq at some point during that detention, before he was charged.

201.8   Mr Gerrard saw no problem with an individual being detained for a prolonged period without charge and being interrogated in that period: "They have a process. It is not like ours -- many parts of it are -- and he agreed to talk to us whilst he was detained. We followed the process of PACE when we met him." As noted, the claim that PACE was followed was not correct, on Mr Gerrard's own evidence.

**Conclusion**

202.   In order to make good its case that Mr Azima procured and promoted false stories in the media, it was incumbent on RAKIA to establish that the stories which it was intended to publish about human rights violations were untrue. It has not done so. It appears that Project Clay intended to draw attention to actual cases of detention and illegality, not fabricated cases.  The 2014 Amnesty International Report indicates that there were real grounds for concern about detention procedures in RAK. None of RAKIA's witnesses were in a position to refute the findings in that report.

**Mr Azima's role in relation to the Security Assessment**

203.   The facts relating to the Security Assessment as they appear from the documents before the Court were as follows:

203.1   In late 2014 Mr Azima was engaged by Mr Kirby Behre, a lawyer at Miller & Chevalier, lawyers who acted for Dr Massaad (and later Mr Azima) to act as a consultant to assist with a PR campaign involving the investigation of human rights abuses in RAK for the benefit of Dr Massaad who had fled RAK and was in dispute with RAKIA and the government of RAK.

203.2   Mr Azima introduced former CIA operative Scott Modell to Dr Massaad and Miller & Chevalier and commissioned him to produce the Security Assessment and was responsible for arranging Mr Modell's remuneration for producing it.

203.3   The Security Assessment consisted of a review of the security issues affecting Dr Massaad including a detailed series of "Recommendations" which included "aggressive tools" and "offensive media operations" to "display the critical weak points of the RAK", using media teams to "denigrate the reputation of Sheikh Saud and the RAK as a place of doing business", and a campaign going beyond negative stories and including: "Organized protests and other forms of manufactured dissent, sustained over an extended period of time".

203.4   The Security Assessment also included a recommendation for "orchestrating business deals in RAK with disreputable individuals from other parts of the world" setting out how the RAK Government, the ruling family and RAK-owned banks and businesses could be deceptively lured into entering

transactions with serious criminals (including "Latin American drug cartel figures") and deliberately exposed to "Scams, fraud and deceptive partnerships", with the aim of causing the RAK authorities and, in particular, Crown Prince Mohammad to lose large sums of money and of leading to exposure which would serve as a lasting source of shame.

204.  Mr Azima accepted in cross-examination that he made comments on this document. In his witness statement, Mr Azima described the portion of the Security Assessment report that appeared to be a proposal for future work as "naïve and ill-conceived". There is no evidence that he criticised the assessment at the time it was being prepared. In cross-examination he also claimed (for the first time) that he told Mr Modell to "take…out" all the suggestions of illegal and deceptive activity from the Security Assessment. There is no indication in the contemporaneous correspondence that he gave any such instruction. He sent the final version of the report – including what he now claims is objectionable material – to Mr Behre for use by Dr Massaad.

205.  Mr Azima sought to justify his involvement in these matters on the basis that Mr Modell was retained to "investigate allegations of RAK's substantial human rights abuses which Dr Massaad was concerned about, particularly absentee trials which he wanted to avoid happening to him". This description of Mr Modell's work is not borne out by the Security Assessment which did not propose an investigation into human rights abuses but advocated a media campaign highlighting the absence of fundamental legal rights in RAK as a means of embarrassing the RAK authorities and compelling the UAE authorities "to rein in RAK aggression against the Client."

206.  There is moreover no evidence that Mr Azima actually carried out any investigation into human rights abuses. Although he claims to have spoken to Mr Al Sadeq when he was in prison and to his wife, Mr Azima does not claim to have investigated whether Mr Al Sadeq's claims were true or to have commissioned anyone else to do so.

207.  When the allegation of involvement in the campaign was added to the Particulars of Claim by amendment in July 2018 Mr Azima did not seek to defend his role on the basis that he was "investigating human rights" but, rather, denied that he had "any role" in such a campaign.

208.  Mr Azima also engaged in discussions with Mr Modell about using other possible "high risk, high impact" tactics against the "enemy" including possible "Black Bag" methods. Mr Azima admitted during cross-examination that this was a reference to the use of "Illegal operation[s]".

209.  Mr Azima's evidence, which I accept, was that the media campaign proposed in the Security Assessment was never put into effect and that no adverse publicity resulted from it. RAKIA has not attempted to prove that there actually was any media campaign or stories (false or otherwise) in the media at all. As Mr Azima said in cross-examination:

64

> "A. That was not my intent. Nothing happened. There's -- no propaganda was made; no article was written to the best of my knowledge. Nothing happened. The campaign never got started."

210. In summary, Mr Azima oversaw the commissioning of and payment for the Security Assessment report drafted by Mr Modell which included a plan for drawing attention to human rights' abuses in RAK as a means of inflicting significant financial and reputational damage against various RAK institutions and companies. Mr Azima provided comments on the Security Assessment but did not object to any of the proposals which it contained. The Security Assessment was not in the event implemented.

**(d)     Did Mr Azima make representations relating to the Proposed ISR JV?**

211. In late 2015 and early 2016 RAKIA engaged in discussions with Mr Azima and other individuals with whom he was collaborating regarding a proposed joint venture for the provision of ISR services. The proposed partners for the proposed ISR were RAKIA and Global Defence Services Corporation ("GDS"). GDS was specifically formed for the purpose of the Proposed ISR JV. Mr Azima was a major shareholder and director of GDS which operated from the same office address in Kansas City as Mr Azima's company ALG Transportation.

212. RAKIA alleges that Mr Azima was aware that the joint venture proposal submitted by GDS to RAKIA grossly overstated the value of the aircraft that would be acquired by the joint venture SPV, and that, if RAKIA had participated in the joint venture on the terms proposed by Mr Azima, it would have contributed approximately $20 million more than would have been fair to acquire its interest in the joint venture. It alleges that during the course of the discussions and negotiations concerning the Proposed ISR JV in late 2015 and early 2016 Mr Azima made five deliberate false representations to RAKIA and failed to correct other false representations made by the individuals with whom he was collaborating.

213. Mr Azima submits that:

213.1 RAKIA's case in respect of the Proposed ISR JV serves only to highlight the "highly artificial" nature of its claims overall and to provide confirmation of the vendetta pursued by RAKIA to vex Mr Azima and damage his reputation.

213.2 RAKIA's case that Mr Azima had sought to deceive was implausible given that any deception would have come to light at the stage of the due diligence stage performed by RAKIA's experienced advisers who included KPMG and Air Vice Marshall Hobart;

213.3 Mr Azima was happy to deal with RAKIA's experienced counsel;

213.4 Mr Azima's side comprised experienced ex-military officers including Major General John Holmes. RAKIA's case would necessarily be that those individuals were also party to the alleged dishonesty which was inherently unlikely.

**(1)      Alleged misrepresentations as to the value of the aircraft**

214.    RAKIA's case is that Mr Azima misrepresented the value of the aircraft that were to be acquired by the Proposed ISR JV knowing that the valuation was substantially misleading.

215.    The facts are as follows:

215.1 On 28 December 2015, Mr Azima sent an email to Mr Buchanan which attached the written proposal "for the formation of a Joint Venture Company in the Middle East for commercial ISR and defence related services". The proposal was drafted by Mr Adams, reviewed by Mr Azima and circulated by Mr Azima to the participants on the GDS side before being sent to Mr Buchanan.

215.2 The written proposal stated that the proposed joint venture vehicle would acquire two King Air and two Falcon aircraft from GDS for a total of $52,665,252. On that basis, it proposed that RAKIA should "pay GDS US $21,066,100 for 40.00% of the two (2) King Air ISR Assets and the two (2) Falcon ISR Assets."

215.3 The written proposal described the proposed joint venture as follows:

(a) A special purpose vehicle would be formed, to be called GDS Middle East, and to be held, as to 60% by GDS, and as to 40% by RAKIA.

(b) The assets to be placed into the SPV by GDS would include two King Air aircraft valued for the purposes of the proposal at $17 million each, and two Falcon aircraft valued for the purposes of the proposal at $9,332,626 each, giving the assets of the Proposed ISR JV a total value of $52,665,252.

(c) For its 40% stake in the proposed joint venture, RAKIA would contribute the sum of $21,066,100, being 40% of the purported value of the aircraft to be acquired.

(d) In addition, RAKIA would contribute working capital of $2 million, being 40% of the working capital purportedly required by the joint venture.

(e) Following payment of the said sums, GDS would transfer the aircraft to the SPV free of liens and encumbrances.

216.   Attached to the written proposals were detailed technical specifications for the King Air ISR aircraft and Falcon aircraft. Those specifications showed that all four aircraft were already equipped with ISR technology and systems. The specifications also stated that the "Price/Unit Cost" of each of the King Air aircraft was "$17 million (aircraft + communications equipment modifications)" and that the "Original Unit Acquisition Cost" and "Total Acquisition Cost" of each of the two Falcon aircraft was $9,332,626.

217.   RAKIA's case is that these references to the "Price/Unit Cost" and "Acquisition Cost" were unambiguous statements concerning the amount that GDS would actually pay to acquire the aircraft, and not (as Mr Azima asserted in his oral evidence) "budgetary number, generic numbers". RAKIA alleges that the true value of the aircraft was in fact just $6m. It relies on various documents not shown to RAKIA at the time, for example:

217.1   On 9 October 2015, Mr Lepper sent an email to Mr Azima which stated: "F, just spoke with AGD systems. Here is what we can do: If AGD stays in the sale and operating deal with us at 50/50 profit share he will sell us the aircrafts at his cost… The Falcon and the King airs are around 1.5M…"

217.2   A draft "Letter of Intent" from Mr Lepper dated 8 January 2016 stated in respect of the two King Air aircraft that: "Buyer will purchase the Aircraft as is, where is" for One Million Five Hundred Thousand U.S. Dollars ($1,500,000 USD) each, hereafter the "Purchase Price" for a total Purchase Price of Three Million U.S. dollars ($3,000,000) USD."

217.3   On 21 January 2016, Mr Lepper sent an email to Mr Azima and Mr Adams which stated (amongst other things) that: "I have just sent the email out confirming that the 4 ISR aircraft were secured (and can prove ownership) …I had to personally sign 4 promissory notes for 1.5M for each aircraft for a 6 month control period."

217.4   On 14 February 2016, Mr Lepper sent an email to Mr Azima and Mr Jacobs (copying Mr Adams) stating (amongst other things) that: "We all agree that all four aircraft will be a part of the GDS package 2 ISR king airs and 2 ISR falcons at 1.5 each, not just the two king airs… Each aircraft will be bought at $1.5m each. Total 6M".

218.   Accordingly, rather than being worth a total of $52.6 million, the four King Air and Falcon aircraft were in fact worth a total of just $6 million – about a tenth of what was represented by Mr Azima to RAKIA in the written proposal. At no point during the negotiations did Mr Azima disclose to RAKIA that GDS was planning to acquire the aircraft for just $6 million.

219.   Mr Azima contends, in summary as follows.

219.1  RAKIA's case on the December proposal has been presented in different (and contradictory) ways in its pleadings and witness statements, at different stages alleging a misrepresentation as to the cost of the aircraft to be provided, and at others as to their value. RAKIA's skeleton argument now indicates that the case it pursues is that a misrepresentation was made as to the value of the aircraft. RAKIA's case is therefore that Mr Azima made a false representation that the aircraft the subject of the proposal were "worth more than $52.6m".

219.2  The December proposal provided an estimated value of a fully equipped ISR project, which comprises not simply the aircraft but an array of highly sophisticated and expensive military equipment, operated by a trained crew, with official authorisation. The value of a fully equipped aircraft is not comparable to the acquisition cost of aircraft without any ISR equipment, crew or authorisations.

219.3  The December proposal also made clear that the contribution from GDS's side was not simply the aircraft, but rather a fully operational ISR service: "Operational Business Plan. GDS Middle East will offer all four (4) ISR Aircraft (2 x King Air and 2 x Falcons as part of a fully managed operational and manned ISR service (including flight personnel, engineering staff, and ISR expertise, both on the aircraft and on the ground)".

219.4  Mr Azima's evidence was that the figures indicated in the December proposal were simply indicative. Moreover, as Mr Azima explained, the nature of those figures as only indicative was obvious, because the range of equipment used (and hence the cost and value) would depend both on the customer's requirements, and on the government approvals that could be obtained. A reasonable and knowledgeable person would understand that defence articles are subject to approval of United States Government.

220.  In my judgment, the December proposal was clearly representing to RAKIA that the values ascribed to the four aircraft were the acquisition costs and not the value of the aircraft once ISR equipped and operated by SR professionals. Mr Azima's case that the amounts specified in the December proposal included the cost of ISR equipping is contradicted by contemporaneous documents.

220.1  On 16 October 2015 Mr Azima sent an email to Mr Buchanan attaching the specifications for the two Falcon aircraft. This email stated that the "Total Acquisition Cost" of each aircraft was $9,332,626 which is exactly the same value specified in the written proposal. In his email, Mr Azima stated: "Please note price included is the aircraft only. Modifications and Electronics are not mentioned."

220.2  The detailed technical information concerning the two Falcon aircraft in the written proposal stated that $9,332,626 is the "Original Unit Acquisition Cost" and the "Total Acquisition Costs" of the aircraft. Those expressions clearly indicate that $9,332,626 was the amount that the joint venture would need to pay in order to acquire ownership of the aircraft (i.e. the cost price), rather than

a figure that also sought to factor in other operational and support services that would be provided under the joint venture.

220.3   This is reinforced by the fact that the amount of $9,332,626 is a specific figure, rather than a round number (which would be expected if it was intended to represent a notional projection/estimate of future value based on an array of as yet un-quantified costs and services). If, as Mr Azima stated in his witness statement, the cost of equipping the aircraft with ISR technology was unknown and would have been difficult to estimate at that stage, since the parties had not yet agreed on the particular ISR services and the required equipment that the joint venture would offer, the figure communicated to RAKIA is unlikely to have included any such unknown and incalculable component with such seeming precision.

220.4   The aircraft were already ISR-equipped at the time of the negotiations so that to that extent it would not be necessary for further amounts to be spent on the ISR equipment over and above the acquisition cost. The written proposal contains detailed descriptions of their existing ISR equipment and capabilities. For example: The description of the two King Air aircraft explained that the aircraft "hosts a number of Army Intelligence, Surveillance and Reconnaissance/Reconnaissance Surveillance and Target Acquisition (ISR/RSTA) sensor systems". The description of the two Falcon aircraft also referred to the existence of "APS-143B multi-mode radar"; "EO/IR and tactical work station"; "side-looking airborne radar"; "the F-16's APG-66 multi-mode pulse-doppler radar"; "incremental upgrades to its FLOT turret"; and "360' scanning AN/APS- 143BV3 inverse synthetic aperture radar (ISAR)".

220.5   The contemporaneous emails show Mr Azima and his associates were aware that the values represented to RAKIA in the written proposal were inflated and that if RAKIA entered into the Proposed ISR JV on the basis of those valuations then Mr Azima and his associates would receive a significant windfall. In an email sent by Mr Adams to Mr Daniels on 26 January 2016, Mr Adams referred to the upfront cash contribution of $22 million from RAKIA, leaving $10 million to distribute to the partners in GDS, describing the deal as "terrific". On the same date, Mr Adams sent a further email to Mr Jacobs, Mr Azima, Mr Lepper and Mr Daniels which stated: "The economics of the deal are exceptional and are as good or better than anything I have seen in my 35 years in the aviation business because the upfront risk is mitigated". Mr Lepper replied to this email on the same date stating: "I know everyone is working very hard to get this deal done. As we all know this would be a tremendous payday. In speaking for myself, this would be a truly life changing event as I am currently in a very unstable financial position." Mr Lepper then sent out six "recommendations", the last of which was: "Distribute the 10M, have a cocktail and laugh about this".

220.6   Mr Azima's case that the discussions regarding the Proposed ISR JV were "preliminary commercial discussions" and that, by their very nature, the

positions of RAKIA and its counterparties "would be opposed and adversarial" on a large number of issues does not properly reflect the nature of the discussions which concerned a proposed joint venture in which it was to be expected that the parties would cooperate and have a greater regard for each other's  interests that in an ordinary commercial relationship. Moreover, I accept RAKIA's submission that, even if two parties have "opposed and adversarial" interests in the context of ongoing commercial discussions, this does not entitle either party to mislead the other as to the value of assets which it is contributing. A party acting in "good faith" and with the utmost professional integrity would disclose the true position in relation to the assets they were contributing.

**(2)      Alleged representation that GDS was licensed**

221.    On 25 January 2016, Mr Lepper sent an email to Mr Buchanan which stated as follows:

> "Please do not take my directness as disrespect, apologies if it was taken as such. I understand you are under controls of protocol and due diligence. As you will read below and was firmly explained to me, we are as well. We are a licensed weapons dealer with many restrictions and oversight controls. The attachment document officially outlines the required course of action for the TAA and legal guidelines which we must follow. […]"

222.    RAKIA contends as follows.

222.1   The email constituted a clear and express representation that GDS was licensed to sell weapons by the relevant US regulatory authorities and that, contrary to the assertion in that email, GDS was not a licensed weapons dealer and was not registered under the International Traffic in Arms Regulations ("ITAR").

222.2   Mr Azima's pleaded case and witness evidence concedes that GDS was not registered under ITAR.

222.3   Despite being copied to Mr Lepper's email, and despite knowing that GDS was not a licensed weapons dealer and that RAKIA was likely to rely on the false representation that it was, Mr Azima failed to correct Mr Lepper's false representation.

223.    Mr Azima's case is in summary as follows:

223.1   He denies that Mr Lepper was making any representation on his behalf. Mr Lepper's email was not on its face representing Mr Azima's position. It was sent from Mr Lepper's JFJ International email address, it was explaining the position of AGD (whose email on the subject of arms controls Mr Lepper was forwarding), and it did not refer to GDS at all in any way.

223.2   Mr Azima understood the email to refer to AGD's position and he believed AGD to have been registered under the ITAR.

223.3   In any event, it was subsequently made clear to Mr Buchanan that GDS was not registered under the ITAR.

223.4   RAKIA has offered no evidence to dispute Mr Azima's evidence that Mr Buchanan was informed that GDS was not a weapons dealer. Mr Azima's account in this regard is supported by a later note taken by Dechert of a meeting attended by Mr Buchanan, at which it was noted that there were different options for structuring the joint venture, which would include the need to obtain ITAR authorisations: "Option 2 was for FA to take the lead through ACG0 or GDS and get the necessary ITAR authorizations."

224.   In my judgment, RAKIA's case in relation to this alleged misrepresentation is lacking in substance. For the reasons advanced by Mr Azima, I am not satisfied that the statement in the email of 26 January 2016 that "we are a licensed weapons dealer" was made on behalf of Mr Azima, or that it was referring to GDS. I also accept the unchallenged evidence of Mr Azima that it was made clear to Mr Buchanan that it would be necessary for GDS to obtain the necessary authorisiations.

**(3)   Alleged representation that the Technical Assistance Agreement was produced or approved by the US State Department**

225.   Mr Lepper's email dated 25 January 2016 attached a document which purported on its face to be issued by the Directorate of Trade Controls at the US Department of State ("the TAA Document"). In particular:

225.1   The written title of the TAA Document was "U.S. Department of State – Directorate of Defense Trade Controls".

225.2   The electronic title of the TAA Document (shown in the covering email) was "U.S. DEPT OF STATE – GUIDELINE – TECHNICAL ASSISTANCE AGREEMENT".

225.3   The TAA Document bore the official crest of the US State Department.

225.4   The TAA Document contained explanatory text (in bold) which stated: "The Department of State is responsible for the export and temporary import of defense articles and services governed by 22 U.S.C. 2778 of the Arms Export Control Act…and Executive Order 13637." Further: "The following points are intended to provide an understanding of a Technical Assistance Agreement (TAA) defined by the International Traffic in Arms Regulations (ITAR). Of course, these do not replace the regulations defined by the ITAR. The ITAR is controlled and executed by Defense Trade Controls (DTC) which is a directorate under the State Department."

71

225.5  Mr Lepper's covering email stated: "The attached document officially outlines the required course of action for the TAA and legal guidelines which we must follow".

226.  RAKIA's case is as follows:

226.1  These documents, in particular the use of the word "officially" were clearly intended to convey the false impression that the TAA Document was an official State Department publication.

226.2  Contrary to the impression conveyed by the TAA Document and Mr Lepper's email, the document was not, in fact, produced by the US Department of State.

226.3  Mr Azima does not dispute this. Rather, he asserts that he "does not know why the document in question contains the State Department logo" and that he "did not add the logo to the document".

226.4  Mr Azima was copied the email from Mr Lepper to Mr Buchanan and received the false document attached to it. Despite this, he took no steps to correct the false representation that the TAA Document was an official US State Department document.

227.  Mr Azima's response is as follows:

227.1  There is no evidence to suggest that Mr Lepper (still less Mr Azima) added the seal of the US Department of State to the document; Mr Daniels of AGD had sent a document to Mr Lepper, which Mr Lepper appears then to have forwarded to Mr Buchanan.

227.2  In any event, it is very difficult to see where this complaint would lead even if it had any substance. RAKIA makes no suggestion that the contents of the document were in any way incorrect. Moreover, the requirements of the ITAR were later discussed in detail between the parties, both of which were represented by counsel. It was made clear by Timothy O'Toole (Miller & Chevalier) that RAK would need to through the ITAR approval process before the project could move forward. This approval would need to be obtained by RAK at the Federal level i.e. the approval would need to be provided by the US Government (State Department) to the UAE.

228.  In my judgment, this complaint lacks substance. The provenance of the TAA Document is unclear but there is no evidence that Mr Azima had any hand in the authoring of that document or the covering email from Mr Lepper. It is not established that Mr Azima was aware that the designation of the TAA Document as official was incorrect. Moreover, given that it is not suggested that the contents of the TAA Document were incorrect, the misrepresentation, such as it was, was in sufficiently material to found a claim pursuant to Clause 3.2 of the Settlement Agreement.

**(4)   Alleged representation that Mr Lepper was working to obtain the approval of the US Government for GDS' participation in the Proposed ISR JV**

229.   On 11 February 2016, Mr Lepper sent an email to Mr Buchanan in which he stated as follows: "Thank you for your passport documents and I will forward accordingly. In reference to the meeting agenda, I was just informed of the meeting a few days ago myself. I am still working the approval processes from the USG. As you know working with any government entity it may take some time and I will keep you informed of the process."

230.   RAKIA contends as follows:

230.1   This statement was a clear representation that Mr Lepper had initiated the process of seeking the US Government's approval of the Proposed ISR JV and that he was actively engaging with the US Government department to progress that process.

230.2   Contrary to Mr Lepper's representation, no steps had been taken to obtain the US Government's approval of the Proposed ISR JV.

230.3   Mr Azima did not contest this in his witness statement or oral testimony. Instead, he claims that he subsequently "made it clear that, so far as GDS and its potential partners were concerned, the proposed joint venture partners had not yet "initiated" an application for an appropriate licence under ITAR".

230.4   However, while there was subsequent discussion of "the numerous regulatory steps that had to be completed before the joint venture could proceed", at no point did Mr Azima (or anyone else acting on behalf of GDS) inform Mr Buchanan that Mr Lepper had not actually initiated the process of seeking US Government approval on or before 12 February 2016.

230.5   Mr Azima wrongly failed to correct Mr Lepper's misrepresentation. Mr Azima's oral evidence was that Mr Lepper was acting with his approval when he sent the email in question.

230.6   Further, contemporaneous emails show that Mr Azima tasked Mr Lepper with providing information in connection with "Government approvals" concerning the proposed joint venture.

230.7   Mr Azima was copied to Mr Lepper's email, which was itself a reply to an email from Mr Buchanan to which Mr Azima was also copied. Mr Buchanan's email stressed that he required certain information "so we can fully brief the Investment Committee on my return to RAK". Mr Azima was therefore aware that Mr Buchanan intended to rely on information provided by Mr Lepper in response to that request.

73

231.    Mr Azima's response was as follows:

231.1  Mr Lepper's email is expressed in non-specific terms;

231.2  In any event, the contention that Mr Azima left the position unclear is baseless. Mr Azima repeatedly explained to RAKIA that US government approval would be required, in terms making it clear that it had not been sought:

(a)   It was made clear to RAKIA that the approval of the US government in the form of a Technical Assistance Agreement would first require an initial agreement to be in place. The email sent to Mr Buchanan on 25 January 2016 said this in terms: "it is critical to have an initial agreement in place for justification and then to develop and submit the TAA to DTC".

(b)   In an email to Mr Buchanan on 17 February 2016, Mr Azima indicated the steps that would need to be taken in the future, without suggesting that they had been initiated: "I would like to summarize our discussion and as I have state [sic] previously the ISR aircraft are defense articles and as such ITAR controlled articles; technical data and services cannot be exported/shared to a foreign person without State Department approval. In our meeting on the 26th we can discuss the path forward with regards to a DSP 5 or DSP 73. These licenses will need to be considered for both the marketing and the permanent or temporary export plan. After our meeting we will be in a position to initiate/select together a path forward with the State Department."

231.3  The requirement for government approval and the steps that the parties would need to take prospectively before the Proposed ISR JV could proceed were also discussed in detail between the parties, with their counsel present, as recorded in RAKIA's own note of a meeting on 16 March 2016.

231.4  RAKIA failed to deal with any of these contemporaneous documents in cross-examination.

232.    In my judgment, the representation made by Mr Lepper was incorrect and may well have been intended to give a misleading impression to RAKIA of the steps taken towards obtaining US Government approval. However, given that those acting on Mr Azima's side of the negotiations appear to have made clear soon after the email was sent that the process of seeking authorisation had not yet started, I regard the misrepresentation as insufficiently material to found a claim under Clause 3.2 of the Settlement Agreement.

**(5)   Alleged representations that the Proposed ISR JV had the backing of the US Government**

233.     RAKIA alleges that Mr Azima repeatedly represented to RAKIA that the US Government was supportive of the Proposed ISR JV and was interested in becoming a customer of its services.

   233.1   For example, at a meeting on 26 February 2016, Mr Azima represented that the US Government, Central Intelligence Agency and US Special Operations were all intended clients and customers of the Proposed ISR JV. This representation was recorded in an attendance note produced by RAKIA's lawyers, which states: "FA noted that the project would be supported by the US Government "if you know what I'm saying". Further: "[Mr Azima] and WC said that they have talked to many potential clients - the "Northern Client" is interested, though the "Southern Client" would be more interested once the company has been set up. After the meeting, Mr Azima told Mr Buchanan that the "Northern Client" was the US Central Intelligence Agency, while the "Southern Client" was US Special Ops in Jacksonville, Florida…" Further: "WC said that they would go back to the potential customer – and FA interrupted to say "both customers, including the US Government customer" – to get a sense of their timeline. WC said that the US Government would be a launch customer."

   233.2   Other contemporaneous documents demonstrate that Mr Azima had clearly led Mr Buchanan to believe that the US Government supported, and would be the initial customer of, the Proposed ISR JV. For example:

        (a)     On 23 January 2016, Mr Buchanan sent an email to Mr Azima which stated, "You indicated that the US Government is supporting this project" and requesting sight of any approval provided by the US Government.

        (b)     On 30 March 2016, Mr Buchanan sent an email to Mr Azima in which he expressed concern that a draft of the Memorandum of Understanding sent to him by Mr Azima "makes no reference to USG as a client". In his evidence Mr Buchanan explained that he sent this email because "I felt the MOU was incomplete and didn't fairly reflect the discussions which had taken place".

        (c)     Mr Buchanan's email dated 30 March 2016 also stated that, "we discussed exit and you said that would be difficult for us – this I understand with the proposed US client base". This clearly reflected Mr Buchanan's understanding at the time – based on Mr Azima's statements to him – that the US Government would be a client of the Proposed ISR JV.

   233.3   In his evidence Mr Buchanan explained how Mr Azima had made it clear that "firm interest had been expressed by the US Government in being a client of the services that would be provided by the ISR JV" and "represented on multiple occasions that the US Government was both supportive of, and interested in, the services being provided by the ISR JV". He also stated, "Throughout the discussions with Mr Azima it was…clear that the US Government was expected to be the founding client".

233.4   The representation that the US Government supported the Proposed ISR JV was very important to RAKIA. Mr Buchanan's evidence was that if the US Government was not going to be a very early client, "the financials of the whole project would be …in material question".

233.5   The contemporaneous documentary evidence demonstrates that the US Government had not expressed any formal support for the Proposed ISR JV, nor had it expressed formal interest in becoming a customer. Mr Azima states that he "certainly hoped that the US Government would become a customer" but claims that he "made it clear" to Mr Buchanan that "it had not committed to doing so". The communications described above, however, demonstrate that this was not "made…clear" to Mr Buchanan. On the contrary, Mr Buchanan was deliberately led to believe that the US Government firmly supported the Proposed ISR JV and would be (or at least was very likely to be) its principal initial customer. Those statements were not accurate, as Mr Azima well knew.

234.   Mr Azima's response is, in summary, as follows:

234.1   RAKIA distorts the content of Mr Azima's statements regarding the interest of the US Government. Mr Azima explained that, unsurprisingly, he hoped the US Government would become a customer and that he expected them to be supportive, as and when the ISR project had become operational.

234.2   The possibility of the US Government being a customer was obviously discussed, as was the possibility of other possible clients. For example, at the meeting on 26 February 2016, Mr Buchanan referred to both possibilities: "[JB] also said that if the US Government is a founding client then the project would be easy, but if it is another client such as Djibouti then it could take up to three years to establish the framework."

234.3   However, it would not have been possible for the government to commit to doing so before the project had been approved. The parties were well aware of this given the complex approvals required (as discussed as that same meeting).

234.4   Mr Azima's evidence was that he believed the US Government would be clients once the project had become operational: "A. US Government would have been our clients -- various part of US Government would have been clients once we are operational." This understanding was, as he explained, based on confidential discussions with officials.

234.5   There is a clear difference between a statement that, after the project becomes operational, the US Government would be supportive, and a statement that the US Government already actively backed the project and would be a founding client. This distinction was made clear in the meeting held in February 2016. Dechert's note of that meeting records Mr Azima (and a Mr Carmona (WC)) saying as follows: "JB said that in David's mind, having the US Government as a client was a difference maker. David does not believe that regional customers can generate the level of projected returns discussed to date. FA

responded that he had never said that the US Government was a client, and that came from Mark. WC said that he could not assure JB that if the deal happens, the US Government would be a customer."

234.6    Mr Azima's account is supported by other contemporaneous documents. Neither of the written proposals submitted to RAKIA from GDS's/Mr Azima's side identified the US government as a client. The later proposal was prepared by counsel and indeed it defined the likely client base in narrower terms: "The purpose of this MOU is to set forth certain understandings of the parties in relation to the terms and conditions to be agreed between ALG and RAKDL for the formation of a joint venture to provide ISR services to governmental clients in the UAE and the region, subject to and in full compliance with applicable laws in the US and in the UAE."

234.7    Mr Buchanan in fact understood this definition of the client base as excluding the US government as a possible client. The involvement of counsel and the drafting of these agreements are plainly inconsistent with the contention that Mr Azima set out to deceive RAKIA in the manner alleged.

235.    In my judgment, RAKIA has failed to establish that Mr Azima misled it, or permitted it to be misled, with regard to the status of the US Government as a potential client. Some of Mr Azima's comments may have overstated the level of commitment but the note of the meeting on 16 February 2016 made clear that the US Government was not committed to being a customer.

## (3)    Was the Good Faith Representation false?

236.    RAKIA's case is that by virtue of the six instances of Mr Azima's misconduct summarised at paragraph 166 above the Good Faith Representation in the Settlement Agreement was false, in that Mr Azima had not at all times acted in good faith and with the utmost professional integrity in his dealings with RAKIA or other RAK entities and that Mr Azima must have known about his own misconduct.

237.    Based on my conclusion that, of the six instances of misconduct, four have been proved as alleged, I am satisfied that the Good Faith Representation was false to Mr Azima's knowledge.

238.    The remaining two allegations, concerning the planning media campaign and the negotiations for the Proposed ISR JV, were proved in part. Mr Azima contends that his conduct in relation to those two matters, even if proved as alleged, would not have constituted misconduct such as to falsify the Good Faith Representation. Though not necessary for the purposes of my decision, I address these contentions briefly below.

239.    With regard to the media campaign, Mr Azima contends as follows:

239.1   conduct directed at RAK or the Ruler would not be contrary to the representation that Mr Azima had acted in good faith and with professional integrity towards RAKIA, RAK Airways, and other "RAK entities". Even on RAKIA's case, the media campaign would only affect the standing of RAK and the Ruler, and the reputation of its lawyers, Dechert;

239.2   efforts to investigate and expose unlawful detention practices should not be regarded as misconduct contrary to a duty of good faith unless those efforts are carried out without any basis for believing that there were grounds for concern in that regard.

240.   I do not accept these contentions. It seems to me that the media campaign, although not aimed primarily at RAKIA or any RAK entity, would, if successful, have been likely to deter foreigners from doing business in RAK and thereby harmed the interests of RAK commercial entities. The activities contemplated by the Security Assessment are not fairly characterised as "efforts to investigate and expose unlawful detention practices." The activities included the use of "Scams, fraud and deceptive partnerships", and to "ensconc[e] known criminals…such as Latin American drug cartel figures, in official RAK development or business deals", in order to "lead RAK authorities to lose large sums of money", and by plotting to "Orchestrat[e] business deals with disreputable individuals" in order to provide a factual basis for stories about "money laundering in the RAK, tax evasion and even terrorist financing". Mr Azima's involvement in the Security Assessment was such that, as he must have known, he had not acted in good faith.

241.   Mr Azima contends that the conduct alleged as regards the ISR JV, even if proved, was not contrary to the Good Faith Representation on the ground that it is common for misunderstandings, ambiguities or inaccuracies to arise in the course of the discussions which later fall away as the discussions continue. In my view, Mr Azima's misconduct cannot be excused on this basis. The misrepresentations which I have found were made were not in good faith and were intended to result in GDS making a dishonest profit.

242.   I therefore conclude that RAKIA has established that, as Mr Azima must have known, the Good Faith Representation was false.


**(4)      Did RAKIA rely on the Good Faith Representation?**

243.   In support of its case that RAKIA relied on the Good Faith Representation, RAKIA submits as follows:

243.1   To establish inducement, it is not necessary to establish that RAKIA had a positive belief that the representation was true. Rather, it is simply necessary to establish that the representation influenced RAKIA to act to its detriment.

243.2   Mr Azima's assertion that the inducement requirement is not made out because RAKIA entered into the Settlement Agreement "for purposes unconnected to

the settlement of the claim" and because it had reached an "internal evaluation…that Mr Azima was acting against RAKIA, and fraudulently" is incorrect.

243.3   Clause 3.2 of the Settlement Agreement expressly records that the payment of $2.6 million to Mr Azima was "made in reliance on" the Good Faith Representation. Clause 3.2 therefore provides a contemporaneous record (which Mr Azima acknowledged and endorsed by signing the Settlement Agreement) of RAKIA's reliance upon that representation.

243.4   This is consistent with the evidence of Mr Buchanan, who was responsible for signing the Settlement Agreement on behalf of RAKIA. He explains in his witness statement that: "Prior to the execution of the Settlement Agreement…I was aware of allegations having been made against Mr Azima and concerns expressed about his conduct… However, had I known what I know now insofar as concerns Mr Azima's wrongdoings towards RAKIA, there is no way I would have agreed to recommend that he be paid $2.6 million. However at the time, I was reassured by his willingness ultimately to agree the wording at clause 3.2 of the Settlement Agreement."

244.   The evidence establishes that both Mr Buchanan and the Ruler relied on the Good Faith Representation. Whilst the Ruler and Mr Buchanan may have harboured suspicions about Mr Azima, it does not follow that they did not rely on the Good Faith Representation. The fact that a representee harboured suspicions regarding the honesty of a representor does not negate inducement (see *Zurich Insurance Co plc v Hayward* [2017] AC 142 at [18]-[20] (Lord Clarke) and [67]-[71] (Lord Toulson)).

245.   The Ruler stated that as far he was concerned the purpose of the Settlement Agreement was to settle the claims brought by Mr Azima and to obtain assurance from him that he had acted in good faith towards RAKIA and RAK more generally. It is implicit in this statement that the Ruler relied on the Good Faith Representation. For reasons set out later in this judgment, I reject Mr Azima's case that RAKIA knew about the contents of the hacked material and were inducing Mr Azima to enter the Settlement Agreement as a trap.

**(5)   Loss**

246.   The damage sustained by RAKIA as the result of its reliance on the Good Faith Representation is the sum of $2.6 million paid pursuant to the Settlement Agreement.

**The Unlawful Means Conspiracy Claim**

247.    RAKIA's case is that Mr Azima's actions in connection with the intended sale of the Hotel gave rise to a further cause of action, namely the tort of unlawful means conspiracy. It contends that:

247.1    Mr Azima conspired with others including Dr Massaad, Mr Adams, and Mr Al Sadeq, to procure the illicit payments totalling $1,562,500 from RAKIA and to conceal that misappropriation by fraudulently creating the sham Referral Agreement.

247.2    As a result of that conspiracy, RAKIA was unlawfully deprived of $1,562,500.

247.3    Mr Azima is liable to RAKIA for the tort of unlawful means conspiracy and is required to compensate RAKIA for the losses it suffered as a result.

248.    Mr Azima's response, apart from denying the alleged misconduct, is that the conspiracy claim fails on the ground that illicit payments preceded the creation of the Referral Agreement. The Referral Agreement was drafted many months after the illicit payments were made but that is not a valid objection to the claim. RAKIA's case is not that the Referral Agreement caused the illicit payments to be made but that it is evidence of the earlier conspiracy which was causative of the illicit payments.

249.    In my view, it is to be inferred from the fact that Dr Massaad received a bribe out of the illicit payments (paragraphs 182 – 185 above), and from the involvement of Mr Sadeq in the retrospective drafting of the Referral Agreement (paragraphs 180.2 to 180.17 above) that Mr Azima had agreed at least with Dr Massaad and probably with Mr Al Sadeq as well that the illicit payments would be made.

250.    It follows that Mr Azima is liable to pay the sum of $1,562,500 to RAKIA by way of damages.


**Mr Azima's Hacking Claim**

251.    There is no dispute that RAKIA's case against Mr Azima is based on evidence obtained as a result of the hacking of Mr Azima's confidential emails. Mr Buchanan said that until September 2016, when the hacked material came to light, he had not thought of Mr Azima as implicated in Dr Massaad's frauds. He then changed his mind after seeing the hacked material. Mr Azima's case is that the hacking was carried out by RAKIA. RAKIA denies any involvement in the hacking and claims to have obtained the data from publicly available sources innocently.

252.    Mr Azima submits that, if the Court concludes that RAKIA hacked Mr Azima's emails, it should strike out RAKIA's claim as an abuse of process on the basis that its process is being used by RAKIA in a manner that would bring the administration of justice into disrepute. In *Hunter v Chief Constable of the West Midlands Police* [1982] AC 529 Lord Diplock held as follows:

"This is a case about the inherent power which any court of justice must possess to prevent misuse of its procedure in a way which, although not inconsistent with the literal application of its procedural rules, would nevertheless be manifestly unfair to a party to litigation before it, or would otherwise bring the administration of justice into disrepute among right-thinking people. The circumstances in which abuse of process can arise are very varied. … It would, in my view, be most unwise if this House were to use this occasion to say anything that might be taken as limiting to fixed categories the kinds of circumstances in which the court has a duty (I disavow the word discretion) to exercise this salutary power."

253.   More recent authority has confirmed that the Court has power to strike out a claim which would be an abuse of the Court's process. In *Summers v Fairclough Homes* [2012] 1 WLR 2004, Lord Clarke held as follows:

"The language of the CPR supports the existence of a jurisdiction to strike a claim out for abuse of process even where to do so would defeat a substantive claim. The express words of CPR r 3.4(2)(b) give the court power to strike out a statement of case on the ground that it is an abuse of the court's process. It is common ground that deliberately to make a false claim and to adduce false evidence is an abuse of process…"

254.   In addition, CPR 32.1 confers on the Court the power to exclude evidence which would otherwise be admissible to be exercised in light of the overriding objective. The exercise of the discretion involves balancing, on the one hand, the public interest in doing justice on the basis of all available evidence and, on the other hand, the public interest in deterring breaches of the law entailed in the collection of the evidence, taking into account all relevant circumstances. As the Court of Appeal explained in *Jones v University of Warwick* [2003] EWCA Civ 151 [2003] 1 WLR 954 in which evidence had been obtained unlawfully and in breach of the claimant's right to privacy (para 28):

"That leaves the issue as to how the court should exercise its discretion in the difficult situation confronting the district judge and Judge Harris. The court must try to give effect to what are here the two conflicting public interests. The weight to be attached to each will vary according to the circumstances. The significance of the evidence will differ as will the gravity of the breach of article 8, according to the facts of the particular case. The decision will depend on all the circumstances."

**Mr Azima's pleaded case**

255.   Mr Azima's pleaded case in support of his hacking claim (at paragraph 8J of the Re-Re-Amended Defence and Counterclaim) is as follows.

"(a)  Between autumn 2015 and July 2016 Mr Azima was assisting in the mediation of a dispute between RAKIA and Dr Massaad.

(b)  To the best of Mr Azima's knowledge, on or around 14 October 2015 Mr Azima received several emails containing malicious internet links which were aimed at him specifically so as to induce him to open the emails. The opening of the emails and the links in them enabled those carrying out the hacking to gain unauthorised access to and steal Mr Azima's confidential data.

(c)  RAKIA has targeted Mr Azima in the context of its dispute with Dr Massaad. In particular, in around April 2015, the Ruler told Mr Buchanan that he wanted Mr Buchanan and other assistants to "target" Mr Azima. The Ruler directed his associates to bring "charges" against Mr Azima and also to pursue "other channels" for taking action against Mr Azima. The Ruler's associates discussed meeting to "coordinate our attack" on Mr Azima and Dr Massaad. In or around July 2015, the Ruler instructed another of his assistants, Mr Bustami, to "go after" Mr Azima.  Further, in the context of his role in assisting in the mediation of the dispute between RAKIA and Dr Massaad, Mr Azima had meetings and discussions with RAKIA's representative, Mr Buchanan, and its counsel, Mr Neil Gerrard, of Dechert LLP. At a meeting on or about 23 July 2016, Mr Gerrard told Mr Azima that if Dr Massaad would not agree to a settlement, Mr Azima would be made "collateral damage" in a war that RAKIA would then wage on Dr Massaad. Mr Azima understood this statement to be a threat.

(d)  The dispute between RAKIA and Dr Massaad was not resolved. RAKIA engaged investigators and public relations consultants (including the now defunct firm, Bell Pottinger) to make inquiries into Mr Azima and to disseminate information about him.

(e)  On around 29 July 2016, Mr Azima learned of a website making allegations against Dr Massaad, similar to those which RAKIA had made in the course of the mediation of its dispute with Dr Massaad. Shortly thereafter, Mr Azima learned of two other websites containing similar allegations against him. The websites contained links to BitTorrent internet sites, where certain materials stolen from Mr Azima were available to download with appropriate software and expertise. At this point, Mr Azima apprehended that his emails and data had been stolen, and so changed his passwords and increased his computer security.

(f)  RAKIA has admitted that it and its lawyers, Dechert LLP, hold a substantial quantity of the data stolen from Mr Azima, including an admission made in September 2016 to holding around 30GB of material. RAKIA denies responsibility for the hacking and theft of data or awareness of the persons responsible. Its explanation for holding these materials, given through its solicitor Mr David Hughes, is that the materials were obtained from internet sites. In proceedings brought by Mr Azima against RAKIA in the United States

District Court complaining of the hacking, RAKIA appointed a computing expert. That expert was not able to access the majority of the material hacked from Mr Azima from the internet, and could obtain only a portion of Mr Azima's material, substantially less than 30GB. RAKIA's own computing expert was therefore unable to replicate the process by which RAKIA (through its counsel) claims to have obtained the stolen data.

(g) Mr Azima has through his Counsel alleged RAKIA's responsibility for the hacking of his data and has quoted in support of this allegation the inability of RAKIA's expert in the US proceedings to access the majority of the stolen material. Following Mr Azima making this complaint, further links to materials stolen from Mr Azima (additional to those limited materials that RAKIA's expert had been able to access) appeared on several internet sites.

(h) Mr Azima avers that, to the extent his stolen data has been made available on the internet (and websites and links have been created to facilitate access to those data), this has been done by RAKIA and/or those acting at RAKIA's direction, to cause damage to Mr Azima, to provide a pretext for RAKIA to have possession of the data, or for other improper purposes.

(i) The materials that have more recently been made available as described in paragraph (g) above do not include certain documents that had been among Mr Azima's data. Mr Azima infers that the persons responsible for publishing the materials on the BitTorrent sites decided to withhold these specific materials for their own reasons. The materials withheld are damaging to RAK's reputation. They include:

    (i) emails concerning an article originally published in October 2009 on a website, TheSmokingGun.com ("TSG"), which reported on the arrest of the Ruler of RAK for sexual assault in a hotel in Minnesota. On 31 July 2018, TSG reported that a denial of service cyber-attack seeking to overwhelm its servers had been made, targeting this specific article with the apparent purpose of seeking to make it unavailable to legitimate visitors. TSG also reported that representatives of the Ruler had previously requested it to remove the article from its website, which it had declined to do; and

    (ii) an article critical of RAK and describing it as a rogue state within the UAE, commissioned by the Ruler's brother, apparently in connection with a power struggle in the RAK ruling family."

256. Thus, Mr Azima's pleaded case in support of his hacking claim relies on the following six main contentions:

256.1 that RAKIA "targeted" him in the context of its dispute with Dr Massaad. Particular reliance is placed on internal emails sent in April and July 2015;

256.2  that his data was accessed as a result of his opening "phishing emails" on or around 14 October 2015;

256.3  that in July 2016 Mr Gerrard threatened that Mr Azima would be made "collateral damage" if Dr Massaad would not agree a settlement. A settlement was not agreed;

256.4  shortly afterwards, RAKIA engaged investigators and public relations consultants (including Bell Pottinger) to make inquiries into Mr Azima and disseminate information about him. The consultants engaged by RAKIA created two websites containing publicly available information about Dr Massaad's perfidy which went live just a short while before Mr Azima's hacked documents were published on the internet;

256.5  RAKIA's expert in the US was not able to obtain access to the majority of the material hacked from Mr Azima and was therefore unable to replicate the process by which RAKIA claims to have accessed the material. Following that complaint further links appeared;

256.6  that the materials which have been made available do not contain documents damaging to RAK's reputation.

257.  Mr Azima's hacking claim was supplemented in the course of the hearing by the following additional allegations:

257.1  That RAKIA's motivation for pursuing Mr Azima was to seek "retribution for his refusal to join RAKIA's side" in its dispute with Dr Massaad and to "punish him for his involvement in investigating human rights abuses in RAK".

257.2  By March 2015 the Ruler had come to believe that Dr Massaad was working to destabilise his regime. The Project Update (which did not feature anywhere in the statements of case) is said to have led the Ruler to believe that Mr Azima was an accomplice of Dr Massaad heading the "US Team" and involved in a critical press campaign. This enraged the Ruler and led him to demand the targeting of Mr Azima, and the hacking of his emails.

257.3  RAKIA put together a well-armed team with the capability of carrying out the hacking and publication online, including Mr Page who had been repeatedly connected with hacking in other cases and who had connections to Israeli operatives formerly of that country's intelligence services who facilitated the hacking.

257.4  In October and November 2015, acting on the instruction of the Ruler, Mr Page caused or procured the hacking of Mr Azima's emails through spear-phishing attacks on his data.

257.5 RAKIA was able to gather information about Mr Azima from the hacked material by December 2015, as evidenced by the View from the Window document;

257.6 Although Mr Azima had (on his case) a genuine entitlement to receive $2.6 million in compensation from RAKIA in respect of the Training Academy JV, the Settlement Agreement was in fact a device which was intended to equip RAKIA with a legal mechanism to bring a claim against Mr Azima on the basis of material which it already had from hacking his emails. The $2.6 million was paid to "lure" Mr Azima into an agreement, to "reel him in and use him in our negotiation with Dr Massaad".

257.7 RAKIA's case as to how it came across the hacked material innocently was untrue and designed to conceal RAKIA's role in the hacking. Contemporaneous emails which show that RAKIA innocently discovered the hacked material were in fact a false "paper trail"created by Mr Buchanan and Mr Gerrard in order to conceal their involvement in the hacking.

257.8 Wrongdoing can be inferred from RAKIA's "highly suspicious" approach to the documentary evidence.

258. RAKIA's position is, in summary, as follows.

258.1 The hacking claim is unfounded. RAKIA had no involvement whatever in the hacking of Mr Azima's emails/devices or in the publication of any hacked documents online. These were documents which were publicly available on the internet which were discovered by individuals who reported them to RAKIA in early August 2016 at about the same time as the documents were discovered by individuals acting on behalf of Mr Azima.

258.2 An allegation that a party engaged in a criminal conspiracy to unlawfully hack into and publish a person's confidential data in pursuit of a malicious vendetta, and then took extensive steps to deliberately and dishonestly conceal that criminal activity from the Court, is an allegation of the utmost seriousness. It is trite law that cogent evidence is required to justify a finding of discreditable conduct and that "the cogency of the evidence relied upon must be commensurate with the seriousness of the conduct alleged".

258.3 These principles required Mr Azima to adduce particularly cogent and persuasive evidence in order to make good his hacking claim. Mr Azima's hacking claim necessarily entails not only a claim that RAKIA dishonestly obtained access to his emails but that its witnesses including Mr Buchanan, the Ruler, Mr Gerrard, Mr Halabi, Mr Bustami and Mr Handjani were parties to a conspiracy to deceive the court by the presentation of a fundamentally false case concerning RAKIA's role in the hacking of Mr Azima's emails.

258.4 In any event, whatever the position about RAKIA's direct or indirect involvement in hacking, the public interest in the fair and just disposal of the

action on the basis of the best available evidence prevails and the Court should take these documents into account in any event.

**The Facts**

259.    The facts relating to the hacking claim are as follows.

**(1)     Mr Page and the Project Update**

260.    Mr Page's initial engagement in RAK was between 2008 and 2010 when he undertook surveillance work on the behalf of the Ruler who was at the time the Crown Prince. His remit was to try to ascertain through surveillance what plans Sheikh Khalid, the Ruler's brother, had to try to destabilise the Crown Prince's position.

261.    In January 2015, at the instigation of the Ruler, a meeting took place between Mr Page and Mr Buchanan. This was a "get to know you" meeting and no specific mandate was discussed.

262.    A few days later, a meeting took place between the Ruler and Mr Page at which the Ruler asked Mr Page to investigate a rumour that Dr Massaad was working with a member of the royal family to the detriment of the Ruler and the government of RAK.

263.    Subsequently, in or about March 2015, a second meeting took place between Mr Buchanan and Mr Page at which Mr Buchanan told Mr Page that he was involved in investigating wrongdoing by Dr Massaad and the misappropriation of assets. He wanted Mr Page's assistance in tracing assets, investigating Dr Massaad's involvement with Iran, his links to Hezbollah and Lebanon and his relationship with Viktor Bout (who was serving a sentence in the US for arms trafficking).

264.    Thereafter Mr Page had regular monthly meetings with the Ruler and Mr Buchanan. Sometimes his meetings were with the Ruler alone. Mr Page said that the Ruler "had a habit of compartmentalising things. He would ask me to do certain things, but not involve Jamie Buchanan. So, therefore, I had this Chinese wall between what His Highness wishes me to undertake and what he wishes Mr Buchanan to understand."

265.    Mr Page made no reference to any written reports in his witness statement, asserting that he does not keep contemporaneous documents "…and my briefings to clients are invariably oral, especially in the Middle East where this is very normal." The implication that Mr Page did not give written briefings was untrue. In fact, as Mr Page accepted in cross-examination, he regularly provided the Ruler with written update reports to accompany his oral briefings. By the beginning of 2020, Mr Page had provided some thirty update reports, all of which were in the same format. Mr Page was unable satisfactorily to explain his reference to his briefings being "invariably oral" which he accepted was misleading. Mr Page referred to the five

years' lapse of time and to extraordinarily difficult family issues affecting his recollection of dates and events. I do not regard these factors as a satisfactory explanation.

266.   Only one of Mr Page's written reports was in evidence, namely the Project Update dated 26 March 2015. The evidence of Mr Buchanan and Mr Page was that RAKIA did not keep copies of the other reports because of a "protocol" agreed with Mr Page whereby copies of reports would be returned to Mr Page two weeks after they were produced. The reason why a copy of the Project Update is still available is that Mr Buchanan inadvertently breached the protocol by arranging for the Project Update to be emailed from his office to his private MSN email account so that he could read it at home; the email copy has survived. Prior to the hearing Mr Azima was unaware that the Project Update was provided by Mr Page. The fact that it was provided by Mr Page emerged early in Mr Buchanan's cross-examination.

267.   Much of the Project Update was redacted on the ground of irrelevance but it included the following unredacted passages relating to Mr Azima:

> "In the US, KM's hired a team of advisors managed by Farhad Azima (FA) in order to spread allegations against our client. The main allegations against the client are on human rights issues and in particular the allegation that RAK uses a dedicated facility in RAK where it imprisons and torture political opponents. FA, who might also be responsible for paying the US team, handles all KM's activities in the US. KM's lawyer in the US, Kirby D. Behre, hired a consultant, who is a former WSJ reporter, named Christopher Cooper, who due to his good contacts. Cooper approached a British reporter named Simon Goodly of The Guardian and briefed him on the RAK torture allegations, in order to raise public opinion against RAK and to harness international civil rights organizations to the subject.
>
> According to our source, FA also hired a private investigator from Northern Virginia name 'Joseph Aboud', an American - Egyptian who seems to have SIGINT capabilities, and probably managed to get access to the client's Email traffic. We couldn't verify until now the identity and capabilities of Aboud, but we are working on it.
>
> Our sources have reported that KM's team suspects that they have an information leak since they noticed some of RAK's actions in the last few months. They believe that the client is having someone monitor their activities either electronically or in other methods.
>
> **KM efforts against the client**
> FA and the US Advisory Team
> In continuation to our previous report, we were informed by several new sources that FA is managing KM's efforts in the US and perhaps even paying their bills. At the moment, KM's strategy in the US is to spread human rights violations allegations against the client. In particular the allegations focus on the notion that RAK uses a dedicated facility in RAK where it imprisons and torture political opponents. According to KM, the main figure assisting our client to

cover this alleged activity is Niel [sic] Gerard, a partner in Dechert LLP (London) law firm.

Additionally, KM claims that the reach of RAK's No. 1 is also away from RAK, claiming that the client recently got a Jon Doe locked up in the Republic of Georgia upon his request.

**Summary. Conclusion and Queries**

As we reported above, KM's US team has a certain plan to smear RAK and its ruler with human rights allegations. As far as we know, at this point, they do not have any evidence to back up these allegations, but they started gathering information for a campaign, based on hearsay and testimonies, and started searching for a platform to make it public. The campaign is not public yet, so we will be able to gather intelligence on their progress in order to monitor their activities and attempt to contain or ruin their plans."

268.  The Project Update shows that the activities of Mr Azima, as an associate of Dr Massaad with responsibility for managing a team of US advisors, were being monitored although Mr Azima was not the initial or main target of RAKIA's investigation. Mr Page's evidence was as follows:

"--Farhad Azima's name came out -- completely out of the blue. It was not part of our mandate to look at Farhad Azima. This information came from a confidential source. The confidential source was not even given --because we weren't instructed to look at Farhad Azima He provided what he heard in the marketplace, if that's the expression, my Lord."

269.  Mr Page's evidence in cross-examination was that his reports were drawn up by Insight, an Israeli company whose staff are former Israeli intelligence operatives:

"Q. And what do they specialise in?
A. Well, the founder of the company is the former head of the Lebanese desk of Shin Bet and Shin Bet is the Israeli equivalent of MI5.
Q. Right.
A. So they specialise in collating information, particularly in the Middle East. They obviously specialise in collating information on Iran, on Hezbollah, on Lebanon, and they were the – the expression I use, my Lord, is the "think tank".
Q. So would it be fair to say, Mr Page, that in relation to the matters covered by your project updates, you had in fact subcontracted at least some of that work to this Israeli company called Insight?
A. That is correct.
Q. And they were, amongst other things, intelligence-gathering specialists?
A. They were specialists at obtaining information from confidential sources and, my Lord, the important thing was to analyse a significant amount of data being recovered from multiple jurisdictions and cross-referencing it, seeing really how it related to Khater Massaad and his links. So, in answer, my short answer is, yes, they were the conduit to receive all the information from my other subcontractors.
…

Q. And they were really -- they were the people, were they, who you enlisted to carry out some of this electronic data-gathering?
A. By which you mean electronic -- I don't understand. By "electronic", you mean open source information on the internet?
Q. I mean of any source.
A. Well, they were -- yes, they were using the dark web, open source information on the internet."

270.   Mr Page also explained that whether or not one of his sources breached legal obligations in providing information was "not for [Mr Page] to consider":

"Q. In other words, this aggrieved employee would have told you confidential things that he'd learnt when he was working as a security officer for Sheikh Khalid? A. Yes, and it's not for me to question whether he was in breach of any of his employment obligations.
Q. Or for you to question whether he was breaching any duty ofconfidentiality presumably, Mr Page?
A: It's -- that was not for me to consider."

271.   It was submitted on behalf of Mr Azima that RAKIA's witnesses (Mr Buchanan, Mr Gerrard and the Ruler) deliberately minimised Mr Page's involvement and the importance of the Project Update in their witness statements. I consider that there was some substance to this criticism.

272.   Mr Buchanan did not mention the Project Update in his witness statement even though he accepted in cross-examination that it was an important document. His explanation for this omission was that when he prepared his witness statement he did not believe that the Project Update had come from Mr Page but had come from some organisation which was introduced to him (Mr Buchanan) briefly but which he advised the Ruler against using. He said that in the month prior to the hearing it became clear to him what the source of the document was, at which point he advised RAKIA's solicitors. This was an unconvincing explanation. It must have been at all times obvious to Mr Buchanan that the Project Update was the work of Mr Page, from its content and format, from the fact that he had briefed the Ruler on it and shown it to Mr Gerrard and from the unusual circumstances in which a copy of it was retained by him in breach of Mr Page's protocol. Mr Buchanan's witness statement said nothing about his dealings with Mr Page in 2015.

273.   Mr Gerrard did not mention the Project Update in his witness statement either. His witness statement gives the impression that the first time he came across Mr Page was in August 2016 at the time of the discovery of the hacked material. It transpired in the course of his cross-examination that Mr Gerrard was aware of Mr Page's work in 2015 and that he was shown the Project Update report in March 2015 when he discussed it with Mr Page. The Project Update was of concern to him because it dealt with the involvement of Simon Goodley, the Guardian journalist, who Mr Gerrard knew was taking a significant interest in RAK related human rights issues and phoning witnesses and junior lawyers on the case.

274. Mr Azima criticised the assertion in the Ruler's witness statement that he "never saw" the Project Update as being outright false. Based on Mr Page's account of the primarily oral briefings of the Ruler, I consider that it is possible that the Ruler had no recollection of seeing the Project Update. It is, however, notable that the Ruler was less forthcoming about the Project Update than he might have been. Mr Azima had suggested in his first witness statement that the Project Update had led the Ruler to target him, pointing out that the author of the Project Update was "unknown" but that the report had "presumably been produced by or for RAKIA and/or other RAK entities and seen by the Sheikh". When he came to respond to this part of Mr Azima's witness statement, the Ruler must have known who produced the report and on whose instructions, even if he did not recollect seeing it, but he did not provide this information and simply dismissed the paragraph in Mr Azima's witness as erroneous speculation: "This is incorrect. I never saw the report".

275. RAKIA's response to the criticism that the Project Update had not been dealt with more extensively in the witness statements was that it was not a document referred to in Mr Azima's statements of case; the fact that RAKIA had disclosed the Project Document showed that it was not intent on concealing it or Mr Page's involvement in its production which was likely to emerge at the hearing. Had RAKIA or Mr Buchanan set out to conceal the authorship of the document, Mr Buchanan would not have voluntarily divulged its authorship to RAKIA's solicitors or the Court. If Mr Azima's theory of deliberate concealment were correct, there would be no conceivable advantage to RAKIA of divulging this information at trial.

276. I do not regard this as a satisfactory explanation, given what I consider to be the clear relevance of the document to the hacking claim (in that it evidences the fact that Mr Azima was the subject of covert surveillance in 2015 being carried out under the supervision of Mr Page who, on RAKIA's own case, was subsequently responsible for finding the hacked material) and the witnesses' accounts in cross-examination as to the importance of the document. I recognise nevertheless that the failure to deal more fully with the Project Update may simply be explained on the basis that it was an unhelpful document that was not referred to in Mr Azima's statements of case rather than on the basis that it was part of a plot to put forward a false case about RAKIA's role in the hacking. I accept that, if there had been such a plot, it is surprising that the Project Update was disclosed.

277. Mr Azima also criticised the assertion in Mr Page's witness statement (under the heading "Knowledge of Farhad Azima") where he said that he did not come across the name Farhad Azima in 2015 and that the first time he came across his name was in early 2016 at one of his regular catch up meetings with Mr Buchanan. When it was pointed out to him that the Project Update showed that he knew of Mr Azima a year earlier, so that his evidence was plainly wrong, Mr Page's response was that Mr Azima was just a side issue in the report which covered matters across the globe involving many countries and people.

278. Although I accept that Mr Azima was only one of a large number of characters who were the subject of his investigation, the April and July 2015 emails show that,

following the Project Update, the Ruler was concerned about Mr Azima and interested in pursuing him. The Ruler said in his witness statement that in early 2015 he wanted information about Dr Massaad's organised criminal scheme and, in particular, as to the role Mr Azima had played. It seems most unlikely that he did not discuss Mr Azima with Mr Page, the investigator with whom he was having monthly meetings, in which case it is hard to believe that Mr Page could have completely forgotten about any mention of Mr Azima prior to his meeting with Mr Buchanan in early 2016.

**(2)      The April and July 2015 emails**

279.   On 4 April 2015, Mr Buchanan emailed Mr Handjani as follows:

"HHSS [i.e. the Ruler] had wanted us to target FA [i.e. Mr Azima] – on what basis would we do this?"

280.   It is unclear precisely what prompted this email. Mr Handjani's evidence, which I accept, was that Mr Azima had called him out of the blue in March 2015 and said that there was a big problem between him and the Ruler in that he was owed $8m by RAK and that, if things were not resolved, they could "get ugly" for everyone. Mr Handjani was also called by Dr Massaad at about this time who asked him to talk to the Ruler and get the Ruler to stop investigating him. Mr Handjani then spoke to the Ruler about both calls.

281.   Mr Buchanan's evidence was that the Ruler's instruction to target Mr Azima in April 2015 was prompted in part by Mr Azima's claim for $8 million, which the Ruler considered to be unfounded, and in part by the information in the Project Update. He said that the reference to "targeting" was a reference to the bringing of criminal charges.

282.   The Ruler's own evidence as to his state of mind was that he wanted information about the extent of the criminal scheme organised by Dr Massaad and, in particular, as to the role Mr Azima had played and, if he was involved in those schemes, to have criminal charges brought against him. He dismissed the suggestion that the emails were prompted by the Project Update.

283.   The email of 4 April 2015 led to the following exchanges on the same day:

(a)   Mr Handjani: "I'm not sure that's possible at the moment. I don't know what basis you would target him. Thoughts?".
(b)   Mr Bustami: "As for Farhad, I would say get AH [Mr Handjani] on the case to check with the boss on what exactly he wants done".
(c)   Mr Buchanan: "AH has no idea how we might go after him"
(d)   Mr Bustami: "I think next week Amir is in town so we can both hook up with him and brain storm it."

284.   Later that day, Mr Bustami wrote to Mr Handjani and Mr Buchanan as follows:

"I have had few discussions with boss about FA [Mr Azima] and he is adamant that we bring charges against him. He was very happy that you told him that FA is no longer asking for the $8 m.

The boss told me that you have checked with your people and confirmed back to him that the boys with the hotel are no issue now and we should not be intimidated by them and that FA may not be orchestrating this.

He wants me to get you on the case to file some sort of charges against Farhad. He also told me today that you have another channel that you are using with khater [Dr Massaad]. When are you next in town so that me you and Jamie [Mr Buchanan] could hook up and coordinate our attack?"

285.    Mr Handjani's evidence, which I accept, was that the reference to "going through another channel" was a reference to attempts that were going on at that time to open a dialogue with Dr Massaad.

286.    On 6 April 2015 Mr Handjani wrote to Mr Bustami and Mr Buchanan as follows:

"Subject: Re Farhad Azima
Dear Naser
Thank you for your email. I spoke to the boss and advised him against both using other channels and pressing charges against Farhad for now. I believe both approaches could undermine the work that you and Jamie are doing. I was very clear with him that we should speak with one voice-and for the moment you and Jamie are that voice.

We have to see how Khatter responds with his lawyer. If we start pressing charges with Farhad it would disrupt this process. My humble opinion is that we should not be fighting multiple fires at one time.

We need to keep this circle of information tight and give full weight and support to you and Jamie.

I have advised boss as much as
well. Best,
AAH"

287.    There is no evidence of any steps being taken against Mr Azima between April and July 2015 and the natural inference from this email is that the Ruler was dissuaded from taking any action for the time being. Mr Buchanan's evidence was that Mr Azima did not feature at all in his discussions with the Ruler in this period.

"Q.  What was going on in relation to investigating Mr Azima between the beginning     of April 2015 and 19 July 2015?
A. Absolutely nothing to my knowledge.
Q. Did you have some monthly meetings with Mr Page over this time?
A. Yes, I would have done.
Q. And would there have been some reports in all likelihood, written reports?
A. Yes, written or verbal, and I can't tell you which they were.
Q. And you would have discussed those with the Ruler?
A. I would have done -- I did.

92

Q. And is it your evidence that Mr Azima didn't feature at all in any further updates from Mr Page between the beginning of April 2015 and 19 July 2015?
A. I have no recollection of Mr Azima's name or his activities coming on to the radar screen in that period."

288.   On 19 July 2015, Mr Buchanan wrote to Mr Handjani as follows:

"NB [Naser Bustami] says the Boss wants criminal stuff taken out of letter and to go after FA subject to guidance from AF [Andrew Frank].

Nothing ELSE new from NB - will speak to AF tomorrow and fill you in."

Mr Handjani replied as follows:

"Talking to the boss now. He wants me to respond to the little guy in an email and to coordinate with you."

289.   Mr Buchanan's evidence about this exchange in his witness statement was that he had received a message from Mr Bustami to the effect that the Ruler wanted criminal allegations taken out of a letter to be sent to Dr Massaad's lawyers. The reference "to go after FA" was a reference to the prospect of some form of criminal proceedings or criminal charges being brought against Mr Azima which were not in the event pursued although in cross-examination, Mr Buchanan said that he did not know what was meant by "going after FA". "Guidance from AF" was a reference to guidance being sought from Mr Andrew Frank who provided public relations assistance to RAK in the US and whose guidance would be sought in relation to any reputational issues that might arise as a result of criminal charges being brought against Mr Azima as a US citizen. The reference to "the little guy" was a reference to Mr Azima. Mr Buchanan said that the planned coordinating was to do with the HeavyLift claim for compensation about which Mr Azima had emailed Mr Handjani on the same day (19 July 2015).  Mr Bustami's and Mr Handjani's evidence was to the same effect. On 28 July 2015 Mr Handjani sent a response to Mr Azima explaining that there was nothing he could do beyond putting him in touch with Mr Buchanan.

290.   It is unclear what prompted the Ruler to give the indication or instruction reflected in Mr Buchanan's email of 19 July.  Mr Buchanan was unable to explain what prompted the Ruler to want Mr Azima to be "gone after" at this time. What is clear is that the Ruler's desire for action to be taken against Mr Azima had not abated since April. The evidence of Mr Buchanan and Mr Handjani was that this desire was prompted in part by annoyance over what the Ruler perceived was an unmeritorious claim for the $8 million but this seems unlikely given that Mr Handjani's email of 4 April 2015 had made clear that this claim was not being pursued. The Ruler himself does not suggest that the $8 million claim prompted his desire to go after Mr Azima. It is more likely that the Ruler's hostility towards Mr Azima stemmed from his perception, originating in the Project Update, that Mr Azima was an associate of Dr Massaad who was threatening to cause trouble for him.

291.   There is nothing to indicate that the Ruler was persuaded that it was a bad idea to "go after" Mr Azima or that he changed his mind about doing so. In his witness statement the Ruler does not deal specifically with the July email but says that "as the emails show" he was advised not to consider criminal charges against Mr Azima and accepted that advice. But the emails concerning criminal charges were sent in April, not July. I infer that the Ruler continued to harbour feelings of hostility towards Mr Azima in the period following the July email but it is unclear what, if any, hostile action was taken.

292.   There is no evidence about any guidance being sought or obtained from Mr Frank, as mentioned in the email. There are no records of the Ruler's discussions with Mr Page at this time. There is no indication that any consideration was given to the hacking of Mr Azima's email accounts but neither is there any documentary evidence that this was ruled out as a way of "going after" Mr Azima.

### (3)   The spear-phishing emails

293.   There is no specific evidence that RAKIA was planning to take, or took any steps to obtain intelligence about Mr Azima from July 2015 onwards.

294.   Mr Azima's case is that in October and November 2015, that is to say, some three to four months after the July emails referred to above, his emails were hacked as a result of his opening or clicking on links contained in spear-phishing emails that he received on or around 14 October 2015. The spear-phishing emails were sophisticated and included a malicious email purporting to be sent from Dr Massaad's personal assistant, Ms Beudjekian.

295.   The parties' forensic computer experts ("the Experts") agree that Mr Azima received several "spear phishing" emails in October and November 2015. They also agree on the following:

   295.1   there is no evidence that Mr Azima opened any of those emails or clicked on the links within them;

   295.2   there is no evidence that any of those emails (or any other emails received by Mr Azima) led to Mr Azima's online credentials being stolen or to any unauthorised access to his devices;

   295.3   a single spear-phishing email could be an effective means of targeting Mr Azima;

   295.4   there is no evidence that identifies the person(s) who sent the emails; based on the information made available to them, it is not possible to determine who was responsible for the unauthorised access to Mr Azima's data and the publication of that data online, how and when the unauthorised access occurred or how much data was obtained as a result;

295.5    there were three tranches of data, the first 27.775 GB in size, the second of which became available on or about 30 August 2016 with a size of 10.33MB and the third with a size of 4.43 GB;

295.6    the contents of two of the three tranches of the hacked data appear to emanate from iCloud account(s); Mr Azima appeared to have at least two iCloud accounts and a number of Apple devices including an iPhone but since the iCloud logs identifying contemporary access to Mr Azima's iCloud accounts are not available to the Experts, the Experts agree that it is not possible to confirm whether, and if so when, how and by whom, unauthorised access was gained to Mr Azima's iCloud accounts;

295.7    analysis of the access logs for Mr Azima's fa@fa1.us account and the connection record and recent access change record for his account fa@farhadazima.com do not enable any conclusions to be drawn as to how, and by whom, any unauthorised access to either of those accounts occurred;

295.8    given Mr Azima's statements that the access to his fa@fa1.us account shown by the logs in October 2015 was carried out without his authorisation, the access on those dates appears to be suspicious;

295.9    suspicious activity in October 2015 does not provide determinative evidence of when the fa@fa1.us emails contained in the Internet Data may have been taken from Mr Azima's account.

296.    The Experts do not agree as to whether one of the five emails identified in the report of Mr Tarbell (Mr Azima's expert) as a spear-phishing email was a spear-phishing email or a non-targeted phishing email; nor do they agree as to whether the spear phishing emails indicate that Mr Azima was being targeted in a systematic campaign by a single attacker.

297.    Whilst it is not possible to say precisely how Mr Azima's emails were accessed without his authorisation, the indications are that it began at around the time the spear-phishing emails were received. Mr Tarbell examined the records of instances when Mr Azima's email account, "fa@fa1.us" was accessed in October 2015. That examination indicated that there were multiple instances between 13 and 15 October 2015 during which time the account was accessed from IP addresses that are unfamiliar to Mr Azima. Mr Krone agrees that the access on these dates appears to be suspicious.

298.    Mr Tarbell also found that the emails stored in the "fa@fa1.us" account also included a number of emails in which Mr Azima had recorded passwords for other email accounts. The person who had covertly accessed the "fa@fa1.us" account could therefore have obtained the means of accessing other email accounts used by Mr Azima.

299.    The "authorised connection record" for another of Mr Azima's email addresses, "fa@farhadazima.com", indicates that this address was accessed from several

countries with which Mr Azima had no connection. Mr Krone accepts that this access appears to be suspicious.

300.    In summary, it is possible that the hacking of Mr Azima's emails is linked to his receipt of spear-phishing emails in October 2015 but this is not firmly corroborated by the evidence. There is no evidence as to who carried out the hacking.

**(4)      The View from the Window document**

301.    Following the alleged hacking in October/November 2015, on 29 December 2015 a document was prepared on RAKIA's side which described a "series of investigations" and labelled Mr Azima as a participant in "fraudulent activities". It was prepared by Andrew Frank, a senior individual at Karv Communications, a PR company working for RAKIA, who had been mentioned in Mr Buchanan's email of 19 July 2015. It was sent to Mr Gerrard on 4 January 2016.

302.    The document reads as follows:

> "View from the window
> The window has opened on Ras Al Khaimah through a series of investigations that have unearthed a massive fraud that has taken place in the Emirate, the UAE, and several other countries including the Republic of Georgia, India, Congo and others.
> A number of things have been exposed as fact over the past twenty-four months:
> -KM was the CEO of RAK Ceramics beginning in 2003, as well as the RK Investment Authority (RAKIA) beginning in 2006 and oversaw a series of investments inside and outside of RAK that are under now intense scrutiny and have exposed wrong-doing
> -Gila Mikadze was head of RAKIA's operations in Georgia and created and oversaw numerous corporations that stole money from the Emirate and was used for his own purposes and to bribe former government officials.
> -Others committed crimes inside RAK, including the Ruler's Chief legal advisor and the legal advisor to RAKIA (they also happen to be cousins(?))
> … -FA, a U.S. citizen, appears to have orchestrated, if not (fully) participated in numerous fraudulent activities.
> … -Companies were set up with Iranian nationals"

303.    Mr Azima's case is that the reference in the document to "FA" (i.e. Mr Azima) appearing "to have orchestrated, if not (fully) participated in numerous fraudulent activities" establishes that RAKIA must by this stage have hacked into Mr Azima's emails because otherwise Mr Frank would not have not known about what RAKIA alleges in these proceedings to be his "fraudulent activities".

304.    In support of this case, Mr Azima submits as follows:

304.1   It is striking that none of RAKIA's witnesses even acknowledged the existence of the View from the Window document. RAKIA failed to call Mr Frank

as a witness and failed to identify Karv when ordered by HHJ Kramer QC to identify its public relations consultants, indicating an awareness that his evidence would be damaging to RAKIA.

304.2   The View from the Window document establishes "beyond serious argument" that by the end of December 2015, RAK and RAKIA had obtained access to Mr Azima's confidential emails and data. The author of the document had clearly been informed that RAK and RAKIA had a firm basis for asserting that Mr Azima had orchestrated or participated in "numerous fraudulent activities".

304.3   A belief on RAKIA's part that there was such a basis could only have come from the hacked material. As Mr Buchanan, who was leading RAKIA's investigation, explained, RAKIA only believed that Mr Azima had engaged in any fraud upon reviewing the Hacked Material:

> "A. The investigations that had taken place until that point gave me no cause to believe that Mr Azima was involved in any frauds in respect of Dr Massaad.
> Q. But you changed your mind when you saw the hacked data; is that right?
> A. I changed my mind when I saw the hacked data, that is correct."

304.4   When Mr Buchanan was shown the View from the Window document, he claimed to be able to offer no explanation for its contents and to have been unaware of it until it was put to him in cross-examination.

304.5   Mr Gerrard gave inconsistent explanations for the document, alleging initially that it was "ramblings" of Mr Frank which had come "out of the blue" and later that it was the product of a meeting which had taken place two weeks earlier concerning a "blitzkrieg" of negative publicity. He claimed that he told Mr Frank that the section of the View from the Window concerning Mr Azima "isn't going to work" because all that was known about Mr Azima was "suspicions".

304.6   This account is not credible given the absence of any response by Mr Gerrard to Mr Frank's email attaching the View from the Window document and the inconsistency with the evidence of Mr Buchanan, according to whom the "blitzkrieg" meeting did not take place until January 2016. Moreover, the View from the Window does not purport to describe "suspicions". It states that investigations have "unearthed a massive fraud" and that the matters listed in it (including Mr Azima's involvement in "numerous frauds" "have been established as fact".

305.   The View from the Window document shows that in late 2015, a negative PR campaign was being planned against Mr Azima alongside Dr Massaad. Mr Azima had not dropped out of the picture. It also suggests that someone had planted in Mr Frank's mind the idea that Mr Azima had been involved in fraudulent activities. That

person was probably Mr Gerrard who had briefed Mr Frank before the document was sent. It was put to Mr Gerrard in cross-examination that, in order to have accused Mr Azima of fraud, Mr Gerrard must have been aware of the contents of Mr Azima's confidential emails:

> "Q. … by that stage, I suggest, Mr Gerrard, you were aware of the confidential material that had been procured illegally from within Mr Azima's email records in October/November 2015 and one way or another you thought you were on to something. You started to think that you could -- that you had some material to allege fraud. That's what I put to you.
> A. So I'd like to deny that, my Lord. It's preposterous. But I'd also like to explore that question because what you're suggesting is I had a secret little stash of Mr Azima's documents which I could select at will to identify frauds. I mean, how would I do that? How do I pull this stuff down? How do I search for it?"

306.    Shortly thereafter, the following exchange took place:

> "Q. And you would have been aware that Mr Page had been successful in gathering intelligence from within Mr Azima's confidential email archive?
> …
> Q. I'm putting that to you.
> A. Right. No, I wasn't aware.
> Q. And that this is the only explanation for why Mr Frank has recorded, based upon what you and Mr Buchanan must have told him, the idea that Mr Azima had been involved in numerous fraudulent activities.
> A. My Lord, that's ridiculous. Mr Frank is a clever man, but he's not a lawyer. He will have heard on a regular basis concerns as to gun-running, fraud, etc, etc. What he will not have grasped that we did not have sufficient evidence to proceed. On everything else we had stacks of evidence against -- let's take the first bullet point, Dr Massaad. We had evidence. Indeed he was prosecuted. We had evidence against Mikadze. He was prosecuted. We had evidence of other crimes inside RAK, including the Ruler's chief adviser and the general counsel. They were prosecuted. Let me ditch Farhad Azima for the moment. We had dummy corporations set up in the RAK, UK, Georgia, Cayman Islands, etc. We could have put those in, and so on. Fraudulent bank accounts, possible gun-running … we did not have any evidence that we could have proceeded against of actual fraud against Farhad Azima. That is just plainly wrong and that's what I told Andrew Frank"

307.    Mr Gerrard's explanation for the reference in the View from the Window document to Mr Azima's "orchestrating if not participating" in "numerous fraudulent activities" was confused. At one point he referred to the Project Update, although this had not alleged fraud against Mr Azima. He also referred to information provided to Mr Frank at a meeting attended by Mr Buchanan, although this meeting did not take place until later. His evidence was essentially that Mr Frank was told about suspicions concerning Mr Azima but these suspicions had nothing to do with Mr Azima's hacked emails.

308.   It is credible, in my view, that suspicions about Mr Azima's involvement in fraud had arisen because of his association with Dr Massaad rather than because access had been obtained to Mr Azima's confidential emails. I do not attach great significance to Mr Buchanan's expression of surprise at the contents of the View from the Window document when it was shown to him in cross-examination accompanied by the suggestion that the document revealed prior knowledge of Mr Azima's confidential emails.

309.   In my judgment, the references to Mr Azima's orchestrating, if not participating in, numerous fraudulent activities in the View from the Window document are too vague to establish that RAKIA had obtained access to Mr Azima's confidential emails by the time this document was prepared. Although the document lists Mr Azima's apparent orchestration of or participation in fraud as one of a number of established "facts", I agree with RAKIA's submission that the document reads like a series of points for a press release or article rather than a carefully sourced analysis. I do not consider that any adverse inferences can be drawn against RAKIA from its failure to call Mr Frank as a witness, given that Mr Azima did not refer to the View from the Window document as part of his pleaded case.


**(5)     The Settlement Agreement**

310.   On Mr Azima's case, RAKIA cynically entered into the Settlement Agreement as a device to trap him into agreeing a duty of good faith and an English jurisdiction clause, which, with its access to the hacked material, would give RAKIA leverage over Mr Azima. It would enable RAKIA to exact retribution for Mr Azima's failure to take RAKIA's side in its dispute with Dr Massaad and provide RAKIA with the means of turning Mr Azima against Dr Massaad.

311.   In support of this case, Mr Azima submits as follows:

311.1   The lack of internal documentation on RAKIA's side to indicate that any detailed review of the HeavyLift claim actually took place suggests that, contrary to Mr Buchanan's assertions, there was no investigation of the HeavyLift claim, no internal review of the claim and no working group in RAK gathering relevant information, auditing financials and speaking with individuals; RAKIA was not interested in ascertaining the specific amounts that HeavyLift had actually invested; there were no documents evidencing such an analysis;

311.2   There is no record of any board meeting to approve the Settlement Agreement;

311.3   The letter sent to the Ruler by Mr Buchanan and Mr Bustami dated 15 February 2016 seeking the Ruler's approval of the Settlement Agreement indicates the importance of the obligation of good faith: "It is on this basis that we have been able to successfully negotiate the inclusion of Clause 3.2 referred to below which we believe is the key clause in this agreement bearing

in mind your wider objectives." Those objectives were to manufacture a basis for bringing an action against Mr Azima in England as part of a campaign to ruin his reputation and good standing;

311.4   Clause 3.2 purports to include an assurance of good faith by Mr Azima not only towards RAKIA but also towards other entities in which the government of RAK had a shareholding, irrespective of the place of incorporation. This is important given that HeavyLift's claim was against RAKIA and concerned a joint venture entered into in 2007 with RAK Airways, which was incorporated in RAK also. There was no need to include this reference to the place of incorporation in clause 3.2 unless RAKIA envisaged that other RAK entities, such as RAKIA Georgia, might be involved in some way.

312.   Mr Azima's contention that the entering into of the Settlement Agreement is consistent with RAKIA having hacked his emails some five months previously gives rise to an obvious objection. If, as Mr Azima alleges, RAKIA had by the end of 2015 got access to his confidential emails and discovered evidence of what it now contends were his fraudulent activities, it is, on the face of it, inherently unlikely that RAKIA would have been willing to enter into the Settlement Agreement or to make any payment to Mr Azima in settlement of the HeavyLift claim. The fact that RAKIA paid out $2.6 million to Mr Azima under the Settlement Agreement suggests that RAKIA was unaware of the contents of the hacked material.

313.   A possible answer to this objection, advanced by Mr Azima, is that entering into the Settlement Agreement, even at a cost of $2.6 million, made commercial sense for RAKIA because the Good Faith Representation and the jurisdiction clause, coupled with its knowledge of the hacked material, gave RAKIA leverage over Mr Azima, enabling RAKIA to sue, or threaten to sue Mr Azima and thereby maintain pressure on him in the context of RAKIA's dispute with Dr Massaad. Ultimately, if necessary, it could sue Mr Azima to recover the $2.6 million, as it has done.

314.   Mr Azima's "leverage" explanation for the Settlement Agreement is not, however, compelling. RAKIA did not need to enter into the Settlement Agreement in order to sue or to threaten to sue Mr Azima on the basis of the hacked emails. It could have sued him or threatened to sue him in relation to the fraudulent misappropriations in connection with the intended hotel sale without Clause 3.2 (though not in an English court). Moreover there is no evidence that RAKIA ever in fact attempted to use the Settlement Agreement or the hacked material to exercise leverage over Mr Azima.

315.   I consider that the letter of recommendation dated 15 February 2016 from Messrs Buchanan and Bustami to the Ruler provides some support for Mr Azima's "leverage" explanation. It is striking that Messrs Buchanan and Mr Bustami described Clause 3.2 (rather than the full and final settlement provision) as the key clause in the agreement, bearing in mind the "wider objectives". Mr Azima says that these enigmatic words are a veiled reference to the Ruler's objectives to pursue Mr Azima. It is possible to read the letter in the way contended for by Mr Azima but it is also possible to read "wider objectives" as referring to the Ruler's objectives concerning Dr Massaad and the benefit of getting an assurance from Mr Azima that he was acting in good faith in the discussions with Dr Massaad. The Ruler's evidence was that an assurance from Mr

Azima that he had acted properly served the wider objectives of understanding Dr Massaad's fraud and obtaining recompense.

316.   I am not persuaded by the contention advanced on behalf of Mr Azima that there was no meaningful investigation by RAKIA into the HeavyLift compensation claim. Mr Buchanan's witness statement contains an account of the attempts to obtain information from HeavyLift's side and the difficulties arising from the absence of documentation. The evidence of Mr Buchanan and Mr Gerrard was that there was an investigation by Dechert and that the documents produced by Dechert are covered by legal professional privilege, which they would be.

317.   I do not regard the absence of formal board approval of the settlement as significant. I accept Mr Buchanan's explanation that the Settlement Agreement went straight to the Ruler for his approval. The scope of Clause 3.2, extending to RAK entities irrespective of their place of incorporation, is in my view explicable as "belt and braces" drafting rather than denoting knowledge of the hacked material.

**(6)   The engagement of Digitalis**

318.   In March 2016, RAKIA engaged (through Bell Pottinger) Digitalis to prepare a primarily defensive strategy in order to protect the client's reputation, as set out in Digitalis' engagement letter of 21 March 2016. They were also instructed to create two websites to promote publicly available material relating to Dr Massaad and his involvement in frauds.

319.   In his skeleton agreement, Mr Azima identified Digitalis, along with Mr Page and Bell Pottinger, as being part of a team engaged by RAKIA with a view to conducting an aggressive internet and media campaign and with "the capability of obtaining material through hacking". There was, however, no basis in the evidence for the assertion that either Bell Pottinger or Digitalis had any such capacity. The evidence of Mr Leach, who worked for Bell Pottinger, was that Bell Pottinger prepared a media and communications strategy that was sent to RAKIA but not in the event implemented. Mr Azima did not feature at all as he was not someone they were focused on.

320.   The evidence of Mr King, the Chief Executive Officer of Digitalis, which I accept, was to the effect that prior to 1 November 2016, when they were asked by Dechert to preserve documents relating to the dispute between Mr Azima and RAKIA, they were unfamiliar with the name of Mr Azima and undertook no work in relation to Mr Azima. Mr Azima did not feature in their plans for an "offensive" online campaign and was not being targeted.

321.   Mr Azima submitted that the absence of relevant documents in Digitalis's possession was concerning. Mr King provided a full and clear explanation of his company's document retention policies. There was no evidence of deliberate

document destruction, much less of any instruction by RAKIA to destroy relevant documents.

**(7)   The July 2016 meeting**

322.   Following execution of the Settlement Agreement in March 2016, Mr Azima continued to engage with RAKIA with a view to brokering a settlement of its dispute with Dr Massaad.

323.   On 16 July 2016, a meeting was held between Mr Azima and three representatives of RAKIA: Mr Buchanan, Mr Gerrard, and an associate in Mr Gerrard's firm, Dechert, at the Churchill Hotel in London.

324.   Mr Azima's case is that at this meeting Mr Gerrard threatened him that if Dr Massaad would not agree to a settlement, Mr Azima would be made "collateral damage" in a war that RAKIA would then wage on Dr Massaad, a threat that was put into effect a few weeks later.

325.   Mr Azima's evidence was as follows:

325.1   Mr Gerrard told him to stop acting as a mediator, and instead work solely for RAKIA to assist them in their campaign against Dr Massaad.

325.2   He refused and told Mr Gerrard that is not how he operated; this aggravated Mr Gerrard who proceeded to reference his history, stating that he had been a policeman, a detective, a prosecutor and a lawyer, and that he had connections with "Number 10" and that if Mr Azima did not settle the case with Dr Massaad then there would be a war against Dr Massaad and Mr Azima would be "collateral damage".

325.3   Mr Azima asked Mr Gerrard whether he was threatening him. He told Mr Azima that this was not a "threat but a promise."

325.4   At the end of the meeting, he asked Mr Buchanan for a copy of the handwritten notes that Mr Gerrard's colleague had taken. Mr Buchanan informed Mr Azima that he would be sent a copy of the notes after they were transcribed that evening. However, after repeated chasing, Mr Buchanan said that Mr Azima could not have them without Mr Gerrard's permission. He also set out in an email dated 23 July 2016, in response to Mr Azima's complaint that what Mr Gerrard had said to him amounted to "extortion" and "blackmail", a dictionary definition of those terms.

326.   Dechert's note of the relevant part of the meeting reads as follows:

"NG noted that Kirby had referred to "mutually assured destruction" but that KM was delusional if he thought that bringing the criminal and civil actions would destroy HHSS. NG noted that HHSS was now engaging with  Abu

Dhabi and the risk was that, the further this went, the more likely collateral damage would occur. It would be difficult to keep the scope of RAK's actions within a narrow compass. NG asked FA to inform KM that Dechert has access to the whole of the Dana Jets database, the whole RAK Ceramics database, which included the whole of Sheba Nair's emails. Essentially, Dechert had all of the client's documents and were analysing them."

327.    This note suggests that the reference to collateral damage was in response to Mr Azima's lawyer's reference to the possibility of "mutually assured destruction" and to the possibility that the greater the engagement with Abu Dhabi (i.e. the UAE authorities) the more likely it was that collateral damage would occur. In his witness statement, Mr Gerrard confirmed what was recorded in the note, saying that he had wanted to convey to Mr Azima that the Ruler was already engaging with the criminal authorities in the UAE and that, once criminal proceedings were started, there was a greater risk of collateral damage for Dr Massaad and any of his associates. As he put it in cross-examination: "The evidence as it was mounting was clearly going to move, we anticipated, from fraud to more federal-type offences and that wouldn't be for us to determine." He meant that once litigation is started or a prosecutor takes over, these things get a life of their own. He was not thinking about anything other than the usual effects of litigation or criminal proceedings.

328.    In his witness statement, Mr Buchanan said as follows: "The meeting was a tense one because it was during a critical stage of the negotiations with Dr Massaad but that Mr Gerrard was firm, focused and professional. Mr Azima raised his voice at times, Mr Gerrard did not. Mr Gerrard did not tell Mr Azima to stop acting as a mediator (which was not Mr Azima's role) and work solely for RAKIA. Instead he impressed on Mr Azima the importance of his role acting as Dr Massaad's representative in the discussions and encouraged Mr Azima to act in Dr Massaad's best interests and do his bit to help resolve the dispute."

329.    In their oral evidence, Mr Buchanan and Mr Gerrard denied that any demand was made that Mr Azima "change sides", pointing out that this would, from RAKIA's perspective, have been pointless. As Mr Gerrard put it:

          "A.  At no stage did I ask Farhad Azima -- I think you said change sides or whatever it was. That would be faintly ridiculous. He told us many times it was difficult enough talking to Dr Massaad without thinking he had changed sides for RAKIA. We recognised he was in Dr Massaad's camp, that's okay, and I think he was trying to mediate on behalf of Dr Massaad, but unfortunately, as I say, he and we failed."

Mr Buchanan made the same point: "We absolutely did not wish Mr Azima to take RAKIA's side, because that would have been disastrous in terms of the negotiations."

330.    In my judgment, it is unlikely that Mr Gerrard would have demanded that Mr Azima cease to act as a mediator and "change sides" as this would have been an unrealistic and potentially counter-productive demand. I consider that the note of the meeting is probably accurate and that when referring to "collateral damage" Mr Gerrard was

referring to damage to Dr Massaad and others from legal proceedings, rather than a threat to Mr Azima.

331.    I accept that Mr Azima appears to have been troubled by what passed at the meeting and that he told Mr Buchanan that what Mr Gerrard said amounted to extortion and blackmail (as appears from Mr Buchanan's email of 23 July 2016). I can well believe that Mr Gerrard conducted the meeting in a forceful and even aggressive way. At the same time, I bear in mind that, after learning of the BitTorrent sites accessing the hacked material, Mr Azima did not immediately perceive RAKIA and the Ruler to be responsible for the hacking.

332.    After denying that there was any extortion or blackmail, Mr Buchanan's email of 23 July 2016 continued as follows:

> "To be absolutely clear, Neil did not demand money nor anything else from you in return for anything whatsoever. Neil has previously challenged you as to whether you have always acted in the best interests of HH. He did so again at our last meeting. I personally don't see the problem. You have signed an agreement confirming that you have never acted against the interests of HH. All he did was raised [sic] questions as to HeavyLift. In a previous meeting he asked you about Eurasia Hotel Holdings."

333.    Mr Azima submitted as follows:

333.1   the references in the email to HeavyLift and Eurasia Hotel Holdings support the inference that RAKIA (or at least Mr Gerrard) already had access to at least some information taken from the hacked material;

333.2   Mr Buchanan's explanation for the reference to "HeavyLift" (namely that it was a reference to an inquiry that RAKIA had conducted into the ownership of HeavyLift itself, not to the Training Academy JV) was untrue because there was no documentary evidence to indicate that RAKIA ever raised a concern about the ownership of HeavyLift;

333.3   Mr Gerrard's explanation for the reference to Eurasia Hotel Holdings (namely that RAKIA had become aware through the Panama Papers and through a "tip off" that Mr Azima and Dr Massaad were both listed as directors of Eurasia Hotel Holdings, and that this gave him reason for suspicion) was untrue because there is no complaint in these proceedings that Dr Massaad was a director of Eurasia Hotel Holdings.

334.    I do not consider that the references to HeavyLift and Eurasia Hotel Holdings necessarily support the inference that Mr Gerrard knew about the hacked material. As with the View from the Window document, these references are insufficiently specific to denote knowledge of the hacked material and they can be explained by reference to other sources of information, as Mr Gerrard did. Mr Azima expressly confirmed that no one on RAKIA's side had threatened to use the hacked material

or the Settlement Agreement to force him to change sides. The note of the meeting on 16 July 2016 makes clear that Mr Gerrard did threaten to use RAKIA's access to emails in the ensuing "war", but these were emails on the Dana Jet and RAK Ceramics databases, not Mr Azima's.

335.   It was put to Mr Buchanan in cross-examination that his failure to hand over the notes of the meeting on 16 July 2016 to Mr Azima was because of concern that the meeting notes evidenced threats. The disclosed meeting notes do not disclose threats and do not support Mr Azima's version of events. I accept Mr Buchanan's evidence that he did not send the notes to Mr Azima when they were first requested because he was busy on other matters and that subsequently he was advised by Mr Gerrard not to send them because it was felt that the negotiations with Dr Massaad had broken down.

**(8)      The Massaad websites, the blogging websites and the BitTorrents**

336.   Following the 16 July 2016 meeting, the next day Mr Buchanan sent an email to Mr Azima saying that he had spoken to the Ruler about a verbal settlement offer from Dr Massaad but that if Dr Massaad failed to put forward a realistic offer in writing and a proposal for reaching a final settlement by the "end of the ceasefire" i.e. 31 July, "we must assume that the ceasefire has now ended". The dispute between RAKIA and Dr Massaad was not resolved by the end of July and at the beginning of August websites appeared making allegations against Dr Massaad. These websites were, it is common ground, set up by Digitalis on RAKIA's and Bell Pottinger's instructions. Mr Azima and Mr Buchanan exchanged friendly emails expressing disappointment at this outcome.

337.   Within days of the websites concerning Dr Massaad appearing, a series of other websites also appeared attacking Mr Azima. One set of websites was activated on 7 and 8 August 2016.  These were blogging websites denigrating Mr Azima as a "fraud" and a "scammer". The author of the blogging website with the headline "Farhad Azima Exposed Again" (the "Exposed" blog) was listed by the username of "crimeboard". That individual initially allowed his or her location to be shown, which indicated that he or she was in the UAE. This may have been a blunder; the location reporting was subsequently disabled. The blogging website with the headline "Farhad Azima Scammer" ("the Scammer blog") also referred to Mr Azima's connections with Mr Adams and Dr Massaad: "Click the link to find Azima's involvement with some big personality's [sic] including his close associates like Ray Adams & Dr. Khater Massaad."

338.   The blogging websites provided links to BitTorrent websites on which Mr Azima's personal data had been uploaded and/or cached. A BitTorrent website is a site from which a computer user can access a BitTorrent network, that is to say a group of computers using the BitTorrent protocol which enables them to share anonymously data or "torrents" downloaded simultaneously from different computers in the group. Over the course of August and September 2016, three caches of Mr Azima's data emerged, the first appearing on or about 4 August 2016, the second on or about 30 August 2016 and the third on or about 8 September 2016. The hacked data

included email communications up to August 2016 suggesting that the hackers had access to Mr Azima's email accounts throughout the period from October 2015 to August 2016.

339.    Mr Azima contends that the proximity in time between (i) the breakdown in the negotiations with Dr Massaad and RAKIA and the consequential appearance of the websites attacking Dr Massaad (which RAKIA admits to arranging through Digitalis) and (ii) the websites with links to the hacked material, cannot realistically be a coincidence but is a clear indication that the Ruler or RAKIA were behind both attacks.

340.    RAKIA contends that there is no connection between the Massaad websites and the appearance of the blogging websites with links to the hacked material and that it is inherently unlikely that sophisticated hackers (which is what the hackers would be, if Mr Azima's hacking claim were correct) acting on the instructions of RAKIA or the Ruler, would put up the blogging websites so soon after the Massaad websites as this would inevitably give rise to suspicion that both the blog websites and the Massaad websites were part of the same PR campaign and hence that RAKIA had carried out the hacking. On Mr Azima's case, RAKIA had had access to the hacked material since the preceding October 2015 and could have delayed publicising it for several more weeks or months. Mr Azima's answer to this point is that RAKIA may have been sufficiently confident that it had covered its tracks for it not to be concerned about detection.

341.    In my judgment, if the hackers were acting on the instructions of the Ruler or RAKIA, it is unlikely that they would have timed the publication of the hacked material to coincide with the end of the "ceasefire" and the posting of the anti-Dr Massaad websites. It is more probable in my view that the two incidents, while close in time, were not in fact related. The posting of the Massaad websites was a deliberate PR campaign instructed by the RAKIA; the other was the unrelated act of hackers.


**(9)      RAKIA's alleged discovery of the hacked material**

342.    RAKIA has sought to explain how it became aware of the hacked material on the internet. Mr Azima submits that RAKIA's account is false and dishonest and is advanced by RAKIA in order to cover up its own responsibility for the hacking.

343.    RAKIA's pleaded case, and the case it advanced in its witness statements concerning its discovery of the hacked material, is, in summary, as follows:

343.1   Following a meeting in January 2016 with Mr Azima, Mr Buchanan was alarmed by a warning from Mr Azima that, if RAKIA did not resolve matters with Dr Massaad soon, there would be an aggressive and negative public relations campaign directed against the individuals and companies involved and the Emirate of RAK more generally.

343.2   Mr Buchanan discussed this warning with Dechert. It was decided that it would be prudent to take steps on RAK's behalf to prepare for any such

campaign, including by actively monitoring what was being published online. As part of that preparation, Mr Buchanan discussed Mr Azima's warning with various advisers including Mr Page.

343.3   In around February/March 2016, Mr Buchanan met with Mr Page and asked him to look out for anything relevant about a possible negative publicity campaign against RAK. Following that meeting, Mr Page contacted Mr Halabi and asked him to keep an eye out for anything interesting and unusual relating to RAK, the Ruler, Dr Massaad and Mr Azima.

343.4   Following Mr Page's request, Mr Halabi carried out Google searches for those names from time to time. During one of those regular Google searches in early August 2016, Mr Halabi discovered the blog sites containing links to a torrent file containing information relating to Mr Azima.

343.5   Mr Halabi therefore contacted Mr Page and sent him the links to the torrent sites. Mr Page then informed Mr Buchanan and Mr Gerrard about the links.

343.6   Mr Gerrard, in turn, contacted Mr del Rosso at Vital Management Services ("VMS") to seek advice on instructing a suitably qualified company to download the materials. Mr del Rosso emailed Chris Swecker, a former Assistant Director of the FBI and VMS's attorney, to ask for recommendations.

343.7   On Mr Swecker's recommendation, VMS then contacted Mr Garcia at NTi and engaged NTi to download the materials and to identify any other websites containing information relevant to Mr Azima.

343.8   On 23 and 24 August 2016, Ms Gray, a senior analyst with NTi, downloaded the contents of the files listed in the torrent file entitled "Farhad Azima of the Aviation Leasing Group Exposed" using BitTorrent software (the "First Tranche of the Internet Data").

343.9   On 1 September 2016, Mr del Rosso sent an email to Mr Swecker, Mr Garcia and Ms Gray informing them that a new dump of data relating to Mr Azima had been discovered online. The following day Mr del Rosso sent a further email with links to the torrent site. When she returned to the office the following week, Ms Gray downloaded the contents of the files that were listed in that torrent file (the "Second Tranche of the Internet Data").

343.10 Ms Gray thereafter continued actively searching for any additional information relating to Mr Azima. During the course of those searches on 9 September 2016 she discovered an additional dump of data relating to Mr Azima. She then proceeded to download the contents of the files listed in that torrent file (the "Third Tranche of the Internet Data").

343.11 NTi provided copies of the First, Second and Third Tranches of the Internet Data to Mr del Rosso. Mr del Rosso then provided those copies to RAKIA's lawyers at Dechert.

344.   Mr Page deals in his witness statement with Mr Halabi's involvement as follows:

344.1   Following a conversation with Mr Buchanan in early 2016 in which he had been asked to keep his ears and eyes open for anything he heard about a negative publicity campaign that might be damaging for RAK, Mr Page spoke to a few contacts he uses occasionally in the investigations business, journalism and PR industry and asked them to keep their ear to the ground. One of those was Mr Halabi, whom he believes he met at a round table lunch in 2012. Mr Halabi is an Israeli journalist who specialises in Middle Eastern affairs. They have more of a friendship than a professional relationship.

344.2   At some point later that year, Mr Halabi called him and told him that he had come across something interesting on the internet about Mr Azima. As far as he could recall Mr Halabi sent him the website address where the material could be found in a WhatsApp message. He cannot check because he regularly deletes his WhatsApp messages for security reasons. Mr Halabi also told him that he believed the information came from the UAE. Mr Page did not ask why he thought this.

344.3   When Mr Page received this information from Mr Halabi, he would have picked up the phone to Mr Buchanan although he does not specifically remember doing so. He believes that Mr Buchanan asked him then to contact Neil Gerrard at Dechert and let him know what he had heard but it may have been the other way round.

344.4   A few weeks later, he learned that a second set of data relating to Mr Azima had been put onto the Internet. He cannot recall when or how exactly he learned of this. As he had not discussed the first set with any of his sources other than Mr Halabi, he believes it may have been Mr Halabi that told him about the second set but it is possible that he was told by one of his other sources. He does not recall being told anything about how or when the second set had been discovered. He believes that he would have called Mr Buchanan or Mr Gerrard immediately. He made no attempt to download the data.

344.5   He was never asked to hack or otherwise access Mr Azima's emails or data by RAKIA or anyone else. He does not know who hacked Mr Azima's computers or placed his data online. His involvement in this matter was limited to passing on of information provided by sources to RAKIA.

345.   Mr Page's evidence in cross-examination was different from his witness statement in that he claimed that he passed on the information that he had received from Mr Halabi on a single occasion and that was the end of his involvement.

"A… I passed on the information -- as I said, this was not a mandate from Mr Buchanan. This was, "Please have a look". I found it. I passed it on. That was the end of my involvement in that particular exercise, which again was not a mandate. It was just, "Can you do this?"

Q. So after you had passed on this information t Mr Buchanan and MrGerrard for the first time – after you'd initially passed it on -- that was the end of you contacting them in that regard?

A.  Other than that I am aware, because I am aware, that they hired a specialist -- computer forensic specialist to download the material. Other than that, I'm not aware of -- and I am aware, my Lord, that Decherts have reviewed, interrogated the information, but other than that, I'm not aware of anything else.

Q.  But as far as you're concerned, Mr Halabi gave you the information, the two links, you then passed it on on the phone to Messrs Buchanan and Gerrard or one or both of them; is that right?

A. Yes, that's correct, my Lord.

Q.  And you didn't pass on any further links to either those gentlemen subsequently?

A. My Lord, I run at that time a company turning over - I am the chairman of a company turning over £27 million a year. I am running complex contracts in hostile environments. This was a favour for Mr Buchanan. It was not -- I didn't keep -- it was literally, "Can you do it?" I passed the information on and that was it. I don't recall, I could not possibly recall, four years -- nearly four years down the road or something, my Lord -- four years after the event, what exactly was said and what I said and who I said because I run a very big organisation. I'm the chairman of the group."

346.  Mr Halabi's evidence in his witness statement was as follows:

346.1  Mr Page called him in March or April 2016 and asked him to keep an eye out for anything interesting and unusual relating to RAK, the Ruler, Dr Massaad and Mr Azima. He sometimes makes requests such as this.

346.2  Following this request, he searched for those names on Google. He saw there were many articles about those individuals already. Every couple of days he would search again to see if there was anything new, interesting or different. He also spoke to a few contacts he was working with in the Gulf to check that he had the right names and to ask them to contact him if they heard or saw anything.

346.3  In early August 2016, whilst working in his home office, in one of his regular Google searches, he found links to a torrent containing information relating to Mr Azima. He thought it looked interesting because the title referred to Mr Azima being exposed. He called Mr Page and told him that he had found something that Mr Page might find interesting. He provided Mr Page with two links via Whatsapp. Following his call to Mr Page, they did not discuss the matter again.  He was not interested in the data because it was not relevant to his area of work as there was no Israeli connection.

111

347. Mr Halabi's evidence in cross-examination was also to the effect that he spoke to Mr Page on a single occasion:

> "Q. So can his Lordship take it that the only occasion when you spoke to Mr Page to tell him that you had found some interesting information of the sort that he had asked you to look out for was this call in August 2016?
> A. In this matter, yes.
> Q. So you had not spoken to Mr Page about any other interesting material that you'd found before the August 3 call?
> A. No, because I didn't have any interesting material until that time, my Lord.
> Q. Yes, and nor did you speak to Mr Page again after this first call in relation to this matter?
> A. We didn't mention this matter -- he didn't mention it, I didn't mention it, and I think it's over and I don't know what happened there and what happened after that. Now I know because of the court, but at that time it was something that I did to him as a favour and it's over for me, my Lord."

348. RAKIA's case concerning the discovery of the blogging websites raises a number of questions.

348.1 There is no obvious reason why an Israeli journalist should have been asked by Mr Page to conduct the task of looking for references to Mr Azima and others via simple Google searches. There was no suggestion in the witness statements of Mr Page or Mr Halabi that Mr Halabi had been asked to look for references in Arabic. Even if Mr Page was, as he claimed, not able to carry out simple Google searches himself, the other consultants engaged by RAKIA, or, most obviously, Insight or Digitalis, could have done this. RAKIA's pleaded case was that Bell Pottinger and Digitalis were engaged by RAKIA to monitor the press, internet and other media reports for references to individuals including Mr Azima.

348.2 From Mr Halabi's perspective, he had no reason to undertake the work apart from as a favour to a friend (though in his witness statement he did not say that he and Mr Page were friends). He was not paid. His alleged area of expertise is on the "relationship between Israel and Arab countries". Mr Halabi accepted that the material he found had no connection to his work and was of no interest to him.

348.3 The assertion in Mr Halabi's witness statement that he had conducted searches every "couple of days" would mean that Mr Halabi had, from March or April 2016, conducted searches every other day, and continued doing so despite finding nothing of interest until early August 2016 (in other words, at least some 50 times). In his oral evidence Mr Halabi suggested that a "couple of days" should be read as "some days" or "from time to time". Under cross-examination on what he meant by this, Mr Halabi was evasive and eventually claimed a lapse of memory and that he was unable to assist on this important point.

"Q: Can you answer that question?
 A.  I answered, my Lord. I answered the question. I said -- I said that it's from time to time, several times, every -- maybe it's three days, three days, then maybe week, and it's not something that I remember very well how often I do it and which times because I didn't write any documents or comments about it because it was a favour for a friend, my Lord.
Q: So is it right, Mr Halabi, that you can't actually provide any accurate indication to his Lordship as to how often you think, even approximately, you performed these searches?
 A: It was, my Lord, a long time ago and I don't remember"

348.4   Mr Halabi said that he never spoke to Mr Page about these matters again after providing him with the links. However, there is no apparent reason why he would or should have considered that the task had come to an end: on his own account, he did not know what the data was for. He does not suggest that Mr Page told him to stop searching; he appears simply to have assumed that "it's over".

349.   RAKIA's case as to the transmission of information from Mr Halabi to Mr Page and from Mr Page to Mr Gerrard and Mr Buchanan is not directly evidenced by any documents (the relevant communications are said to have made by a now deleted WhatsApp message and by phone). There is some contemporaneous documentation consisting of emails emanating from Mr Gerrard, Mr Buchanan and NTi. This is inconsistent with Mr Page's and Mr Halabi's evidence.

349.1   Mr Halabi's evidence was that he found two links in the course of the same Google search and provided them to Mr Page by WhatsApp shortly afterwards, on the same day after he had spoken to Mr Page by phone and that he did not speak to Mr Page about it again. In his witness statement he said that following his call to Mr Page, he and Mr Page "did not discuss the matter again." Mr Halabi was asked about this in cross-examination:

"Q.  So can his Lordship take it that the only occasion when you spoke to Mr Page to tell him that you had found some interesting information of the sort that he had asked you to look out for was this call in August 2016?
 A. In this matter, yes."

349.2   Mr Halabi's evidence would suggest that he had come across the Exposed blog and forwarded to Mr Page the two links mentioned on that blog (a "piratebay" link and a "molova" link) (in the course of cross-examination, Mr Halabi said he did not recognise either the Exposed blog or the Scammer blog but no other source for his information about the links was suggested).

349.3   This evidence is inconsistent with the email from Mr del Rosso (who had by this stage been contacted by Mr Gerrard) to Chris Swecker on 9 August 2016. This refers to the "piratebay" link and the "monova" link being discovered and notified on two different days, not on a single occasion, the piratebay

link being "discovered" at some time in the week beginning 1 August 2016, and the monova link on the weekend of 6-7 August 2016. It reads as follows:

> "I've spoken to Rich Garcia and agreed that you will instruct his company on this matter. I've told him that as recently as last week - we were advised by researchers that a deep web search indicated that data relating to Farhad Azima was on a site: https://thepiratebay.Org/torrent/15484452 and we'd initially like to learn exactly what is there. In addition, over this past weekend, we were told that another sitehttps://monova.org/42248895 also held either the same or additional information on Azima and indications that there may be further sites with more information. I'm not sure if the deep web is the same as the dark web but I'm sure NTI will know I'm not able to access the first site (piratebay.org) and it's most likely my ISP or lack of technical prowess, preventing me."

349.4 Mr del Rosso's email also refers to the links being identified with "deep web" searches. This is inconsistent with Mr Halabi's and Mr Page's account in two respects. Mr Halabi was clear that he conducted only simple Google searches. Mr Page and Mr Halabi also maintain in any event that Mr Halabi provided no information to Mr Page about the way the links were "discovered".

349.5 Mr Page said that he only spoke to Mr Gerrard on one occasion (on or about 8 or 9 August 2016). However, Mr Gerrard's email of 15 August 2016 to Mr del Rosso referred to a second call:

> "I've had another call from Stuart who confirms again that there is a website on FA. He seems to think it's been generated from a UAE source. I've asked for details. He said he would try and get them to me. Can you undertake a search for it?"

There is no evidence that Mr Gerrard sought further details from Mr Page.

349.6 It is RAKIA's pleaded case that a link to a second BitTorrent download was found in early September 2016 and that Mr Page was informed of the existence of the link by an unidentified "person who was not engaged by or acting on behalf of RAKIA". Mr Del Rosso's email dated 1 September 2016 reads as follows:

> "The client's 'spotter' in Dubai has reported a new data dump. I can't open the message (no good signal) to give you the link - could you search and if anything exists, download. If not I'll get home tonight and will be able to open the file with the supposed links."

349.7 Mr Del Rosso stated in his witness statement that he had assumed that the "spotter" was Mr Page. However, as noted above, Mr Page's evidence was that, once he had provided the first two links allegedly identified by Mr

Halabi to Mr Gerrard and Mr Buchanan on or around 8 or 9 August 2016, he considered the task complete and did not contact Mr Gerrard or Mr Buchanan again. Mr Halabi was also clear that he only spoke to Mr Page on one occasion.

349.8   There is therefore no explanation in the evidence as to how RAKIA found out about the Second Tranche of Data.

350.   There are further discrepancies between the evidence of Mr Page and the documents. On 16 August 2016 Mr Buchanan emailed Mr Frank and Mr Handjani, copied to Mr Gerrard, as follows.

> "Good morning. I have been informed by Stuart last night that there is an internet site that is carrying a huge amount of material relating to FA - I will get you the link later. I have asked Neil to have a team start reviewing the material as a matter of urgency. At this time, I have no idea whether this relates to us or whether it is of value in respect of our ongoing dispute with KM. More importantly, I cannot tell you whether there is anything on the site about which we should have any concern. Clearly, it would be very interesting to know who is behind this action - Stuart tells me it is UAE based. We will speak later. Jamie"

351.   This email raises further questions.

351.1   The email reads as Mr Buchanan was "breaking the news" regarding the hacked material (as Mr Buchanan accepted in cross-examination) even though, on RAKIA's case, Mr Buchanan had been informed of the Hacked Material by Mr Page over a week before, on 8 or 9 August 2016.

351.2   Mr Page denies contacting either Mr Gerrard or Mr Buchanan after the initial alleged call in which he passed on the two links from Mr Halabi, which is said to have taken place on 8 or 9 August 2016. It follows that Mr Page did not contact Mr Buchanan on 15 August 2016.

351.3   Mr Buchanan's email states that he would "get the link later". There is no evidence that Mr Buchanan ever did get "the link" or that any of the recipients of the email followed up to ask for the link. Mr Gerrard's evidence is that he believed that he "already had it by then" but there is no evidence that Mr Gerrard was provided with a link on 15 August 2016 or that he provided a link to anyone else at that time or thereafter. The emails between Mr del Rosso and NTi do not identify any such new link being provided.

351.4   No reply was sent to this email at all, by any of the recipients despite the dramatic nature of the news that Mr Buchanan had 'broken'.

351.5   The email refers to "Stuart", meaning that Mr Buchanan understood his audience – Mr Frank and Mr Handjani – to know who Mr Page  was  and that he was undertaking some sort of work for RAKIA.

However, Mr Handjani's evidence was that he did not know who Mr Page was until the trial. It would therefore not have made sense for Mr Buchanan to have referred to Mr Page in this way in an email to Mr Handjani.

352.    RAKIA's account of how it discovered the hacked material is unsatisfactory.

352.1   There was no convincing explanation for Mr Page's alleged enlisting of an Israeli journalist acquaintance to carry out simple Google searches nor for Mr Halabi's alleged searching, for no remuneration, on a regular basis for month after month.

352.2   The evidence of Mr Page was both internally inconsistent and inconsistent with the contemporaneous documents.

352.3   There was no explanation from RAKIA's side as to how it came across the Second Tranche of Internet Data in September. Even assuming in RAKIA's favour that (as pleaded by RAKIA) Mr Page told RAKIA about the second tranche (and that he had simply forgotten this conversation when giving evidence), there is no explanation as to where Mr Page got his information from. Mr Halabi was consistent that he only spoke to Mr Page on one occasion, in connection with the first set of links, in early August. It follows that someone else must have informed Mr Page about the second tranche but that person has not been identified.

353.    RAKIA did not attempt to reconcile all these discrepancies. It accepted that its account of how it discovered the links to the hacked material was "messy and unclear" but contended that the reason it was "messy and unclear" was because it was true; if it had been intent on deception, it would have been relatively straightforward for RAKIA to devise a mechanism, such as a simple Google alert, for "discovering" the links (which were publicly available and discovered more or less at the same time by Mr Azima and his associates). As against this point, it was reasonably submitted on behalf of Mr Azima that an explanation along the lines of a simple Google alert would not have distanced RAKIA from the "discovery" in the way that Mr Page's account, involving Mr Halabi, did. RAKIA also submitted if that, if they were sophisticated plotters, they would not have disclosed, or would have concocted more efficiently, the documents which were said to be inconsistent with the witness evidence, such as Mr Buchanan's email with its erroneous reference to a "call last night".

354.    In my judgment, it is not enough for RAKIA to say that, because it is messy and unclear, its evidence as to how it discovered the hacked material should be accepted as true. There is no obvious reason why a truthful account of how it came across the evidence could not have been clear and coherent.

355.    I conclude from the unexplained contradictions, inconsistences and implausible elements that RAKIA's case that Mr Page discovered the blogging websites linked to the BitTorrent sites innocently via Mr Halabi and another unidentified informer

is not true and that the true facts as to how RAKIA came to know about the hacked material have not been disclosed.

356. It does not of course necessarily follow from this conclusion that RAKIA was responsible for the hacking. As RAKIA pointed out, there would be variety of explanations for Mr Page's failure to give a true account of the discovery. He may, for example, have wanted to conceal his sources of information, even though they were not the hackers, for reasons of confidentiality.

## (10)   RAKIA's deployment of the hacked data

357. Mr Azima submits that RAKIA's responsibility for the hacking should be inferred from the fact that, apart from RAKIA no other party in any jurisdiction has sought to use any of Mr Azima's stolen material in any proceedings or indicated that it was able to access the stolen data using the BitTorrent sites.

358. RAKIA's response to that argument is that Mr Azima appears to have been the subject of long term interest by Iran who perceived him as an enemy of the Iranian Government and who actively sought to acquire information and intelligence about him by targeting his communications and the communications of his close associates. In particular:

358.1  On 2 September 2012, for example, Ms Azadeh sent an email to Mr Azima which described how Mr Azima was being spied on by agents of Iran. The email was sent after Ms Azadeh was arrested and detained for more than three months by the Iranian Government and Revolutionary Guards.

358.2  On 24 February 2016, Ms Azadeh emailed Mr Azima a detailed account of her arrest and detention in Iran which made it clear that she and her communications were deliberately targeted by the Iranian state because of her close connection to Mr Azima, whom the Iranians believed was working with the CIA. She went on to explain that, "They had access to my computer and emails" and that she was eventually released after being "made to confess that I was a CIA agent and I was working with Farhad Azima in relation to all anti-Islamic government activities supported by U.S."

358.3  Jay Solomon, a former journalist for the Wall Street Journal, published an article in the Columbia Journalism Review dated 7 March 2018 which stated his belief that the Government of Iran was responsible for the hacking of Mr Azima's emails. The article recounted how emails between him and Mr Azima were hacked and put on the web as a torrent file. This happened just weeks after his first story broke in August 2016 about the Obama administration's secret cash shipments to Iran.

358.4  On 18 July 2016 – two weeks before the First Tranche of the Internet Data was published online – Ms Azadeh filed a lawsuit against the Islamic Republic of Iran and the Islamic Revolutionary Guards Corps before the United States

District Court for the District of Columbia. The lawsuit described how Ms Azadeh was detained in Evin Prison, Tehran where she was tortured, drugged and subjected to mock executions, and interrogated "about the cargo airline company at which she had worked since May in 2005 in various corporate roles" (this is a reference to HeavyLift). The US Court subsequently delivered a detailed judgment which found (amongst other things) that during her detention in Iran officials of the Revolutionary Guard "demanded that [Ms Azadeh] give them the passwords to her email and electronic devices" and interrogated her "about her employment with HeavyLift, specifically about the company's contracts with the U.S. Department of Defence". In September 2018, the US Court awarded Ms Azadeh damages of more than $36m against the Republic of Iran and the Revolutionary Guard.

358.5  There is evidence that persons in Iran attempted to gain access to Mr Azima's accounts. In particular, on 1 May 2016 an email was sent to Mr Azima's farhad@farhadazima.com email account from an email address entitled "administration@farhadazima.com". It stated that Mr Azima's account had been disabled and invited him to click on a link "where we'll ask you some questions to verify your identity". The email was bogus and was not a genuine account recovery message. The phishing email was sent from an IP address in Iran – indicating that Mr Azima was being actively targeted by a person or persons within that country.

358.6  In addition to the apparent targeting of Mr Azima's devices and communications by agents of the Iranian state, it is apparent that third parties managed to gain unauthorised access to Mr Azima's email accounts. For example:

(a)  On 5 April 2015, Mr Azima sent a text message to Mr Adams asking if Mr Adams had changed the password on his Gmail account because unusual activity had been detected on the account. Mr Adams replied that he had not changed the password. Mr Azima then replied: "I bet it is hacked".

(b)  On 12 April 2016, Mr Azima sent an email to Ray Adams which showed that a third party had managed to send spam messages from his farhad@farhadazima.com email account. Mr Azima's email stated: "Looks like I am hacked".

(c)  On 10 June 2016, Mr Azima sent another email to Mr Adams which again showed that a third party had managed to send spam messages from his farhad@farhadazima.com email account. Mr Azima stated: "Ray, does this means [sic] my email act [sic] is hacked again?".

(d)  Two days later, Mr Azima sent a further email to Mr Adams which showed another spam message had been sent by a third party from his farhad@farhadazima.com email account. Mr Azima stated: "Hacked again!"

358.7   Accordingly, not only has Mr Azima failed to establish that RAKIA was directly or indirectly responsible for hacking his emails, it is apparent that various other third parties had access to Mr Azima's accounts and may have had the means and motivation to access, publish and utilise his electronic data.

358.8   In early August 2016, despite his claim that he was threatened by Mr Gerrard a few weeks earlier, Mr Azima did not suspect RAK or RAKIA had hacked his emails. His suspicion came only when RAKIA brought proceedings based on the hacked data.

359.   Mr Azima's response to the theory that the Iranian state may be responsible for the hacking is, in short, as follows.

359.1   The evidence concerning Ms Azadeh's arrest by the Iranian authorities, her apprehension that those authorities were surveilling her and others, and her lawsuit against the Iranian Revolutionary Guard does not come close to establishing that the Iranian authorities may have hacked Mr Azima, still less that they are a more likely culprit than RAKIA. In particular:

(a)   Ms Azadeh's arrest was in May 2012, more than 4 years prior to the publication of the BitTorrent sites.

(b)   Ms Azadeh was released by the Iranian authorities after paying a fine (in lieu of lashes); this is hardly consistent with a theory that those authorities regarded her or Mr Azima as connected with the CIA.

(c)   There is no evidence at all that the Iranian state or its authorities have sought to use the hacked material, to contact Mr Azima in relation to it or to take advantage of it.

(d)   The email to Mr Azima on 1 May 2016 was sent well after access had been obtained to his email accounts. The fact that the apparent IP address registers in Iran does not itself indicate that the sender was actually located in Iran. In the copy of the hacked material that is available in these proceedings, the malicious email appears in a junk email folder. As the email was in a junk email folder, it appears unlikely to have been opened by Mr Azima. The email does not appear in the image taken of Mr Azima's emails after the hacking was discovered.

(e)   The fact that Mr Azima did not immediately perceive RAKIA and the Ruler to be responsible for the hacking upon learning of the BitTorrent sites is of no consequence. He mistakenly believed that he had a good relationship with the Ruler and RAKIA.

119

360. In my judgment, the evidence of the possible involvement of Iran in the hacking, while falling far short of showing that Iran had any responsibility for the hacking, does at least displace any inference that RAKIA must have been responsible for carrying out the hacking because no other party conceivably had the means or the motivation to do so.

**(11)   The inability of RAKIA's IT expert to download all the internet data in April 2017**

361. Mr Azima relies on the fact that in proceedings in the United States brought by Mr Azima, RAKIA appointed an IT expert who "could obtain only a portion of Mr Azima's material" from the internet in April 2017. Mr Azima contends that, "RAKIA's own computing expert was therefore unable to replicate the process by which RAKIA claims…to have obtained the stolen data" and this therefore supports his case that RAKIA was responsible for the hacking.

362. RAKIA submits that there is no merit in this argument on the following grounds:

362.1 RAKIA's US expert attempted to download the hacked data between 31 March and 10 April 2017 – more than seven months after the hacked data first became available. The fact that he was able to download some, but not all, of the hacked data in April 2017 does not provide any insight into the availability of the hacked data some seven or eight months earlier.

362.2 The parties' independent forensic IT Experts agree that "the availability of data shared over a torrent may change over time and that it is not possible to retrace peer to peer activity". Mr Krone, RAKIA's expert, further explains that the availability and ease of download of the torrent files relating to Mr Azima were likely to have varied on a daily or even hourly basis depending on the number of "seeders" (i.e. users uploading data previously downloaded from other users) available at any specific time, the existence of servers keeping track of the location of seeders and their immediate availability and the number of people attempting to download the same shared file.

363. For the reasons advanced by RAKIA, I agree that the inability of RAKIA's computing US expert to download the hacked material does not provide any support for Mr Azima's case that RAKIA was responsible for the hacking.

**(12)   "Deliberately withheld documents"**

364. Mr Azima contends that certain materials that had been within Mr Azima's emails were not included among the hacked materials on the BitTorrent sites. Those include materials that would be damaging to RAK, including the so-called Smoking Gun report about the arrest of the Ruler for sexual assault.

365. The Experts have not been able to confirm whether the materials in question would have been available to the hackers. The evidence of Mr Krone, RAKIA's expert,

120

was that as Mr Azima did not provide him with access to the preserved devices or a contemporaneous copy of the devices/accounts that Mr Azima alleges were compromised, it was impossible for him to confirm what material was stored on those devices/accounts at the time they were hacked and therefore it was impossible to identify any differences between that material and the content of the data on the internet. Mr Tarbell agrees that it is impossible to confirm what material would have been found on or in Mr Azima's devices/accounts at the time they were compromised and thus whether any of that material was withheld from the Internet Data.

366.   RAKIA also points out that on 12 September 2019 RAKIA made a request for further information asking how many documents in total had allegedly been withheld from the hacked data on the BitTorrent sites and whether Mr Azima had taken any steps to identify documents that were allegedly withheld and which were not damaging to the reputation of RAK or RAKIA. Mr Azima refused to answer those questions on the grounds that the information requested was not needed or was privileged. RAKIA submits that it is to be inferred that either Mr Azima has failed to examine whether any documents not damaging to RAKIA/RAK were withheld from the hacked materials on the BitTorrent sites or Mr Azima has examined that issue and has concluded that the category of withheld documents does include documents which are not damaging to RAKIA/RAK.

367.   I accept that Mr Azima's failure to provide clarification as to which documents were withheld from the materials available on the BitTorrent sites means that no weight can be placed on his argument that documents allegedly missing from the hacked material on the BitTorrent sites show that RAKIA must have been responsible for the hacking.

## (13)   Mr Page's "track record"

368.   It is submitted for Mr Azima that, in assessing the inherent likelihood of Mr Page arranging for committing the hacking, I should take into account what is alleged to be his track record of involvement with other instances of hacking and illegal information gathering, as follows.

368.1   In the case of *Dubai Aluminium v Al Alawi* [1998] EWHC 1202 a sub-agent engaged by Mr Page had obtained confidential information using pretext calls, which Mr Justice Rix found to be illegal (and which Mr Page accepted was illegal). Mr Page said he did not instruct the subagent to act illegally and was unaware of it at the time.

368.2   Following Mr Page's engagement by the Board of Control for Cricket in India to investigate several board members and players, confidential emails passing between individuals (who were the subject of the inquiry) found their way to the media. Page Protective Services was accused of obtaining unauthorised

121

access to those emails. In his oral evidence Mr Page denied being involved in the illegal obtaining of emails.

368.3   Most recently, Mr Page was associated with the theft of confidential documents by Israeli hackers. Sir Andrew Smith had noted in passing, in the course of a judgment in *JSC BTA Bank v Ablyazov* [2018] EWHC 259 (Comm) that the claimant bank was contacted in early 2016 by Mr Page who claimed to act for unnamed Israeli hackers who had extracted information from a computer belonging to a Mr Aggarwal, an accountant. Mr Page was asked to approach the Bank to find out whether it was interested in obtaining the information which might be useful in relation to claims brought by the bank.

369.   These cases highlight the fact that Mr Page operates in a world of covert surveillance in which agents acquire confidential information unlawfully and that Mr Page has dealings with such agents. It would be a reasonable inference to draw from these incidents that Mr Page has access to agents with the capacity to hack emails. However these other incidents do not establish that Mr Page ever personally carried out or authorised the unlawful obtaining of confidential information and therefore do not affect my assessment of the inherent likelihood of Mr Page acting unlawfully in this case. Mr Azima also relied on the level of Mr Page's remuneration of between $100,000 and $300,000 per month as being "consistent with Mr Page obtaining information by illicit means and of seeking a premium for such nefarious activity." Mr Page was certainly generously remunerated but I do not consider that his rate of remuneration can sensibly be taken as a sign of illicit activity.

## (14)   Allegations against Mr Gerrard

370.   The serious allegations made against Mr Gerrard in proceedings brought by Eurasian Natural Resources Corporation ("ENRC") against the Serious Fraud Office (the "SFO") in which it is alleged that Mr Gerrard leaked information covered by ENRC's confidentiality and privilege to journalists and to the SFO, in breach of his fiduciary duties and his retainer with ENRC and set to overcharge ENRC, are no more than unproven allegations denied by Mr Gerrard and are similarly of no assistance in the present case.

## (15)   RAKIA's conduct of other litigation

371.   For Mr Azima it was alleged that RAKIA's conduct of litigation has been highly improper, showing that RAKIA (and on occasion its lawyers) were willing to break the rules in pursuit of its own ends.

371.1   First, a chain of emails in June 2016 involving Mr Buchanan, and lawyers at Dechert and Pillsbury describes a plan for two former Georgian judges, now employed by Pillsbury, to seek to have certain cases heard by a particular judge as a "personal favour". The emails refer to those individuals demonstrating "influence with the judiciary". Mr Buchanan accepted that this was

inappropriate.

371.2   Second, it was alleged that RAKIA Georgia had put improper pressure on Gela Mikadze through the Georgian government. In August 2013 the then CEO of RAKIA Georgia wrote to the then CEO of RAKIA and others in relation to the support that RAKIA could seek to obtain from the Georgian government in its dispute with Mr Mikadze. Mr Buchanan agreed that enlisting the support of a government and threatening imprisonment in order to pressure him into settling a dispute was an improper thing to do.

371.3   Third, it was alleged that in September 2014 RAKIA had lobbied the Georgian government to put pressure on Dr Massaad. Mr Bustami had emailed individuals in the Ruler's office, copying Mr Gerrard, indicating that RAK intended to "target" certain outcomes.

371.4   Fourth, it was alleged that documents confidential to Mr Mikadze, who has been embroiled in litigation with RAKIA in Georgia since 2015, were mailed anonymously to RAKIA's lawyers (Dechert) marked for the attention of Mr Gerrard. It was submitted that RAKIA's receipt of confidential information from anonymous benefactors in two sets of proceedings cannot be coincidental and that a more likely explanation is that RAKIA or an agent acting on its behalf obtained the material illicitly and then sought to 'launder' it by providing it anonymously through the post.

372.   The circumstances of these other incidents do not, in my view establish that RAKIA had a highly improper attitude to litigation and do not shed any useful light on the issue of whether RAKIA was responsible for the hacking of Mr Azima's emails in the present case.

372.1   The first incident comprised a proposal by a lawyer working for Pillsbury to speed up the disposal of two cases by persuading a judge to hear them before his retirement.

372.2   The second incident did not involve the individuals concerned in the present proceedings. Moreover, the email about which complaint is made was copied to RAK's lawyers.

372.3   The third incident, involving the suggestion that RAK should enlist the support of the Georgian government in its pursuit of claims against Dr Massaad, was not in itself improper. Mr Bustami was not advocating support inconsistent with Dr Massaad's legal rights.

372.4   As to the fourth incident, I am not in any position to draw any conclusions as to whether documents confidential to Mr Mikadze were obtained illicitly. There is, in any event, no suggestion that the documents were obtained by email hacking.

**Conclusions on the hacking claim**

373.   Email hacking, or the gaining of authorised access to a person's email account, is self-evidently a serious wrongdoing, a violation of privacy and a criminal offence under the Computer Misuse Act 1990.

374.   Mr Azima invites me to find, on the balance of probabilities, not only that Mr Page, acting on the instructions or with the connivance of the Ruler, arranged for Mr Azima's emails to be hacked, but also that RAKIA's main witnesses, Mr Buchanan, Mr Gerrard, the Ruler, Mr Page, Mr Halabi, Mr Handjani and Mr Bustami, have conspired to present a false case to the Court concerning RAKIA's lack of involvement in the hacking and have given perjured evidence in support of that false case.

375.   It is trite law that cogent evidence is required to justify a finding of discreditable conduct and that "the cogency of the evidence relied upon must be commensurate with the seriousness of the conduct alleged". This is because of the inherent improbability of people committing serious wrongdoing. Most people are not serious wrongdoers and, even if capable of serious wrongdoing, are likely to be deterred by the fear of detection. Thus as Andrew Smith J stated in *Fiona Trust v Privalov* [2010] EWHC 3199 (Comm) at 1438:

>    "It is well established that "cogent evidence is required to justify a finding of fraud or other discreditable conduct": per Moore-Bick LJ in Jafari-Fini v Skillglass Ltd., [2007] EWCA Civ 261 at para.73. This principle reflects the court's conventional perception that it is generally not likely that people will engage in such conduct: "where a claimant seeks to prove a case of dishonesty, its inherent improbability means that, even on the civil burden of proof, the evidence needed to prove it must be all the stronger", per Rix LJ in *Markel v Higgins,* [2009] EWCA 790 at para 50. The question remains one of the balance of probability, although typically, as Ungoed-Thomas J put it in *In re Dellow's Will Trusts,* [1964] 1 WLR 415 , 455 (cited by Lord Nicholls in In re H, [1996] AC 563 at p.586H), "The more serious the allegation the more cogent the evidence required to overcome the unlikelihood of what is alleged and thus to prove it". Associated with the seriousness of the allegation is the seriousness of the consequences, or potential consequences, of the proof of the allegation because of the improbability that a person will risk such consequences: see *R(N) v Mental Health Review Tribunal (Northern Region),* [2005] EWCA 1605 para 62, cited in Re Doherty, [2008] UKHL 33 para 27 per Lord Carswell."

376.   The forensic evidence established that the hacking of Mr Azima's emails could have taken place in October 2015 but it is common ground that it is impossible from the forensic evidence to identify the hackers. Mr Azima's case that Mr Page engaged agents to carry out the hacking therefore depends on inferences to be drawn from a series of pieces of circumstantial evidence, what Counsel for Mr Azima referred to as "a few but very powerful forensic pointers".

377.   I consider that the following facts and matters support the inference that the hacking of Mr Azima's emails was carried out by Mr Page acting on the instructions of the Ruler:

377.1   The fact that, as reported in Mr Page's Project Update, in early 2015 Mr Azima was being monitored by sophisticated surveillance specialists engaged by Mr Page who planned to gather intelligence on the progress of the team of advisors managed by Mr Azima in the US to spread allegations against RAK and the Ruler in order to "monitor their activities and attempt to contain or ruin their plans";

377.2   The fact that in 2015 the Ruler felt hostile towards Mr Azima, probably because of the matters reported in the Project Update, leading the Ruler to express the wish in April and again in July 2015 that Mr Azima should be targeted and gone after; he wished to obtain information about the role Mr Azima had played in Dr Massaad's schemes;

377.3   The fact that throughout 2015 the Ruler had regular monthly meetings with Mr Page to discuss the ongoing investigations organised by Mr Page into Dr Massaad's activities, sometimes on a one to one basis without the involvement of Mr Buchanan;

377.4   The fact that in December 2015 plans were being drawn up by RAKIA for a media campaign against Mr Azima, who was suspected of orchestrating and participating in fraudulent activities, alongside Dr Massaad;

377.5   The fact that the blogging sites attacking Dr Massaad and the sites attacking Mr Azima with links to the hacked material appeared within a few days of each other, suggesting that both attacks were coordinated and directed on behalf of RAKIA/the Ruler, (although, as noted above, I recognise that the coincidental timing may also suggest that RAKIA was not involved);

377.6   The implausible nature of the evidence adduced by RAKIA to explain how Mr Page discovered the blogging sites and the second tranche of data, suggesting that Mr Page, whom I considered to be an unreliable witness, was not disclosing all the facts.

378.   As against these considerations, there are a number of significant features of Mr Azima's hacking case which are improbable and point away from RAKIA being responsible for the hacking, as follows:

378.1   The inherent improbability of RAKIA, several months after Mr Azima's emails were hacked and at a time when, *ex hypothesi*, it had had time to analyse the contents of the material hacked in October 2015, entering into the Settlement Agreement with Mr Azima and paying Mr Azima $2.6 million; Mr Azima's explanation for the Settlement Agreement as a device to trap him is not compelling;

125

378.2   The inherent improbability of RAKIA negotiating the ISR joint venture with GDS, of which Mr Azima was a shareholder and director, at a time when it had *ex hypothesi* concluded, on the basis of the hacked material, that Mr Azima was a fraudster;

378.3   The absence in RAKIA's internal communications in the period following October 2015 of any reference to the hacking or information clearly derived from the hacking;

378.4   The fact that from October 2015 onwards RAKIA did not make use of the hacked material other than as the basis for bringing proceedings to recover the settlement sum and did not use the material to exert leverage on Mr Azima in his role as go between with Dr Massaad;

378.5   The inherent improbability of RAKIA's witnesses, including Mr Gerrard as a solicitor, conspiring together to conceal RAKIA's role in the hacking and participating in proceedings which, if successful, would result in a relatively modest award of damages and reputational damage to Mr Azima but which would carry with them a risk of no less serious reputational damage to RAK, RAKIA and themselves, were the hacking to come to light.

379.   I was not persuaded that the View from the Window document or the meeting on 16 July 2016 support Mr Azima's hacking claim. They do not, in my view, show that Mr Gerrard was aware of the contents of the hacked material. I was not persuaded that Mr Buchanan knew about the hacking. More generally, I was not satisfied that there was sufficiently cogent evidence to establish a conspiracy between the RAKIA witnesses to advance a false case in these proceedings.

380.   I accept that the hypothesis advanced on behalf of Mr Azima that Mr Page, acting with the express or implied authority of the Ruler, arranged for Mr Azima's emails to be hacked, that the Settlement Agreement was entered for tactical reasons and that it was decided to deploy the hacked material in August 2016 once the ceasefire with Dr Massaad was over, is not impossible. It would provide an explanation for the fact that the hacked material came to light when it did and for RAKIA's failure to provide a convincing account of its innocent discovery of the hacked material. It is equally not impossible that Mr Page arranged for Mr Azima's emails to be hacked without the knowledge of Mr Gerrard or Mr Buchanan or the Ruler's advisers so that the instigation of these proceedings did not entail a conspiracy between them, even though the witnesses may have harboured suspicions about Mr Page's role.

381.   It is, however, not enough for Mr Azima to advance a case that is not impossible. Based on all of the documentary and witness evidence, I was not satisfied on the balance of probabilities that RAKIA was responsible for the hacking of Mr Azima's emails. The facts supporting the inference that RAKIA was responsible for the hacking are far from conclusive and the improbable features of Mr Azima's case can only be explained away on the basis of speculative assumptions for which there is no sufficiently firm evidence.

382. Given my conclusion, based on all the evidence, that it has not been proved that RAKIA was responsible for the hacking of Mr Azima's emails, the issues which would have arisen upon a finding that RAKIA's case was based on illicitly obtained evidence fall away.

383. Had I upheld the hacking claim, it would have been necessary to decide whether to admit or exclude the illicitly obtained evidence or to strike out RAKIA's claim entirely as I was invited to do by Mr Azima. As the Court of Appeal noted in *Jones v Warwick¸* the decision would have depended on all the circumstances, including my findings of fact in connection with the hacking.

384. If I had found that RAKIA had hacked Mr Azima's emails, I would not necessarily have excluded the illicitly obtained evidence as, without it, RAKIA would have been unable to prove its claims and Mr Azima would have been left with the benefit of his seriously fraudulent conduct. If, however, I had found that, as alleged by Mr Azima, not only had RAKIA hacked Mr Azima's emails and used them as the evidential basis of this case, but also that its witnesses had conspired to put forward a fabricated case concerning RAKIA's lack of involvement in the hacking, there would have been strong grounds to strike the proceedings out as an abuse of process, as envisaged in *Summers v Fairclough Homes Ltd*.

**Overall conclusion**

385. Mr Azima is liable to pay RAKIA the sums of $2,600,000 and $1,562,500 making a total of $4,162,500.

386. I will give directions for the service of submissions on interest and costs.

# EXHIBIT C



# Investigative Report

**Prepared by:**

Quaestio Intelligence Services Ltd

1 King Street
London
EC2V 8AU

**Reference:**

QIS2020/STP/KAS/BT/001

**Date**

27th June 2020

**Report Prepared for:**

Stokoe Partnership Solicitors
Chancery House
53/64 Chancery Lane
London
WC2A 1QU

**RESTRICTED USE WARNING**

This report is prepared by Quaestio Intelligence Services Ltd at the request of the Client to whom it is furnished. The Client agrees that reports and information received from Quaestio Intelligence Services Ltd, including this report, are strictly confidential and are intended solely for the private and exclusive use of the Client. Any other use and any communication, publication, disclosure, dissemination or reproduction of this document or any portion of its contents without the written consent of Quaestio Intelligence Services Ltd is strictly forbidden.

Quaestio Intelligence Services Ltd assumes no direct, indirect or consequential liability to any third party or any other person who is not the intended addressee of this report for the information contained herein, its interpretation or applications, or for omissions, or for reliance by any such third party or other person(s) thereon. To the extent information provided in this report and any subsequent report is based on a review of publicly-available records, such information, as presented, relies upon the accuracy and completeness of those records, which have not been corroborated by Quaestio Intelligence Services Ltd.

Statements herein concerning financial, regulatory or legal matters should be understood to be general observations based solely on Quaestio Intelligence Services Ltd' experience as consultants and may not be relied upon as financial, regulatory or legal advice, which Quaestio Intelligence Services Ltd is not authorised to provide. All such matters should be reviewed with appropriately qualified advisors in these areas.

**THIS REPORT AND ANY SUBSEQUENT REPORT DOES NOT CONSTITUTE A RECOMMENDATION, ENDORSEMENT, OPINION OR APPROVAL OF ANY KIND WITH RESPECT TO ANY TRANSACTION, DECISION OR EVALUATION, AND SHOULD NOT BE RELIED UPON AS SUCH UNDER ANY CIRCUMSTANCES.**

## Contents

1.   Introduction .......................................................................................................................... 2

2.   Executive Summary .............................................................................................................. 3

3.   Investigation & Findings ...................................................................................................... 4

Data Assessment .................................................................................................................... 4

Data Assessment Summary - Pre Quaestio ............................................................................ 6

Stokoe Legal Team in Dubai – Hotel Break-in & Surveillance ............................................ 8

Tracing Operation ................................................................................................................. 11

Reported Phishing Attempts ................................................................................................. 31

ANNEXES ............................................................................................................................ 33

# 1. Introduction

In March 2020 Quaestio Intelligence Services Ltd ("**Quaestio**") was approached by a confidential source, known hereinafter as Source A1 ("**Source A1**"), with information that attempts were being made to source confidential information from Stokoe Partnership Solicitors ("**Stokoe**"), a long term client of Quaestio.

On receiving this information, Quaestio immediately informed the founding partner of Stokoe, Mr Haralambos Tsiattalou, who instructed Quaestio to speak to Source A1 and establish further details about the attempts to access Stokoe's information, who the relevant individuals were, and what specific information was being targeted.

As a result of further discussions with Source A1, Quaestio has now established that the information being sought from Stokoe consists of its banking coordinates, certain bank transactional information, and information regarding Mr Tsiattalou's travel to and from Dubai in February 2020.

In addition, following further investigations and discussions with Source A1, Quaestio understands that the following additional information has previously been sought from other individuals who have connections with Stokoe and litigation being conducted by one of its clients, Mr Karam Al Sadeq:

(A)   Background profile – Radhar Stirling
(B)   Current whereabouts – Radhar Stirling
(C)   Background profile – Maltin PR
(D)   Banking information and  transactional history – Maltin PR
(E)   Background profile – Mr Tim Maltin
(F)   Records of call history – Mr Tim Maltin
(G)   Specific transactional history – Maltin PR's transactions with Hogan Lovells International LLP, Stokoe, Mr Farhad Azima, Radhar Stirling
(H)   Banking information, transactional history – Hogan Lovells International LLP (specific account targeted)
(I)    Banking information, transactional history – Stokoe (various accounts)
(J)    Travel dates to and from Dubai – Mr Tsiattalou of Stokoe

During our discussions with Source A1 we were informed that the above requests were being passed to Source A1 by another individual whom we refer to in this report as Source A2. In turn, we were informed that Source A2 was receiving the requests from another individual, Mr Paul Robinson, with the requests ultimately originating from clients in the Middle East.  We are informed that Source A1 believes Mr Robinson was himself receiving instructions from one or more other intermediaries in London and that Mr Robinson was forwarding information to the London agent(s) back to their ultimate clients in Dubai.

Having considered the information from Source A1 that had been obtained by Quaestio, Mr Tsiattalou instructed Quaestio to carry out its own investigations into the chain of instructions being issued and received, including the requests for information from Mr Robinson.

LIMITATIONS

Please note that, where appropriate, we have obtained intelligence through discreet human source (HUMINT) investigations where the individuals may be close to, or familiar with, the subject of enquiry and their interests. Therefore, this report describes the sources of the information but has anonymized certain sources to protect their identity. If, during the course of our enquiries, we identify potential witnesses whose identity can be disclosed, this will be reported on accordingly.

## 2. Executive Summary

1.  According to our investigations, between July 2019 and April 2020 Mr Paul Robinson has requested various items of confidential information from different sources and has instructed Source A2 and, through him, Source A1 to obtain that information. The confidential information includes, among other things, requests for banking co-ordinates and specific transactional information from Stokoe. We are advised by Stokoe that it appears a number of the individuals and companies targeted by Mr Robinson are connected and are involved in current High Court litigation brought by one of Stokoe's clients, Mr Karim Al Sadeq.

2.  It appears that the requests being made by Mr Robinson are for obviously confidential information. It also appears that Mr Robinson, Source A2 and Source A1 have used secure, anonymous, and encrypted methods of communication to pass on the requests for information and any information obtained in response to those requests. It is Quaestio's view that these methods appear to demonstrate that Mr Robinson and those instructing him are likely to be aware that they have no entitlement to access this information.

3.  Quaestio has identified that, in addition to requests relating to Stokoe, a number of other targets have been identified by Mr Robinson including: Maltin PR, Mr Tim Maltin and, to lesser extent, Hogan Lovells International LLP, Mr Farhad Azima, and Radhar Stirling. In addition to this, we believe that attempts have been made, and may be on going, to enquire into Mr Tsiattalou's travel to and from Dubai.

4.  Since Quaestio's involvement in this matter, we have been able to assist Stokoe in resisting the requests by Mr Robinson for confidential information (or, at least, those requests of which we have been made aware as a result of speaking with Source A1). It is not possible, however, to provide a complete assurance to Stokoe that no further or other attempts to access its confidential information have been made. Quaestio has also worked to resist any further intrusion into the confidential information of Mr Farhad Azima and Radhar Stirling.

5.  The investigation so far has not confirmed to a reasonable degree of certainty the identities of the individuals other than Source A1, Source A2, and Mr Robinson who have received requests to access confidential information. In particular, whilst Source A1 has informed us of certain individuals who may be involved in these matters, we have not yet been able to obtain corroboration. Nor are we able, at this stage, to state with any reasonable degree of certainty the positive identity of the London agent(s) or Dubai clients mentioned by Source A1. Quaestio can state, however, that certain incidents of surveillance notified to us separately by Mr Tsiattalou are not inconsistent with Source A1's account.

6.  In particular, Queastio believes that Mr Stuart Page has admitted in recent legal proceedings that he has previously been retained as a private security and corporate investigator on behalf of the Government of Ras Al Kamiah. We understand from Mr Tsiattalou that Mr Page was identified by Stokoe's legal team during one of a number of recent trips to Dubai during which surveillance operatives were apparently observed. We are also informed that Mr Tsiattalou believes that his hotel room may have been accessed on one of those trips.

**45**

## 3. Investigation & Findings

### Data Assessment

Quaestio's initial approach to this investigation was to obtain an account of relevant events from Source A1 and to assess which communications Source A1 had been involved in. Quaestio has prepared a timeline setting a chronological order of the events of which we are aware, including information provided to us by Source A1 and document(s) we have been shown. The chronology reveals the lines of communication and the nature of the instructions being received and relayed by Mr Robinson.

The key events relating to our Source A1 are set out below, which includes events we believe have occurred prior to Quaestio's involvement in March 2020. Source A1 has indicated that Source A2 has been involved in these events, although we are informed that Source A2 is currently unaware of Source A1's approach to Quaestio. Source A1 has informed us that he is not willing to divulge this Source A2's identity.

| Date | Time | Notes |
|------|------|-------|
| | | |
| Jul - Oct | | A1 to A2 via phone call / Threema Identify Radhar Stirling - mobile - address and/or whereabouts / banking |
| Dec | | A1 to A2 re mobile for Radhar Stirling and obtain month of calls/texts - could not identify subscriber |
| 13-Feb | | Excel spreadsheet created for Maltin PR banking |
| 17-Feb | | Access Maltin PR Ltd - mobile of Tim Maltin - Password Protected |
| | | |
| 08-Mar | | A2 instructs A1 via Threema messaging platform asking A1 to open up payments on Radhar Stirling & F Azima |
| 11-Mar | | A2 instructs A1 via Threema messaging platform to 'open up' credits on Maltin PR Bank statement dated 2nd December 2019 for £37,695.00 & 20th December £18000.00 re 'HLI') |
| | | |
| 02-Apr | | A2 instructs A1 via Threema messaging platform - Open up Stokoe Partnership re Maltin results |
| 03-Apr | | A2 sent email to duedilligence@husmail.com with Maltin PR further banking info for Feb & March 2020 |
| 06-Apr | | A2 asks A1 via Threema to investigate HLI and pull three months corporate banking |
| 08-Apr | | A2 emails duedilligence@husmail.com with the Stokoe Partnership Manch Account statement |
| 09-Apr | 07:56 | A2 asked A1 via Threema platform to proceed with the Stokoe Partnership to further ID main trading account x 3 months |
| 14-Apr | 14:41 | A2 advises A1 via Threema platform that A2 may be able to meet his client in next few days re payment |
| 14-Apr | | Telephone call A1 to A2 via Threema and establishes A2 is due to meet with client (duedilligence@husmail.com) in Waitrose Petersfield |
| 15-Apr | 10:46 | A2 emails duedilligence@husmail.com main Stokoe Bank Account |
| 17-Apr | | A2 to email duedilligence@husmail.com further report on Stokoe main account containing 1st April transactions |
| 20-Apr | | duedilligence@husmail.com emails A2 to look at x2 landline telephone numbers 0203 936 5703 / 0203 9367073 |
| 20-Apr | | A2 meets with duedilligence@husmail.com in Southampton re cash drop circa 1700 - 1800 |
| 21-Apr | 14:30 | duedilligence@husmail.com emails and instructs A2 to identify the ins and outs of Feb 2020 re Dubai BT |
| 22-Apr | | A2 to A1 via Threema to ID client account and initially provide one month for March 2020 with a view for doing November to Feb |
| 23-Apr | | A1 provides A2 HLI negative report with incorrect banking and other information |
| 23-Apr | 11:56 | A2 calls via Threema A1 re Stokoe re 'SFB' payment asking if anything had been amended re statement - A1 explains that narrative is put down by the user |

46

During our investigation, we have been able to review a number of email communications[1] and Threema[2] message threads (private messaging platform). These documents demonstrate requests being made by Mr Robinson and the return of information to Mr Robinson.

Where email and private messaging has been mentioned in this report, Source A1 has provided copies of this to Quaestio. Source A1 has informed us that he had been given access to an email account: fairydust1998@protonmail.ch. In these exchanges we can see information being sent by and received by Source A2 and in turn being sent and received by Mr Paul Robinson. All Threema messages that were provided by Source A1 were given to Quaestio with Source A1's consent for reference purposes only.

It was established by Source A1 that Mr Robinson was using the email account: duediligence@hushmail.com.

**Example of Email Instruction from email account operated by Paul Robinson**





[1] Annex 1 – Emails between Paul Robinson & Source A2
[2] Annex 2 – Threema Private Messages between Source A1 & Source A2

47

Data Assessment Summary - Pre Quaestio

Prior to Source A1 approaching Quaestio, it can be seen from the material available that those instructing Mr Robinson were keen to obtain information about Radhar Stirling. According to Source A1, no useful information on her whereabouts, telephone numbers and banking information was reported back to Mr Robinson. We note however that these requests were being made as far back as July 2019 and the reader will need to consider what relevance this date may have. We have no way of telling whether Mr Robinson has made any further attempts to obtain the same or related information about Ms Stirling from other sources.

In February 2020, Mr Robinson requested two categories of information in relation to Maltin PR and Mr Tim Maltin. In the instance of Maltin PR, Mr Robinson requested confidential financial records in the form of periods of transactional history from the company's bank account. According to Source A1 and the material available to us monthly transactional data was in fact delivered to Mr Robinson for onward transmission to his clients. Mr Tim Maltin's phone records were also requested, although Quaestio understands that these were not available and that Mr Robinson was informed about this. Quaestio has no way of telling whether Mr Robinson has made any further attempts to obtain this information through other sources.

On 8 March 2020 requests were made by Mr Robinson for specific transactional data relating to the Maltin PR bank account. The specific transactions related to payments in relation to Radhar Stirling and Mr Farhad Azima. Mr Robinson asked for the banking coordinates for these two subjects. An exchange between A1 and A2 is seen below where Quaestio is aware that the narrative in this request has been copied from Mr Robinson's message and relayed down the line.



As will be mentioned later in this report, no information was delivered back to Mr Robinson in relation to these specific requests. Source A1 was now providing cooperation to Quaestio and steps were taken to control the information provided in response to these requests.

On 11 March 2020, Mr Robinson sent a further instruction requesting that the Maltin PR bank account be accessed in relation to transactions pertaining to Hogan Lovells and that he required the banking co-ordinates for this firm of solicitors. As will be mentioned later in this report no information was delivered back to Mr Robinson in relation to these specific requests.

In short, it appears that the requests by Mr Robinson were being made on behalf of other persons. According to Source A1, the ultimate clients of Mr Robinson were believed to be in Dubai. It is Quaestio's view that the information requested was obviously confidential and was being requested in a manner which suggests Mr Robinson, and those for whom he acts, were likely aware that they had no entitlement to this information.

### Stokoe Legal Team in Dubai – Hotel Break-in & Surveillance

In the course of this investigation, Quaestio has been provided with an account from Mr Tsiattalou as to certain suspected surveillance activities during recent trips he has made to Dubai. We understand that, having been instructed by Mr Karim Al Sadeq in mid-October 2019, Mr Tsiattalou and his legal team made various trips to Dubai throughout January, February and March 2020 in connection with Mr Al Sadeq's case. During those trips, the members of the legal team stayed at the 'One and Only' hotel on the Palm.

On 19 February 2020 Mr Tsiattalou returned to his hotel room to find the balcony door left open. Mr Tsiattalou reported the matter to the hotel and requested sight of the hotel's CCTV as he believed that his room had been accessed without permission. Quaestio understands that the hotel was resistant to these requests and suggested that it was in fact the cleaner who had left the balcony door open. We understand that Mr Tsiattalou did not accept this explanation as the cleaner had denied leaving the balcony door open. We are informed that Mr Tsiattalou complained to the general manager at the time and that further letters of complaint have since been sent.

We are also informed that, upon further investigations by Mr Tsiattalou and members of his team, a member of the hotel staff told them that Dubai security services were monitoring Mr Tsiattalou and the Stokoe legal team and had been doing so throughout the times they had stayed at the hotel.

We are also instructed that, in the evening of Saturday 6 March 2020, members of the legal team witnessed an individual who they believed was Mr Stuart Page in the hotel. We understand that the following photograph was taken of Mr Page.

Image of Stuart Page at The One & Only Mirage Palace Hotel – Dubai



50

On Saturday 7 March 2020, Mr Tsiattalou contacted Quaestio whilst still in Dubai and requested Quaestio to try find a photograph of Mr Page to confirm whether it was indeed him in the hotel.

In response to this request, Quaestio provided the following image[4] to Mr Tsiattalou and his team. This led to Mr Tsiattalou making a positive identification:



Various images of suspected surveillance operatives who were seen in hotel are shown below: -



[4] https://www.thetimes.co.uk/article/blue-is-the-colour-football-is-the-game-m8xwk6cqvp7





## Tracing Operation

### Operational Scope

Having been approached by Source A1, Quaestio commenced a tracing operation which ultimately looked to establish who was involved in the chain of command instructing Paul Robinson and whether this could be traced back to a number of people thought to be behind those instructions.

According to Stokoe, given the information that was being presented to them and what they had experienced on the trips to Dubai, it was thought that the most likely people orchestrating these instructions were connected in some way to litigation involving Mr Al Sadeq. In particular, a number of individuals known to be involved in the relevant disputes had connections to Dubai. Mr Page was also known to be the private security and corporate investigation agency retained by the Government of Ras Al Kamiah who are connected to the relevant proceedings.

The strategy adopted by Quaestio was to carry out the following enquiries: -

- Conduct background profiles of all relevant persons and companies of interest and how they were associated.
- Continue to obtain information from Source A1 and and be kept informed of any new instructions being sent through from Mr Robinson and track any documents back to those persons instructing Mr Robinson.
- Conduct surveillance on persons of interest when necessary.
- Forensic assessment of potentially compromised digital devices following the possible hotel break-in.

### Initial Taskings

Quaestio was advised by Source A1 that, prior to his making contact with Quaestio, there were still live enquiries being conducted on behalf of Paul Robinson.  These enquires were  in relation to the identification of banking co-ordinates for Radhar Stirling, Mr Farhad Azima and the corporate bank account identification of Hogan Lovells. Quaestio believes that Mr Robinson was informed that those details were not available, although a report on the Hogan Lovells request was being prepared and would be sent by Source A1 in due course.

### Ongoing Enquiries & Document Tracking

On 2 April 2020, Paul Robinson requested research to be undertaken into identifying the banking co-ordinates of Stokoe.



This request enabled Quaestio to liaise with Stokoe and an agreement was made that if we were able to transcribe the company bank account to a format that would be recognisable to Mr Robinson and his clients, we could then implement a covert tracking facility into this document and look to establish its recipients.

The document was prepared and delivered by Source A1 to Source A2. Source A2 then delivered this document (unbeknown to A2) back to Paul Robinson at the duedilligence@hushmail.com email account.

54



The following results were obtained:

**Target Document Pathway (Stokoe Manch)**

| | |
|---|---|
| **Opened on different computer** | |
| Doc Opened | 8-Apr-20 at 17:38:58pm (UTC +01:00)  -  2hours4mins7secs after sending |
| Location | London, United Kingdom (86% likelihood) |
| Opened on | host31-48-65-176.range31-48.btcentralplus.com (31.48.65.176:65261) |
| Doc Opened | Tracked document opened at 8-Apr-20 at 17:38:58pm (UTC +01:00) |
| Browser | Used by recipient: Moz/4.0 (MSIE 7.0; WinNT 6.1; Trident/6.0; SLCC2; .NET CLR 2.0.50727; .NET CLR 3.5.30729; .NET CLR 3.0.30729; Media Center PC 6.0; CMDTDF; .NET4.0C; .NET4.0E; tb-mailcom/2.7.4; MSOffice 12) |

| | |
|---|---|
| **Re-Opened (by earlier reader #1)** | |
| Opened | 8-Apr-20 at 20:13:21pm (UTC +01:00)  -  4hours38mins30secs after sending |
| Location | London, United Kingdom (86% likelihood) |
| Opened on | Host86-152-6-157.range86-152.btcentralplus.com (86.152.6.157:50268) |
| Language | Recipient's PC: en-gb (English/United Kingdom) |
| Doc Opened | Tracked document opened at 8-Apr-20 at 20:13:21pm (UTC +01:00),  8-Apr-20 at 20:15:41pm (UTC +01:00) |
| Browser | Used by recipient: Moz/4.0 (ms-office; MSOffice 16) |
| Last log | No more activity after 8-Apr-20 at 20:15:41pm (UTC +01:00)  -  Log data indicates email was read for at least 2mins20secs (approx.) |

| | |
|---|---|
| **Re-Opened (by earlier reader #2)** | |
| Opened | 9-Apr-20 at 11:51:46am (UTC +01:00)  -  20hours16mins55secs after sending |
| Location | London, United Kingdom (86% likelihood) |
| Opened on | Host31-48-65-176.range31-48.btcentralplus.com (31.48.65.176:56080) |
| Doc Opened | Tracked document opened at 9-Apr-20 at 11:51:47am (UTC +01:00) |
| Browser | Used by recipient: Moz/4.0 (MSIE 7.0; WinNT 6.1; Trident/6.0; SLCC2; .NET CLR 2.0.50727; .NET CLR 3.5.30729; .NET CLR 3.0.30729; Media Center PC 6.0; CMDTDF; .NET4.0C; .NET4.0E; tb-mailcom/2.7.4; MSOffice 12) |

| | |
|---|---|
| **Re-Opened (by earlier reader #2)** | |
| Opened | 9-Apr-20 at 12:05:34pm (UTC +01:00)  -  20hours30mins43secs after sending |
| Location | London, United Kingdom (86% likelihood) |
| Opened on | Host31-48-65-176.range31-48.btcentralplus.com (31.48.65.176:56407) |
| Doc Opened | Tracked document opened at 9-Apr-20 at 12:05:37pm (UTC +01:00) |
| Browser | Used by recipient: Moz/4.0 (MSIE 7.0; WinNT 6.1; Trident/6.0; SLCC2; .NET CLR 2.0.50727; .NET CLR 3.5.30729; .NET CLR 3.0.30729; Media Center PC 6.0; CMDTDF; .NET4.0C; .NET4.0E; tb-mailcom/2.7.4; MSOffice 12) |

As can be seen from the records above, Quaestio was able to track two readers of the document using two separate IP addresses namely 31.48.65.176 & 86.152.6.157. We can confirm that the IP address 86.152.6.157 is that of Source A2.

56

The IP address of 31.48.65.176 has been identified as being associated to the following:

| IP Address: | 31.48.65.176 |
|---|---|
| Reverse DNS: | 176.65.48.31.in-addr.arpa |
| Hostname: | host31-48-65-176.range31-48.btcentralplus.com |
| Nameservers: | ns1.bt.net >> 217.32.105.91<br><br>ns2.bt.net >> 217.32.105.90<br><br>ns0.bt.net >> 217.35.209.188 |
| **Location For an IP: 31.48.65.176** | |
| Continent: | Europe (EU) |
| Country: | United Kingdom (GB) |
| Capital: | London |
| State: | West Sussex |
| City Location: | **Burgess Hill** |
| Postal: | RH15 |
| ISP: | BT |
| Organization: | BT |
| AS Number: | AS2856 British Telecommunications PLC |
| **Extra Information for an IP Address: 31.48.65.176** | |
| Continent Lat/Lon: | 48.69083 / 9.1405 |
| Country Lat/Lon: | 54 / -4.5 |
| City Lat/Lon: | (50.9583) / (-0.1342) |
| IP Language: | English, Irish, Ulster Scots, Scottish Gaelic, Scots, Welsh, Cornish |

Searches were then carried out in relation to the geo location of the IP address and where the document had been opened. In respect of the IP Address 31.48.65.176, Quaestio identified the location shown by the yellow pinpoint in the image below:

57



According to our research, the document was opened by the same recipient in the location of Burgess Hill RH15. This location was in remarkably close proximity, some 482 metres away, from 28a Church Road Burgess Hill RH15 9AE, which is the office address occupied and used by Mr Robinson and his company "Company Documents Ltd".







The document can then be seen to have been opened on two further occasions on 9 April 2020 with the following results returned:

| Forwarded/opened on different computer | |
|---|---|
| Opened | 9-Apr-20 at 13:06:37pm (UTC +01:00)  -  21hours31mins46secs after sending |
| Location | Manchester, United Kingdom (86% likelihood) |
| Opened on | 81.92.206.4:50345) |
| Doc Opened | Tracked document opened at 9-Apr-20 at 13:06:37pm (UTC +01:00), 9-Apr-20 at 13:12:07pm (UTC +01:00) |
| Browser | Used by recipient: LibreOffice |
| Last log | No more activity after 9-Apr-20 at 13:12:07pm (UTC +01:00)  -  Log data indicates email was read for at least 5mins30secs (approx.) |

| Re-Opened (by earlier reader #3) | |
|---|---|
| Doc Opened | 9-Apr-20 at 13:22:46pm (UTC +01:00)  -  21hours47mins55secs after sending |
| Location | Manchester, United Kingdom (86% likelihood) |
| Opened on | 81.92.206.4:58149) Provider: M247 LTD Manchester Infrastructure (m247.com) |
| Doc Opened | Tracked document opened at 9-Apr-20 at 13:22:46pm (UTC +01:00) |
| Browser | Used by recipient: LibreOffice |

The IP address of 81.92.206.4 can be identified as being associated to the following: -

| IP Address: | 81.92.206.4 |
|---|---|
| Reverse DNS: | ** server can't find 4.206.92.81.in-addr.arpa: SERVFAIL |
| Hostname: | 81.92.206.4 |
| **Location For an IP: 81.92.206.4** | |
| Continent: | Europe (EU) |
| Country: | United Kingdom (GB) |
| Capital: | London |
| State: | London, City of |
| City Location: | **London** |
| Postal: | EC2P |
| ISP: | Venus Business Communications Limited |
| Organization: | Venus Business Communications Limited |
| AS Number: | AS9009 M247 Ltd |
| **Extra Information for an IP Address: 81.92.206.4** | |
| Continent Lat/Lon: | 48.69083 / 9.1405 |
| Country Lat/Lon: | 54 / -4.5 |
| City Lat/Lon: | (51.5088) / (-0.126) |

This IP address appears to be used by a business to business hosting company M247 Ltd.



The IP address geo location is that of the following address: 2 Adelaide Street Charing Cross London WC2N 4HZ.



61

At this stage of the enquiry we have not been able to confirm who were the recipients that opened this document (Stokoe Manch).  We observe, however, that the IP address geo location is in close proximity, circa 800 metres, to the address of the UK office of Page Corporate Investigations 5-8 The Sanctuary Westminster London SW1P 3JS.  This company is believed to be associated with Mr Stuart Page.



Image of distance between Adelaide Street & Page Office Location.



62

The document, geo located to Adelaide Street, is also in the vicinity to a number of other known corporate intelligence agencies.



| Summary Stokoe (Manch) -   as at 9-Apr-20 at 17:35:05pm (UTC +01:00)   -   1day 2hours 14secs after sending | |
|---|---|
| Total | Opened 7 times by 3 readers |
| Reader #1 | Opened 2 times for 2mins20secs total |
| Reader #2 | Opened 3 times |
| Reader #3 | Opened 2 times for 5mins30secs total |

On 9 April 2020, Paul Robinson requested that the main Stokoe trading bank account be accessed and requested transactional data for the business bank account for the last three months history.

Surveillance April 2020

Via discrete enquiries made by Source A1 on 14 April 2020, it was established that Source A2 would be meeting with Paul Robinson within the next 24/48 hrs and that the meeting location would be the car park of Waitrose in Petersfield.  Source A2 was to be furnished with a cash payment from Paul Robinson regarding the work being carried out on his behalf.

Considering this information carefully, Quaestio deployed a three-man surveillance team at short notice, to monitor the activities of Paul Robinson.

Intelligence received from Source A1 over the subsequent days identified A2 had in fact informed Source A1 that the meeting location had changed, for unbeknown reasons to A1, and that in fact the meeting was to take place in an unknown location in Southampton, given that Paul Robinson was in the location of Gosport and it would be more convenient. Quaestio later learned that the meeting between Paul Robinson and Source A2 did take place on 20 April 2020.

Unfortunately, due to the short notice of the intelligence surrounding the meeting location on 20th April 2020, surveillance operatives were unable to observe this meeting.

On 15 and 17 April 2020, Quaestio took instructions from Stokoe regarding the request made by Paul Robinson on 9 April 2020 regarding access to the transactional data of Stokoe's main trading account. Quaestio then re-deployed the tracing exercise and transcribed additional banking information from Stokoe's London office account so that it looked in line with what Mr Robinson would have been expecting. The document was transcribed in such a way to protect certain confidential information relating to Stokoe's clients, employees, service providers and the people and companies involved in the current set proceedings.

This document was prepared, executed and launched and A2 delivered this document (unbeknown to Source A2) back to Mr Robinson at the **duedilligence@hushmail.com** email account.



On these occasions however, the document appears not to have registered at any location during the tracing exercise.  Quaestio does not know the reason for this, but one likely possibility is that the document was never opened on a device that was live and connected to the internet. Given that the document was launched at around the time that Source A2 understood Paul Robinson was liaising with his client(s), it is entirely possible that he printed these documents off and personally handed them over.

What can be said, however, is that we have demonstrated that these documents were delivered to the same email account controlled by Paul Robinson and, as can be shown later in this report, very specific requests were then made in conjunction with receiving these documents.

On 21 April 2020 Paul Robinson requested that research be conducted in relation to Mr Tsiattalou of Stokoe and specifically his travel movements in and out of Dubai for the month of February 2020.

64

Screen shots of these requests are shown below. Source A1 understands that Source A2 was unable to source this information from a contact in Dubai until at least late May or early June 2020. Quaestio understands that Mr Tsiattalou reported these requests for further information to the relevant authorities.







On 22 April 2020 Paul Robinson requested, via Threema, that he was now seeking information on the client account - or more specially the feeder account - to the main Stokoe trading account given that the information he was seeking was not detailed in the material he had seen following the transmission of the 15 and 17 April 2020 banking information which had been transcribed by Quaestio.  These instructions were then relayed by Source A2.

In this request Mr Robinson instructed the acquisition of transactional information for the month of March 2020 and, subject to those findings, he was intending to request the period November 2019 to February 2020.

Given that Source A1 was now working with Quaestio, it was reported to Paul Robinson via Source A2 that this information was not achievable given that Stokoe now had heightened security.

On 11 March 2020 and  6 April 2020 the following requests were received by Source A1:





Source A1 compiled a report containing incorrect information and outlining why this information was not possible to obtain. It did however provide Quaestio with another opportunity to track this material.

The document was prepared and delivered by Source A1 to Source A2. Source A2 then delivered this document (unbeknown to Source A2) back to Paul Robinson at the duedilligence@hushmail.com email account.



The following results were obtained: -

**Target Document Pathway (Hogan Lovells International LLP)**

| Subject | Hogan Lovells International LLP | |
|---|---|---|
| Sent on | 23-Apr-20 at 17:50:01pm 'Europe/London' time | |
| 1st Open | **23-Apr-20 at 17:51:17pm** +01:00 | (86%) **Test location, United Kingdom** |

| | | |
|---|---|---|
| Doc Opened | 24-Apr-20 at 17:40:43pm (UTC +01:00)  -  23hours50mins42secs after sending | |
| Location | London, United Kingdom (86% likelihood) | |
| Opened on | host5-81-45-198.range5-81.btcentralplus.com (5.81.45.198:52751) | |
| Doc Opened | Tracked document opened at 24-Apr-20 at 17:40:43pm (UTC +01:00),   24-Apr-20 at 17:41:57pm (UTC +01:00),   24-Apr-20 at 17:48:37pm (UTC +01:00),   24-Apr-20 at 17:53:28pm (UTC +01:00) | |
| Browser | used by recipient: Moz/4.0 (ms-office; MSOffice 16) | |
| Last log | No more activity after 24-Apr-20 at 17:53:28pm (UTC +01:00)  -  Log data indicates email was open for at least 12mins45secs (approx.) | |

| **Re-Opened (by earlier reader #1)** | | |
|---|---|---|
| Doc Opened | 24-Apr-20 at 18:07:18pm (UTC +01:00)  -  1day17mins17secs after sending | |
| Location | London, United Kingdom (86% likelihood) | |
| Opened on | host5-81-45-198.range5-81.btcentralplus.com (5.81.45.198:53111) | |
| Doc Opened | Tracked document opened at 24-Apr-20 at 18:07:18pm (UTC +01:00),   24-Apr-20 at 18:09:18pm (UTC +01:00) | |
| Browser | used by recipient: Moz/4.0 (ms-office; MSOffice 16) | |
| Last log | No more activity after 24-Apr-20 at 18:09:18pm (UTC +01:00)  -  Log data indicates email was read for at least 2mins (approx.) | |

As can be seen from the two records above there was one known reader of the document which Quaestio has tracked which has identified, with one IP address namely 5.81.45.198.

70

The IP address of 5.81.45.198 can be identified as being associated to the following: -

| IP Address: | 5.81.45.198 |
|---|---|
| Reverse DNS: | 198.45.81.5.in-addr.arpa |
| Hostname: | host5-81-45-198.range5-81.btcentralplus.com |
| Nameservers: | ns0.bt.net >> 217.35.209.188<br>ns2.bt.net >> 217.32.105.90<br>ns1.bt.net >> 217.32.105.91 |
| **Location For an IP: 5.81.45.198** | |
| Continent: | Europe (EU) |
| Country: | United Kingdom 🇬🇧 (GB) |
| Capital: | London |
| State: | West Sussex |
| City Location: | **Haywards Heath** |
| Postal: | RH17 |
| ISP: | BT |
| AS Number: | AS2856 British Telecommunications PLC |
| **Extra Information for an IP Address: 5.81.45.198** | |
| Continent Lat/Lon: | 48.69083 / 9.1405 |
| Country Lat/Lon: | 54 / -4.5 |
| City Lat/Lon: | (50.9933) / (-0.1567) |

The IP address geo location is that of the following address: -

Ansty, Haywards Heath RH17.



Upon further research it can be seen that this location is approximately 1500 meters from the home address of Paul Robinson whose residential address is located at 6 Belvedere Walk Haywards Heath RH16 4TD.

Image of distance between document tracker record and home address of Paul Robinson.



| Summary  -  as at 27-Apr-20 at 16:30:07pm (UTC +01:00)  -  3days22hours40mins6secs after sending | |
|---|---|
| Total | Opened 4 times by 2 readers |
| Reader #1 | Opened 3 times for 14mins45secs total |
| Reader #2 | Opened 1 time for 28secs total (Document Test) |

On 23 April 2020, Mr Robinson made enquiries of Source A2 via Threema as to the entry in the Stokoe main trading bank account. He enquired as to the payments referenced "SFB". According to Mr Tsaittalou, this entry relates to one of Mr Tsiattalou's other companies, Speciality Flat Breads Ltd. Mr Robinson asked whether these entries had been amended or shortened. Quaestio understands that it was explained to Mr Robinson by Source A2 that he had only provided what had been given to him and could not comment further. In Quaestio's assessment, this suggests that Mr Robinson and possibly those instructing him have read the Stokoe Main Trading bank account as transcribed by Quaestio.

72

## Reported Phishing Attempts

Quaestio has also been instructed that, since the litigation involving Mr Al Sadeq first became publicly known, a number of individuals and companies acting in that litigation have received an unusual number of targeted phishing attempts to access their personal data.

Quaestio has not carried out an extensive analysis of these attempts. We are, however, able to comment that the heightened activity and level of sophistication of these phishing attempts is understandably concerning. Quaestio is also aware that allegations of phishing have also been raised in a related set of legal proceedings involving Mr Farhad Azima, who is one of the targeted individuals referred to above in this report.

A short summary of some of these malicious communications is set out below.

Stokoe Partnership Solicitors

Quaestio understands that Mr Tsiattalou has received numerous emails with varying links contained within them all of which appear not to originate from known or genuine sources. At this early stage of Quaestio's analysis, it would appear clear to us that these are ultimately phishing and spear phishing attempts to access data or confidential information.

Quaestio has been informed that, as recently as 16 June 2020, Mr Tsiattalou has reported receiving an SMS message on his mobile phone timed at 15.32 hrs with what appears to be a phishing message enticing him to click on a suspicious link. What is of additional interest here is that Mr Tim Maltin and Arthur Maltin, representatives of Maltin PR who are also mentioned above in this report, have also received exactly the same SMS message with exactly the same link at 15.31 hrs on the same day, only one minute before Mr Tsiattalou.

In addition to the above, on the 16th March 2020, Nicholas Wright of 4 Stone Buildings and Maria Theodoulou of Stokoe received suspicious phone calls from phone numbers they did not recognise. Opensource tracing exercises revealed that the number that called Mr Wright (which was not answered) could be traced back to Ras Al Khaimah. Ms Theodoulou answered the she received and then heard a ringing tone as if she was in fact the person making the phone call.

Given Mr Tsiattalou's overall concerns about potential malicious actors in this case, he has personally liaised with his outsourced IT specialists company who have been monitoring closely the activity on the Stokoe servers. What can be said from this exercise is that there has been a surprising increase in suspect activity on the servers over the April 2020 bank holiday.

Other targets

Quaestio has also received reports from other members of the legal team and other professionals connected with Mr Al Sadeq's High Court proceedings that they, too, have suffered sophisticated phishing attempts including purported LinkedIn private messages with suspect links

We do not comment further on these matters at this stage.

73

**STATEMENT OF TRUTH**

I, Alexander Sawyer, of Quaestio Intelligence Services Ltd, confirm that I have made clear which facts and matters referred to in this report are within my own knowledge and which are not.  Those which are within my knowledge I confirm to be true.  The opinions I have expressed represent my true and complete professional opinions on the matters to which they refer.  I understand my duty to the Court and have complied with that duty and I am aware of the requirements of Part 35, the Practice Direction and the Protocol for Instruction of Experts to give Evidence in Civil Claims.

I understand that proceedings for contempt of court may be brought against anyone who makes, or causes to be made, a false statement in a document verified by a statement of truth without an honest belief in its truth.

SIGNED:       _____

**ALEXANDER SAWYER**

DATED:        **27th June 2020**

74

# ANNEXES



From: Fairydust1999 <Fairydust1999@protonmail.ch>

To: duediligence@hushmail.com

Show details

Fyi

76



This conversation contains non-trashed messages. Show non-trashed messages

↑ From: Fairydust1999 ▾ 🔒
<Fairydust1999@protonmail.ch>

To: rhapsody7@protonmail.ch <rhapsody7@protonmail.ch> ▾ ▾ 🔒

Size: 1.1 KB

Sent

Hide details

Sent with ProtonMail Secure Email.

------- Original Message -------
On Wednesday, 1 April 2020 14:55, Fairydust1999 <Fairydust1999@protonmail.ch> wrote:

Matter - awake re FA

search

77

**Mr Paul Antony Robinson – Company Documents Limited**



**Mr Paul Antony Robinson**

**Mr Paul Antony Robinson** was born on the **16th April 1972.**

We have identified his email address as: info@companydocuments.com

We have **successfully traced them both** to currently reside at:

**6 Belverdere Walk, Haywards Heath, West Sussex, RH16 4TD – Since October 2017**



78

Mr Robinson is the **Managing Director** of **Company Documents Limited.**

We comment upon this limited concern as follows:

**Company Documents Limited**

This **private limited company** which bears the **registered number 04578591** was incorporated in the England & Wales on the **31st October 2002.**

The company's **registered office address** is provided as: **66 Prescot Street, London, E1 8NN.**

The company lists it **trading address** as: **Kinsfield House, 66 Prescot Street, London, E1 8NN.**

It is registered for VAT under **VAT number: GB936721411.**

The company has a website: www.companydocuments.com

The nature of the company's business is recorded as:

**SIC 63990 – Other Information Service Activities N.E.C**

**SIC 7487 – Other Business Activities**

Its **principal activity** is listed as **Corporate Research.**

At incorporation the company has an **authorised share capital** of **£400.00** divided in to **400 shares** of **£1 each.** These were allotted as follows:

| | | |
|---|---|---|
| **Paul Antony Robinson** | **200 Ordinary Shares** | **50% Share Count** |
| **Michelle Jenkins** | **100 Ordinary Shares** | **25% Share Count** |
| **Christine Robinson** | **100 Ordinary Shares** | **25 % Share Count** |

On the **1st November 2002** the following individuals were **appointed officers** of the company:

| | |
|---|---|
| **Company Director** | **Mr Barry Graham Robinson, Born January 1941. He recorded his address as 28a Church Road, Burgess Hill, West Sussex, RH15 9AE. He listed his business occupation as: Consultant.** |
| **Company Director** | **Mr Paul Antony Robinson, Born April 1972. He recorded his address as 28a Church Road, Burgess Hill, West Sussex, RH15 9AE. He listed his business occupation as Consultant.** |
| **Company Secretary** | **Mr Barry Graham Robinson, Born January 1941. He recorded his address as 28a Church Road, Burgess Hill, West Sussex, RH15 9AE. He listed his business occupation as: Consultant.** |

On the **25th June 2013** the following individual was also **appointed as an officer** of the company:

| | |
|---|---|
| **Company Director** | **Mrs Michelle Emma Jenkins, Born June 1983. She recorded her address as 28a Church Road, Burgess Hill, West Sussex, RH15 9AE. She listed her business occupation as: Researcher.** |

Due to the company's size, it is only required to file **abbreviated accounts**. It last filed accounts for the **year ended 31.03.2019** and which showed it had recorded **shareholders funds of £67,791** compared to the **previous year of £33,009.**

The company has **no mortgages** or **charges** registered against it.

It also has **no detrimental information** recorded in relation **County Court Judgements** etc.

We now deal with the addresses listed for the company:

**Kinsfield House, 66 Prescot Street, London, E1 8NN**

This is the trading address of **Carter Backer Winter LLP** who are **accountants, Tax and business advisors.**

**28a Church Road, Burgess Hill, West Sussex, RH15 9AE**

This is the trading address of **Laurence Gould Partnership Ltd.** They are **business consultants** who assist companies in all manner of business development.

Corporate website: [www.companydocuments.com](www.companydocuments.com)

A screen shot taken:



This provides the following contact details:

**Company Documents Ltd**
5 Chancery Lane
London
WC2A 1LG
United Kingdom
Tel- +44 (0)20 7383 4477
Fax- +44 (0)20 7383 4488
info@companydocuments.com

We now deal with the identified contact details:

80

The address: **5 Chancery Lane, London, WC2A 1LG** are **serviced offices** provided by www.offices.org.uk.

**Directorship searches"** under his name which has revealed the following additional information:

### Risk Awareness Limited

This **private limited company** which bears the **registered number: 05198734** was incorporated in England and Wales on the **5th August 2004.**

The company's Registered Office address and trading address is the same and provided as: **Cepea, St Georges Lane, Hurstpierpoint, Hassocks, BN6 9QX.**

The nature of the company's business is provided as:

| SIC Code | 63990 | **Other Information Services Activities N.E.C** |
| SIC Code | 7487 | **Other Business Activities** |

**It principal business activity** is listed as the **provision of training services**.

The company has an **authorised share capital** of **£1000** divided in to **1000 ordinary shares of £1 each.** These have been allotted as follows:

| **Barry Graham Robinson** | **500 Ordinary Shares** | **50% Share Count** |
| **Paul Antony Robinson** | **500 Ordinary Shares** | **50% Share Count** |

On the **5th August 2004**, the following individuals were **appointed as officers** of the company:

| **Company Director/Secretary** | **Mr Barry Graham Robinson,** Born January 1941, Cepea, St Georges Lane, Hurstpierpoint, Hassocks, West Sussex, BN6 9QX. He provided his business occupation as Consultant. |
| **Company Director** | **Mr Paul Antony Robinson,** Born April 1972. |

**However he resigned on the 11th September 2004.**

Other **previous recorded officers:**

| **Company Director** | **Mr John Watts,** Born September 1943. |

He was **appointed** as a **Director** on the **5th August 2004** and **he resigned** on the **5th July 2007.**

| **Company Director** | **Mr James John Oakes,** Born August 1957 |

He was **appointed** as a **Director** on the **14th September 2004** and he **resigned** on the **4th July 2007.**

| **Company Director** | **Christine Robinson,** Born June 1945. |

She was **appointed** as a **Director 5th July 2007** and **she resigned** on the **1st July 2010.**

For further information, please refer to the company report.

81

# EXHIBIT D

*Amended Claim Form under CPR 17.1(1) dated 30.06.2020*



**Claim Form**

| In the | **HIGH COURT OF JUSTICE QUEEN'S BENCH DIVISION** |
|---|---|
| **Fee Account no.** | |
| **Help with Fees – Ref. no. (if applicable)** | H W F - ☐☐☐ - ☐☐ |

You may be able to issue your claim online which may save time and money. Go to www.moneyclaim.gov.uk to find out more.

| Claim no. | |
|---|---|
| Issue date | |

29 Jun 2020

QB-2020-002218

Claimant(s) name(s) and address(es) including postcode

STOKOE PARTNERSHIP SOLICITORS
Chancery House, 53/64 Chancery Lane, London, WC2A 1QU

Defendant(s) name and address(es) including postcode

(1)   PAUL ROBINSON
      6 Belvedere Walk, Haywards Heath, West Sussex RH16 4TD

(2)   COMPANY DOCUMENTS LTD
      28a Church Road, Burgess Hill, RH15 9AE

(3)   OLIVER MOON
      10 Heather Close, Copthorne, West Sussex, RH10 3PZ

Brief details of claim

1. The Claimant brings these proceedings against the First and Second Defendants for injunctive relief to restrain actual or threatened breaches of confidence, ancillary disclosure orders.  The Claimant also seeks disclosure orders against all three Defendants pursuant to the principle expressed in *Norwich Pharmacal v. Customs and Excise Commissioners* [1974] AC 133 (HL).

2. The Claimant is a solicitors firm.  It is presently instructed by Mr Karam Al-Sadeq in on-going High Court proceedings in Claim No. QB-2020-000322 (the "**Al Sadeq Litigation**").

| Claim no. | |
|---|---|

3. On/about 27.03.20 the Claimant became aware from information provided by the Third Defendant as a 'whistle-blower' that the Defendants had been instructed to obtain confidential information from the Claimant.  In particular, so far as the Claimant is presently aware:

   a. On/about 02.04.20 the Defendants were instructed to obtain the banking co-ordinates of the Claimant.  This instruction coincided with enquiries made in the course of the Al Sadeq Litigation concerning the source of funding in those proceedings.

   b. On/about 09.04.20 the Defendants were instructed to access the Claimant's business bank account and to obtain transactional data for the past three months.  This period broadly coincided with the period that elapsed since the issue of the Claim Form in the Al Sadeq Litigation.

   c. On/about 21.04.20 the Defendants were instructed to obtain information as to the "*movements in and out of Dubai – for Feb 2020*" of the partner of the Claimant with conduct of the Al Sadeq Litigation.  This period broadly coincided with the period during which he travelled to the United Arab Emirates in connection with the Al Sadeq Litigation.  On one or more of those occasions, the solicitor was the subject of covert surveillance.

4. The Defendants' instructions to obtain confidential information from the Claimant followed from earlier instructions to obtain information from other persons connected to the Al Sadeq Litigation.  In particular, so far as the Claimant is presently aware:

   a. In/about October to December 2019, the Defendants were instructed to obtain information about Ms Radha Stirling, who is a human rights advocate assisting Mr Al Sadeq.

   b. In/about February and March 2020, the Defendants were instructed to obtain financial records and monthly transactional data from a bank account held by Maltin PR, which is a public relations entity assisting Mr Al Sadeq.

5. So far as the Claimant is presently aware, at all material times the Defendants communicated using anonymised and encrypted electronic communications including: (i) Threema messages; (ii) an email account: 'duedilligence@husmail.com' believed to be held by the First and/or Second Defendants; and (iii) an email account 'fairydust1998@protonmail.ch' believed to be held by the Third Defendant and another individual whose identity is presently unknown to the Claimant.

6. In response to the information provided by the Third Defendant, the Claimant has taken steps to trace the public IP addresses used to request access to its confidential information.

51

| Claim no. | |
|-----------|--|

7. The Claimant believes that, unless restrained, the First and/or Second Defendants may make further attempts to access the Claimant's confidential information and/or may disclose information that has already been obtained from the Claimant. The Claimant therefore applies for injunctive relief against those Defendants together with other orders.

8. In addition, by this action, the Claimant applies for *Norwich Pharmacal* orders against all Defendants requiring them to swear affidavits providing full information as to (a) the identity of the persons ultimately providing them with instructions; (b) the extent of the confidential information that has already been obtained from the Claimant; and (c) the identity of all persons to whom the Defendants have passed on the Claimant's confidential information.

9. The Claimants believe that it is just and convenient in all the circumstances to make interim and final orders in these terms.

AND THE CLAIMANT CLAIMS:

FROM THE FIRST AND SECOND DEFENDANTS
(1)    Injunctive relief;
(2)    Declaratory relief;
(3)    *Norwich Pharmacal* disclosure orders;
(4)    Damages in an amount to be assessed;
(5)    Costs; and
(6)    Such further or other relief as the Court may think just.

FROM THE THIRD DEFENDANT
(1)    *Norwich Pharmacal* disclosure orders
(2)    Such further or other relief as the Court may think just.

Value: The Claimant cannot presently say how much is likely to be recovered in any damages.

**You must indicate your preferred County Court Hearing Centre for hearings here** *(see notes for guidance)*

Defendant's name and address for service including postcode

See above

| | £ |
|---|---|
| Amount claimed | TBA |
| Court fee | 5528.00 |
| Legal representative's costs | TBA |
| **Total amount** | |

52

| Claim No. | |
|-----------|--|

Does, or will, your claim include any issues under the Human Rights Act 1998?    [ ] Yes [X] No

Particulars of Claim to follow.

---

**Statement of Truth**

*The Claimant believes that the facts stated in these brief details of claim are true. I understand that proceedings for contempt of court may be brought against anyone who makes, or causes to be made, a false statement in a document verified by a statement of truth without an honest belief in its truth.

*I am duly authorised by the claimant to sign this statement

Full name   **HARALAMBOS TSIATTALOU**

Name of claimant's legal representative's firm **STOKOE PARTNERSHIP SOLICITORS**

signed _____    position or office held **PARTNER**
                                                                (if signing on behalf of firm or company)

(Claimant's legal representative)

*delete as appropriate

---

Stokoe Partnership Solicitors
Chancery House
53/64 Chancery Lane
London  WC2A 1QU
Tel: 020 3427 5710 Fax: 020 3427 5711
DX167 Chancery Lane

Claimant's or claimant's legal representative's address to which documents or payments should be sent if different from overleaf including (if appropriate) details of DX, fax or e-mail.

# EXHIBIT E

**IN THE HIGH COURT OF JUSTICE**

**QUEEN'S BENCH DIVISION**

**BEFORE THE HONOURABLE MR JUSTICE CHAMBERLAIN**

**DATED 7 JULY 2020**

**Claim No. QB-2020-002218**

**BETWEEN:**

**STOKOE PARTNERSHIP SOLICITORS**

*- and-*

**(1)PAUL ROBINSON**

**(2)COMPANY DOCUMENTS LTD**

**(3)OLIVER MOON**

**Claimant**

QB-2020-002218

**Defendants**

---

**ORDER**

---

**PENAL NOTICE**

**IMPORTANT**

**IF YOU PAUL ROBINSON, COMPANY DOCUMENTS LIMITED, AND OLIVER MOON DISOBEY THIS ORDER YOU MAY BE HELD TO BE IN CONTEMPT OF COURT AND YOU, OR YOUR DIRECTORS, MAY BE SENT TO PRISON, FINED, OR HAVE YOUR ASSETS SEIZED.**

**UPON** the Claimant and the Defendants compromising: (i) the claims in the Amended Claim Form dated 29 June 2020; and (ii) the Claimant's applications made by Application Notice dated 29 June 2020 on the terms recorded in this Order save for paragraph 3 below;

*1*

**AND UPON** the Court making the order at paragraph 3 below as to the use of the information supplied by the Defendants;

**IT IS ORDERED THAT:**

*Disclosure and Provision of Information*

1.  By no later than 4:30pm on 7 July 2020, the First Defendant shall swear an affidavit stating on oath:

    1.1.  the identity of any person who has requested the First and/or Second Defendants to obtain Confidential Information from the Claimant;

    1.2.  (i) the manner in which the communication took place, (ii) the gist of the requests made, (iii) whether the requests were in writing, and (iv) if in writing, providing a copy if one exists in the possession or control of the First and/or Second Defendants;

    1.3.  what, if any, Confidential Information originating from the Claimant was obtained; and

    1.4.  the use, if any, of the Confidential Information, identifying any person to whom it has been provided and in respect of each such person, stating: (i) when, (ii) where, and (iii) how the Confidential Information was provided and (iv) for what purpose.

2.  By no later than 4:30pm on 10 July 2020, the Third Defendant shall swear an affidavit stating on oath:

    2.1.  the identity of any person who has requested him to obtain Confidential Information from the Claimant;

    2.2  (i) the manner in which the communication took place, (ii) the gist of the requests made, (iii) whether the requests were in writing, and (iv) if in writing, providing a copy if one exists in the possession or control of the First

and/or Second Defendants;

2.2.   what, if any, Confidential Information originating from the Claimant was obtained; and

2.3.   the use, if any, of the Confidential Information, identifying any person to whom it has been provided and in respect of each such person, stating: (i) when, (ii) where, and (iii) how the Confidential Information was provided and (iv) for what purpose.

3.   The Claimant is permitted to use the information and documents provided by the Defendants for the purpose of legal proceedings (if so advised) to identify, trace and seek damages against other wrongdoers, to protect its confidential information and to trace its use, and to seek damages or such other relief as the Court may think fit.

### *Injunction*

4.   The First and Second Defendants shall not seek unlawfully to obtain Confidential Information as defined in paragraph 6 below from the Claimant.

5.   The First and Second Defendants shall not use, publish, communicate or disclose to any other person any Confidential Information as defined in paragraph 6 below, other than: (i) by way of disclosure to legal advisers instructed in relation to these legal proceedings for the purpose of obtaining legal advice in relation to these proceedings; (ii) for the purpose of carrying this Order into effect; (iii) with the written permission of the Claimant; or (iv) with permission of the Court.

6.   For the purpose of this Order:

6.1.   "Confidential Information" shall mean any information sourced or derived, in whole or in part, from any document, whether paper or electronic, that has been obtained from the Claimant without its authority and is either designated as confidential, or is evidently confidential by reason of its subject-matter or the manner in which it has been obtained.

6.2.   "Confidential Information" shall include, but shall not be limited to: (i) the Claimant's banking records, accounts and statements; (ii) the Claimant's telephone records, accounts and statements and (iii) documents which have not been published and which, on their face, relate to the conduct of legal proceedings on behalf of Mr Karim Al Sadeq.

### Stay against Defendants

7.   All further proceedings against the First, Second and Third Defendants in this action shall be stayed on the terms of this Order save for the purpose of enforcing the terms of this Order.

8.   Each party shall have liberty to apply to the Court to enforce the terms of this Order without the need to bring a new claim.

### Confidentiality

9.   No person shall obtain a copy of the confidential exhibit to the witness statement of Haralambos Tsiattalou dated 29 June 2020 without the permission of a High Court Judge. Any such application shall be made on no less than 3 clear days' notice in writing to all parties to this action.

*Costs*

10.   There shall be no order as to costs.

*Interpretation*

11.   A Defendant who is an individual who is ordered not to do something must not do it himself or in any other way. He must not do it through others acting on his behalf or on his instructions or with his encouragement.

12.   In this Order the words "he", "him" or "his" include "she" or "her" and "it" or "its".

# EXHIBIT F

**First and Second Defendants**
**First Affidavit**
**Exhibit PR-1**
**6 July 2020**

**Claim No. QB-2020-002218**

<u>**IN THE HIGH COURT OF JUSTICE**</u>
<u>**QUEEN'S BENCH DIVISION**</u>

**B E T W E E N:**

**STOKOE PARTNERSHIP SOLICITORS**

<u>**Claimant**</u>

**- and -**

**(1)  PAUL ROBINSON**

**(2)  COMPANY DOCUMENTS LTD**

**(3)  OLIVER MOON**

<u>**Defendants**</u>

---

**AFFIDAVIT OF PAUL ROBINSON**

---

I, **PAUL ROBINSON**, of 6 Belvedere Walk, Haywards Heath, West Sussex, RH16 4TD **STATE ON OATH** as follows:

1.   I am the First Defendant in this action.  I make this affidavit on behalf of the First and Second Defendants to provide the information sought by the Claimant pursuant to the draft Consent Order signed on behalf of the First and Second Defendants on 5 July 2020, a copy of which is now produced and shown to me.

2.   Except where I indicate otherwise below, the facts and matters stated in this affidavit are within my own knowledge and are true.  Where information has been supplied to me by others, its source is identified and I believe it to be true.

3.   There is now produced and shown to me, marked "**PR-1**" an exhibit containing true copies of documents to which I will refer in this affidavit.

*1*

4.     This affidavit records information that has been provided by me to the Claimant's legal representatives at a meeting at the Claimant's offices in Central London on 5 July 2020, at which my counsel and solicitor were present.

5.     I confirm that, for the purposes of providing this Affidavit, I have carefully read and considered the Witness Statement of Haralambos Tsiattalou dated 29 June 2020.  Except where I state otherwise below, the matters stated in that witness statement are true so far as they relate to me and to my involvement in the events described.

6.     Nothing in this affidavit should be treated as waiving privilege in any privileged information.

**(1)     Persons seeking Confidential Information from the Claimant**

7.     I am asked to provide the identity of all persons from whom I received instructions to investigate the Claimant and to obtain its confidential information.

8.     My instructions to investigate the Claimant and to obtain the information referred to at paragraphs 62 to 85 of Mr Tsiattalou's witness statement originated from Mr Patrick Grayson. I believe that Mr Grayson is a private investigator and was until approximately one year ago a partner in the firm of GPW Investigations.  I have previously worked from time to time on other instructions provided to me by Mr Grayson before I was instructed to investigate the Claimant.

9.     The first instruction that I received to investigate the Claimant was given to me by Mr Grayson in person at a meeting that took place at the Goring Hotel in Belgravia, London. I recall that this meeting took place in January 2020. The meeting was arranged by text messages and calls using the "Signal" private messaging system. I refer, in particular, to the messages dated 30 January 2020 that are now produced and shown to me at **PR-1 page 2.**

10. During the meeting, Mr Grayson asked me whether I knew of anyone who was capable of obtaining bank records and other information relating to the Claimant. I told him that I did know of somebody who would be able to do this. That person was Mr John Gunning, who I now understand is referred to as "Source A2" in Mr Tsiattalou's witness statement. Only once these proceedings were served on me, did I read that Mr Gunning had, in turn, asked Mr Oliver Moon to assist him in obtaining the relevant information. I did not know Oliver Moon, and have not had any contact with him.

11. I am also asked, specifically, whether I am aware of the identity of any persons from whom Mr Grayson was receiving his instructions to investigate the Claimant. I do not know this information. Mr Grayson did not tell me who was instructing him at the time and I did not ask him for this information.

(2) **Persons seeking Confidential Information from Others**

(a) Radha Stirling

12. At paragraphs 55 to 57 of his witness statement, Mr Tsiattalou refers to requests that were made to investigate Ms Radha Stirling and an organisation called "Detained in Dubai". In particular, Mr Tsiattalou refers to requests to obtain background information, Radha Stirling's whereabouts, her telephone numbers, and her banking information.

13. I confirm that, in around July 2019, I was asked by Mr Grayson to investigate both Ms Radha Stirling and Detained in Dubai. To the best of my knowledge, the account of these events given in these paragraphs of Mr Tsiattalou's statement is true, but only so far as it concerns me and my involvement. I do not now recall whether any information was obtained in response to these requests.

(b)    <u>Maltin PR</u>

14.    At paragraphs 58 to 61 of his witness statement, Mr Tsiattalou refers to requests that were made to access financial records and monthly transactional data from Maltin PR's bank account. In particular, Mr Tsiattalou refers to requests made on 8 March 2020 and 11 March 2020 to access the bank account and obtain information relating to payments to Ms Radha Stirling, Mr Farhad Azima, and the solicitors firm Hogan Lovells.

15.    I confirm that I was asked by Mr Grayson to obtain this information. He gave me the document containing company information that I have exhibited in **PR-1, pages 13-14**. To the best of my knowledge, the account of these events given in these paragraphs of Mr Tsiattalou's statement is true but only so far as it concerns me and my involvement.

(c)    <u>Hogan Lovells</u>

16.    At paragraphs 86 to 92 of his witness statement, Mr Tsiattalou refers to requests that were made to access banking information from Hogan Lovells. In particular, Mr Tsiattalou refers to a request made on 6 April 2020 to obtain three months of corporate banking information.

17.    I confirm that I was asked by Mr Grayson to obtain this information but it was never obtained. To the best of my knowledge, the account of these events given in these paragraphs of Mr Tsiattalou's statement is true but only so far as it concerns me and my involvement.

(3)    **Relevant Communications**

18.    At paragraphs 52 to 54 of his witness statement, Mr Tsiattalou refers to communications between me and Mr Gunning using an encrypted messaging application called "Threema" and by encrypted emails.

19.    I confirm that I am the account holder and user of the email address: "duediligence@hushmail.com" and that I communicated with Mr Gunning using this email address in the manner described by Mr Tsiattalou in his witness statement.

20.     I am also asked how I communicated with Mr Grayson at the relevant times.  I communicated with Mr Grayson using Signal private messages and calls.  I no longer have a complete record of those communications because, shortly after my meeting with him in January 2020, Mr Grayson configured the Signal messaging application to delete all text messages exchanged between us automatically after a period of 12 hours.

21.     I do, however, still retain screenshots of records of the calls that took place between Mr Grayson and me during the period between January and June 2020. I also retain screenshots of a small number of text messages that were exchanged between Mr Grayson and me during the period before the Signal application was set to delete messages automatically.  I now produce and exhibit these screenshots at **PR-1 pages 2-12**.

**(4)     Gist of Communications**

22.     I am asked to provide the gist of the requests that I received from Mr Grayson to investigate the Claimant.

23.     I have already referred to the communications between Mr Grayson and me at the meeting that took place in January 2020.  On that occasion, Mr Grayson asked me whether I knew anyone who was able to investigate the Claimant and obtain banking information.  I told him that I did know someone who could do so.

24.     Following the meeting, there were a number of communications that took place between Mr Grayson and me concerning the investigation.  The gist of those communications were follow up questions to the initial enquiry, I do not have any records of the message content since on 30 January the Signal communications were set by Mr Grayson to disappear after 12 hours.

25.     I recall, in particular, that Mr Grayson asked me a number of follow-up questions from time to time based on the information that had been obtained from the Claimant. I did not, myself, study the information and so I passed on these requests to Mr Gunning.  To the extent that further information was obtained by Mr Gunning, I passed this on to Mr Grayson.

26. Mr Grayson and I agreed a fee of £10,000 for the investigation into the Claimant. At the date this affidavit is sworn, I have been paid £5,000 in cash by Mr Grayson. The remaining £5,000 has not been paid.

27. Shortly after being served with these proceedings, on Wednesday 1st July 2020 I called Mr Grayson and informed him of the situation. Mr Grayson told me not to call him again. There has been no further communication between us since.

**(5)   Confidential information originating from the Claimant**

28. I am asked to specify what confidential information originating from the Claimant was requested and obtained by me. I understand that, in answering this question, I must state all requests made by me for the Claimant's confidential information and not only those requests that are mentioned in Mr Tsiattalou's witness statement.

29. I confirm that I requested, and obtained, the confidential information that is described at paragraphs 62 to 85 of Mr Tsiattalou's witness statement. I did not request, or obtain, any other confidential information from the Claimant not mentioned in Mr Tsiattalou's witness statement.

**(6)   Use of Confidential Information**

30. I am asked to state the use of the Claimant's confidential information identifying, in each case, (i) to whom it has been provided, (ii) when, (iii) where, (iv) how, and (v) for what purpose.

31. During the investigation, Mr Gunning passed information to me by email as described at paragraphs 52 to 54 of Mr Tsiattalou's witness statement. Shortly after receiving this information from Mr Gunning, I passed it on to Mr Grayson. I recall that, on one occasion, I believe it was early March 2020, that I met Mr Grayson in Sloane Square, and provided him with a hard copy print out of the information given to me by Mr Gunning, and a USB stick containing the same information electronically. .

120

32.     On other occasions, I sent Mr Grayson the information I had received from Mr Gunning using a 'Proton Mail' encrypted email account. I sent the messages from my 'hushmail' email address to Mr Grayson at the email address cloverdock@protonmail.com, which he provided to me. I have, however, deleted the emails that I sent to Mr Grayson from this account. I confirm that I did so before being served with these proceedings.

33.     I am asked to state for what purpose the confidential information has been used by Mr Grayson. I do not know this information. I did not ask Mr Grayson about this at the time.

**(7)     Documents**

34.     I have been asked to provide any documents in the possession of the First and Second Defendants relating to the requests to obtain the Claimant's confidential information. I have provided those documents at Exhibit PR-1. I confirm that, apart from those documents, the First and Second Defendants do not retain any documents relating to the investigations.

**(8)     Other Matters**

35.     At Section E of his witness statement, Mr Tsiattalou has stated that he was the subject of surveillance during trips that he took to Dubai in February and March 2020. I do not have any knowledge of these matters.

36.     I have been asked whether I know Mr Stuart Page. I confirm that I do know him and that I have previously worked with him on more than one occasion. In particular, I worked with Mr Page approximately 20 years ago on an investigation not relevant to this case. Since then, I have also worked with Mr Page from time to time on small pieces of corporate research.

37.     Shortly after being served with these proceedings, on 1st July 2020, after seeing Mr Page's name in the documents I called Mr Page and informed him that he had been mentioned in Mr Tsiattalou's witness statement. I sent the first few pages to him, I can't recall how many pages exactly.

38.     Mr Page called me back a few days later on Friday 3rd July 2020.  He suggested
        to me that I could fight this case and offered to provide me with a "top lawyer"
        to do so.  He also stated that, if funding was likely to be a problem, he could
        assist me with this.  I did not accept Mr Page's offer, as by that stage I had
        obtained legal representation.  I have not spoken to Mr Page since this date.

39.     At Section F of his witness statement, Mr Tsiattalou has stated that both he and
        other persons have received emails and text messages which appear to be
        'phishing' attempts to access information.  I confirm that I do not have any
        knowledge of these matters.


SWORN by Paul Robinson

Signed:     ………………………………

This 6th day of July 2020

Acknowledged before me by the above named this 6th day of July 2020, he having
solemnly averred the truth of the above contents.

Signed:     ………………………

JENSEN MARK BOURKE
COMMISSIONER FOR OATHS
FCILEX  86825
JUDGE e PRIESTLEY LLP
JUSTIN HOUSE
6 WEST STREET
BROMLEY BRI  1JN

8

# EXHIBIT G



**Claim Form**

In the High Court of Justice
Queen's Bench Division

| Fee Account no. | |
|---|---|
| **Help with Fees – Ref. no.** (if applicable) | H W F - ☐☐☐ - ☐☐☐ |

You may be able to issue your claim online which may save time and money. Go to www.moneyclaim.gov.uk to find out more.

| Claim no. | |
|---|---|
| Issue date | |

16 Jul 2020

QB-2020-002492

SEAL

Claimant(s) name(s) and address(es) including postcode

STOKOE PARTNERSHIP SOLICITORS
Chancery House, 53/64 Chancery Lane, London WC2A 1QU

Defendant(s) name and address(es) including postcode

(1)   MR PATRICK TRISTRAM FINUCANE GRAYSON
      3 Rosenau Crescent, London SW11 4RY

(2)   GRAYSON + CO. LIMITED
      Ground Floor, Unit 501 Centennial Park, Centennial Avenue, Elstree, Borehamwood,
      Hertfordshire WD6 3FG

(3)   MR STUART ROBERT PAGE
      14 Montpellier Road, London W5 2QP

(4)   PAGE CORPORATE INVESTIGATIONS LIMITED
      Room 213a, Boundary House, Boston Road, Hanwell, London W7 2QE

**N1** Claim form (CPR Part 7) (06.16)
This form is reproduced from http://hmctsformfinder.justice.gov.uk/HMCTS/FormFinder.do and is subject to Crown copyright protection. Contains
public sector information licensed under the Open Government Licence v3.0                    © Crown Copyright 2016

Brief details of claim

1. The Claimant seeks remedies relating to unauthorised access to its confidential information in breach of confidence. The Claimant claims: (a) injunctive relief to restrain actual or threatened breaches of confidence; (b) ancillary disclosure orders; (c) damages to be assessed; (d) disclosure orders pursuant to the principle expressed in *Norwich Pharmacal v. Customs and Excise Commissioners* [1974] AC 133; (e) costs; (f) further or other relief.

2. The Claimant is a firm of solicitors. It is presently instructed by Mr Karam Al Sadeq in on-going High Court proceedings in Claim No. QB-2020-000322 (the "**Al Sadeq Litigation**").

3. On/about 27.03.20 the Claimant became aware from information provided by Mr Oliver Moon that Mr Paul Robinson (and/or Company Documents Limited, of which Mr Robinson is a director) had been instructed to obtain confidential information from the Claimant. In particular:

   a. On/about 02.04.20: Instructions to obtain the banking co-ordinates of the Claimant. These instructions coincided with enquiries made in the course of the Al Sadeq Litigation concerning the source of funding in those proceedings.

   b. On/about 09.04.20: Instructions to access the Claimant's business bank account and to obtain transactional data for the past three months. This period broadly coincided with the period that elapsed since the issue of the Claim Form in the Al Sadeq Litigation.

   c. On/about 21.04.20: Instructions to obtain information as to the "*movements in and out of Dubai - for Feb 2020*" of the partner of the Claimant with conduct of the Al Sadeq Litigation. This period broadly coincided with the period during which he travelled to the United Arab Emirates in connection with the Al Sadeq Litigation. On one or more of those occasions, the solicitor was the subject of covert surveillance.

4. These instructions to Mr Robinson (and/or Company Documents Limited) followed from earlier instructions to obtain information from other persons connected to the Al Sadeq Litigation. In particular, so far as the Claimant is presently aware:

   a. In/about October to December 2019: Instructions to obtain information about Ms Radha Stirling of Detained in Dubai, which is a human rights advocacy organisation assisting Mr Al Sadeq.

   b. In/about February and March 2020: Instructions to obtain financial records and monthly transactional data from a bank account held by Maltin PR, which is a public relations and litigation support entity assisting the Claimant with the Al Sadeq Litigation.

5. In response to the information provided by Mr Moon, the Claimant took steps to trace the public IP addresses used to request access to its confidential information and commenced High Court proceedings under claim number QB-2020-002218 for (in particular) disclosure orders against Mr Robinson and Company Documents Limited to identify their ultimate clients.

6. As to the involvement of the First and Second Defendants in seeking and/or accessing the Claimant's confidential information, in breach of confidence, the Claimant relies in particular on the following facts and matters:

   a. Mr Robinson provided an affidavit dated 6 July 2020 identifying the First Defendant as the source of his instructions to obtain confidential information, and admitting that Mr Robinson had provided confidential information of the Claimant to the First Defendant in hard copy, on USB stick and by encrypted email.

   b. The First Defendant is a director of the Second Defendant, which is understood to be the company through which the First Defendant provides investigation services.

7. As to the involvement of the Third and Fourth Defendants in seeking and/or accessing the Claimant's confidential information, in breach of confidence, the Claimant relies in particular on the following facts and matters:

   a. A public IP address used to access the Claimant's confidential information has been geolocated to an address in the vicinity of the premises at 5-8 Sanctuary, London SW1P 3JS which were at material times the address of both the Third and Fourth Defendants.

   b. The Third Defendant is an investigation agent who has admitted being instructed by the ruler of the Emirate in which the Claimant's client Mr Al Sadeq is detained.

   c. The Fourth Defendant is a company providing investigation services of which the Third Defendant is a director.

   d. The Claimant's lawyers saw the Third Defendant at close quarters at their hotel in Dubai when they were working on the Al Sadeq Litigation. They believe that the Third Defendant and/or his associates were at the time surveilling them.

   e. Mr Robinson has admitted to working with the Third Defendant on more than one occasion, and to contacting the Third Defendant upon receipt of the papers in claim number QB-2020-002218. The Third Defendant offered to assist Mr Robinson with funding a lawyer in connection with defending that claim.

8. The Claimant believes that there was an unlawful means conspiracy in which some or all of the Defendants participated, together with Messrs Moon, Gunning and/or Robinson.

9. The Claimant believes that, unless restrained, the Defendants may make further attempts to access the Claimant's confidential information and/or may disclose information that has already been obtained from the Claimant. The Claimant therefore applies for injunctive relief against them together with other orders.

10. In addition, by this action, the Claimant applies for *Norwich Pharmacal* orders against the Defendants requiring them to swear affidavits providing full information as to (a) the identity of the persons ultimately providing them with instructions; (b) the extent of the confidential information that has already been obtained from the Claimant; and (c) the identity of all persons to whom the Defendants have passed on the Claimant's confidential information.

11. The Claimants believe that it is just and convenient in all the circumstances to make interim and final orders in these terms.

AND the Claimant claims:

(1) Injunctive relief;
(2) *Norwich Pharmacal* disclosure orders;
(3) Damages in an amount to be assessed;
(4) Costs; and
(5) Such further or other relief (including declaratory relief) as the Court may think just.

Value

The Claimant cannot presently say how much is likely to be recovered in any damages but it will not exceed £100,000.

You must indicate your preferred County Court Hearing Centre for hearings here *(see notes for guidance)*

| Defendant's name and address for service including postcode | (as above) |

| | £ |
|---|---|
| Amount claimed | TBA |
| Court fee | £5,528.00 |
| Legal representative's costs | TBA |
| **Total amount** | TBA |

Does, or will, your claim include any issues under the Human Rights Act 1998?  [ ] Yes  [X] No

Particulars of Claim (attached)(to follow)

**Statement of Truth**
*(I believe)(The Claimant believes) that the facts stated in these brief details are true. I understand that proceedings for contempt of court may be brought against anyone who makes, or causes to be made, a false statement in a document verified by a statement of truth without an honest belief in its truth.

* I am duly authorised by the claimant to sign this statement

Full name   Haralambos Tsiattalou

Name of claimant's legal representative's firm   Stokoe Partnership Solicitors

signed _____   position or office held   Partner
    *(Claimant)(Litigation friend)                         (if signing on behalf of firm or company)
    (Claimant's legal representative)

                                                              *delete as appropriate

Stokoe Partnership Solicitors
Chancery House
53/64 Chancery Lane
London WC2A 1QU
Tel.: 020 3427 5710
Fax: 020 3427 5711
DX167 Chancery Lane

Claimant's or claimant's legal representative's address to which documents or payments should be sent if different from overleaf including (if appropriate) details of DX, fax or e-mail.

# EXHIBIT H

**IN THE HIGH COURT OF JUSTICE**                        Claim no. QB-2020-002492
**QUEEN'S BENCH DIVISION**

**B E T W E E N :-**

STOKOE PARTNERSHIP SOLICITORS

Claimant

and

(1) MR PATRICK TRISTRAM FINUCANE GRAYSON
(2) GRAYSON + CO LIMITED
(3) MR STUART ROBERT PAGE
(4) PAGE CORPORATE INVESTIGATIONS LIMITED

Defendants

_____

**PARTICULARS OF CLAIM**

_____

**Parties**

1.   The Claimant is a firm of solicitors. It is instructed by Mr Karam Al Sadeq in ongoing High Court proceedings under claim number QB-2020-000322 (the "**Al Sadeq Litigation**").

2.   The First Defendant has had a long career in corporate investigation. He was a founding partner of GPW, from which he resigned in or about December 2018.

3.   The Second Defendant is a company registered in England and Wales with company number 10907649. The First Defendant and his wife are its directors and shareholders. The Claimant believes and avers that the Second Defendant is the company through which the First Defendant provides investigation services.

4.   The Third Defendant is an investigation agent. He has admitted being instructed by the ruler (the "**Ruler**") of Ras Al Khaimah ("**RAK**"). RAK is the Emirate in which the Claimant's client Mr Karam Al Sadeq is detained.

5.   The Fourth Defendant is a company registered in England and Wales with company number 05985794. The Third Defendant is a director of the company and is registered as a person with significant control over it. The Claimant believes and avers that the

1

Fourth Defendant is the company through which the Third Defendant provides investigation services.

## Obtaining of the Claimant's confidential information

6. From about January 2020, the First Defendant instructed Mr Paul Robinson to investigate the Claimant and to obtain information about the Claimant which (as explained below) was plainly confidential to the Claimant, for reward. Mr Robinson has explained this in his affidavit dated 6 July 2020. In particular:

   (1) The first such instructions were given in or about January 2020 at a meeting at the Goring Hotel in Belgravia, London. At that meeting, the First Defendant asked Mr Robinson whether he knew anyone who was able to investigate the Claimant and obtain banking information.

   (2) The First Defendant asked Mr Robinson a number of follow-up questions from time to time based on the information that Mr Robinson obtained, in particular by encrypted text messages sent using the Signal system which the First Defendant set to be automatically deleted.

7. Mr Robinson in turn requested Mr John Gunning to obtain such information about the Claimant. Mr Gunning and Mr Robinson have confirmed this in affidavits dated respectively 2 and 6 July 2020. Mr Gunning in turn made requests of Mr Oliver Moon, as Mr Moon has confirmed in an affidavit dated 2 July 2020. In particular:

   (1) On or about 2 April 2020, Mr Robinson requested Mr Gunning to obtain the banking co-ordinates of the Claimant.

   (2) On or about 9 April 2020, Mr Robinson requested Mr Gunning to access the Claimant's main bank account and to obtain transactional data for the past three months.

   (3) On or about 21 April 2020, Mr Robinson requested Mr Gunning to obtain information as to the "*movements in and out of Dubai – for Feb 2020*" of Mr Haralambos Tsiattalou.

   (together, the "**Example Requests**").

2

8.   The subjects of each of the Example Requests coincided with the Al Sadeq Litigation in that:

(1)   As to the first: Around 2 April 2020, enquiries were being made in the course of the Al Sadeq Litigation concerning the source of funding in those proceedings.

(2)   As to the second: The Claim Form in the Al Sadeq Litigation was filed on 28 January 2020.

(3)   As to the third: Mr Tsiattalou is the partner of the Claimant with conduct of the Al Sadeq Litigation. He visited Dubai for the purposes of that litigation in February 2020.

9.   The link with the Al Sadeq Litigation and parties thereto is supported by the following facts, namely that:

(1)   On or about 22 April 2020, the First Defendant also requested Mr Robinson to obtain information relating to the Claimant's client account, including transactional information for March 2020, which request was passed on by Mr Robinson to Mr Gunning. According to Mr Gunning in his said affidavit, he was told by Mr Robinson that it was likely that transactional information of the Claimant would also be sought for the period November 2019 to February 2020. It is to be inferred that this latter information came to Mr Robinson from the First Defendant. The period in question overlaps with the period of the Claimant's instruction by Mr Al Sadeq.

(2)   The First Defendant also requested Mr Robinson to obtain information from other persons connected to the Al Sadeq Litigation. In particular:

(a)   In or about October to December 2019, the First Defendant requested the obtaining of confidential information about Ms Radha Stirling of Detained in Dubai, which is a human rights advocacy organisation assisting Mr Al Sadeq.

(b)   In or about February and March 2020, the First Defendant requested and obtained financial records and monthly transactional data from a bank

3

account held by Maltin PR, which is a public relations and litigation support entity assisting the Claimant with the Al Sadeq Litigation.

(3)   In or about April 2020, the First Defendant requested the obtaining of three months of corporate banking transactions of Hogan Lovells, an international firm of solicitors. Hogan Lovells have no role in the Al Sadeq Litigation. However, Hogan Lovells act on behalf of Eurasian National Resources Corporation ("**ENRC**") in court proceedings commenced by ENRC against Dechert LLP and Mr Neil Gerrard. Dechert LLP and Mr Gerrard are defendants in the Al Sadeq Litigation.

10.   The information which was the subject of the Example Requests was plainly confidential in that:

(1)   A solicitors' firm's bank details and transactional data are not generally available. A solicitors' firm would not wish such information to be generally available.

(2)   The movements of a solicitor while acting for a client engaged in litigation are not generally in the public domain. A solicitor would not wish such information to be generally available, in particular because it is likely to reveal privileged information.

(3)   Those considerations would have been obvious to the reasonable recipient. They were emphasised by the surreptitious way in which the information was gathered and conveyed.

11.   The Claimant cannot be sure if the Example Requests are the only instances on which its confidential information was requested and/or obtained, and reserves its right to supplement these Particulars of Claim to the extent that further instances are discovered.

**Confidential information obtained by the First and Second Defendants**

12.   Mr Robinson provided the confidential information obtained from the Example Requests to the First Defendant. In particular:

4

(1) In or about early March 2020, Mr Robinson met the First Defendant in Sloane Square, London. Mr Robinson provided him with a hard copy print out of the information, and a USB stick containing the same information electronically.

(2) On other occasions, Mr Robinson sent the information using a Proton Mail encrypted email account to the address cloverdock@protonmail.com.

13. The Claimant believes that, in requesting and/or receiving the information, the First Defendant was acting through the Second Defendant (being the company through which he appears to provide investigation services).

**Confidential information obtained by the Third and Fourth Defendants**

14. The Claimant believes and avers that the Third and/or Fourth Defendants have accessed some or all of, and have misused, its confidential information obtained from the Example Requests. The Claimant relies in particular on the following facts and matters:

(1) The Third Defendant is an investigation agent who has admitted being instructed by the Ruler of the Emirate in which the Claimant's client Mr Al Sadeq is detained, meeting the Ruler regularly (sometimes monthly) and alone. The Third Defendant made such admission in the course of giving evidence on behalf of the Ras Al Khaimah Investment Authority ("**RAKIA**") in High Court proceedings between RAKIA and Mr Farhad Azima (the "**Azima Action**") tried in January-February 2020 before Mr Andrew Lenon QC (sitting as a Deputy Judge of the High Court).

(2) In his judgment in the Azima Action – *Ras Al Khaimah Investment Authority v. Azima* [2020] EWHC 1327 (Ch) (the "**Azima Judgment**") – at paragraph 369 the Judge held that "*Mr Page operates in a world of covert surveillance in which agents acquire confidential information unlawfully and that Mr Page has dealings with such agents.*" He further found that "*it would be a reasonable inference ... that Mr Page has access to agents with the capacity to hack emails.*"

(3) In the Azima Judgment, it was found that the Third Defendant was instructed by the Ruler to arrange covert surveillance monitoring and investigation of persons whom the Ruler viewed as adverse to him and/or RAK and/or RAKIA, and

towards whom the Ruler felt hostile, including Mr Azima (see in particular paragraph 377 of the Azima Judgment). The Third Defendant briefed the Ruler on such projects by way of "*Project Updates*", which briefings were also provided to Mr Neil Gerrard of the law firm Dechert LLP (see in particular paragraphs 32, 266 and 273 of the Azima Judgment). Mr Gerrard and Dechert LLP are both defendants in the Al Sadeq Litigation, having carried out work in relation to Mr Al Sadeq on behalf of the Ruler and/or RAK and/or RAKIA in respect of which Mr Al Sadeq claims redress.

(4)   The Claimant believes that the unlawful accessing of its confidential information has been caused or procured by those interested in and/or associated with the defence of the Al Sadeq Litigation. The Azima Judgment shows the way in which the Third Defendant has provided his investigation and monitoring services for or on behalf of persons whom the Claimant avers have an interest in defeating the Al Sadeq claims or those acting for and/or associated with them.

(5)   A public Internet Protocol address used to access the Claimant's confidential information has been geolocated to an address in the vicinity of the premises at 5-8 Sanctuary, London SW1P 3JS which were at material times the address of both the Third and Fourth Defendants.

(6)   The Fourth Defendant is a company providing investigation services of which the Third Defendant is a director.

(7)   The Claimant's lawyers saw the Third Defendant at close quarters at their hotel in Dubai when they were working on the Al Sadeq Litigation. They believe that the Third Defendant and/or his associates were at the time surveilling them.

(8)   According to information provided by the Third Defendant through solicitors instructed by him (Stephenson Harwood) in a letter to the Claimant dated 28 July 2020, Mr Robinson has worked with the Third Defendant on a number of investigations and they have allegedly discussed merging their businesses. It is thereby to be inferred that Mr Page knows of and approves of Mr Robinson's business and methods, and vice versa.  Mr Robinson's said business and methods include the wrongful accessing of the Claimant's confidential information, to which Mr Robinson has admitted in his affidavit, as set out above.

6

(9)   Mr Robinson contacted the Third Defendant when Mr Robinson was served with an application for *Norwich Pharmacal* relief and an injunction arising out of the Example Requests (claim number QB-2020-002218).

(10)  The Third Defendant offered to assist Mr Robinson with funding a lawyer in connection with defending such claim.

(11)  Although, in a short affidavit sworn by the Third Defendant on 27 July 2020, the Third and Fourth Defendants appear to deny obtaining confidential information from the Claimant, the Third Defendant has previously failed to give a true account of his discovery of information in High Court litigation, this being the finding in the Azima Judgment at paragraphs 355 to 356.

(12)  In paragraph 64 of the Azima Judgment, the Third Defendant was described as "*an unsatisfactory and unreliable witness*" whose "*witness statement was misleading in relation to two significant matters*". The Deputy Judge concluded that "*it would be unsafe to rely on any evidence from [the Third Defendant] that was not corroborated by some other source.*"

(13)  It is to be inferred that Mr Robinson contacted the Third Defendant as alleged above because they had a mutual interest in the proceedings concerning the Example Requests since the Third Defendant (and through him, the Fourth Defendant) was/were involved with, party to or otherwise complicit in the wrongdoing comprised within the Example Requests.

15.   As providers of investigation services, it is to be assumed that each of the Defendants typically obtain information on the instructions of others, to whom they pass it on, rather than for their own use.

**Breaches of confidence**

16.   In the premises, the Claimant believes that the Defendants have each committed the wrong of breach of confidence by using its confidential information, in that they have procured access to and/or examined, made, retained and/or supplied copies of it and/or otherwise misused such information. The Claimant does not at present have full knowledge of the precise use of its confidential information, because of the clandestine

nature of the conduct, and reserves the right to amend or supplement its claim as further details emerge through disclosure or otherwise.

17.   As a result of such breaches, the Claimant has suffered loss and damage, in particular:

(1)   loss of confidential information;

(2)   ongoing costs of investigating the wrongdoing;

(3)   ongoing costs of pursuing wrongdoers, including the defendants to claim QB-2020-002218.

The Claimant is entitled to and claims damages in respect of the foregoing. Full particulars will be supplied in due course.

18.   Further or alternatively, the Claimant is entitled to and claims an account of the Defendants' profits from the said breaches of confidence, together with all necessary inquiries.

**Unlawful means conspiracy**

19.   As set out in paragraph 6, the First Defendant (and/or the Second Defendant to the extent that the First Defendant was acting on its behalf) agreed with Mr Robinson to commit the breaches of confidence described above. As set out in paragraph 7, Mr Robinson in turn agreed with Mr Gunning, who in turn agreed with Mr Oliver Moon. Loss was thereby caused to the Claimant. In the premises, the First and/or Second Defendants have committed the tort of conspiracy.

20.   The Claimant is entitled to and claims damages from the First and/or Second Defendants in respect of its resultant loss. Full particulars will be supplied in due course.

**Interest**

21.   The Claimant further claims interest pursuant to section 35A of the Senior Courts Act 1981 on such sums as may be awarded to it at such rate(s) and for such period(s) as the Court deems fit.

**Superseded relief**

22. In the Claim Form, the Claimant further sought injunctions and *Norwich Pharmacal* disclosure orders against all Defendants. By consent orders dated 24 July 2020 made by Mrs Justice Tipples, the Defendants each gave undertakings in lieu of such orders. If and to the extent that those undertakings lapse, or prove insufficient, the Claimant maintains its claim for such relief.

AND the Claimant claims:

(1)   damages to be assessed;

(2)   an account of profits together with all necessary inquiries;

(3)   interest pursuant to statute;

(4)   costs; and

(5)   further or other relief.

TIM LORD QC

GERARD ROTHSCHILD

FREDERICK WILMOT-SMITH

**Statement of truth**

The Claimant believes that the facts stated in these Particulars of Claim are true. I understand that proceedings for contempt of court may be brought against anyone who makes, or causes to be made, a false statement in a document verified by a statement of truth without an honest belief in its truth.

Signed   .................................................................................

Name     BAMBOS TSIATTALOU

Position  PARTNER

Dated    2 SEPTEMBER 2020

# EXHIBIT I

**IN THE HIGH COURT OF JUSTICE**          **Claim no. QB-2020-002492**
**QUEEN'S BENCH DIVISION**

**BEFORE THE HONOURABLE MRS JUSTICE TIPPLES**
**DATED FRIDAY 24 JULY 2020**

**B E T W E E N : -**

STOKOE PARTNERSHIP SOLICITORS

**and**

**Claimant**

**(1) MR PATRICK TRISTRAM FINUCANE GRAYSON**
**(2) GRAYSON + CO. LIMITED**
**(3) MR STUART ROBERT PAGE**
**(4) PAGE CORPORATE INVESTIGATIONS LIMITED**

**Defendants**

_____

**CONSENT ORDER**

_____

**PENAL NOTICE**

**IMPORTANT**

**IF YOU PATRICK GRAYSON OR GRAYSON + CO. LIMITED DISOBEY THIS ORDER (AND/OR THE UNDERTAKINGS RECORDED TO IN IT) YOU MAY BE HELD TO BE IN CONTEMPT OF COURT AND YOU, OR YOUR DIRECTORS, MAY BE SENT TO PRISON, FINED OR HAVE YOUR ASSETS SEIZED.**

**UPON** the application of the Claimant by application notice dated 17 July 2020;

**AND UPON** the First and Second Defendants giving the undertakings which are set out in Schedule A hereto, the Claimant giving the undertaking set out in Schedule B hereto, and the Court accepting those undertakings;

**AND UPON** the Claimant and the First and Second Defendants agreeing the terms of this Order;

1

**AND UPON** reading the Witness Statement of Haralambos Tsiattalou dated 17 July 2020;

**AND UPON** the Claimant and the First and Second Defendants consenting to the terms of this Order and the undertakings set out in Schedule A and Schedule B

**BY CONSENT IT IS ORDERED THAT:**

**USE OF INFORMATION AND DOCUMENTS**

1.    The Claimant is permitted to use the information and documents provided by the First and Second Defendants pursuant to the undertakings in Schedule A to this Order for the purpose of legal proceedings (if so advised) to identify, trace and seek damages against wrongdoers, to protect its Confidential Information and to trace its use, and to seek damages or such other relief as the Court may think fit. The information and documents provided by the First and Second Defendants may also be used in the legal proceedings brought by Mr Karam Al Sadeq under claim number QB-2020-000322.

**CONFIDENTIALITY**

2.    No person shall obtain a copy of the confidential exhibit to the witness statement of Haralambos Tsiattalou dated 17 July 2020 without the permission of a High Court Judge. Any such application shall be made on no less than 3 clear days' notice in writing to all parties to this action.

**COSTS**

3.    The costs of and occasioned by the Claimant's application against the First and Second Defendants are reserved.

**SCHEDULE A**

## Undertakings given to the Court by the First and Second Defendants

**DEFINITIONS**

A1.   For the purposes of these undertakings:

1.1.   "Confidential Information" shall mean any information sourced or derived, in whole or in part, from any document, whether paper or electronic, that has been obtained from the Claimant without its authority and is either designated as confidential, or is evidently confidential by reason of its subject-matter or the manner in which it has been obtained.

1.2.   "Confidential Information" shall include, but shall not be limited to: (i) the Claimant's banking records, accounts and statements; (ii) the Claimant's telephone records, accounts and statements; and (iii) documents which have not been published and which, on their face, relate to the conduct of legal proceedings on behalf of Mr Karam Al Sadeq.

**ACCESSING OR OBTAINING CONFIDENTIAL INFORMATION**

A2.   Until the discharge of this undertaking by the Court, the First and Second Defendants undertake not to make any attempt to access or obtain Confidential Information from the Claimant.

**USING OR DISSEMINATING CONFIDENTIAL INFORMATION**

A3.   Until the discharge of this undertaking by the Court, the First and Second Defendants undertake not to use, publish, communicate or disclose to any other person any Confidential Information, other than: (i) by way of disclosure to legal advisers instructed in relation to these legal proceedings for the purpose of obtaining legal advice in relation to these proceedings; (ii) for the purpose of carrying this undertaking into effect; (iii) with the written permission of the Claimant; or (iv) with permission of the Court.

**AFFIDAVIT PROVIDING INFORMATION**

A4.   By no later than 4.30pm on 29 July 2020, the First and Second Defendants undertake to swear an affidavit stating on oath:

4.1.   the identity of any person who has requested him to obtain Confidential Information from or pertaining to the Claimant, directly or indirectly;

4.2.   (i) the manner in which the communication took place, (ii) the gist of the requests made, (iii) whether the requests were in writing, and (iv) if in writing, providing a copy if one exists in the possession or control of the Defendant;

4.3.   what, if any, Confidential Information originating from the Claimant was obtained;

4.4.   the use, if any, of the Confidential Information, identifying any person to whom it has been provided and in respect of each such person stating: (i) when, (ii) where, and (iii) how the Confidential Information was provided, and (iv) for what purpose; and

4.5.   the treatment, if any, of the Confidential Information, identifying any steps taken in relation to its handling, storage, preservation and/or destruction.

**INTERPRETATION**

A5.   A Defendant who is an individual who undertakes not to do something must not do it himself or in any other way. He must not do it through others acting on his behalf or on his instructions or with his encouragement.

A6.   A Defendant which is not an individual which undertakes not to do something must not do it itself or by its directors, officers, partners, employees or agents or in any other way.

A7.  In this Schedule, the words "he", "him" or "his" include "she" or "her" and "it" or "its".

## **SCHEDULE B**

### **Undertaking given by the Claimant**

B1.  If the Court later finds that this Order has caused loss to the First and/or Second Defendants and decides that they should be compensated for that loss, the Claimant will comply with any Order the Court may make.


**Signed:     The Honourable Mrs Justice Tipples DBE**
**Dated:                Friday 24 July 2020**

**Service of the Order:**

**To**: Stokoe Partnership Solicitors, for the Claimant (Ref: AWN001/003/BT

**And to**: BDB Pitmans LLP, for the First and Second Defendants (Ref: TPC/200994.0001)

# EXHIBIT J

First and Second Defendants
PTF Grayson
First
29 July 2020

Claim No:  QB-2020-002492

IN THE HIGH COURT OF JUSTICE

QUEEN'S BENCH DIVISION

B E T W E E N:

STOKOE PARTNERSHIP SOLICITORS

Claimant

– and –

(1) MR PATRICK TRISTRAM FINUCANE GRAYSON

(2) GRAYSON + CO LIMITED

(3) MR STUART ROBERT PAGE

(4) PAGE CORPORATE INVESTIGATIONS LIMITED

Defendants

_____

**AFFIDAVIT OF**

**PATRICK TRISTRAM FINUCANE GRAYSON**

_____

I, Patrick Tristram Finucane Grayson of 3 Rosenau Crescent, London SW11 4RY **MAKE OATH AND SAY AS FOLLOWS**:

1.    I am the First Defendant in this action.  I am also a director of the Second Defendant: a company registered in England and Wales with company number 10907649.  I make this Affidavit for myself and also on behalf of the Second Defendant by whom I am duly authorised to make this Affidavit.

2.    I make this Affidavit in order to comply with paragraph A4 of the Consent Order in these proceedings dated 24 July 2020.  I adopt in this Affidavit the abbreviations used in the Consent Order.

I

3.   The facts and matters stated in this Affidavit are within my own knowledge and are true.

<u>Paragraph A4 of the Consent Order</u>

4.   I set out below in quotation marks the questions in paragraph A4 of the Consent Answer which I then answer.  For convenience I have retained the paragraph numbering in paragraph A4.  In my answers, as indicated above, I have adopted the definition of "Confidential Information" set out in paragraph A1 of the Consent Order which for convenience I set out here:

"*1.1    'Confidential Information' shall mean any information sourced or derived, in whole or in part, from any document, whether paper or electronic, that has been obtained from the Claimant without its authority and is either designated as confidential, or is evidently confidential by reason of its subject-matter or the manner in which it has been obtained.'*

*1.2    'Confidential Information' shall include, but shall not be limited to:  (i) the Claimant's banking records, accounts and statements; (ii) the Claimant's telephone records, accounts and statements; and (iii) documents which have not been published and which, on their face, relate to the conduct of the legal proceedings of Mr Karam Al Sadeq.*"

<u>Question</u>

4.1   "*the identity of the person who has requested him to obtain Confidential Information from or pertaining to the Claimant, directly or indirectly.*"

<u>Answer</u>

4.1   Nobody requested me to obtain Confidential Information from or pertaining to the Claimant, directly or indirectly.

Question

4.2   *"(i) the manner in which the communication took place, (ii) the gist of the requests made, (iii) whether the requests were in writing, and (iv) if in writing, providing a copy if one exists in the possession or control of the Defendant."*

Answer

4.2   Does not arise in view of my answer to Question 4.1.

Question

4.3   *"what, if any, Confidential Information originating from the Claimant was obtained;"*

Answer

4.3   I did not obtain any Confidential Information regarding the Claimant.

Question

4.4   *"the use, if any, Confidential Information, identifying any person to whom it has been provided and in respect of each person stating:  (i) when; (ii) where, and (iii) how the Confidential was provided, and (iv) for what purpose;"*

Answer

4.4   Nobody.  See 4.3 above.

Question

4.5   *"the treatment, if any, of the Confidential Information, identifying any steps taken in relation to its handling, storage, preservation and/or destruction."*

Answer

4.5   See Answer 4.3 above.

Conclusion

5.   As is apparent from my answers above, I never asked Mr Robinson to obtain

205

Confidential Information relating to the Claimant.

SWORN by Patrick Tristram Finucane Grayson

Signed: .................................

This 29th day of July 2020

Acknowledged before me by the above named this 29th day of July 2020, he having solemnly averred the truth of the above contents.

Signed: ..................................

Name:        SOFIA GALIC

Qualification:    SOLICITOR

Address:

Woodstock Solicitors
First Floor
32 New Road
Woodstock
OX20 1PB

4

# EXHIBIT K

```
 1                                         Tuesday, 28 January 2020

 2       (10.30 am)

 3       MR LORD:  May it please your Lordship --

 4       JUDGE LENON:  Sorry, before we start, can I just say I'm

 5           sorry that the courtroom is a bit small.  I have made

 6           enquiries about getting a larger courtroom, possibly

 7           tomorrow, so that people don't have to stand up.

 8       MR LORD:  That's very kind, my Lord.  That's very kind,

 9           thank you, my Lord.

10                       MR NEIL GERRARD (continued)

11                  Cross-examination by MR LORD (continued)

12       MR LORD:  Mr Gerrard, before court began this morning,

13           I caught your eye to say "Good morning" and you were

14           looking at a notebook, weren't you?

15       A.  That's correct.

16       Q.  A blue hard-backed notebook?

17       A.  Correct.

18       Q.  Do you keep a notebook or notebooks?

19       A.  I do.

20       Q.  In relation to what?

21       A.  In relation to all my matters.  It's a daybook.

22       Q.  It's a daybook?

23       A.  Yes.

24       Q.  And that would apply, would it, to your professional

25           work?
```

```
 1   A.  Yes, it would.

 2   Q.  And your work as a lawyer in relation to the matters in

 3       dispute before his Lordship today?

 4   A.  Yes, it would.

 5   Q.  And that would be, what, notes of meetings?

 6   A.  Yes, some notes of meetings.

 7   Q.  And there would be notes of telephone calls, would

 8       there?

 9   A.  Yes, there would be.

10   Q.  And there would be notes of exchanges you may have had

11       with third parties in relation to the investigations

12       you're doing?

13   A.  Very much so.

14   Q.  Has there been any disclosure of any of your notes in

15       relation to these proceedings, Mr Gerrard?

16   A.  I've no idea.  These books go back some time.  I've no

17       idea.

18   Q.  Have you been in the habit of keeping a daybook since

19       the beginning of 2015?

20   A.  I would imagine so.

21   Q.  And do you keep those daybooks as a record?  I imagine

22       you do.

23   A.  Yes, I do.

24   Q.  And where are they kept?

25   A.  They're kept in my office.
```

1    Q.   And some of the matters in this dispute here concerning

2         you, they concern meetings that you've attended, don't

3         they?

4    A.   Yes, where there is a note-taker, there will be no notes

5         in my notebook.  Where I feel there's a need to take

6         a note of a meeting, I'll take a note.

7    Q.   Have you made your notebooks available to RAKIA or

8         RAKIA's advisers in order that they can check whether

9         there's anything that should be disclosed from those

10        notes?

11   A.   If we were asked, we will have certainly made them

12        available.  I am constantly on the road.  My PA tends to

13        deal with any queries or questions.  I wouldn't know if

14        they've been asked for.

15   Q.   Mr Gerrard, I'd suggest that that can't be right.  You

16        would know if your daybooks had been called for so that

17        someone could see whether any entries that relate to

18        these proceedings ought to be disclosed because they're

19        not protected by some sort of privilege.

20   A.   I wouldn't necessarily know.  My PA has complete access

21        to all documentation.  There are a number of cases going

22        on at the moment where people are asking for information

23        all the time.  I would not necessarily know.

24            In this particular case, I don't necessarily --

25        I don't know.

1    Q.   Can his Lordship take it that where there isn't a formal
2         note produced or there isn't a formal note-taker
3         present, it's likely that you would have made a note in
4         your daybook --
5    A.   No.
6    Q.   -- of the particular meeting?
7    A.   No, not necessarily.  I made a note when I needed to
8         make a note or felt the need to make a note.
9    Q.   It's right, isn't it, that you're a solicitor, aren't
10        you?
11   A.   It is right I'm a solicitor.
12   Q.   And an officer of the senior courts?
13   A.   I'm an officer of the senior court.
14   Q.   That carries with it, doesn't it, Mr Gerrard, some
15        responsibility to keep records of your professional
16        dealings?
17   A.   Correct.
18   Q.   So can his Lordship take it that if you had any sort of
19        meaningful professional meeting or exchange or telephone
20        call, you would, as a matter of professionalism, make at
21        least some record of it?
22   A.   I will from time to time -- I will make notes.  I can't
23        promise to make a note of every conversation or every
24        meeting.
25   Q.   But you'd want, wouldn't you, to have a record -- if

 1         you're working for a client and you speak to somebody

 2         about a matter of any significance, you're going to want

 3         to make a note of that, aren't you, if only for your own

 4         protection?

 5    A.   On the key meetings, yes, my Lord.

 6    Q.   I accept that if you have inconsequential discussions

 7         with your client or with others, I accept that, but

 8         let's say you're engaged in some sort of investigation

 9         of a particular topic and you have a meeting with

10         a particular person, you're likely to make a note of

11         that, aren't you?

12    A.   It depends on the circumstances.

13    Q.   So you may have a material meeting or exchange as part

14         of your professional duties and yet you wouldn't make

15         any note of that event; is that right?

16    A.   It's possible, my Lord.

17    Q.   We know now, Mr Gerrard, that you were privy to the

18         project updating in written form which Mr Page did and

19         which Mr Buchanan spoke about when he gave evidence.

20    A.   That's correct, my Lord.  I'd like to make one

21         clarification from yesterday's cross-examination, if

22         I may.

23    Q.   Go ahead, Mr Gerrard.

24    A.   When you asked me whether or not I only read the reports

25         in the presence of Mr Buchanan, I said I did.  That

1    needs to be clarified.  If I was in Ras Al Khaimah or

2    Mr Buchanan was in London for several days, I wouldn't

3    necessarily read that report in his presence.  He would

4    give it to me and I would give it to him the day back or

5    whatever.  But I would not keep it for sure, but

6    I wouldn't read every report in his presence.  It

7    depends whether it was the full report or just a short

8    section of it.

9  Q.  I see.  So there would have been occasions when

10    Mr Buchanan entrusted you with a copy of this report for

11    you to read and then return back to him at some point?

12  A.  "Some point" being within a day or two --

13  Q.  I understand.

14  A.  -- if we were in the same countries, yes.

15  Q.  Now, we've established with Mr Buchanan, I think, and

16    with you, that Mr Page was engaged upon investigations

17    in relation to Dr Massaad and his associates, wasn't he?

18  A.  That is correct.

19  Q.  Seemingly at the instigation of the Ruler of

20    Ras Al Khaimah, according to Mr Buchanan?

21  A.  Well, I don't know what his precise instructions were

22    because he was engaged before I was, but certainly

23    whilst I was involved, all the reports I saw were in

24    respect of Dr Massaad and others.

25  Q.  And we know, don't we, because we've seen the

1        26 March 2015 update, that at least some of Mr Page's

2        work concerned or featured Mr Azima?

3    A.  I think the only report I saw that featured Mr Azima was

4        the 20 -- whatever it is -- 26th March 2016.

5    Q.  What's the basis for your evidence in that regard,

6        Mr Gerrard?

7    A.  I'm giving it.

8    Q.  What's the basis for your recollection that that seems

9        to be the only -- just to recap, we established I think

10       with Mr Buchanan that Mr Page probably produced

11       somewhere in the region of over 25 written reports in

12       the last four and a half years; all right?  You were in

13       court yesterday, weren't you?

14   A.  Yes, I was.

15   Q.  So you heard that, didn't you?

16   A.  I did.

17   Q.  And you've no basis to challenge that, have you?

18   A.  None.

19   Q.  And you're likely to have been privy to the briefing by

20       Mr Buchanan or Mr Page of most of those reports, aren't

21       you, Mr Gerrard?

22   A.  Most of the 24?

23   Q.  Yes.

24   A.  I doubt it.

25   Q.  How many do you think -- how many of these monthly

```
 1            updates from Mr Page on Project RAK do you think were
 2            not -- you were not apprised of, at least in part?
 3   A.   When you say "reports", are you talking about verbal
 4            reports or written reports?
 5   Q.   Well, deal with either.  Deal with either.
 6   A.   I think I must have, in that period of time -- I think
 7            24 would be a fair number.  It wasn't a regular basis.
 8            Matters weren't -- I understand he did reports which
 9            weren't necessarily relevant to me.  There were reports
10            that were relevant to me, parts of reports that weren't
11            relevant to me -- were relevant to me.
12   Q.   And it's right, isn't it, that Mr Page's investigation
13            included matters such as asset tracing, for example, in
14            relation to which you would be particularly interested
15            given your retainer?
16   A.   That's correct.
17   Q.   And therefore it's right, isn't it, that particularly if
18            no one was allowed to take a copy away of Mr Page's
19            updating reports, you would be likely to make some notes
20            of that updating in order that you had some record to
21            use as part of your work?
22   A.   Not every time, but, yes, I would have -- almost
23            certainly.
24   Q.   So can his Lordship take it that it's likely that you
25            were usually made aware one way or the other of
```

```
 1           Mr Page's monthly updating, whether that updating was
 2           oral or in writing?
 3      A.   Sorry, you'll have to repeat the question.  As it
 4           related to me ...?
 5      Q.   Have you worked on this investigation for RAK or RAKIA
 6           since the beginning of 2015, "Yes" or "No"?
 7      A.   Since 2013.
 8      Q.   So the answer is "Yes"?
 9      A.   Yes.
10      Q.   And do you still work on the investigation of Dr Massaad
11           for RAK or RAKIA?
12      A.   Aspects of it.
13      Q.   And therefore -- and for the period I'm talking about --
14           from the beginning of 2015 to let's say up to now --
15           that's a period of nearly five years, isn't it?
16      A.   Correct.
17      Q.   And we know that Mr Page has been providing monthly
18           reports to the Ruler or Mr Buchanan -- monthly
19           reports -- over that time, don't we?
20      A.   Where's that evidence come from, monthly reports?
21      Q.   It comes from Mr Buchanan.
22      A.   Then if that's -- that must be right, then, yes.
23      Q.   So were you checking my source because, if I hadn't got
24           a source for it, you were going to quibble with it?
25           Is that what you were doing, Mr Gerrard?
```

```
 1    A.   No, I didn't know it was necessarily monthly --

 2    Q.   Right.

 3    A.   -- personally know.

 4    Q.   So now you know it's monthly.

 5    A.   Yes.

 6    Q.   But you would know your involvement, wouldn't you, so

 7         why don't you -- go back to the question.  His Lordship

 8         has been told by Mr Buchanan that these were monthly

 9         updates by Mr Page of Mr Buchanan and at least 50% of

10         the time they were in writing; all right, Mr Gerrard?

11         Do you follow that?

12    A.   (Nods)

13    Q.   So, by my calculation, by now we're up to about 30-plus

14         written updates from Mr Page; yes?

15    A.   On your calculation, yes.

16    Q.   I think on any calculation, I think.  I think half of 60

17         is 30.

18    A.   On your calculation.  I don't know whether there were

19         60 reports or 50 reports or 40 reports.

20    Q.   If Mr Page reported monthly over a period of five years,

21         how many monthly updates do you think that would be,

22         Mr Gerrard?

23    A.   I don't know that he necessarily reported monthly.

24         That's what we're told, but I don't know.

25    Q.   Well, let's assume that that's what he did do, how many
```

1        times is he going to have given a report per month?

2   A.   Yes, I take your point.

3   Q.   How many?

4   A.   60.

5   Q.   And if half of those -- at least half of those -- were

6        in writing, how many written reports would Mr Page have

7        produced by way of a project update for Mr Buchanan?

8   A.   30.

9   Q.   We've established, Mr Gerrard, that you've been involved

10       working on this investigation over that entire period of

11       five years, haven't you?

12   A.   That is correct.

13   Q.   And you've accepted this morning that Mr Page's work

14       would at least in part be relevant to your professional

15       investigation work as well, haven't you, Mr Gerrard?

16   A.   I have said some of it would be relevant, yes.

17   Q.   And that presumably is why you were privy to Mr Page's

18       monthly updates?

19   A.   Absolutely.

20   Q.   And we know from Mr Buchanan that your involvement on

21       occasion extended to meetings where the Ruler was

22       present as well, don't we?

23   A.   That is correct.

24   Q.   It would be fair to say, wouldn't it, Mr Buchanan,

25       that --

1   A.   It's Mr Gerrard, actually.

2   Q.   Mr Gerrard, sorry.  It would be fair to say, Mr Gerrard,

3        wouldn't it, that looking at the way in which the Ruler

4        was involved in Mr Page's work and looking at the

5        frequency and formality of Mr Page's updating, Mr Page's

6        assignment looks to have been quite an important part of

7        the overall RAK or RAKIA investigative project?

8        Would you agree?

9   A.   There were definitely, my Lord, certain areas which were

10       important.  As in the nature of these things, a lot of

11       reports (a) weren't necessarily relevant and, two,

12       I queried.

13  Q.   But do you accept that it looks as if Mr Page's work was

14       an important part of the RAK investigation that was

15       carrying on?

16  A.   I don't think I need to repeat my answer, but I will if

17       you want me to.

18  Q.   Yes, please.  Was it important or not?  What parts of it

19       were important?

20  A.   There were aspects of it that were important, but, as in

21       these cases, there was a significant amount which was

22       not relevant and questionable.

23  Q.   But some of what Mr Page was doing was important and

24       relevant to what you were doing?

25  A.   Some of what he was doing was important, yes.  He gave

 1         us --

 2    Q.   And relevant to what you were doing?

 3    A.   Of course, and some of it gave us leads as to where else

 4         to look.

 5    Q.   So, Mr Gerrard, we've heard that there was a protocol in

 6         place according to Mr Buchanan stipulated by the Ruler

 7         of Ras Al Khaimah to the effect that a copy of Mr Page's

 8         written report was not to be disseminated and had to be

 9         returned to Mr Page within two weeks.  You look a bit

10         puzzled by that.

11    A.   No, no, no, I -- when you said "not to be disseminated",

12         beyond --

13    Q.   Beyond a few people, yes, you're right.

14    A.   I was clearly one of those people, yes.

15    Q.   You were.  So, in your understanding, who were the

16         people --

17    A.   I don't think I -- I'm not sure when I knew that the

18         report was necessarily destroyed, but I knew that it

19         was -- it had to go back to Mr Page.

20    Q.   Right.  And who else, as far as you're aware, got to see

21         a copy of Mr Page's reports?  Who else apart from you

22         and Mr Buchanan?  Who else do you think saw them?

23    A.   I don't know, but I doubt whether they will have been --

24         I doubt whether the report itself would have been widely

25         disseminated, but I don't know.

1    Q.  Given that at least some of Mr Page's updating work was
2        important and relevant to what you were doing, you would
3        presumably, Mr Gerrard, have taken some notes in your
4        daybook of the germane points that you gleaned from
5        these monthly updates?
6    A.  Yes, but not every time.
7            Can I give you an example of when I didn't?
8    Q.  No, can I ask you first about the note-taking, please?
9    A.  Yes.
10   Q.  So there would be records -- there would be, still
11       today, notes in your daybook of updates you had -- well,
12       effectively Mr Page's updates, you will have made at
13       least some notes of that in your various daybooks over
14       time?
15   A.  I will have made some notes over time, yes.
16   Q.  None of those notes have been disclosed, Mr Gerrard, in
17       this case, even in a redacted form.
18   A.  I don't know -- if that's what you tell me -- but are
19       they not legally privileged anyway?
20   Q.  You see, Mr Gerrard, it was only when Mr Buchanan gave
21       evidence last Thursday that the fact that Mr Page was
22       the author of the one surviving project update was
23       actually disclosed on behalf of RAKIA at all.
24   A.  Yes.
25   Q.  Were you aware of that?  Were you here on Thursday or

```
 1           did you learn of what Mr Buchanan said that day?
 2      A.   Sorry, can you repeat the question?
 3      Q.   On Thursday, for the first time, it was disclosed
 4           through Mr Buchanan's evidence in the witness box --
 5      A.   Yes, I was there.
 6      Q.   You were there, and you heard the exchanges and perhaps
 7           you heard my surprise because I hadn't appreciated until
 8           then that Mr Page was the author of the project update,
 9           and, as far as we understand it, that's the first time
10           that RAKIA in this litigation has revealed to my client
11           and the judge and the court the authorship of that one
12           surviving page project update.  Do you understand that
13           point?
14      A.   Yes, I do.
15      Q.   And therefore -- and his Lordship asked Mr Buchanan --
16           Mr Buchanan's evidence was that he hadn't -- he sort of
17           overlooked the fact that Mr Page had provided all these
18           written monthly updates and he recollected Mr Page's
19           authorship a month ago when he was preparing for trial.
20           That's what Mr Buchanan said.  All right, Mr --
21      MR TOMLINSON:  That's not what Mr Buchanan said.  He said he
22           had not -- he didn't fail to remember that he'd produced
23           monthly updates.  He failed to recollect that that
24           particular one was one that he produced.
25      MR LORD:  And so, Mr Gerrard, his Lordship can take it,
```

```
 1              can't he, that you would always have known throughout
 2              the period when you were giving assistance in relation
 3              to this litigation, the current proceedings before
 4              his Lordship today -- you would always have known about
 5              Mr Page's monthly updating process, wouldn't you?
 6         A.   I would have always known ... I don't understand the
 7              question.
 8         Q.   You would never have forgotten that Mr Page would have
 9              provided regular updates?
10         A.   If that's the question, no, I don't forget that he's
11              given regular updates.  If the question is would I --
12              did I recognise that report, that's a different
13              question.  Would you like me to answer that one?
14         Q.   Have you told RAKIA -- Mr Gerrard, have you informed
15              RAKIA, the party in this litigation for whom you're
16              giving a witness statement -- have you informed them
17              that you have notes of Mr Page's updating?
18         A.   No, my Lord.
19         Q.   Why not?
20         A.   Why not?  I didn't think it was relevant.
21         Q.   Let's go to your witness statement.  Let's go to your
22              witness statement, Mr Gerrard.  It's at {D/7/1}.  Let's
23              pick up where you talk about Mr Page.  It's at
24              paragraph 15 at {D/7/4}.
25                   Now, Mr Gerrard, before I take you to that, let's
```

```
1              just recap your evidence this morning.

2                   You've said on evidence now that you were privy to

3              Mr Page's work, on occasion it was important and

4              relevant to what you were doing, you read certainly some

5              of his written reports and you would have been apprised

6              of the updating if it was only given orally.  Is that

7              a fair summary of your position?

8     A.   Yes, I think it is, my Lord.

9     Q.   And you'd have known, Mr Gerrard, when you gave this

10             witness statement that I'm taking you to now, that one

11             of the important issues in this litigation was the part

12             that Mr Page had played in any relevant events, wouldn't

13             you?

14    A.   I would, my Lord.

15    Q.   And you would be aware, wouldn't you, that Mr Page, as

16             an investigative agent, investigating amongst other

17             things a matter that concerned Mr Azima, would be likely

18             to be something that would be highly relevant to the

19             court's assessment of the hacking dispute here?

20    A.   Correct, my Lord.

21    Q.   So when his Lordship comes to see how you, Mr Gerrard,

22             introduced Mr Page into your evidence in writing in your

23             statement -- could you look at paragraph 15 {D/7/4}?

24             Can you read paragraphs 15 to 17 to yourself, please,

25             Mr Gerrard?  (Pause)
```

1    A.   Yes.

2    Q.   "At some stage in my relationship with RAK I was

3         introduced to Stuart Page, who I understood did work for

4         RAK.  Stuart Page was not a person I had previously come

5         across."

6              Number 16:

7              "I have never instructed Stuart Page ..."

8              And 17:

9              "I do not remember exactly when, but in early August

10        2016 Jamie Buchanan called me to say he had had a call

11        from Stuart Page ..."

12   A.   Correct.

13   Q.   So the only evidence that you gave, Mr Gerrard, in

14        relation to Mr Page and his part in these events, is

15        what we see starting at paragraph 15, isn't it?

16   A.   That's correct, my Lord.

17   Q.   And you really confined your evidence to the contact you

18        had with Mr Page in August 2016 when RAKIA allegedly

19        first discovered the hacked data, didn't you?

20   A.   That is correct, my Lord.

21   Q.   And you didn't, did you, Mr Gerrard, in your witness

22        statement, really do justice to what you knew about

23        Mr Page's work in relation to the RAK investigation

24        starting around about the beginning of 2015 -- did you,

25        Mr Gerrard?

```
 1   A.   I did what I thought was necessary, my Lord.  You'll see
 2        two other statements or one other statement -- I'm not
 3        sure -- where I provide further information, but at the
 4        time I considered I dealt with the matters of interest.
 5   Q.   Well, you see, Mr Gerrard, I'm going to suggest to you
 6        that you sought to conceal from his Lordship the extent
 7        of Mr Page's work in 2015 and your awareness thereof.
 8   A.   That's not correct.
 9   Q.   And I'm going to ask you, please, to look at -- to keep
10        open, if you don't mind -- could you keep open, please,
11        your witness statement at paragraphs 15, 16 and 17 of
12        your first witness statement, and I wonder if you'd be
13        kind enough to be shown the project update -- sorry, the
14        one surviving project update --
15   A.   Yes, of course.
16   Q.   -- that has not been destroyed in this case.  That's at
17        {H7/299}.
18   A.   I have it in front of me.
19   Q.   You knew, Mr Gerrard, when you gave your first witness
20        statement, didn't you, that one of the issues in this
21        case was Mr Azima's claim that RAKIA -- persons working
22        on behalf of RAKIA had caused or procured the illegal
23        access to his confidential electronic data?
24   A.   Yes, my Lord.
25   Q.   In your witness statement at {D/7/4} you say in
```

```
 1            paragraph 14 that you were never instructed to hack
 2            Mr Azima's emails or computer.  Can you see that?
 3    A.     That's correct, my Lord.
 4    Q.     So you knew the significance of this particular issue,
 5            and I suggest, Mr Gerrard, you would have appreciated
 6            that if there was evidence -- if there was material that
 7            showed that Mr Azima had been the subject of some
 8            investigative work by Mr Page on behalf of RAK or RAKIA,
 9            that would be something that would be relevant to this
10            court's deliberations.  That's right, isn't it,
11            Mr Gerrard?  You'd have been aware of that, wouldn't
12            you, when you gave your first statement?
13    A.     I'm not sure that's true, my Lord, in the same way my
14            statement doesn't cover the two or three reports or
15            feature those reports that mention Farhad Azima.  There
16            were at least three and they're not in my statement
17            either.
18    Q.     But you would have been aware, I suggest, that the fact
19            that Mr Azima had been a person the subject of some
20            investigation would be relevant because -- because,
21            Mr Gerrard -- you'd have realised that you only tend to
22            hack into someone's emails if you want to find out a bit
23            about them, and, therefore, if you're not interested in
24            them, you probably have less of a reason to hack into
25            them.  Do you follow that rather simple point,
```

1      Mr Gerrard?

2  A.  My Lord, we were already looking at the whole of the RAK

3      issue.  It was a huge investigation and, as I said

4      yesterday, Mr Azima came up during that time and there

5      are at least three reports -- not featuring him but

6      mentioning him in some detail.  And I'm happy to talk

7      about those reports.  I didn't include those reports in

8      my statement because I didn't deem them to be relevant,

9      and, anyway, I would have thought they'd have been

10     privileged, but I understand you've taken a different

11     view on that.

12 Q.  Sorry, Mr Gerrard, you've obviously been thinking long

13     and hard about this, have you, over the last few days,

14     this matter?

15 A.  You asked me -- it was clear yesterday that you were

16     going to be asking me about the reports into -- reports

17     or mentions of Farhad Azima, so, yes, I have been

18     looking at those reports or trying to remind myself as

19     to what was said about Farhad Azima, that's correct.

20 Q.  And you've been able to consult the reports themselves?

21 A.  Have I consulted the report?  I have been able to -- not

22     entirely.  I've got notes of them.

23 Q.  And were those notes in one of the blue books that --

24 A.  Yes, yes.

25 Q.  And was that the blue book you were looking at at about

1           10.25 this morning?

2      A.   Yes.

3      Q.   The one that you put in the bag and you took out of the

4           room?

5      A.   Yes, I took my bag out of the room, yes.

6      Q.   And why did you take your bag out of the room with your

7           notebook in?

8      A.   Because I take my bag everywhere.

9      Q.   So at 10.25 you were looking at a notebook in relation

10          to which there were records of reports concerning

11          Mr Azima?

12     A.   There are manuscript notes, my notes, from last night

13          and this morning of summaries from those notes -- from

14          those meetings.

15     Q.   So you made some notes last night --

16     A.   Yes.

17     Q.   -- summarising other notes of yours?

18     A.   No, other notes from the reports.

19     Q.   Sorry, can you tell his Lordship, are there in existence

20          actual reports or extracts thereof concerning Mr Azima?

21     A.   Yes, there are, my Lord.

22     Q.   By whom?

23     A.   By my team, my Lord.  There are three.

24     Q.   Dated when?

25     A.   Dated -- I can't give you the precise month, but 2014,

1          a short summary of our initial view which really doesn't

2          take anyone anywhere, but I'm prepared to go into the

3          detail and, no doubt, if you want to call for a report,

4          assuming privilege has been dealt with, then you can

5          have them.

6              The second report -- we've got to be careful here --

7          was -- yes, the second report was started as a result of

8          the HeavyLift query or demand by Farhad Azima.

9          Initially, you will remember from yesterday's evidence

10         that Mr Buchanan asked for an investigation into it.

11         Dechert undertook an investigation.  I don't know

12         whether that's covered by privilege, but the result from

13         that was, "There's not much information.  We really

14         can't advise you, we suggest further enquiries".

15             A further report came out which again was

16         inconclusive as to the advice of the client as to what

17         to do about the HeavyLift report.  That I won't give you

18         unless I'm asked by the -- by my Lord.

19             Then, off the back of that, as a result of that

20         investigation -- and I think we're now into 2016 and

21         I think we're April, May, June 2016 -- the best report

22         we could do on it, coming out -- what came out of

23         HeavyLift, in summary, was no actual evidence of

24         wrongdoing, queries -- we had a lot more information on

25         the Sheraton by then.  We actually had the documents

```
 1            regarding Eurasia Hotel Holdings, which had come out of
 2            Dr Massaad's own secretary, Mr Adams had emailed to
 3            Eurasia Hotel Holdings showing both Dr Massaad and
 4            Farhad Azima as directors and that they had voted to
 5            change the name to "Eurasian Aviation Holdings",
 6            I think, but that didn't really take us much further.
 7                 There was evidence of gun-running, but nothing we
 8            could actually prove.  There was evidence of rendition,
 9            which we didn't know whether was formal or informal, if
10            you take my drift, and evidence that he had connections
11            with the CIA.
12                 There was no evidence that we felt we could act on.
13                 From there I sought further advice, legal advice --
14     MR TOMLINSON:  My Lord, I'm not entirely sure what
15            Mr Gerrard is talking about, but obviously he doesn't
16            have authority to waive any privilege on behalf of
17            RAKIA.  It appears that he's talking about privileged
18            documents that have been prepared by Dechert in relation
19            to various matters, but ...
20     JUDGE LENON:  Yes, I understand that, and, Mr Gerrard, you
21            said at one point that you thought that I had ruled
22            against you on privilege.
23     A.  Yes.
24     JUDGE LENON:  I certainly hadn't intended to do that.
25     A.  You had or hadn't?  Sorry, my Lord.
```

1    JUDGE LENON:  I had not, no.  As far as the discussion
2         yesterday was concerned --
3    A.   Sorry.
4    JUDGE LENON:  -- I was not persuaded that the questions had
5         actually impinged on any privileged matters, which is
6         why I allowed the questions to proceed, but I haven't
7         made any ruling on the question of privilege or waiver.
8    A.   Thank you, my Lord.
9    MR LORD:  So, Mr Gerrard, I was asking you about your notes
10        of Mr Page's update.  We'll come back to these reports
11        you've just been talking about which may or may not be
12        privileged -- we'll come back to those -- but coming
13        back to the -- so it's right, isn't it, that you have
14        been looking into Mr Azima's affairs over 2014, 2015 and
15        2016?
16   A.   From time to time, as a result of our investigation,
17        Mr Azima's name came up and we did look at those areas,
18        yes.
19   Q.   I was asking you about the project update at {H7/299} --
20        sorry, given that you were looking at Mr Azima in the
21        ways in which you've described in 2014, you would,
22        wouldn't you, be likely to have made a note of what
23        Mr Page was doing so far as it pertained to Mr Azima?
24        Confine yourself to that.  Don't go beyond that to other
25        matters, but just look at Mr Azima for now.

```
 1   A.   The only time Mr Azima came up in the notes or reports
 2        or verbal briefings from Mr Page was that 26 March 2015
 3        report.
 4   Q.   How do you know that?
 5   A.   I do know it.  It's as clear as day.
 6   Q.   Have you gone back through all your notes to check that?
 7   A.   No, no.  Okay, from memory -- and the reason why that
 8        report in March 2015 --
 9   Q.   Yes.
10   A.   -- sticks out is that final bit about "Mr Azima may be
11        helping Farhad" and in particular the mention of
12        Mr Goodley.
13   Q.   And you think that the March report is the only report
14        that would have referred to Mr Azima?
15   A.   Yes, because I don't think Mr Page was ever asked to
16        look at Farhad Azima.  It's not -- I saw some of those
17        reports.  I had discussions with Mr Buchanan.
18        I don't -- I personally do not believe Mr Page was ever
19        asked to look at Farhad Azima.  I was about to say
20        Dr Massaad, but that would be wrong.
21   Q.   Well, let's look at the report at {H7/299}.
22   A.   What's H7/299?
23   Q.   It's the March project update, Mr Gerrard.
24   A.   Oh yes, thank you.
25   Q.   It's {H7/299}.  I think you were in it just then.
```

```
 1    A.   Yes.

 2    Q.   Can you see the front:

 3              "RAK Project Update.

 4              "Executive summary."

 5              Then if you go please to the second page {H7/299/2}:

 6              "In the US, KM's hired a team of advisors managed by

 7         Farhad Azima ..."

 8    A.   Yes.

 9    Q.   I'll come back to that.  Can you go to page {H7/299/2},

10         please, the heading "KM efforts against the client":

11              "FA and the US Advisory Team."

12    A.   Yes.

13    Q.   "In continuation of our previous report, we were

14         informed by several new sources that FA is managing KM's

15         efforts in the US and perhaps even paying their bills."

16    A.   Yes.

17    Q.   So it looks from this as if the previous report of

18         Mr Page may well have concerned Mr Azima, at least in

19         part, doesn't it?

20    A.   You'll have to ask Mr Page, but my -- from my discussion

21         with Mr Page, this was, as far as he was concerned,

22         a piece of luck that this informant happened to -- as

23         I understand it, it was a complete chance.

24    Q.   What's your basis for saying that, Mr Gerrard?

25    A.   From my discussions with him.
```

```
 1    Q.  With Mr Page?

 2    A.  Yes.

 3    Q.  Did he tell you who the informant was?

 4    A.  I asked and he wouldn't give it to me.

 5    Q.  You see, if we go to {H7/299/16} -- we're going to spend

 6        a bit of time on this report.

 7    A.  Sorry, what page is that?

 8    Q.  Page 16, Mr Gerrard.

 9    A.  Yes.

10    Q.  "As we reported above, KM's US team has a certain plan

11        to smear RAK and its Ruler with human right allegations.

12        As far as we know, at this point they do not have any

13        evidence to back up these allegations, but they started

14        gathering information for a campaign, based on hearsay

15        and testimonies, and started searching for a platform to

16        make it public."

17            Now, this is the important bit:

18            "The campaign is not public yet, so we will be able

19        to gather intelligence on their progress in order to

20        monitor their activities and attempt to contain or ruin

21        their plans."

22            Can you see that, Mr Gerrard?

23    A.  Yes, I can, my Lord.

24    Q.  Now it's right, isn't it, Mr Gerrard, as Mr Buchanan

25        accepted, that the reference to "KM's US team" there
```

1          includes Farhad Azima, doesn't it?

2     A.   Correct, my Lord, yes.

3     Q.   And this report, at least in part, shows that Mr Page

4          was working to try to contain or ruin the plans of the

5          US team, wasn't he?

6     A.   Sorry, did you say Mr Page?

7     Q.   Yes.

8     A.   Oh, sorry, Mr Page was working?

9     Q.   He was.

10    A.   I don't think he was, no.

11    Q.   "The campaign is not public yet, so we ..."

12             That must be RAKIA --

13    A.   Oh, "... will be able to gather intelligence on ..." --

14         yes.

15    Q.   Yes, that's right, isn't it?

16    A.   Well, that's what he was suggesting.  When I met Mr Page

17         and Mr Buchanan, I asked -- I was very keen for more

18         information on this --

19    Q.   Right.

20    A.   -- and I did ask what they were going to be doing, and

21         I was told that the -- it had -- they no longer could go

22         down that line of action.

23    Q.   When was this conversation?

24    A.   I can't remember when, but as I said I think yesterday,

25         it will have been about April/May-ish.  I can't remember

```
 1           precisely when.

 2    Q.   Let's go back and go through this report in sequence.

 3    A.   Yes.

 4    Q.   Go back to page 2 {H7/299/2}.  Mr Page reported in this

 5           way -- and this is a report that you accept you would

 6           have read, isn't it, Mr Gerrard?

 7    A.   I don't remember it, but what I remember is the

 8           photograph of Mr Goodley, so I must have read it, yes.

 9           The reason why I say I must have read it is because, if

10           I'd had a verbal report on it, it was the Mr Goodley

11           photograph that reminded me.

12    Q.   You see, if you look at what Mr Page is here reporting

13           on, he's reporting that Mr Azima is managing

14           Dr Massaad's activities in the US, isn't he?

15    A.   That's what it says.

16    Q.   Now, that would be quite a significant development,

17           wouldn't it, in your interest in Dr Massaad that

18           Mr Azima was managing or handling all his activities in

19           the USA?

20    A.   Yes, but I don't think it was surprising.  They were

21           great friends and they'd been working for many years in

22           RAK.  What was more surprising to me -- and I think to

23           the client -- was that there was a press campaign,

24           commonly called the "blitzkrieg", being mounted, and

25           that was the worry.
```

1    Q.   If we go to page {H7/299/3}:

2              "KM efforts against the client.

3              "FA and the US Advisory Team.

4              "In continuation to our previous report, we were

5         informed by several new sources that FA is managing KM's

6         efforts in the US and perhaps even paying their bills."

7              Do you want to read the next paragraph which refers

8         to you, Mr Gerrard?

9    A.   Where is that?  Oh, right.

10   Q.   "At the moment ...", it begins.

11   A.   Where my name is spelt wrongly:

12             "According to KM, the main figure assisting our

13        client to cover this alleged activity is Niel Gerard,

14        a partner in Dechert ..."

15             Yes.

16   Q.   Was it right that at this time you were assisting RAK or

17        RAKIA to cover this alleged activity by Dr Massaad in

18        the US?

19   A.   Sorry, I don't understand what you're talking about.

20   Q.   It says:

21             "According to ..." --

22   A.   "This alleged activity", the alleged activity is the

23        criminal -- the way I read it, the criminal allegations

24        into Dr Massaad.  It's the investigation.  And

25        I certainly was running a global investigation into

```
1              $2 billion worth of monies going missing.

2       Q.   It's saying:

3              "At the moment, KM's strategy in the US is to spread

4              human rights violations allegations against the client."

5              So that's Dr Massaad's strategy.

6       A.   Yes.

7       Q.   "In particular the allegations [those of Dr Massaad]

8              focus on the notion that RAK uses a dedicated facility

9              in RAK where it imprisons and [tortures] political

10             opponents.  According to [Dr Massaad], the main figure

11             assisting our client to cover this alleged activity is

12             Niel Gerard, a partner in Dechert ..."

13             So do you understand Mr Page there to be saying that

14             you are assisting the client with handling this alleged

15             strategy of Dr Massaad's or with some alleged

16             involvement in what Dr Massaad was complaining about?

17             Do you see what I mean?

18      A.   Well, I do, but I can't -- what -- we didn't know or

19             I don't believe we knew of this press campaign until

20             this report.

21             At or around this time, when you read these sorts of

22             things, my Lord, you're always somewhat sceptical as to

23             how accurate they are.  The reason why this report leapt

24             out at me was -- when I saw the Simon Goodley -- was

25             that literally at or around this time, either just
```

1          before or just after -- I can't remember when -- it
2          became clear that Mr Goodley had taken a significant
3          interest and had been phoning witnesses and actually
4          members of my own team about RAK and ultimately wanted
5          to talk to me about human rights issues.
6               Now, with the greatest of respect, this report was
7          on 26 March, Goodley was at or around this time.
8          I wasn't looking at -- from recollection of five years
9          ago, I wasn't looking at human rights issues.  I didn't
10         necessarily know that there were human rights issues.
11    Q.   In your last answer you said that Mr Goodley was phoning
12         witnesses.  Is there anything wrong with somebody
13         phoning up a witness?  Is there any property in
14         a witness?
15    A.   I think the way he was doing it and the way subsequently
16         Mr Kirby Behre was following it up -- and I'll
17         explain -- was inappropriate.  Of course there is no
18         property in a witness and, if the witness wants to talk
19         about human right abuses or indeed anything else at all,
20         that is perfectly proper.
21              However, in this case, Mr Goodley was phoning
22         witnesses, attempting to suggest to them that they'd
23         been abused and that -- asking for information about
24         human rights breaches.
25              What was more worrying was how he knew who to speak

```
 1              to because they were witnesses.
 2                   Secondly --
 3         Q.   Witnesses to what?  What were they alleged to be
 4              witnesses --
 5         A.   They were witnesses to our investigation into
 6              Dr Massaad.  More worrying --
 7         Q.   And just stopping there, so you didn't like the fact
 8              that a journalist was phoning up witnesses to your
 9              investigation?
10         A.   I was concerned that Mr Goodley, who's an excellent
11              reporter, would even know about who my witnesses may or
12              may not have been.  Please let me continue because this
13              is very important.  This is why I was very concerned
14              when I saw this.
15                   After that, my Lord, the gentleman -- the witness
16              concerned -- indeed two witnesses -- said, "No thank you
17              very much, we don't want to talk to you", shortly
18              followed a call by Kirby Behre.  Kirby Behre apparently
19              spoke to the witness and said, "You really ought to
20              speak about all of this and indeed I can tell you that
21              a London law firm is going to be reporting Dechert to
22              the authorities for intimidation", etc.
23                   After that, two of my junior lawyers were then
24              contacted by Mr Goodley.  How he knew they were involved
25              in the matter I do not know, which gave me cause for
```

1          concern again, and he wanted to talk to them

2          confidentially about the RAK matter.  That was obviously

3          denied and those matters were referred to you -- to me,

4          and then subsequently Mr Goodley contacted me, asking to

5          speak to me.

6     Q.   So it sounds, Mr Gerrard, as if this was really quite

7          a significant development as far as you were concerned

8          at this time?

9     A.   Well, the --

10    Q.   The involvement of some journalist sniffing around for

11         human rights matters was obviously something that sounds

12         like it exercised you considerably.

13    A.   Well, certainly, which is why I'm trying to put this

14         into context.  For me, reading that report, you know,

15         it's Dr Massaad very grumpy about all these allegations

16         and, as usual in these sorts of cases, trying to attack

17         the people making the allegations, and that's normal

18         run-of-the-mill stuff.

19             The fact that Farhad Azima was helping a friend

20         wasn't a surprise.  I don't think anyone was -- they

21         were probably grumpy about it, but I don't think there

22         was a particular issue in my mind.

23             For me what was disturbing was the fact that quite

24         confidential issues -- people's names, part of our

25         enquiry, my own legal team were being contacted and the

1        fact that Mr Goodley clearly was aware, had been told --
2        I'm not sure -- sorry, let me strike that.
3        Mr Kirby Behre was aware that we were about to be
4        reported.  Yes, that was a concern, and he knew about it
5        before I did.  And then of course subsequently I was
6        reported to the SRA.
7    Q.  Were you, at that time, assisting any UAE entity in
8        relation to any criminal or prosecution or those sort of
9        matters, any sort of criminal investigations?
10   A.  We were -- was I assisting them?  Only in the sense that
11       my client was a complainant and we were providing
12       information on the complaint.  So, yes, we were feeding
13       in in any way to a prosecutor and providing them with
14       information.
15   Q.  Did you conduct any interviews or interrogations in
16       relation to any of those matters on behalf of any UAE or
17       RAK entity?
18   A.  No, but I did carry out my own interviews and asked --
19       and it was agreed by both the detainee and the
20       authorities -- to interview the detainees.
21   Q.  So you interviewed detainees who had been detained at
22       the hands of RAK, did you?
23   A.  Yes, with their agreement and the agreement of their
24       lawyers.
25   Q.  And where were they being held, these people?

```
 1    A.   They were being held in a prison in RAK.  I can't give
 2         you the precise -- or the detainees were, in RAK.
 3    Q.   Where was the prison?
 4    A.   In RAK.
 5    Q.   You're bound to know.
 6    A.   Well, it's --
 7    Q.   Somewhere in RAK, a prison somewhere in RAK?
 8    A.   It's in Ras Al Khaimah, the actual -- on the outskirts
 9         of the main town.
10    Q.   And you went there to interview prisoners?
11    A.   I went there with Al Tamimi, the local law firm, to meet
12         prisoners at their agreement and the agreement of their
13         lawyers.
14    Q.   And who did you interview at that prison?
15    A.   Primarily Karam Al Sadeq.
16    Q.   And who else?
17    A.   I don't think we did interview many more and I can't
18         remember.  Some of my team will have done it.
19    Q.   You will have a note in your daybook, won't you, on
20         that, Mr Gerrard?
21    A.   No, because -- I might have a note in the daybook, but
22         the interview will have been written down so there will
23         be a note of the interview.
24    Q.   And have any of those notes been disclosed as far as
25         you're aware in this litigation?
```

1    A.   I would have thought they were legally privileged.

2         I have no idea whether those -- I don't even know that

3         they're relevant, are they?  But, anyway, that's not

4         a matter for me.  That's a matter for the lawyers and

5         the court.

6    Q.   Well, one of the issues -- one of RAKIA's claims in this

7         case, Mr Gerrard, is that Mr Azima has acted in

8         bad faith in involving himself and allegedly campaigning

9         in relation to human rights abuses in RAK; all right?

10        That's one of RAKIA's complaints against Mr Azima raised

11        by RAKIA as an issue for his Lordship; all right?  So

12        it's an issue in the case; all right?  And RAKIA has

13        said that Mr Azima has spread false stories about what

14        RAKIA gets up to and that's an issue in the case,

15        Mr Gerrard.

16   A.   I think that's -- there is no doubt --

17   Q.   Do you follow that?

18   A.   -- there is no doubt about it that RAKIA's complaint

19        about Farhad Azima is that he was attempting to peddle

20        false stories about human rights abuses in RAKIA, yes --

21        RAK.

22   Q.   And it sounds like you have notes concerning meetings or

23        interviews in relation to detainees within RAK which

24        have featured within this litigation as part of the

25        resolution of those issues; is that right?

1    A.  Correct, my Lord.

2    Q.  And that material has not been disclosed, has it,

3        Mr Gerrard?

4    A.  I've no idea whether it's been disclosed or not.  My --

5        the lawyers have had complete access to all our

6        material.  I don't know what was relevant or what was

7        not.  Frankly, I cannot see how an interview following

8        PACE, which we insisted on, whereby the detainee had

9        agreed to be interviewed --

10   Q.  Would it have been recorded, then, Mr --

11   A.  No, it wasn't recorded.  It was written down.

12       Furthermore, furthermore, there will be signed notes,

13       certificates, by Karam Al Sadeq, agreeing to be

14       interviewed.  His lawyer that was present, he would sign

15       it.  On a number of occasions, a few occasions, his

16       lawyer didn't want to turn up.  We refused to continue

17       with the interview until the lawyer signed, saying,

18       "It's okay for you to interview him", and

19       Mr Karam Al Sadeq accepting to be interviewed.

20       I followed PACE to the letter and indeed cautioned him

21       at the start of it.

22           There will be a written note of the interview and

23       there is a pro forma that we were using on detainee

24       interviews which was as good as PACE as we could make

25       it, breaks, everything.

```
 1   Q.   So if you -- from that last evidence, if you cautioned
 2        the interviewee, that sounds like it's in the context of
 3        some sort of criminal interview.
 4   A.   We told --
 5   Q.   Sorry, can I just finish?  You wouldn't caution somebody
 6        if you were just interviewing them about a civil claim,
 7        would you?
 8   A.   Of course you would.  I think you would -- you caution
 9        anyone if you are going to use that in evidence, and
10        Mr Karam Al Sadeq was told that anything he told us was
11        likely it would be used if it was relevant in evidence
12        against him.
13   Q.   Did you supply copies of the record of the interview to
14        the interviewees or their lawyers?
15   A.   I can't remember, but I would have thought so.
16   Q.   And there would be a record of that, won't there,
17        Mr Gerrard?
18   A.   I would hope so, yes.
19   Q.   There would be a record on your Dechert files, won't
20        there?
21   A.   I would hope so, yes.
22   Q.   And that can be checked, can't it?
23   A.   Yes, it can, my Lord.
24   Q.   And therefore, if that's happened, you can actually
25        produce the records that show that?
```

1    A.   If what's happened?

2    Q.   If in fact notes of these interviews have been furnished

3         to the interviewee or detainee, you will have a record

4         of that, won't you?

5    A.   The notes were certainly signed, I think -- I'm pretty

6         sure they were signed, but the answer is there should be

7         a record of it, yes.

8    Q.   And where would that be kept?

9    A.   It will be kept in Dechert.  My Lord --

10   Q.   Why was there no audio recording of that?

11   A.   I am 99% sure there was no audio recording.  I may be

12        proven to be wrong.  I can't really remember.  I only

13        did one of the interviews myself.  Why was there no

14        audio recording?  I don't think there were the

15        facilities there for audio recording and it was written

16        down in longhand from memory.

17   Q.   And did any of these interviews that you conducted take

18        place in the Palace in RAK?

19   A.   None at all.

20   Q.   Can we go back, please, to {H7/299}?

21   A.   What's H7/299?

22   Q.   It's the project update.  Can you see that?

23   A.   Yes.

24   Q.   And --

25   A.   What page are we on?

```
1    Q.   Page {H7/299/3}.

2    A.   Yes.

3    Q.   We've established the reference in here to "KM's

4         strategy" and you have given your evidence as to your

5         concern about aspects of that.

6              Can we go over, please, to page {H7/299/4}?  The

7         story runs on.

8    A.   Yes.

9    Q.   Can you see under the picture of Simon Goodley, Mr Page

10        records this:

11             "Goodly showed interest in the subject, although the

12        story does not have at this point any evidence but only

13        hearsay and testimonies.  One of the main testimonies

14        they rely upon was given by the wife of a person who is

15        allegedly jailed in RAK, named Karam (it is probably

16        Karam Al Sadeq, who was RAKIA's in-house counsel and is

17        in for almost a year)."

18   A.   Yes.

19   Q.   Does "in for almost a year" -- would you have understood

20        that to mean in prison -- had been in prison for almost

21        a year?

22   A.   Yes.

23   Q.   And is this the Karam Al Sadeq whom you say you

24        interviewed on at least one occasion, Mr Gerrard?

25   A.   That's correct, my Lord.
```

```
 1    Q.   When he was in prison?

 2    A.   That's correct, my Lord.

 3    Q.   And had he been charged by that time with anything

 4         formally?

 5    A.   There is a different process over there.

 6    Q.   "Yes" or "No"?

 7    A.   I don't remember.  I don't think so.  I don't think I'd

 8         have interviewed him before charge.

 9    Q.   And why was he being detained without charge, do you

10         know, Mr Gerrard?

11    A.   That's the process.  The charge only takes place once

12         they've decided to charge.

13    Q.   I see.  So the process in RAK is they imprison somebody

14         and then they decide what they're going to charge them

15         with; is that the approach?

16    A.   The approach is that they charge them once they have

17         collected -- first of all, the person is arrested if

18         they're suspected of a crime --

19    Q.   Yes.

20    A.   -- in the same situation as the UK.

21    Q.   Yes.

22    A.   They are then detained until the crime -- sometimes

23         they're bailed -- it depends on the seriousness of the

24         case -- and they are detained until charges are brought.

25    Q.   Yes, but in this country, Mr Gerrard, as you know, the
```

```
 1            authorities have to bring charges within a short period
 2            of time, failing which they have to release a suspect,
 3            don't they -- don't they -- Mr Gerrard?
 4     A.    They do, my Lord.
 5     Q.    What they can't do is to imprison somebody here for
 6            a year whilst they decide whether to charge them or not,
 7            can they, Mr Gerrard?
 8     A.    That is correct, my Lord.
 9     Q.    It looks from this -- it looks from what you've said and
10            what Mr Page was saying that Mr Al Sadeq was imprisoned
11            for almost a year by this point in time without being
12            charged --
13     A.    Based on this report, yes, but I think -- I've no idea
14            how long he was detained for.  I have no idea.  I don't
15            think it was for a year, but I don't know either.  But
16            there is a -- my Lord, it's a different process.  From
17            the process I saw, I don't -- it was different.  They
18            got legal advice.  They had independent judges.  The
19            jails were more modern than the ones I've seen.  It's
20            a different process, but it doesn't make it necessarily
21            unfair.
22     Q.    It doesn't make it necessarily unfair.  So can
23            his Lordship take it that in your view, Mr Gerrard, it's
24            appropriate or acceptable to imprison somebody for up to
25            a year without having charged them of any criminal
```

1           offence?

2    A.   I'm sorry, this is in a report.  I have no idea how long

3           he was detained for.

4    Q.   Can his Lordship take it, Mr Gerrard, that you consider

5           it appropriate for you to go and interview a person who

6           has been imprisoned in the manner that we've just seen,

7           in other words locked up without charge, and you come in

8           to interview them in relation to some claims or

9           whatever?  Is that appropriate, Mr Gerrard?

10   A.   In these circumstances, my Lord, yes, it was, because

11          there was a substantial evidence against him.  He was

12          the general counsel of RAKIA.  There were great

13          concerns -- much wider concerns than just frauds with

14          Dr Massaad.  There were concerns as to sanctions issues

15          that he'd been involved in.  So it was a very serious

16          matter.

17               Now, I do not believe he was in for a year.  They

18          have a process.  It is not like ours -- many parts of it

19          are -- and he agreed to talk to us whilst he was

20          detained.  We followed the process of PACE when we met

21          him.  He had his own lawyers present who were perfectly

22          happy with the situation.

23   Q.   If you go back to page {H7/299/4}, please, of this

24          report by Mr Page, can you see halfway down it says:

25               "In addition, Christopher Cooper is already in touch

```
 1           with several organisations such as Amnesty and others
 2           that allegedly already showed interest in the subject.
 3           The KM team main angle is that RAK's uses Niel Gerard to
 4           cover up the alleged torture activities.  According to
 5           our sources, Goodly set [up] a meeting with Gerard, but
 6           later cancelled at the last minute."
 7               I'm not sure -- it said "later cancelled at the last
 8           minute".  Can you see that?
 9       A.  Yes, I can.
10       Q.  Was there a meeting set up with Mr Goodley at some
11           stage?
12       A.  There was, my Lord.
13       Q.  And who cancelled it?
14       A.  No one did.
15       Q.  Did it take place?
16       A.  Yes, it did, my Lord.
17       Q.  When was that?
18       A.  I'm not sure, but there are emails where we tried to get
19           together a few times, but eventually met.  Whether we
20           met or had a telephone conversation I can't remember,
21           but there was a -- we talked about this issue --
22       Q.  When was that roughly, Mr Gerrard?
23       A.  It could have been March, it could have been April.
24       Q.  2015?
25       A.  Definitely.
```

```
 1   Q.  And did you let Mr Goodley know about your concerns as
 2       to the investigations that were then being carried out
 3       by journalists?
 4   A.  I -- Mr Goodley asked me about human rights abuses.
 5       I told him I didn't see any human rights abuses at all
 6       in respect of the matter that I was dealing with him.
 7       I told him that I thought he was being manipulated by
 8       Dr Massaad and others, who were creating false stories
 9       about the RAK investigation in an attempt to take the
10       attention away from them.  Having discussed that, I can
11       only assume he got the drift of what I was saying
12       because, as I understood it -- well, in fact he did not
13       write any reports on this subject at all.
14   Q.  So after you set Mr Goodley straight, he basically
15       stopped his journalistic investigation into the matter;
16       is that a fair summary, Mr Gerrard?
17   A.  I talked through the issues, I explained the systems and
18       processes, I said, "From my perception this is my
19       experience", and I explained that -- what Dr Massaad --
20       I thought he was behind it and this was all an attempt
21       to take the attention away from the actual
22       investigation.
23   Q.  Can you see at the foot of that page it says -- sorry,
24       reading on, it says:
25           "Both FA and KM are concerned regarding several
```

```
 1              arrests made by the RAK authorities."
 2                   Can you see that?
 3      A.   No.  Where is that?
 4      Q.   About a third of the way up from the bottom.
 5      A.   Yes, let me just read it, please.  (Pause)  Yes.
 6      Q.   Then you can see at the foot of the page it says this:
 7                   "KM's team suspects that they have an information
 8              leak."
 9      A.   Yes.
10      Q.   "They are afraid that the client is well aware regarding
11              their activities."
12                   Can you see that?
13      A.   Yes.
14      Q.   Did you know anything about whether or not Dr Massaad's
15              team did have an information leak?
16      A.   Well, clearly they did because Mr Page was getting this
17              information.
18      Q.   Thank you.  Could you go, please, to page {H7/299/16}?
19      A.   You don't want to ask me about the Interpol notices.
20      Q.   No, thank you.
21      A.   You wanted me to look at it, but you don't want to ask
22              me about it?
23      Q.   That's exactly right.
24      A.   Okay.  Sorry, what page?
25      Q.   Page {H7/299/16}, which I do want you to look at and
```

1          I will ask you something.

2    A.   Thank you.  I'm there.

3    Q.   We read this paragraph before.  This paragraph records

4         Mr Page reporting that:

5              "The campaign is not public yet, so we will be able

6         to gather intelligence on their progress in order to

7         monitor their activities ..."

8              All right?

9    A.   Yes.

10   Q.   Now, it's right, isn't it, that this would have been

11        a serious matter as far as RAK was concerned at this

12        time, this alleged campaign?

13   A.   Yes.  The client and I -- because I think earlier I was

14        going to be targeted -- were concerned, absolutely.

15   Q.   And this report states that intelligence can be gathered

16        on the progress of the alleged plotters, doesn't it?

17   A.   That was Mr Page's initial view, but when I asked him

18        whether that -- we could continue on that, apparently --

19        I can't remember the precise reason now, but they were

20        unable to.  So, from memory, this is the last of the

21        information we got on this.

22   Q.   Well, I suggest, Mr Gerrard, that that's a convenient

23        thing for you to say now because you --

24   A.   Why is that?

25   Q.   Because -- because -- you know that the case against RAK

1          is that hacking took place and it may well have taken
2          place through Mr Page's work.  You know that, don't you,
3          Mr Gerrard?
4     A.   I know that's your allegation, but I can only -- I was
5          there at the time and all I can say is I'd have been
6          very interested in getting more information as to what
7          they were going to do next.  As it happens, we did get
8          more information, but not through Mr Page.
9     Q.   Will there be a record in your daybook or some other
10         notes that will show his Lordship when, if you like, the
11         Page intelligence-gathering drew a blank?
12    A.   No.
13    Q.   Why is that?
14    A.   Because I wouldn't have made a note of someone saying,
15         "I don't think we're going to be able to go down that
16         line".
17    Q.   I put it to you, Mr Gerrard, that you're not telling the
18         truth to his Lordship and that what you're doing is
19         trying to truncate this line of questioning about the
20         intelligence-gathering and monitoring activities which
21         Mr Page was promising to carry out on 26 March 2015.
22         That's what I put to you, Mr Gerrard, that you're not
23         telling his Lordship the truth.
24    A.   That is completely wrong.  I asked for more information.
25         You'll have to take it up with Mr Page.  This was the

1           last that Mr Page was able to provide us in respect of

2           Farhad Azima, from memory.

3    Q.    What sort of intelligence-gathering -- let's take this

4           in stages.  Did you agree that this

5           intelligence-gathering looks to apply to KM's US team's

6           plans on the face of it?

7    A.    Yes.

8    Q.    And that would include Mr Azima, wouldn't it, because he

9           was alleging managing the US team?

10   A.    Well, I don't know where the informant was.

11   Q.    That wasn't the question.

12   A.    Well, it's my answer.  I didn't know where the informant

13          was.  Was he in KM's team or Farhad Azima's team?

14   Q.    I'll ask it again, Mr Gerrard.  You're on oath.  On the

15          face of this report from Mr Page, he is there presaging

16          gathering intelligence on their progress.  Can you see

17          those words?

18   A.    Correct.

19   Q.    When he's talking about "their progress", he is talking

20          about the progress of KM's US team, isn't he?

21   A.    Correct.

22   Q.    KM's US team for these purposes was believed to include

23          Mr Azima, wasn't it?

24   A.    Correct.

25   Q.    So on the face of it Mr Page is saying that he will be

```
 1            able to gather intelligence on, amongst other people,
 2            Mr Azima.  Do you agree?
 3   A.   I agree that whoever his source is and where he is, we
 4            are going to get more information in respect of what
 5            this team are up to.
 6   Q.   Including Mr Azima?
 7   A.   If Mr Azima was involved and designing it, then maybe
 8            that will come out as well, yes.
 9   Q.   But Mr Azima is plainly thought to be part of the team,
10            isn't he?
11   A.   Well, it says "KM's US team".  That's what it says.
12            What I have no doubt is that Farhad Azima was assisting
13            in some way.  I've no doubt about that.  And there's
14            also a suggestion in here that he may have been paying
15            for it.
16   Q.   We know from this report, don't we, that Mr Page has
17            identified Mr Azima as managing the US team for
18            Dr Massaad -- managing it.
19   A.   Where does it say that?
20   Q.   Page 2 {H7/299/2} at the top, the first two lines and
21            then the fifth line.
22   A.   Yes, you're right:
23                "... KM's hired a team of advisers managed by Farhad
24            ...", yes.
25   Q.   "... in order to spread allegations ..."
```

1  A.  Yes.

2  Q.  So Mr Azima, on this view, is going to be of central

3      interest in terms of intelligence-gathering, isn't he,

4      Mr Gerrard?

5  A.  On this report's view, Mr Farhad Azima will certainly be

6      of interest, yes.

7  Q.  Of central interest in terms of his handling of the

8      US activities?

9  A.  Well, I don't think -- yes, whether he's central or --

10     he's certainly important, yes.

11 MR LORD:  Would that be a convenient moment, my Lord?

12 JUDGE LENON:  Yes.

13 (11.49 am)

14                       (A short break)

15 (11.57 am)

16 MR TOMLINSON:  My Lord, before my friend resumes, can I just

17     ask through you a question about timing?

18         On his version of the timetable Mr Gerrard is due to

19     conclude at lunchtime today and I just wanted to

20     ascertain whether that was likely because I have -- the

21     next two witnesses are now here and I wanted to know

22     whether it's likely we're going to reach either one or

23     both of them today because obviously, if not, then they

24     can be released to do other things.

25 MR LORD:  My Lord, I think I may be most of the day with

1          Mr Gerrard in view of the material that's come out in

2          this trial, I'm afraid.

3     JUDGE LENON:  I'm obviously concerned about that because

4          we've got to stick to the timetable essentially.

5          I mean, there is a bit of room for slippage, but ...

6     MR LORD:  There is, my Lord.  I would expect that I will be

7          shorter with the later witnesses.  It's plain that

8          Mr Buchanan covered the whole story.  Mr Gerrard is

9          obviously an important witness.  I would expect I will

10         be quicker with other witnesses.

11         There is an issue as to Friday.  Your Lordship will

12         see that we have always sought to use Friday on the

13         basis of the amount of witnesses we had to

14         cross-examine, but my learned friend thinks that we

15         shouldn't have any or much of Friday.  I think that's

16         how matters stand at the moment.  We would certainly

17         finish our cross-examination this week by Friday.

18    MR TOMLINSON:  Well, my Lord, I'm very pleased to hear that.

19         I said advisedly that on my friend's version of the

20         timetable he was due to finish this lunchtime.  On his

21         version he's supposed to be starting Mr Halabi this

22         afternoon, not on my version, so that would suggest that

23         he's half a day or perhaps a little more behind, which

24         would suggest that Mr Handjani won't be finished on

25         Friday.  But if he is sure that Mr Handjani will be

1          finished on Friday, then at least we'll stick to his
2          version of the timetable.
3     MR LORD:  And it's right, my Lord -- I accept that, but it's
4          right to note that the revelation that the project
5          update is Mr Page's has had a profound effect on my
6          questioning.  I've had to recalibrate -- that is an
7          important piece of information which your Lordship will
8          hear in my closing submission and that has an effect
9          throughout the questioning by me.  It affects all the
10         witnesses.  Until Thursday I didn't know that Mr Page
11         was the author of that important document.
12    MR TOMLINSON:  My Lord, this is a document that's not even
13         mentioned in the pleadings.  It's not actually relied on
14         in my friend's defence at all.  He constantly repeats
15         it's an important document, but it's only very recently
16         he's noticed that it is.
17    JUDGE LENON:  All right.  Well, I don't want to take up time
18         arguing about why there's slippage.  You've heard what's
19         said and let's try and stick to that.
20    MR LORD:  Yes, my Lord, I will.
21         Mr Gerrard, if you go, please, to -- I was asking
22         you about page {H7/299/16} of the project update, and
23         you agreed -- you agree that Mr Azima would be an
24         important person for intelligence-gathering in the light
25         of what was said in this report of Mr Page's, didn't

```
 1          you, just before we broke today?
 2     A.   Yes, he will be an important person.
 3     Q.   And the intelligence-gathering -- and therefore
 4          his Lordship can expect, can't he -- it's likely,
 5          isn't it, Mr Gerrard, that there will be
 6          intelligence-gathering after 26 March 2015 that pertains
 7          to Mr Azima?
 8     A.   None that I am aware of.  As I've said to the court --
 9     Q.   That wasn't the question.  The question was whether it
10          was likely, on the face of this, that there would be
11          intelligence-gathering in relation to Mr Azima.  I'll
12          ask about what you know about it in a minute.  Is it
13          likely, on the face of this report, that there will be
14          intelligence-gathering in relation to Mr Azima --
15     A.   I think that was certainly Mr Page's intention and I've
16          no doubt -- yes, the answer's "Yes".
17     Q.   And it's likely, isn't it, that there will be monitoring
18          of Mr Azima's activities if Mr Page could achieve it
19          after 26 March 2015, given this report?
20     A.   Yes.
21     Q.   What sort of intelligence-gathering did you discuss with
22          Mr Page or Mr Buchanan -- when you were involved in the
23          update back at the time --
24     A.   Yes.
25     Q.   -- what sort of intelligence-gathering, if any, did you
```

```
 1              discuss with Mr Page or Mr Buchanan?

 2     A.   Actually, I didn't.  I discussed with --

 3     Q.   That's what I asked you.  Then the answer is that you

 4          didn't.

 5     A.   No, I'd like to finish the question, if I may.  I've

 6          actually already answered this question, but I don't

 7          want to stop there.  I'd like to repeat my answer, if

 8          I may, my Lord.

 9     JUDGE LENON:  Yes.

10     A.   I reminded -- I discussed this with Mr Page and

11          Mr Buchanan.  I think we were all together.  I can't

12          remember.  I asked Mr Page whether we could get more

13          information from this source and he didn't think that

14          was likely.

15              He may or may not have come back to me at some stage

16          or other, but as far as I'm aware that is where it ended

17          and I've no doubt Mr Page will be able to tell you more.

18          But I don't believe that after this date I received any

19          more information, certainly from Mr Page, where he was

20          never even instructed, as far as I'm aware, as regards

21          to Mr Azima.  I didn't see any more information coming

22          out of Mr Page or indeed anyone else, other than my own

23          legal team.

24     Q.   And what did you understand by "attempt to contain or

25          ruin their plans" would comprise?
```

```
 1    A.   I didn't.  I had no doubt that he'd got a plan, but it
 2         was going to require more information from the source.
 3    Q.   But how did you understand that the plotters' plans
 4         could be contained or ruined?  How did you understand
 5         that phrase?  You've got plotters, they're planning to
 6         smear RAK and they're going to be contained or ruined --
 7         their plans are.  So how did you take that phrase?  How
 8         did you understand it, Mr Gerrard?
 9    A.   How did I understand it?  This is Mr Page's language.
10         We never got on to his plans.  I'm afraid you'll have to
11         ask him.  I wanted to know what more information could
12         we get and that's as far as we got.
13              So I can tell you what the client did after this and
14         what plans the client made to try to manage or head off
15         this, but I can't tell you what Mr Page's plans were
16         because we never got that far because it was clear to me
17         he was not going to be able to go any further at all.
18    Q.   So when you had your subsequent meetings with Mr Page in
19         2015 and you discussed the intelligence-gathering, is
20         your evidence that he said to you to the effect -- words
21         to the effect of, "My one source has dried up so I've
22         got no information on Mr Azima"?  Is that your evidence,
23         Mr --
24    A.   That's my evidence, my Lord.
25    Q.   Did you have a discussion with him along those lines?
```

1    A.    I asked -- yes.

2    Q.    And, what, he sort of shrugged and said, "Well, my one

3          informant's gone.  I suppose that's it.  I won't gather

4          any more intelligence.  Sorry, Mr Gerrard"?  Is that

5          what he said?

6    A.    Well, as I understood it, the source that he had he

7          could no longer use.  Now, if he came back to me and

8          said "I've got another source", then I would have been

9          interested, but I think this was a one-off, as he

10         explained it to me, sheer happanstance luck, and that

11         they couldn't take it any further.

12   Q.    I see.  So if you go to {H7/299/3}, please, at the top

13         of --

14   A.    What page is that?

15   Q.    {H7/299/3} of this document in front of you.

16   A.    What page is that?

17   Q.    Page 3.

18   A.    Sorry.

19   Q.    At the top of the page, can you see Mr Page said this --

20   A.    Hang on.  I'm not there yet.  Yes.

21   Q.    "In continuation to our previous report, we were

22         informed by several new sources ..."

23   A.    Yes.

24   Q.    Have you got that, Mr --

25   A.    I have.

1    Q.   "Several new sources".

2    A.   Yes.

3    Q.   Not one existing source, but several new sources.

4    A.   Yes.

5    Q.   Now, did you discuss with Mr Page or Mr Buchanan -- as

6         part of this updating process, did you discuss the

7         several new sources?

8    A.   No.

9    Q.   So it looks, doesn't it, as if Mr Page had more than the

10        one source available to him, doesn't it?

11   A.   I have no doubt.

12   Q.   So why did you suggest earlier today that you thought

13        Mr Page just had the one source?  I thought that's what

14        you said.

15   A.   No, because -- my Lord, I didn't know where the other

16        sources -- who they related to.  When I asked, "Okay, we

17        have a problem, let's see -- what can we do?  Can we get

18        any more information?", I was told as clear as day that

19        he was not going to be able to proceed with the current

20        source that related to information that Mr Azima was

21        managing this issue.  So whether the other sources

22        related to KM, I have no idea.

23   Q.   It's likely, isn't it, Mr Gerrard, that if one source of

24        Mr Page had dried up for some reason, he would look to

25        find other sources, wouldn't he, Mr Gerrard?

 1    A.   My Lord, this is a question that Mr Page will have to

 2         answer.   All I was told was he didn't think he could

 3         pursue that particular line of enquiry.

 4    Q.   And did you understand that source to refer to some

 5         insider, somebody working as some sort of informant?

 6         Is that how you understood the source?

 7    A.   That's how I understood it.

 8    Q.   So somebody who was likely to owe a duty of confidence

 9         but was breaching it in order to reveal matters to

10         Mr Page?

11    A.   Very possibly.

12    Q.   Possibly or likely?

13    A.   Very possibly.   I don't know -- I didn't know who the

14         source was.

15    Q.   Could you go in your witness statement, please, to

16         {D/7/2} to paragraph 8 --

17    A.   Yes.

18    Q.   -- where you say:

19             "I recall we investigated HeavyLift and various

20         other entities/investments as part of the wider

21         privileged investigation into Dr Massaad's frauds based

22         on what documents we had available at the time.

23         Farhad Azima was not the target of the investigation."

24    A.   Correct.

25    Q.   I thought you said this morning that your team carried

```
 1            out an investigation into HeavyLift in relation to --
 2            you said there were three reports concerning Mr Azima
 3            and I thought you said that one of them was in relation
 4            to HeavyLift.
 5       A.   Yes, when I said the investigation was not targeted,
 6            I was talking about the global investigation.  When
 7            we -- in 2003, when we pulled the first report together,
 8            without breaching any privilege, it was a 33-page
 9            scoping exercise, over 20 witnesses identified, lots and
10            lots of companies, and Mr Farhad Azima did not feature
11            in that, nor did HeavyLift.
12                The only reason HeavyLift became of interest, when
13            Farhad Azima raised HeavyLift, and it was this that
14            caused us to focus on HeavyLift, essentially the claim,
15            but thereafter issues regarding some -- the bizarre
16            activities of Farhad Azima.
17       Q.   Yes, but if you read your paragraph 8, if you read that
18            paragraph, you're giving the reader the impression,
19            aren't you, that the HeavyLift investigation did not
20            concern Mr Azima.  That's the burden of paragraph 8 of
21            your evidence, isn't it?
22       A.   No, I disagree.  We were investigating HeavyLift because
23            of the claim made by Farhad Azima.  By definition, when
24            you're looking at HeavyLift, you're going to be looking
25            at Farhad Azima.  Farhad Azima wasn't the target;
```

 1          HeavyLift was the target.

 2     Q.   So why didn't you say in paragraph 8, "Farhad Azima was

 3          not the target of the global investigation, but we did

 4          look into him in three respects"?  Why didn't you say

 5          that, Mr Gerrard, because that would have been more

 6          truthful, wouldn't it?

 7     A.   I could have expressed it differently.  I don't regard

 8          in any way, shape or form that the way I've expressed

 9          this is lacking in truth.

10     Q.   Could you be shown, please, {H7/266}?  It's likely,

11          isn't it -- Mr Gerrard, if you attended meetings at the

12          Palace with the Ruler, it's likely that those would be

13          recorded in your daybook, wouldn't they?

14     A.   Not -- no, not necessarily.  They weren't those sorts of

15          meetings.  They were very formal and not at a desk.  You

16          tend not to take notes when you're with the Ruler.

17     Q.   Not with the Ruler, but afterwards I would suggest you'd

18          have made a note that you'd seen the Ruler of RAK,

19          wouldn't you?

20     A.   There will be a note that I was seeing the Ruler, but

21          I'm not sure how much detail would have been in it.

22     Q.   Sorry, it's {H7/268}.  It's my fault.  Two pages on.

23          These are emails in early April 2015, Mr Gerrard.  Have

24          you seen this document before?

25     A.   No.

1    Q.   Not even when you were preparing for giving evidence?

2    A.   No, no.

3    Q.   It's right, isn't it, that you saw Mr Buchanan as

4         certainly the -- if not one of your clients or

5         effectively the representative for one or more clients

6         of yours?

7    A.   At this stage I can't -- I think -- initially it was

8         Naser Bustami and then gradually Jamie Buchanan took

9         over, so I've got two potential clients here, but at

10        either stage one of them was my client, yes.

11   Q.   And there came a stage when Mr Buchanan has given

12        evidence that -- there came a stage when he basically

13        took over --

14   A.   Correct.

15   Q.   -- leading this --

16   A.   Correct, absolutely.

17   Q.   And that happened certainly by April 2015, didn't it?

18   A.   Yes, I would have thought so.

19   Q.   Can his Lordship take it that you were likely to have

20        liaised quite closely with Mr Buchanan from that point

21        in relation to the investigations?

22   A.   Yes, of course.

23   Q.   You can see in these emails that Mr Buchanan -- at the

24        foot of the page he sent an email to Mr Handjani:

25             "Good afternoon.  HHSS had wanted us to target FA --

```
 1            on what basis would we do this?"
 2                 Then there's a series of exchanges.  Mr Bustami
 3            features a bit.  Then if we go, please, to {H7/273}, you
 4            can see Mr Bustami sends an email to Mr Handjani and
 5            Mr Buchanan on 4 April.  Could you read that to
 6            yourself, please, Mr Gerrard -- just to yourself.
 7            (Pause)
 8       A.   Yes.
 9       Q.   Can you see that it looks as if in early April 2015
10            the Ruler was stipulating or was directing that he
11            wanted Mr Azima to be targeted?  Can you see that?
12            There's a reference in the previous email to "targeting
13            FA".
14       A.   Where is that?
15       Q.   Page {H7/268}, the bottom email that I just took you to.
16       A.   Well, you'd got me on another email.
17                 My Lord, I wasn't copied in on these.  I wasn't
18            aware of any of these conversations.  I thought I was
19            a witness of fact.  I don't really see how much more
20            I can do to help the court in respect of these emails.
21       Q.   Right, but you have read the email, have you, now,
22            Mr Gerrard?
23       A.   I --
24       Q.   I'm going to ask you some questions.
25       A.   Which email are we on now?
```

 1    Q.   Well, the point for you to gauge is that Mr Buchanan,
 2         who we've established is probably your client or the
 3         instructing representative for your client at this
 4         point --
 5    A.   Yes, yes, my Lord.
 6    Q.   -- is recording that the Ruler of RAK wanted Mr Azima
 7         targeted; all right?  That's what's recorded here.  I'm
 8         not asking you whether it's true or not.  I'm just
 9         asking you just to clock that; all right?
10    A.   I've clocked it, my Lord.
11    Q.   Well done.  Then if we go, please, to {H7/273}, you can
12         see --
13    A.   Where's 273?
14    Q.   {H7/273}, the second page I took you to, I asked you to
15         read --
16    A.   Right.
17    Q.   -- which you've read.
18    A.   Well, I'm going to read it again.  We're darting about
19         all over the place.  These are emails that I have not
20         seen before.  I would like to take the time to read
21         them, if I may, my Lord.  Thank you.  (Pause)
22              Thank you, my Lord.  I've read this email.
23    Q.   You can see that in the email that you're now looking
24         at, Mr Bustami records this for the benefit of
25         Mr Handjani and Mr Buchanan:

1           "I have had few discussions with boss about FA and
2       he is adamant that we bring charges against him."
3           Can you see that?
4   A.  I can see that, my Lord.
5   Q.  A bit further on:
6           "He wants me to get you on the case to file some
7       sort of charges against Farhad."
8           Can you see that, Mr Gerrard?
9   A.  I can see that, my Lord.
10  Q.  And then two lines on:
11          "When are you next in town so that me you and Jamie
12      could hook up and coordinate our attack."
13          Can you see that?
14  A.  I do see that.
15  Q.  So it looks from these emails as if the Ruler was
16      letting it be known to Mr Buchanan or Mr Buchanan had
17      understood that the Ruler wanted to target Mr Azima and
18      bring charges.  Can you see that, Mr Gerrard?
19  A.  I -- where's the word "target"?  I see -- I see that the
20      boss, His Highness, is clearly upset about something and
21      he's "adamant that we bring charges against him".  So
22      that's what I see.  I don't see the word "target" and
23      please bring it to me.  Is there a "target" on another
24      email?
25  Q.  I just asked you to read it, Mr Gerrard.

1    A.   No, no -- I have read it, and then you say --

2    Q.   268 --

3    A.   You asked me was he targeting him.  Does that come in

4         the email or is that your view?

5    Q.   Mr Gerrard, I simply asked you to look at two quite

6         short emails.  You have run a global investigation for

7         decades.

8    A.   Yes, I have.

9    Q.   I assumed you could absorb four or five lines of text

10        where there is one central point in there that I could

11        then put to you.

12   A.   But I don't see the word "target".

13   Q.   The word "target" was in the previous email.

14   A.   All right, but we're on this email.  So what I see from

15        this email --

16   JUDGE LENON:  I think you've said what you see -- we know

17        what's in the email.

18   A.   Thank you.

19   JUDGE LENON:  Can you get on with it?

20   MR LORD:  Ask the question?  Yes.

21   A.   I have answered the question.

22   Q.   Given that you were working for Mr Buchanan at this time

23        and given what appears to be the importance of taking

24        steps in relation to Mr Azima --

25   A.   Certainly charging Mr Azima would be an important step,

```
 1              yes, my Lord.
 2    Q.   And I suggest that you would have been made aware at
 3         this time or about this time that these were the Ruler's
 4         wishes.
 5    A.   Absolutely not, and my question would have been, as
 6         indeed I think the others are saying, "With what?"
 7    Q.   Is it your evidence to his Lordship that Mr Buchanan did
 8         not discuss with you at around this time what appears to
 9         be the Ruler's wish for Mr Azima to be targeted and
10         charged?
11    A.   Absolutely.  This looks like someone getting annoyed and
12         reacting.  There was no evidence at all -- what,
13         2015? -- no evidence at all -- indeed right the way up
14         to before the details, there was no evidence that we
15         could bring at all against Dr -- sorry -- yes, against
16         Dr Massaad, let alone Farhad Azima -- sorry, evidence
17         against Dr Massaad; no evidence against Farhad Azima.
18         Apologies.
19    Q.   And when you said until the details, you mean the hacked
20         data?
21    A.   Yes, until the hacked data.
22    Q.   Until the hacked data?
23    A.   Yes.
24    Q.   So until the hacked data there was no basis at all --
25    A.   I outlined wrongly the various reports, the last one
```

1               being in April/May 2016, where we had no evidence other

2               than -- significant suspicions, but no evidence to take

3               action against Farhad Azima.

4        Q.     So as Mr Buchanan gave evidence, the only time that

5               RAKIA appreciated that it had a basis to accuse Mr Azima

6               of fraud was as a result of the material in the hacked

7               data?

8        A.     I'm not sure that's 100% right -- civil, criminal fraud,

9               that -- one of the reasons why I took legal advice,

10              further legal advice, from another jurisdiction in 2016,

11              and they subsequently agreed that there was no action,

12              but that's as far as we got.

13       Q.     Could we go, please, to {H7/464}?  This is the email of

14              20 July -- or 19 and 20 July 2015.  Again, Mr Gerrard,

15              have you seen this email before?

16       A.     I'm sorry, the screen for me is blurred because of my

17              glasses, but --

18       Q.     I think we have a hard copy for you, I think.  (Handed)

19       A.     (Pause)  Yes, I've read it.  Thank you.

20       Q.     Have you seen this document before?

21       A.     No, I haven't.

22       Q.     You can see that it looks on its face as if in July 2015

23              Mr Buchanan and Mr Handjani are having an email

24              conversation in which it is recorded that the "boss",

25              who is the Ruler, wants to go after "FA", which is

```
 1          Mr Azima.  Can you see that?
 2     A.   My Lord, I'm a witness of fact.  I haven't seen this
 3          email.  Surely counsel is better served -- the court is
 4          better served by asking the people in this email.
 5     JUDGE LENON:  Well, you've been asked the question.  Can you
 6          answer it?
 7     A.   Okay, my Lord.
 8     MR LORD:  Out of fairness to you, Mr Gerrard -- because I'm
 9          going to submit that you are not telling the truth and
10          I'm giving you some of the reference points that will
11          ground my submission, and I'm showing you that again
12          in July 2015 the Ruler of RAK seems to be directing that
13          Mr Azima is gone after, and we've established that
14          Mr Buchanan is somebody -- is a client of yours in the
15          sense that he represents one of your clients, we've
16          established that you and he will work closely together,
17          and, therefore, I will submit to his Lordship, it is
18          overwhelmingly likely that you and he would have
19          discussed this sort of direction from the Ruler.
20     A.   I understand that.
21     Q.   In fairness to you, Mr Gerrard, I thought I should let
22          you see why.
23     A.   Fire away.
24     Q.   Are you happy now for me to --
25     A.   Fire away.
```

1    Q.  I'm grateful.  Can I suggest to you, Mr Gerrard, that

2        you would have discussed with Mr Buchanan, around about

3        the time of these emails, what appears to be the Ruler

4        of RAK's direction or command in relation to Mr Azima?

5    A.  Okay, I'll repeat my previous answer.  I haven't seen

6        these emails before, nor did I discuss with Mr Buchanan

7        or indeed anyone else the irritation that His Highness

8        seems to have explored.  But what surprises me from this

9        note is the penultimate sentence:

10            "NB says the Boss wants criminal stuff taken out of

11       a letter [well, I don't know what letter we're talking

12       about] and go after FA -- subject to guidance from AF."

13            Well, I think they're talking here about PR stuff.

14       Andrew Frank was running Karv Communications.  What

15       would Andrew Frank be involved in an email about

16       criminal matters for?

17   Q.  So as far as you were concerned, Mr Frank's involvement

18       was really on the public relations side?

19   A.  He was the strategic adviser for the global

20       investigation, so not being a party to the emails, there

21       was obviously some sort of fuss.  His Highness clearly

22       was upset.  But "subject to guidance from AF" can only

23       be a press strategic PR thing.

24   Q.  Mr Gerrard, we've established, haven't we, that

25       in March 2015 Mr Page does a report aimed at part in

```
 1              ruining --
 2    A.   Absolutely.
 3    Q.   -- the plans?
 4    A.   Absolutely.
 5    Q.   And we've agreed that that relates to Mr Azima at least
 6              in part, haven't we?
 7    A.   Absolutely.  Mr Azima seemed to be helping drive that,
 8              yes.
 9    Q.   And we've seen emails in April and July 2015 where it
10              looks as if, putting it colloquially, the Ruler is still
11              on the warpath as far as Mr Azima is concerned, haven't
12              we?
13    A.   What, the ones we've just seen now?
14    Q.   Yes.
15    A.   Yes, he appears to be on the warpath, absolutely --
16    Q.   And Mr --
17    A.   -- but the previous emails you talked about also talk
18              about 8 million.
19    Q.   Mr Buchanan gave evidence yesterday or maybe the day
20              before -- yesterday, I think -- that one of the prompts
21              for the April emails -- one of the prompts for the
22              Ruler's wish to go after Mr Azima we've seen in
23              the April emails was the March report from Mr Page that
24              revealed the part Mr Azima was playing allegedly in the
25              campaigning.
```

1    A.   I would have imagined His Highness will have been upset

2         that Dr Massaad, aided and abetted by Farhad Azima, were

3         creating a press campaign, yes.

4    Q.   And there's no evidence, is there, that by July 2015

5         the Ruler's concern had abated -- is there?

6    A.   Sorry, say that again.

7    Q.   There's no evidence that by July 2015 the Ruler's

8         concerns in relation to Mr Azima had abated?

9    A.   I don't see why they would have done.  I agree.

10   Q.   They continued, didn't they?

11   A.   Well, to the extent that the client, through

12        Andrew Frank, Bell Pottinger and others, started to work

13        on their own press communication strategy, the crisis

14        plan, call it what you like.

15   Q.   In 2016?

16   A.   Yes, so the worry about the press campaign caused the

17        client -- indeed I think I even advised that we instruct

18        Bell Pottinger, as is normal in big investigations,

19        crisis management and all that -- to instruct them.  So,

20        yes, this was something that went on in some sort of

21        preparation for some time.

22   Q.   And is it your evidence that you did not discuss with

23        Mr Buchanan, let's say around July or August or

24        September 2015, this particular concern of the Ruler's,

25        in other words the campaigning, including Mr Azima's

1    part in it?  Did you not discuss it at all with

2    Mr Buchanan over that time, over the summer?

3  A. Yes, of course -- sorry, did I discuss the Ruler's

4    worries?

5  Q. The concern, the concern, that there was a campaign

6    allegedly being cooked up by Dr Massaad and his US team

7    to smear RAK?

8  A. Yes, yes.  Sorry, and your question is ...?

9  Q. Did you not discuss those matters with Mr Buchanan?

10  A. Yes, of course.

11  Q. Regularly?

12  A. No, not necessarily regularly, but it was a concern.

13    Mr Buchanan will have been told -- I think things came

14    to a head particularly with (a) Mr Goodley, which I've

15    already walked through, and subsequently the allegations

16    against Dechert and myself to the SRA, which were

17    investigated and the determination that there was no

18    evidence.

19    So there was no doubt that we were hearing that

20    there was a press campaign coming down the track,

21    my Lord.  We were beginning to see evidence of a press

22    campaign and the client was taking steps, albeit slowly

23    in my opinion, to start to try to counter that.

24  Q. And that would include gathering confidential

25    information on the alleged campaigners, wouldn't it?

```
 1    A.   Funnily enough, it didn't.  We got -- the information
 2         dried up from Mr Page's report.  Thereafter we got
 3         titbits of information from Bell Pottinger and people
 4         who were hearing in the marketplace who Farhad and his
 5         team -- not Farhad, actually -- it might have been
 6         Farhad -- Khater Massaad, whoever was driving it, were
 7         speaking to various PR agents, and that was the
 8         information that we were getting in the marketplace.
 9         That's as much as I can say on that.
10    Q.   And what was your understanding of what, if any,
11         intelligence-gathering Mr Page was achieving in the
12         second half of 2015, please -- the second half?
13    A.   From March, 26 March, as far as I was aware, Mr Page was
14         back to his day job, looking at Georgia, Khater Massaad,
15         etc.  That's what his focus was.  It will have been
16         wider than that, I've no doubt, but it certainly, as far
17         as I was aware, did not include Farhad Azima.
18    Q.   That wasn't my question.
19    A.   Well, you asked me what Mr Page was doing and I've just
20         told you.
21    Q.   Well, no, Mr Gerrard, we've seen that
22         intelligence-gathering was going to be carried out,
23         including in relation to Mr Azima.  You've just agreed
24         that the concern about the campaigning didn't abate.  In
25         fact you said it got stronger and stronger.  Mr Page's
```

```
 1            remit clearly extends to those matters, and that's why
 2            I'm asking you what happened, as far as you're
 3            concerned, in the second half of 2015 through Mr Page's
 4            work to gather intelligence or monitor the activities of
 5            this increasing plot.
 6      A.    I apologise, my Lord.  I thought I'd answered this
 7            twice.
 8                As far as I was aware, Mr Page made it abundantly
 9            clear to me and Mr Buchanan that he had either lost his
10            contact or his contact didn't want -- whatever it was,
11            I can't remember.  That line of enquiry was gone.  We
12            did not -- maybe we were wrong -- we did not ask him to
13            carry on looking at Farhad Azima.  In fact he'd never
14            been asked to in the first place.  This came by chance.
15                From that period on, as far as I'm aware, I didn't
16            give him any instructions and I certainly don't think
17            Jamie Buchanan did.  He was looking at this massive
18            investigation and we had a lot to do, as indeed others
19            were looking at it.
20      Q.    Mr Gerrard, by 4 January 2016 you had uncovered no
21            basis, had you, to allege that Mr Azima had been engaged
22            in fraud at the expense of RAK or RAKIA?
23      A.    A little bit later than that -- April, I think it was,
24            2016.
25      Q.    So you can confirm on oath that by 4 January 2016 you
```

1        had not uncovered any basis for alleging fraud against

2        Mr Azima in relation to RAK or RAKIA or any RAK entity?

3   A.  That's not -- we had suspicions.  Could we go to court

4        with them?  The view was no.

5   Q.  So what were these bases, then?

6   A.  So we had by then -- we had some tip-off on the

7        Panama Papers, but it didn't really take us that far.

8        But that was the first time we realised that -- in fact,

9        I think we may have already had the information from

10       Cynthia Payne, Dr Massaad's secretary, about the Eurasia

11       Hotel Holdings.  That was bizarre on two counts: one,

12       the only directors appeared to be Farhad Azima and

13       Dr Massaad; two, they were then the ones that voted for

14       the change of name.  So we had those emails.  Ray Adams

15       sent those emails to Dr Massaad's secretary, asking

16       Dr Massaad to sign them.

17   Q.  When was that?

18   A.  Sorry?

19   Q.  When was that?  When did you see those emails?

20   A.  I can't remember when we first saw them, but they would

21       be a matter of record.  They've come out of

22       Cynthia Payne's emails.  Cynthia Payne -- I think that's

23       her name -- certainly Cynthia -- was Dr Massaad's

24       private secretary.  We reviewed the emails of

25       RAK Ceramics, we reviewed the emails of Dana Jets, we

1          reviewed what we could from HeavyLift, we reviewed

2          Karam Al Sadeq's emails.  That is where we got the

3          majority of our information from.  By 2019, 12 people

4          had been arrested and charged and, as you'll appreciate,

5          it was a significant operation.

6     Q.   Mr Buchanan gave evidence that as far as he was

7          concerned by January 2016, there was no basis to

8          consider that Mr Azima had engaged in fraudulent

9          activities at the expense of RAK or RAKIA.

10    A.   I wouldn't have gone that far.  I suspected

11         Farhad Azima.  The trouble is I didn't have hard enough

12         evidence.  So he is a bizarre, mercurial character.  You

13         could almost call him "Teflon man".  He was around

14         gun-runners, he was closely connected, if not involved,

15         in rendition.  Was it illegal rendition?  I'm not sure

16         how it can be, but sometimes these things are

17         sanctioned.  It was clear that he was involved in

18         gun-running to us, but could we prove it?  And also

19         right -- yes, so there were a number of things.  To say

20         that he wasn't involved was going too far in my opinion.

21    Q.   You identified earlier today three different reports you

22         claim your team had carried out into Mr Azima.

23    A.   Correct.

24    Q.   Can we have those on the screen, please?  They were

25         I think starting about [draft] page 23.  Can we have

```
 1              those on screen, [draft] page 23.  {Day5/22:1}

 2                   I asked you about the actual reports.  You said

 3              there were three -- [draft] line 23, page 23 for the

 4              transcript.  Can you see, Mr Gerrard?

 5         A.   Yes, I'm on 23.  I can't see where it says "three".

 6         Q.   [Draft] line 23 {Day5/22:23}:

 7                   "By my team, my Lord.  There are three."

 8         A.   Are we looking at the very top page?  I'm sorry.

 9         Q.   I'll ask you.  You gave evidence this morning to

10              his Lordship that there were three reports into

11              Mr Azima.

12         A.   Well, three reports which covered Mr Azima, yes.

13         Q.   Yes, and one of which -- the first one you say was in

14              2014.

15         A.   I think that was right.

16         Q.   And you said it didn't really take anyone anywhere.  Can

17              you see that?

18         A.   Yes.

19         Q.   So that wouldn't be a basis for saying that Mr Azima had

20              been fraudulent, would it?

21         A.   No, but it -- what it did do, he came out as a pretty

22              colourful character.  But you're right, by 2014 we had

23              no hard evidence.  But his track record was interesting

24              and it did tweak our interest.

25         Q.   And the second report you identify of the three,
```

```
 1          starting at [draft] line 6 -- I don't want you to go

 2          into privileged matters --

 3     A.   Where are we now?  On the second page?

 4     Q.   [Draft] page 24, line 6, {Day5/23:6}.

 5     A.   Okay, I'm getting the hang of this now.  6, yes:

 6               "The second report -- we've got to be careful

 7          here -- was -- yes, the second report was started as

 8          a result of ..."

 9               Yes, that's right, yes.  HeavyLift, correct.

10     Q.   And you said that the result from that was that there's

11          not much information.  Can you see that?

12     A.   Yes, that's -- yes.  So when I say there's not much

13          information, to base our views as to whether or not he

14          had a claim.

15     Q.   Yes, and then the third report you identify is at

16          [draft] page 24, line 18 {Day5/23:19}.

17     A.   [Draft] page 24, line 18?

18     Q.   You say:

19               "Then, off the back of that, as a result of that

20          investigation -- and I think we're now into 2016 and

21          I think we're April, May, June 2016 -- the best report

22          we could do ..."

23               And so it runs on.

24     A.   Yes.

25     Q.   So those are the total of your alleged investigations
```

```
 1         into Mr Azima, aren't they?
 2    A.   My alleged investigations?  I did carry out
 3         investigations.
 4    Q.   Right.  And the Panama Papers didn't come out until
 5         April 2016, did they?
 6    A.   Correct, there were two lots of Panama Papers.
 7    Q.   But they didn't emerge until April 2016, did they?
 8    A.   There were two lots.  The first lot bizarrely included
 9         Farhad Azima.
10    Q.   When did they first emerge, Mr Gerrard?
11    A.   I can't remember the date.
12    Q.   Around about April 2016?
13    A.   If that's -- yes, if that's the right date, yes.
14    Q.   So by January 2016 there were no Panama Papers, were
15         there?
16    A.   No.
17    Q.   So can we go, please, to the document at {H9/105},
18         please?  Can you see that, Mr Gerrard?
19    A.   I haven't got there yet.
20    Q.   If you're looking at it on screen, have you seen that
21         before?
22    A.   I can't remember it.  Oh right.  So -- okay.  Sorry,
23         I thought we were still on the reports.
24    Q.   {H9/105} and I see you've turned over to the attachment,
25         but {H9/105} is an email from Mr Frank to you on
```

```
 1              4 January 2016.
 2    A.   Yes.
 3    Q.   Have you seen this document before?
 4    A.   Yes -- have I seen it before?  Yes, I didn't remember
 5         it, but, yes, I've now seen it.
 6    Q.   When is the last time you think you looked at this
 7         before today?
 8    A.   I would have thought within the week.
 9    Q.   So you looked at it for the purposes of giving evidence
10         today?
11    A.   Yes, I have.
12    Q.   And it's been drawn to your attention, has it?
13    A.   Yes.
14    Q.   Now taking this in stages --
15    A.   Yes.
16    Q.   -- can his Lordship take it that you did receive this
17         email from Mr Frank in this way?
18    A.   Yes, I would imagine so.  I can't see any reason why --
19         if it's been sent to me, it will be -- I'll have
20         received it.
21    Q.   Mr Frank worked for Karv Communications, didn't he?
22    A.   He does.  He was the global strategic adviser and
23         I instructed him in 2014.
24    Q.   And he deals with the US aspects of --
25    A.   No.  I've already said he is global.  We needed a global
```

1        overview, we have a global investigation.  We were in

2        six/seven countries.  It was my advice that we needed

3        a global strategic plan.  His Highness -- I've never met

4        Mr Frank before -- His Highness had used him previously.

5        Maybe he's on some sort of standing instruction.

6        I don't know.  I met him and I instructed him.

7    Q.  Because Mr Buchanan gave evidence that

8        Karv Communications, Mr Frank's role, would come into

9        play when there was a US angle -- I think was the burden

10       of Mr Buchanan's evidence.  It sounds as if you don't

11       agree with that.

12   A.  I certainly don't.  Yes, of course he might be more --

13       he would be interested in the US issues, but his role

14       was global.  He advised on Georgia, he advised on UAE,

15       he took a global overview, but did obviously communicate

16       and deal with the PR advisers on the ground.  So

17       Bell Pottinger, for example, was really just UK.

18       I think we had some separate people in the US.  We had

19       separate people in Georgia and the global overview was

20       Mr Frank.

21   Q.  And he sent you a document, didn't he?

22   A.  Yes, he did.

23   Q.  And he asked you to confirm receipt and he said:

24           "Best, A."

25           Can you see that at the bottom of the email?

```
 1    A.   "Best" -- yes, sorry, I thought we were on to --
 2    Q.   By signing off with the letter "A", would it be right
 3         that you and Mr Frank were on quite familiar terms by
 4         that point?
 5    A.   Familiar?  Yes, yes, I probably had known him now for
 6         nearly two years.
 7    Q.   And Mr Frank said to you, didn't he, "Please confirm
 8         receipt"?  Can you see that?
 9    A.   Yes, yes.
10    Q.   Now, on the face of it, it looks as if Mr Frank
11         therefore wanted to know that you had actually received
12         this email and attachment, doesn't it?
13    A.   Yes.
14    Q.   We haven't had disclosure of any email back from you in
15         response to this email from Mr Frank.  Can you explain
16         that?
17    A.   I -- almost certainly I would have telephoned him.
18    Q.   Can you go, please, to the attachment at {H9/106}?
19    A.   Yes, I'm there.
20    Q.   Can you tell his Lordship what this document comprises?
21    A.   When he sent me the document, it was a bit out of the
22         blue so I wasn't quite sure what it was about.  When
23         I talked to him -- we'd been talking previously, I think
24         in the US, about the global -- about the campaign, and
25         this was the beginnings of how RAK would respond to the
```

 1          press campaign that was coming down the track.  That was

 2          my understanding of what this was about.

 3     Q.   So your evidence is that Mr Frank produced this

 4          document; is that right?

 5     A.   Yes, yes.  That's my understanding, yes.

 6     Q.   And he appears to be summarising here, doesn't he, the

 7          state of play on investigations by RAK or RAKIA over the

 8          previous two years, doesn't he?

 9     A.   Yes, I think what he was trying to achieve was -- and of

10          course, apart from the attacks on RAK and whatever, what

11          he was trying to do was address the imbalance that we

12          thought was going to come down the track.  And so this

13          was, you know, a "View from the window".  It's very

14          Andrew.  He was going to put RAK's case to the market.

15          So it was his -- I describe it as "ramblings", which is

16          a little unfair, but that's the way it looked to me.

17     Q.   Well, Mr Gerrard, Mr Frank doesn't -- so you're saying

18          that the very first time --

19     A.   This is the very first time I received anything from

20          Mr Frank.  You know, it was his -- I think we'd had

21          a meeting previously, I think it was in the US, where we

22          were worrying about how we were going to manage the

23          "blitzkrieg", as it's been called.

24     Q.   Well, that makes more sense, Mr Gerrard; in other words

25          this hadn't really come quite out of the blue, had it,

```
 1            because there had been a meeting where in fact some sort
 2            of summary of the position had been discussed with you,
 3            hadn't it?
 4       A.   Yes, absolutely.  When I say it came out of the blue,
 5            I didn't know why he was writing to me.  That's what
 6            I meant.
 7       Q.   Who should he have been writing to, then?
 8       A.   He was the strategic press guy.  I would have expected
 9            him to be doing it and then circulating it elsewhere.
10            But here -- this was a bit thin on the ground, but
11            anyway.
12       Q.   And when was this meeting, do you think?
13       A.   It will have been a couple of weeks before we sent it
14            or -- I can't remember.  It will be in my diary.
15       Q.   That will be to do with this alleged countering of the
16            PR campaign, will it?
17       A.   Yes.
18       Q.   So it wouldn't be to do with litigation?
19       A.   No.
20       Q.   And would there be a record of that in your daybooks?
21       A.   I don't know.
22       Q.   There's likely to be a record, isn't there, of a meeting
23            in the US?
24       A.   No, there's not likely to be a record.  If we're talking
25            about PR, I don't think I would have been making
```

```
 1          a record on PR.
 2     Q.   And so I think your evidence is that this was Mr Frank's
 3          first stab at --
 4     A.   That's my interpretation of this, yes.  I hadn't
 5          received anything else before this.
 6     Q.   Because there aren't any other emails we've seen where
 7          Mr Frank discusses it with you or says, "How about this
 8          for a first draft" or --
 9     A.   No, that's why I say I think it's his first stab --
10          I mean, he will have had other discussions, but this is
11          the first time he sent me anything.
12     Q.   And Karv Communications still work for RAK or RAKIA,
13          don't they?
14     A.   Yes, I think they do.
15     Q.   And there's no reason why Mr Frank couldn't have given
16          evidence in this case, is there, as far as you --
17     A.   I have no idea, my Lord.
18     Q.   Do you know any reason why he can't give evidence?
19     A.   I didn't know that he wasn't going to until very
20          recently.
21     Q.   Who was at this meeting that you've just described?
22     A.   I would -- definitely Mr Buchanan, there will have been
23          me, obviously Mr Frank.  I'm not sure who else.  I doubt
24          whether there would have been anyone else.  Mr Handjani
25          might have been.  He floated in and out.  But I don't
```

 1         know.

 2    Q.   And so it would be fair, would it, for his Lordship to

 3         understand that what Mr Frank was purporting to do in

 4         this attachment at {H9/106} was to summarise what he

 5         understood to be the state of play in relation to the

 6         investigations into the alleged massive fraud affecting

 7         Ras Al Khaimah?

 8    A.   Yes, my Lord, that's what he was attempting to do in my

 9         view.

10    Q.   And he was doing that, wasn't he, based upon what he'd

11         been led to understand was that state of play by you at

12         a meeting a week or two before 4 January 2016?

13    A.   Yes, I think so.  That's a fair assessment.

14    Q.   And in October and November 2015 Mr Azima's emails were

15         the subject of a spear-phishing attack, Mr Gerrard --

16         were you aware of that?

17    A.   No.

18    Q.   -- which potentially allowed the hacker to access

19         Mr Azima's confidential email data.

20    A.   And what date do you say that was?

21    Q.   In October and November 2015, so shortly before the

22         meeting you had with Mr Frank and Mr Buchanan in the US.

23              Can you see what this document records?

24    A.   Yes.

25    Q.   "The window has opened on Ras Al Khaimah through

1       a series of investigations that have unearthed a massive

2       fraud ..."

3          You were in overall charge of the global

4       investigation for Dechert, weren't you, at that time?

5  A.  That's correct, my Lord.

6  Q.  You can see what it says in the top hole-punch:

7          "A number of things have been exposed as fact over

8       the past twenty-four months:"

9          Can you see that?

10  A.  I do.

11  Q.  Can you see about halfway down it says:

12          "- FA, a US citizen, appears to have orchestrated,

13       if not (fully) participated in numerous fraudulent

14       activities."

15          Do you see that?

16  A.  I do.

17  Q.  Mr Buchanan gave evidence that as far as he was

18       concerned RAKIA had never had any basis to allege

19       Mr Azima had been fraudulent, still less participated in

20       numerous frauds, until the hacked data had been

21       analysed.

22  A.  Correct.

23  Q.  And that's right, isn't it?  RAKIA didn't have any basis

24       to think that Mr Azima had been guilty of any sort of

25       serious fraud until it saw the hacked data?

1    A.   Certainly not guilty, but we certainly suspected him of
2         wrongdoing.
3    Q.   And by 4 January 2016 we've seen that, of your three
4         reports, the first one in 2014 didn't really go
5         anywhere.  We can forget that.
6    A.   Correct.
7    Q.   The second one was into the Mr Azima's HeavyLift
8         Training Academy claim, wasn't it?
9    A.   Correct.
10   Q.   And the third one in 2016 postdated this document,
11        didn't it?
12   A.   Correct.
13   Q.   It's right, isn't it, Mr -- so can his Lordship take it
14        that you and/or --
15   A.   Gerrard.
16   Q.   Mr Gerrard, can his Lordship take it that it's likely
17        that Mr Frank would have got this information about
18        Mr Azima's role from you or Mr Buchanan at that meeting
19        a couple of weeks earlier?
20   A.   No, he will have got what we knew about Farhad Azima (a)
21        coming out of the 26 March Page report.  He will have
22        got --
23   Q.   Stop there, stop there.
24   A.   Yes.
25   Q.   That didn't concern fraud, did it, by Mr Azima?  That

1          was about campaigning.

2    A.  No, I'm telling you what Mr Frank would have known.  So

3        Mr Frank would have been aware -- it was campaigning and

4        it was relevant for Mr Frank.

5    Q.  So how would Mr Frank have known about the March report

6        of Mr Page?

7    A.  I'm not sure he knew about the report, but he certainly

8        knew about the issues from the report, ie --

9    Q.  Stop there, stop there.

10   A.  Yes.

11   Q.  How can you give evidence of that?  What's the basis for

12       your saying --

13   A.  Because I was there when I briefed him about the

14       Farhad Azima/Dr Massaad report.  Why else --

15   Q.  When was that?  When was that?

16   A.  I can't remember, but he's the strategic global PR

17       adviser.  He was told this was coming down the track --

18       this is as much as -- I don't know that he was told it's

19       the Page report, but we were -- I also discussed the

20       Goodley thing with him, "We've got Mr Goodley trying to

21       interview me.  What do you think?", and between us we

22       decided, "Neil, go and talk to him".

23       So of course Mr Frank knew about the blitzkrieg

24       issue.  He also knew regular briefings on the case

25       generally and in particular the concerns that we had

1   regarding rendition, regarding gun-running, regarding

2   all of those other issues, but he also knew -- well, he

3   knew our concerns on that.

4     So when I saw this, I said, "I'm sorry, that

5   particular section isn't going to work because you ask

6   for how much to add here and all we can add is

7   suspicions", so he didn't have any evidence for that

8   bullet point.

9  Q. Where is the evidence of your response to this email and

10   attachment?

11  A. My evidence is what I've just given you, which is

12   I phoned him and discussed this with him.

13  Q. Well, where's the revised draft?  Where's the next

14   version of this?

15  A. Well, there isn't one.  There's no version -- well, if

16   there is, I haven't seen it.

17  Q. I suggest, Mr Gerrard, that what you've just said is not

18   truthful and I suggest that the reason that Mr Frank put

19   this line in about Mr Azima is because, at that meeting

20   that you had with him and Mr Buchanan a week or two

21   before, you had led Mr Frank to understand that you had

22   exposed as fact that Mr Azima had participated in

23   numerous fraudulent activities.

24  A. And how would I do that?

25  Q. You would do that because by that stage, I suggest,

```
 1            Mr Gerrard, you were aware of the confidential material
 2            that had been procured illegally from within Mr Azima's
 3            email records in October/November 2015 and one way or
 4            another you thought you were on to something.  You
 5            started to think that you could -- that you had some
 6            material to allege fraud.  That's what I put to you.
 7       A.   So I'd like to deny that, my Lord.  It's preposterous.
 8            But I'd also like to explore that question because what
 9            you're suggesting is I had a secret little stash of
10            Mr Azima's documents which I could select at will to
11            identify frauds.  I mean, how would I do that?  How do
12            I pull this stuff down?  How do I search for it?
13       Q.   His Lordship has your answers, Mr Gerrard.  I'm going to
14            move on.
15               I suggest to you further that by January 2016 you
16            would have been aware of Mr Page's ongoing
17            intelligence-gathering work.
18       A.   Yes, I was, but not into Farhad Azima.
19       Q.   In relation to Farhad Azima?
20       A.   There was no ongoing intelligence work that I was aware.
21       Q.   And you would have been aware that Mr Page had been
22            successful in gathering intelligence from within
23            Mr Azima's confidential email archive?
24       A.   I beg your pardon?
25       Q.   You would have --
```

1    A.   Is this your supposition now?

2    Q.   It's what I'm putting to you.

3    A.   Okay.  Sorry.

4    Q.   I'm putting that to you.

5    A.   Right.  No, I wasn't aware.

6    Q.   And that that is the only explanation for why Mr Frank

7         has recorded, based upon what you and Mr Buchanan must

8         have told him, the idea that Mr Azima had been involved

9         in numerous fraudulent activities.

10   A.   My Lord, that's ridiculous.  Mr Frank is a clever man,

11        but he's not a lawyer.  He will have heard on a regular

12        basis concerns as to gun-running, fraud, etc, etc.  What

13        he will not have grasped that we did not have sufficient

14        evidence to proceed.  On everything else we had stacks

15        of evidence against -- let's take the first bullet

16        point, Dr Massaad.  We had evidence.  Indeed he was

17        prosecuted.  We had evidence against Mikadze.  He was

18        prosecuted.  We had evidence of other crimes inside RAK,

19        including the Ruler's chief adviser and the general

20        counsel.  They were prosecuted.

21             Let me ditch Farhad Azima for the moment.  We had

22        dummy corporations set up in the RAK, UK, Georgia,

23        Cayman Islands, etc.  We could have put those in, and so

24        on.  Fraudulent bank accounts, possible gun-running,

25        that's the bit down there.

1              What we did not have -- we had grave suspicions, we

2         had very interesting emails about rendition, wing to

3         wing in Belgium Airport, but we did not have any

4         evidence that we could have proceeded against of actual

5         fraud against Farhad Azima.  That is just plainly wrong

6         and that's what I told Andrew Frank.

7    MR LORD:  Would that be a convenient point, my Lord?

8    JUDGE LENON:  Yes.

9    MR TOMLINSON:  As you know, Mr Gerrard, you remain in

10        purdah.

11   (1.00 pm)

12                      (The luncheon adjournment)

13   (2.00 pm)

14   JUDGE LENON:  Before you start, Mr Lord, I understand that

15        from tomorrow the court will be sitting in court

16        number 12, which has more seating for the public.

17   MR LORD:  Thank you, my Lord.  That's very kind.

18   MR TOMLINSON:  My Lord, I understand.  I don't know about

19        the practicalities.  It takes quite a long time to set

20        up.  I don't know whether it's going to be possible to

21        set it up for 10.30 or not.  We'll obviously have to

22        make enquiries.

23   JUDGE LENON:  All right.  Well, if it's not going to be

24        possible, somebody needs to tell listing office.

25   MR TOMLINSON:  I think I was just warned earlier that if we

1           were moving court, we needed to have plenty of notice so

2           that we could -- everything could be set up because

3           there's quite a lot of equipment.  Let's hope it can be

4           done.

5      JUDGE LENON:  Yes.  Okay.  Well, let's see how we get on.

6      MR LORD:  Mr Gerrard, I'm going to ask you about the meeting

7           on 16 July 2016 now, if I may, please.  There's

8           a Dechert note of that meeting, most of which is

9           redacted, but an excerpt of which is not, at {H10/226}.

10          I'd like you to go, please, to {H10/226/2}.

11     A.   Yes, thank you, my Lord.  I've got it.

12     Q.   Would you have made a note or any notes of this meeting

13          in your daybook or some other place?

14     A.   No, I wouldn't.

15     Q.   Do you see in paragraph 10 --

16     A.   I do.

17     Q.   -- there is a record of what "NG", which I think must be

18          you, is meant to have said at this meeting?

19     A.   Yes.

20     Q.   Do you see that?

21     A.   Yes.

22     Q.   Do you see what you say in the third line?

23              "NG noted that HHSS was now engaging with Abu Dhabi

24          and the risk was that, the further this went, the more

25          likely collateral damage would occur.  It would be

1        difficult to keep the scope of RAK's actions within

2        a narrow compass."

3           Can you see that?

4  A.  I can.

5  Q.  I asked Mr Buchanan about this on Day 3 and he accepted

6        that the impetus behind the enlargement of RAK's actions

7        in this regard would come from RAK and RAKIA as the

8        complainant or sort of driving force, as it were.  Do

9        you agree with that?

10  A.  Not entirely.  I'm not sure this note accurately records

11        what I said here.  I think I said -- because I don't

12        think we were engaging, and when I say "we", I mean the

13        RAK prosecutor or the client.  The client hadn't

14        reported, as far as I'm aware, to Abu Dhabi.  It was

15        certainly either in the process of reporting or had

16        already reported to the RAK prosecutor.  Dependent on

17        the sorts of charges, my Lord, it would be for the RAK

18        prosecutor to refer to Abu Dhabi if it was regarded

19        a federal offence.

20  Q.  Yes, but leaving aside the fact that there may be an

21        issue of whether ultimately the matter was taken up at

22        the RAK level or the federal level or the UAE level, the

23        way in which matters could escalate in this way into

24        criminal investigations and prosecutions would be if RAK

25        or RAKIA continued to push that process along.  That's

```
 1            right, isn't it, Mr Gerrard?
 2     A.   You say "push along".  I don't quite know what you mean.
 3           If you mean that RAK in reporting crimes to the
 4           prosecutor as pushing along, then yes.  The evidence as
 5           it was mounting was clearly going to move, we
 6           anticipated, from fraud to more federal-type offences
 7           and that wouldn't be for us to determine.  That was
 8           a RAK prosecution determination or would have been.
 9     Q.   In other words, I put it to you, Mr Gerrard, that your
10           clients -- ie RAK/RAKIA, in other words, RAK Government
11           entities and the like -- they could in effect cause the
12           criminal matters to escalate as you were suggesting they
13           might.
14     A.   No, that's not true.  Any company here in the UK can
15           decide to report crimes to the police.  Once it goes to
16           the police, the police determine -- pass it to the CPS
17           and so on.  That's what was happening here.  So I don't
18           quite understand -- it's absolutely no different.
19     Q.   No different, the process of investigating crime and
20           prosecuting within the UAE, to the UK?
21     A.   No, no difference in reporting a crime to the
22           authorities.
23     Q.   And is that your truthful answer, that the prosecution
24           here -- that the expansion of the prosecution's interest
25           would be independent of the impetus lent to that process
```

1          by RAK or RAK entities?  Is that your evidence?

2     A.   The code in RAK, my Honour, is that the judiciary are

3          separate from the Ruler.  Now, that's my -- that's my

4          evidence, that's my truthful evidence.  Whether --

5          counsel seems to be suggesting they're not.  I have no

6          idea whether they are or not independent.

7     Q.   Could you --

8     JUDGE LENON:  Sorry, what do you mean by "the code"?

9     A.   The law.  They have a process which sets out certain key

10         areas.  You're presumed innocent until found guilty.

11         Legal advice, the judiciary is independent.  I call it

12         a "code"; it's probably the law of the UAE.

13    MR LORD:  And where would we find a copy of that, Mr --

14    A.   I've no idea, but if you go on the internet, I'm sure

15         you'll find it.

16    Q.   So you're talking about a code or law about which you

17         have no idea; is that right?

18    A.   I read it some time ago and I can't remember, but I was

19         advised on this (a) from the internet and (b) from

20         Al Tamimi, the lawyers.

21    Q.   You're giving evidence on oath to his Lordship about the

22         code or the law, so help his Lordship.  What does that

23         comprise?  Where would we find it?  What does it look

24         like?  What are the statutes or when did they come in?

25         You must have some idea.

```
 1    A.   I can't remember.

 2    Q.   You're just making it up as you go along, Mr Gerrard,

 3         aren't you?

 4    A.   If you would like, I am sure by close of business today

 5         that material can be drawn down from the internet and we

 6         can provide that information to you if that would help

 7         the court.

 8    Q.   And that's what should happen in theory, is it, or does

 9         it happen in practice as well?

10    A.   I've already given evidence that I -- we researched the

11         issue, both on the internet and counsel, Al Tamimi --

12         and in fact another law firm I can't remember now, and

13         that was our understanding.

14    Q.   And will that code you refer to or the codification --

15    A.   The code or the law, yes.

16    Q.   Yes, the code or the law, will that deal with the rules

17         as to detaining suspects?

18    A.   Yes.  Detaining suspects ... Yes, there is set out

19         a process as to when people are entitled to legal

20         advice, when charges are supposed to be made.  There is

21         a process.

22    Q.   And it will deal with the basis upon which somebody

23         could be kept in prison pending charge, will it?

24    A.   I didn't research that, but I'm sure it will do, very

25         much like our own laws do.
```

```
 1   Q.  Could you go, please, to paragraph 11 of your witness
 2       statement at {D/7/3}?
 3   A.  We're on 16 July?
 4   Q.  Yes.
 5   A.  Yes.
 6   Q.  You refer halfway through paragraph 11 to an attendance
 7       note of yours -- can you see? -- which I've just taken
 8       you to.
 9   A.  Yes, yes.
10   Q.  You say there:
11           "... to the best of my recollection is an accurate
12       note of what was discussed ..."
13   A.  Yes.
14   Q.  I think you have just said to his Lordship that you
15       don't think it was entirely accurate, haven't you?
16   A.  To the best of my recollection, but that particular
17       I don't think is entirely accurate, no.
18   Q.  If we go back to your meeting note, please, at {H10/226}
19       --
20   A.  Yes.
21   Q.  -- when you are referring to "collateral damage" --
22   A.  Yes.
23   Q.  -- and the difficulty of keeping the scope of RAK's
24       actions within a narrow compass, you were there
25       threatening Dr Massaad via Mr Azima, weren't you?
```

1    A.   No, I was not, my Lord.

2    Q.   You were effectively saying to Dr Massaad via Mr Azima,

3         "If you don't cooperate with our investigation into your

4         alleged wrongdoing, RAK, my clients, are effectively

5         going to escalate the criminal cases that they've got

6         against you".  Isn't that what you were saying?

7    A.   My Lord, this needs to be put into context.  We had been

8         trying to speak to Dr Massaad about the whole -- the

9         issue.  Dr Massaad, as far as I know even today, still

10        is completely unaware of the allegations and concerns

11        that we had, and we wanted to talk to him about it (a)

12        because there may have been an innocent explanation and

13        (b) I don't think His Highness had much desire to

14        actually report him to the authorities.

15             The closest we ever came to Dr Massaad being

16        informed was a meeting I think in -- I'm going to

17        say April 2014, but I may be wrong, where I met with

18        Kirby Behre, where we walked through many pages of

19        concerns, and unfortunately my understanding is

20        Dr Massaad refused to talk to his lawyer and that lawyer

21        was subsequently sacked.

22             So what we were trying to do here was, through

23        Farhad Azima, inform Dr Massaad that the investigations

24        were mounting, the issues were getting serious and we'd

25        very much like to sit down and talk to him, failing

```
 1            which the matter would be reported and it would go the

 2            way all prosecutions go.  That was what I was trying to

 3            convey.

 4       Q.   Could you go to your witness statement, please, at

 5            {D/7/3}?

 6       A.   Yes.

 7       Q.   Look at paragraph 13.  Go over the page to {D/7/4}.  You

 8            say this:

 9                "In raising the point again on 16 July 2016 ..." --

10       A.   Sorry, where is this?

11       Q.   The top of {D/7/4}, reading on in paragraph 13 of your

12            witness statement.

13       A.   "Behre had previously ...", that paragraph?

14       Q.   I'll read out the beginning of the paragraph for you.

15       A.   Yes.

16       Q.   "In raising the point again on 16 July 2016 ..."

17       A.   Sorry, I haven't got it.  I'm not there.

18       Q.   {D/7/4}, the top of the page.  It's a continuation of

19            paragraph 13 --

20       A.   Yes.

21       Q.   -- and it's two lines down, second line at the end of

22            the line.

23       A.   Yes, sorry.  I'm there now.

24       Q.   That's all right.  That's all right:

25                "In raising the point again on 16 July 2016,
```

1          I wanted to convey to Farhad Azima that His Highness was

2          already engaging with the criminal authorities in the

3          UAE and that, once criminal proceedings were started,

4          there was a greater risk of collateral damage for

5          Dr Massaad and any of his associates.  I meant that once

6          litigation is started or a prosecutor takes over, these

7          things get a life of their own."

8     A.   Correct.

9     Q.   So it's right, isn't it, Mr Gerrard, that you were

10         saying to Mr Azima for his benefit and that of

11         Dr Massaad that it wasn't too late to get RAK to call

12         off the dogs?  That was essentially the message you were

13         relaying there, wasn't it, Mr Gerrard?

14    A.   No, I don't think I was.  The proceedings -- I can't

15         remember where the proceedings were, but the reports had

16         already started, yes.

17    Q.   But you're saying to him -- you're saying -- this is

18         your evidence, and I put it to you a few moments ago

19         that the impetus for further criminal attention to

20         Dr Massaad and Mr Azima would come from your client, and

21         you said, "No, no, no, there's a code.  It's all

22         independent.  That wasn't what we were doing there.  It

23         wasn't really in RAK's hands anymore".  When we come to

24         your witness statement, you in fact say the opposite.

25         In your witness statement you're saying that you were

```
 1              effectively saying to Dr Massaad and Mr Azima, "This is
 2              your last chance to avoid terrible, terrible criminal
 3              and prosecution consequences".  That's what you were
 4              telling them, weren't you?
 5     A.       What I was telling him is that, if he refused to engage,
 6              the matter was only going to get worse.  It was bad
 7              enough as it was.  The matter had been reported to the
 8              prosecutor.  At that time the prosecutor only had RAK
 9              matters and the way we could see it going was federal,
10              and that's a much more serious issue.
11     Q.       The way you would see it going?  The way that your
12              client would have directed operations, Mr Gerrard.
13              That's right, isn't it?
14     A.       No.  My client, like any client, has -- assuming, of
15              course, the authorities don't seize the material -- had
16              the ability to -- or the right to give whatever the
17              authorities -- whatever he wanted to give to the
18              authorities.  So he didn't have to give all the evidence
19              over.  He could have stopped it at the allegations he
20              was making.
21     Q.       Who could have stopped it?  Your client could have
22              stopped it?
23     A.       He didn't have -- yes.
24     Q.       Who's that?  The Ruler?
25     A.       RAKIA -- RAKIA, the Ruler.
```

```
 1    Q.   But who's "he"?  You said "he".  It's the Ruler then,
 2         is it?
 3    A.   It's RAKIA.
 4    Q.   Why do you say "he"?
 5    A.   Well, okay, Jamie Buchanan.
 6    Q.   I see.  So Mr Buchanan was really -- he was instrumental
 7         in the driving forward of the criminal process, was he,
 8         at this time on behalf of the authorities, was he?
 9    A.   Yes, he was my point of contact.  If you're suggesting
10         that His Highness had no involvement in it, then that's
11         clearly not right.  His Highness would have been
12         involved and no doubt approved of the process.
13    Q.   And what was His Highness' involvement in this process
14         that you're describing in paragraph 13?
15    A.   Well, I -- other than confirming what we were doing,
16         I don't know.  I didn't ever attend a meeting where
17         His Highness said, "This man must be prosecuted".  He
18         was aware of what was going on.  I was getting my
19         instructions through Mr Buchanan.  I was aware that
20         His Highness would have liked to have settled the matter
21         if that was humanly possible.
22    Q.   You see, reading out your evidence for a moment, you
23         said this {D/7/4}:
24              "I wanted to convey to Farhad Azima that
25         His Highness was already engaging with the criminal
```

1        authorities in the UAE and that, once criminal

2        proceedings were started, there was a greater risk of

3        collateral damage for Dr Massaad and any of his

4        associates."

5   A.  Yes.

6   Q.  Now stopping there, Mr Gerrard, you are there giving

7        evidence about some collateral effects that will be felt

8        by Dr Massaad and his associates --

9   A.  Yes.

10  Q.  -- beyond the criminal proceedings, aren't you,

11       Mr Gerrard?

12  A.  No, I'm not.  I'm talking about greater criminal -- this

13       was -- RAK is an Emirate within the UAE and more serious

14       crimes are dealt with at federal level.  That is what

15       I was trying to get across.

16  Q.  And is the punishment more severe for those federal

17       crimes?

18  A.  Yes, yes.

19  Q.  What would it include?

20  A.  I don't know.

21  Q.  I'm sure you do know, Mr Gerrard.

22  A.  I genuinely don't know.

23  Q.  Might it include capital punishment?

24  A.  I don't think so, not in -- I don't think so in the UAE,

25       no.  Let me go back to my first answer.  I don't know.

```
 1    Q.   So you were in fact threatening Dr Massaad and his
 2         associates -- in other words, Mr Azima, as you thought
 3         it -- you were essentially threatening them with much
 4         more serious criminal consequences, weren't you?
 5    A.   It was going to escalate to federal level, yes.
 6    Q.   The answer is "Yes", isn't it?
 7    A.   The answer is "Yes".
 8    Q.   Thank you.  And you were doing that, weren't you, in
 9         order to try to extract from Dr Massaad some settlement
10         that was satisfactory to your client?
11    A.   I was trying to get him to engage with us to see whether
12         or not he could assist us in that settlement, that he
13         provide us with information and -- I mean, the criminal
14         process had started so he couldn't stopped the RAK
15         process.
16    Q.   Do you think it's appropriate, Mr Gerrard, to threaten
17         somebody with serious criminal consequences in order to
18         get them to assist with some investigation or claim for
19         money or asset tracing, for example?
20    A.   I'm sorry, I don't agree I was threatening anyone.
21         I was --
22    Q.   Do you agree in principle?  Do you agree --
23    A.   I was warning him, I was warning him that things were
24         going to naturally get worse and I was asking
25         Farhad Azima to pass that on to Dr Massaad and his
```

```
 1          lawyer.

 2    Q.    You were warning?

 3    A.    I was asking Farhad Azima to pass that on --

 4          Farhad Azima knows perfectly well because he's the

 5          person that's had grave difficulties in getting the

 6          message across.  We had been trying for ages.

 7          Farhad Azima himself was frustrated.  It was -- I was

 8          trying to get across the severity, the -- of this was

 9          going to get worse, there would be collateral damage

10          coming out of Dr Massaad's action to refuse to engage.

11    Q.    What sort of collateral damage were you talking about,

12          then?  Give his Lordship some examples.

13    A.    Well, that it would widen -- the case would widen.  So

14          the case was almost certainly going to widen into, as we

15          saw it then, gun-running, my Lord, sanctions busting,

16          people trafficking.  These were serious issues and

17          that's where -- if we'd carried on, that's where it

18          looked like -- and, by the way, Hezbollah terrorist

19          funding.  It was about as bad as it could possibly be

20          and, for reasons which ought to be obvious, His Highness

21          would have preferred to have settled that, rather than

22          that explode.

23              So it seemed utterly reasonable to me to sit down

24          with Farhad Azima, who had tried repeatedly to bring the

25          parties to the table, and say, "Look, Farhad, this is
```

```
 1              getting very serious.  We've got more evidence now.
 2              This is heading into a dark place.  Please warn your
 3              client and get him to engage with a lawyer".  That's
 4              what I was trying to get across.
 5    Q.   Mr Buchanan --
 6    A.   It's Mr Gerrard.
 7    Q.   Sorry, Mr Gerrard.  So you were warning, were you -- you
 8              were warning Dr Massaad and his associates that they
 9              were going to be pursued in relation to gun-running if
10              they didn't cooperate with your investigation?  Is that
11              right?  Think very carefully before you answer that,
12              Mr Gerrard.
13    A.   I was warning him that the matters were serious and that
14              he ought to engage.
15    Q.   I'll put it to you again.  On oath for his Lordship,
16              were you warning Dr Massaad and his associates at this
17              time that, if they didn't engage with your
18              investigation, they could face criminal sanctions and
19              collateral damage in relation to gun-running
20              allegations?  Is that right?
21    A.   I was informing Dr Massaad via Farhad Azima that matters
22              were getting considerably more serious.
23    Q.   Could you answer the question, please?
24    A.   I did answer the question.
25    Q.   You didn't answer the question.  Answer the question.
```

```
 1            You keep giving a speech about rendition and gun-running

 2            and all sorts of extravagant complaints, many of which

 3            haven't featured before until today in this litigation,

 4            which you raise for the first time to justify your

 5            evidence.

 6                 Now, for his Lordship on oath, did you warn

 7            Dr Massaad and his associates at any time that if they

 8            didn't cooperate with your investigation, they would

 9            face sanctions in relation to alleged gun-running?

10            "Yes" or "No"?

11    A.   I informed Mr Kirby on -- in April when we first met

12            that there were allegations -- well, there were concerns

13            at that stage and his client should sit down and talk to

14            us.

15    Q.   What's the answer to my question, Mr Gerrard?  What's

16            the answer?

17    A.   Can you repeat it again?

18    Q.   Did you warn Dr Massaad --

19    A.   I can't remember whether in the note that was actually

20            raised, but that's the -- I'm sure I did, yes.

21    Q.   And did you warn Dr Massaad and his associates that they

22            could face --

23    A.   I didn't warn any associates.  I warned -- I asked

24            Farhad Azima to inform Dr Massaad and his lawyer that

25            they needed to understand this was getting grave.
```

```
 1   Q.   Did you warn Dr Massaad, Mr Azima, anybody like that,
 2        that if they didn't cooperate with your investigation,
 3        they were going to face sanctions or investigations in
 4        relation to rendition?  Did you warn people about that
 5        at this time?
 6   A.   I certainly didn't mention rendition.
 7   Q.   You did not mention rendition?
 8   A.   I don't think I mentioned rendition.
 9   Q.   So why did you mention it earlier today?
10   A.   Because rendition is -- has been identified in our
11        investigation.
12   Q.   To besmirch Mr Azima.  That's why you mentioned it
13        today, didn't you, Mr Gerrard?
14   A.   No, to besmirch Mr -- rendition is a finding of ours as
15        far as Farhad Azima is concerned, yes.
16   Q.   None of these matters -- these matters about gun-running
17        and rendition, you've never taken them up in earnest
18        with Mr Azima, have you?  You've never seriously pursued
19        them and said, "Mr Azima, have you done this and let's
20        sort this out".  You've never raised them in that way,
21        have you?
22   A.   I -- in one meeting I did raise with Farhad Azima, but
23        that's a without prejudice note.
24   Q.   Well I suggest, Mr Gerrard, what this shows, what you've
25        revealed today, is that you were adopting a deliberately
```

```
 1            menacing and threatening approach in this meeting in

 2            order to try to bring Dr Massaad to book.

 3      A.    My Lord, I don't agree.  Can I just point out to the

 4            court that this aggressive threat, as you put it, is at

 5            page 2 {H10/226/2} and, of course, Mr Azima then later

 6            complained about it, but it goes on -- the meeting goes

 7            on for another seven pages.  I don't think Mr Azima took

 8            it particularly -- took it in that way.

 9      Q.    Can you go to {D/8/2}, please, which is your second

10            witness statement.

11      A.    Yes.  What paragraph?

12      Q.    Paragraphs 5 and 6.

13      A.    Yes.

14      Q.    See what you say there.  (Pause)   Can you see that?

15      A.    Yes, I do.

16      Q.    Mr Azima's evidence is that when you appreciated that

17            Mr Azima was not going to in effect betray Dr Massaad

18            and deliver him into your clutches, you lost your temper

19            and became angry; is that right?

20      A.    That's not true, my Lord.

21      Q.    That is the context for these threatening exchanges

22            which we've just been looking at.

23      A.    That's not true, my Lord.  As I pointed out, if that

24            were the case, why did the -- this is on page 2

25            {H10/226/2} of the meeting.  The meeting barely started.
```

```
 1              The meeting goes on for another seven pages.  If
 2              Mr Azima had taken such offence, I can't believe he was
 3              still there -- whenever it was -- later.
 4      Q.      And Mr Azima said something to you along the lines of
 5              that he wasn't the sort of person to throw somebody
 6              under a bus, which is what he understood you wanted him
 7              to do in relation to Dr Massaad.
 8      A.      I did not want Farhad Azima to throw anyone under the
 9              bus.  This was -- as I tried to put into context
10              earlier, my Lord, we couldn't get to meet with him.
11              Even his own lawyers wouldn't -- couldn't meet him.
12              Dr Massaad was just in this bubble, unaware of what was
13              going on, and Farhad Azima, frankly, in my view, was our
14              best chance of getting Dr Massaad to engage, and, as
15              Mr Azima will tell you no doubt when he's here, he tried
16              and ultimately we all failed.
17      Q.      Can you go, please, to --
18      A.      Can I just make -- answer your question?
19      Q.      By all means.
20      A.      At no stage did I ask Farhad Azima -- I think you said
21              change sides or whatever it was.  That would be faintly
22              ridiculous.  He told us many times it was difficult
23              enough talking to Dr Massaad without thinking he had
24              changed sides for RAKIA.  We recognised he was in
25              Dr Massaad's camp, that's okay, and I think he was
```

```
 1            trying to mediate on behalf of Dr Massaad, but
 2            unfortunately, as I say, he and we failed.
 3       Q.   And you were threatening Mr Azima by way of this
 4            collateral damage reference because you were saying that
 5            Mr Azima would get caught up with the escalation that
 6            would happen if things didn't resolve as you wanted;
 7            isn't that right?  You were threatening Mr Azima with
 8            collateral consequences.
 9       A.   No, I certainly wasn't threatening him with collateral
10            consequences.  I've made it very clear I was trying to
11            get the message -- I was asking Farhad to convey that
12            message.
13       Q.   Could you please look at paragraph 6 of your witness
14            statement at {D/8/2}, the second witness statement,
15            where you say:
16                "I do not recall whether I referred to my previous
17            roles in the police during this meeting.  I may have
18            mentioned that I used to be a prosecutor in order to
19            emphasise the gravity of the evidence RAKIA had in
20            relation to Dr Massaad."
21                So is that right, that you refer to the fact that
22            you'd been a prosecutor in order to emphasise the
23            gravity of the evidence that RAKIA had?  Wasn't that
24            threatening?
25       A.   Well, I say "I may have mentioned".  I may have
```

 1           mentioned I was a prosecutor, but I didn't think that

 2           was threatening.  If anything, I was hoping, if I'd have

 3           mentioned it, that it would have underlined with

 4           Mr Azima how important it was.

 5       Q.  Could you go, please, to {E/3/14}?  It's bundle E.

 6           That's Mr Azima's witness statement, please.

 7       A.  Sure.

 8       Q.  Paragraph 54.  Can you see what Mr Azima says in his

 9           evidence in paragraph 54 about this same meeting?  Have

10           you read this before, Mr Gerrard?

11       A.  Many moons ago.  Do you mind if I take some time to read

12           it now?

13       Q.  Paragraphs 54 and 55, please.  Thank you.

14       A.  Thank you.  (Pause)   Yes, I've read it.

15       Q.  It's right, isn't it, Mr Gerrard, that you did become

16           angry and belligerent during the meeting?

17       A.  No, it's not right, my Lord.

18       Q.  And that you took over the meeting?

19       A.  No, it's not right, my Lord.

20       Q.  And you told Mr Azima to stop acting as a mediator,

21           didn't you?

22       A.  No, I did not, my Lord.

23       Q.  And you told him instead to work for RAKIA, didn't you?

24       A.  That would be pointless, my Lord, and no, I didn't.

25       Q.  It's right, isn't it, that Mr Azima refused to change

1              sides like that, didn't he?

2    A.   It never came up, my Lord.

3    Q.   And it's right that you went on to -- in effect to

4         parade what you thought would be relevant credentials,

5         such as your past as a policeman, detective, prosecutor

6         and lawyer; isn't that right, Mr Gerrard?

7    A.   And apparently being able to pop into the UK

8         Prime Minister's office to boot.

9    Q.   That's right, isn't it, Mr Gerrard, that you did boast

10        that you had connections with Number 10 in that meeting,

11        didn't you?

12   A.   That is completely ridiculous.  Completely ridiculous.

13   Q.   And that Mr Azima asked you whether you were threatening

14        him and you said to him, "It wasn't a threat, but

15        a promise"?  That sounds like the sort of words you

16        might use, Mr Gerrard, doesn't it?

17   A.   No.

18   Q.   Are you sure?

19   A.   I am very sure.

20   Q.   Do you agree, if you had said that, that would have been

21        a threatening thing to say?

22   A.   Well --

23   Q.   "I promise you that there will be these consequences",

24        do you think that would be a threat?

25   A.   Yes, it would be, if it was true.

```
 1    Q.  Yes.  Can you go, please, to {H10/229}, which is an
 2        email exchange which Mr Buchanan had with Mr Azima about
 3        a week after this meeting.
 4    A.  Yes.
 5    Q.  Again, Mr Gerrard, have you seen this fairly recently,
 6        this document?
 7    A.  No, I haven't, but I have seen it before.
 8    Q.  Right.
 9    A.  Can I read it, please?  Where does it start?  Over the
10        page?
11    Q.  There's an email from Mr Buchanan on 23 July setting out
12        some sort of proposal, which then elicits the response
13        from Mr Azima at the foot of {H10/229}, to which
14        Mr Buchanan responds in the top two-thirds of that page.
15    A.  (Pause)  Yes, I've read it.  Thank you.
16    Q.  So you can see that Mr Azima complained around the time
17        of this meeting, a few days afterwards maybe -- he
18        complained about what had happened at the meeting.  You
19        can see that that's the upshot of these emails,
20        isn't it?
21    A.  Yes.
22    Q.  And in the interim, between the meeting and 23 July,
23        Mr Azima had been pressing Mr Buchanan for a note of the
24        meeting.  I'm not suggesting that you were necessarily
25        aware of that --
```

```
 1    A.   No.
 2    Q.   -- but there are documents we've seen with Mr Buchanan
 3         in evidence that show Mr Azima pressing for notes of the
 4         meeting which in the end Mr Buchanan did not supply him
 5         with.
 6    A.   Correct.
 7    Q.   Were you aware that Mr Buchanan had not, in the event,
 8         supplied Mr Azima with any notes of that meeting on
 9         16 July?
10    A.   Yes, I was.
11    Q.   And did you -- well, I won't ask that.
12             You can see that it looks as if Mr Buchanan thinks
13         that what's being alleged is extortion and blackmail as
14         a result of what you said at the meeting.  Can you see
15         that?
16    A.   Yes, I can.
17    Q.   And then Mr Buchanan responds with some -- what he
18         thinks was the definition of these offences.  But can
19         you see the paragraph that begins {H10/229/1} "To be
20         absolutely clear ..."?  Can you see that, Mr Gerrard?
21    A.   Sorry, say that again.
22    Q.   Halfway down the page:
23             "To be absolutely clear ..."
24             It's in smaller typeface.  Can you see?
25    A.   No -- oh yes, sorry.  Yes.
```

1    Q.   "To be absolutely clear, Neil did not demand money nor

2         anything else from you in return for anything

3         whatsoever.  Neil has previously challenged you as to

4         whether you have always acted in the best interests of

5         HH.  He did so again at our last meeting.  I personally

6         don't see the problem.  You have signed an agreement

7         confirming that you have never acted against the

8         interests of HH.  All he did was [raise] questions as to

9         HeavyLift.  In a previous meeting he asked you about

10        Eurasia Hotel Holdings."

11             It's right, isn't it, Mr Gerrard, that you had, by

12        this point in time, challenged Mr Azima as to whether

13        he'd been acting in bad faith in relation to HeavyLift,

14        hadn't you?

15   A.   Yes, in a previous meeting.

16   Q.   And you'd effectively accused him of bad faith; is that

17        right?

18   A.   I asked him whether or not he'd acted properly in

19        HeavyLift and Eurasia Hotel Holdings and he didn't say

20        "Yes" and he didn't say "No", and he said if I wanted to

21        raise this, he should -- I should contact my lawyers,

22        which is fair enough.

23   Q.   And as far as Mr Buchanan was concerned when he gave

24        evidence, the only basis for raising any allegations of

25        bad faith against Mr Azima in relation to HeavyLift

1          would have been as a result of what was seen within the

2          hacked data.

3     A.   No.

4     MR TOMLINSON:  My Lord, that's not what he said.

5     MR LORD:  Sorry, in relation to the training academy.

6          I think he did say that.  I think that is what he said

7          at the end, my Lord.  I thought that was what he did

8          say.

9     MR TOMLINSON:  He said that there had been investigations

10         into the transfer of shares in HeavyLift.

11    A.   My Lord, I've already given --

12    JUDGE LENON:  Perhaps we'd better look at what he did say.

13    A.   My Lord, he'd had the benefit, by the 23rd of the 7th,

14         of the information from the two reviews by Dechert.

15    MR LORD:  Sorry, my Lord, I'll find it.  (Pause)

16         Yes, if you go to page 175, please, of the

17         transcript {Day3/175:1}, do you see at line 17,

18         Mr Gerrard, the question:

19         "There wouldn't be any relevance ..."

20         Can you see that?

21    A.   Yes.

22    Q.   Can you read down or be shown down to line 12 on

23         page 176 {Day3/176:12}.

24    A.   Sorry, down to ...?

25    Q.   Line 12 on page 176.

 1    A.  So you want me to start from the top --

 2    Q.  I was corrected -- I was interrupted by counsel for

 3        RAKIA on the basis that I had wrongly summarised what

 4        Mr Buchanan had said in this regard, but I don't think

 5        I did wrongly summarise it.  But I'll show you what

 6        Mr Buchanan said.  If you read the extract, so there can

 7        be no misunderstanding, starting at page 175 at line 11,

 8        down, please, to line 12 on page 176 for the transcript.

 9        Just read it to yourself {Day7/175:12}  (Pause)

10            Have you read that, Mr Gerrard?

11    A.  I'm still reading.

12    Q.  Oh, well, I think -- my Lord, I'm going to put the point

13        because I think I was right.  The first 12 lines of 176

14        involved Mr Buchanan twice confirming the position.

15    A.  The position being ...?

16    Q.  The position being that, as far as Mr Buchanan was

17        concerned, although there had been some investigation

18        into HeavyLift and there had been the training academy

19        claim -- as far as he was concerned, by 23 July there

20        was no basis to allege fraud or bad faith against

21        Mr Azima in relation to HeavyLift, including the

22        training academy, as far as he was concerned because

23        that only came from the hacked data.  Do you understand?

24    A.  No.  What I thought he was referring to here is our

25        HeavyLift investigations review, where the issues that

```
1          we were worried about was HeavyLift -- RAK had a 51%
2          share in HeavyLift.  We had -- the board didn't consist
3          of anyone from RAK.  There were board meetings without
4          anyone from RAK.  Only HeavyLift had access to the bank
5          signing-wise.  RAK had tried to put -- RAKIA had tried
6          to put people on the board and they were sacked within
7          two months.  It was a complete black box.  There was --
8          there were those sorts of issues.
9               Now, did we have evidence of fraud?  No.  But we
10         certainly had concerns as to what was going on.
11    Q.   I suggest, Mr Gerrard, that your reference there to
12         "challenging" -- the fact that you felt able to
13         challenge Mr Azima about bad faith in relation to
14         HeavyLift was because by this stage you knew what was in
15         the hacked data?
16    A.   Oh, I see.  Absolutely not.
17    Q.   And the same in relation to Eurasia Hotel Holdings.  By
18         this stage --
19    A.   No, I -- it was very clear to me that there was
20         bad faith there because I'd had the Cynthia -- KM's
21         emails and --
22    Q.   What are those?  Sorry.  What are you talking about?
23    A.   I had the Ray Adams emails -- I've already explained
24         this.  I had the Ray Adams emails to Cynthia Payne --
25    Q.   Dated when?
```

1    A.    -- on Eurasia Hotel Holdings.

2    Q.    Saying what?

3    A.    This was at the time of the Eurasia Hotel Holdings, and

4          they emailed RAK, RAK Ceramics, saying, "Here are the

5          Eurasia Hotel Holdings board minutes.  Farhad's signed

6          them.  Dr Massaad, can you sign them?"  Where were the

7          three Iranians?  No, just those two, and they, according

8          to the Panama Papers -- it was the Iranians who moved to

9          Eurasian Aviation Holdings, but not according to those

10         documents.  These documents suggested that Farhad Azima

11         and Dr Massaad had moved the name from one to the other.

12              So did I have evidence of fraud itself?  No, but

13         I had some really -- I had significant questions and it

14         looked very smelly to me.  That's the point I was

15         making.  And I have -- and if I may say that I have

16         never -- whilst he's a very -- he's a maverick and

17         a very likeable man, judging by his track record, seeing

18         what I could see, he runs with the hares and the hounds

19         and I didn't trust him.  That's for sure.  And I don't

20         think our client should have trusted him either.

21   Q.    It's right, isn't it, that when RAKIA entered into the

22         settlement agreement with Mr Azima in March 2016, on

23         your view of things they were entering into a settlement

24         agreement with somebody who may have committed some

25         serious frauds?

1    A.   They were entering into someone -- they were entering

2         into something with someone that we did not -- I did not

3         trust.

4    Q.   But you suspected had committed --

5    A.   I did suspect he had committed --

6    Q.   -- numerous frauds?

7    A.   Well, no, I didn't say that.  I suspected he was

8         involved in gun-running.  What I said was I didn't know

9         whether that was on behalf of a government or not.

10        There was evidence of rendition.  I don't know whether

11        that was in respect of a government or not.  I was

12        worried about HeavyLift.  I think we had been -- I was

13        going to say defrauded.  I think we'd been had.  So

14        I had numerous concerns.  Unfortunately, I hadn't got

15        hard evidence that I could sue or criminally prosecute

16        on.

17   Q.   It's right, isn't it, that -- did you tell the Ruler

18        prior to the entry into the settlement agreement that

19        you had these concerns?  Presumably you did share them

20        with your client, didn't you?

21   A.   That I would have thought is privileged, my advice to

22        the Ruler.  I'm a little confused as to how far I can go

23        now.  But suffice to say I think you already know

24        Mr Buchanan has let it slip of what my thoughts were.

25   Q.   It's right, isn't it, that RAK/RAKIA was effectively

```
 1          setting up Mr Azima through this settlement agreement
 2          in March 2016?  It was setting him up, wasn't it, in
 3          order that they could come after him subsequently if
 4          they saw fit?  It was a set-up, wasn't it, Mr Gerrard?
 5   A.     It wasn't a set-up.  We had no hard evidence.  I told
 6          you that I even took instructions showing the evidence
 7          we had at the time to another lawyer.  They too didn't
 8          think we had enough.
 9             My client was well aware of my concerns.  Their main
10          priority in my view -- because we're talking about
11          Farhad Azima -- was that they wanted to keep him sweet
12          because they wanted him to continue in attempting to
13          bring the two parties together.  That's my view.
14   Q.     Yes, so --
15   A.     So I do not accept your proposition that this was some
16          sort of trap.
17   Q.     So the settlement agreement was designed to keep
18          Mr Azima sweet.  So that was the carrot part of the
19          settlement agreement, wasn't it, Mr Gerrard?  That was
20          the carrot?
21   A.     It was, I think, an incentive to keep him in the game.
22   Q.     Yes, to keep -- for him to continue assisting RAKIA in
23          its negotiations with Dr Massaad.
24   A.     Correct.
25   Q.     And the stick I suggest comprised within the settlement
```

1    agreement was the good faith clause, which would allow
2    RAKIA to beat Mr Azima with that clause subsequently if
3    he did not in fact continue to assist them.  That's
4    right, isn't it?
5  A.  Well, I think it's a little bit more subtle than that.
6    I think it's a case of, "We don't trust you ..." --
7    I mean, it's a very similar clause to the Eurasia Hotel
8    Holdings clause, the Sheraton agreement.  It goes
9    a little further, but that's because we knew an awful
10   lot more about Farhad Azima at that stage or our
11   concerns were heightened by then.  So I don't really see
12   how this is substantially different.
13      We were saying, "Look ..." -- in fact, Mr Buchanan
14   even put it to him had he acted against us and he said
15   "No".
16      So this might very much fit with your claim, but in
17   reality the clause -- Mr Buchanan asked for a similar
18   clause to the Sheraton Hotel -- I didn't draft it, but
19   it's largely similar.  If you think the Sheraton clause
20   is a stick, then I'm afraid I can't help you.
21  Q.  I'm going to ask you about the discovery of the hacked
22   data, if I may now, please, Mr Gerrard.
23  A.  Yes.
24  Q.  The --
25  A.  Can I see my statement?

1   Q.  I'm sure you can.

2   A.  Thank you.

3   Q.  RAKIA's alleged discovery of the hacked data took place

4       in August 2016, didn't it, on RAKIA's account of things?

5   A.  Yes, I think so, yes.

6   Q.  Well, you know my client's account, that it had been

7       hacked into the previous year or some time

8       before August --

9   A.  I have only recently heard that, but, yes.

10  Q.  Well, that's the case -- all right? --

11  A.  Yes.

12  Q.  -- that by August 2016, RAKIA had already procured,

13      illegally, access to Mr Emails -- Mr Azima's emails.

14  A.  Yes.

15  Q.  Not "Mr Emails' Azimas".

16  A.  That doesn't quite work.

17  Q.  No, that's not as good.

18  A.  No.

19  Q.  It's right, isn't it, on RAKIA's explanation of how it

20      came into possession of this hacked data -- RAKIA's

21      account in the first instance involves three people.  It

22      involves Mr Page, Mr Buchanan and you, doesn't it?

23  A.  Yes.

24  Q.  And those are the three people who were involved in

25      Mr Page's project update discussion back in March 2015

```
 1          along with the Ruler, weren't they?

 2     A.   Sorry, repeat the question.  Sorry, who are the people

 3          involved?  Me, Mr Buchanan --

 4     Q.   And Mr Page.

 5     A.   -- Mr Page on that immediate discussion.  Others will

 6          have been brought in on the --

 7     Q.   I want to deal with the immediate discussion.

 8     A.   Okay, yes.  That's absolutely right.

 9     Q.   The initial discovery concerned Mr Page allegedly

10          discovering it through Mr Halabi --

11     A.   Yes.

12     Q.   -- and then exchanges variously between Page, you and/or

13          Buchanan, in which the matter was then moved forward.

14     A.   That's right, my Lord.

15     Q.   So what I was putting to you was it was -- the three

16          people, if you like, who were initially involved in the

17          discovery of this hacked data of Mr Azima's were in fact

18          the three people who, along with the Ruler, were

19          discussing Mr Page's March 2015 project update --

20     A.   Yes, my Lord.

21     Q.   -- which update included Mr Page signing off in relation

22          to Mr Azima by saying that, "We would be able to gather

23          intelligence and monitor their activities".  Do you

24          remember that?

25     A.   And have a plan.
```

1    Q.   Yes.  Do you remember that?

2    A.   I do.

3    Q.   Yes.  Now, it's right, isn't it, that by July and August

4         2016 there were other agents working for RAK or RAKIA

5         apart from Mr Page, you and Mr Buchanan?

6    A.   Yes, that's correct.

7    Q.   Bell Pottinger were working at that time, weren't they?

8    A.   They were.

9    Q.   Can we go, please, to {Day4/172:1}, to the

10        re-examination of Mr Buchanan yesterday by my learned

11        friend.

12   A.   Day 4/172?

13   Q.   Yes, Day 4/172.

14   A.   What line?

15   Q.   Well, it starts at {Day4/172:18}.  Mr Buchanan was asked

16        whether Bell Pottinger were instructed to look for

17        material relating to Mr Azima in August or July

18        and August 2016, and he said:

19             "Answer:  Following my meeting with Mr Azima in

20        the January, I did ask Bell Pottinger to keep an eye out

21        as well."

22             Can you see that?

23   A.   Yes.

24   Q.   Then he was asked about Digitalis:

25             "Question:  And were Digitalis instructed as far as

```
 1          you're aware?
 2               "Answer:  I asked them the same question."
 3               Can you see that?
 4     A.   Yes.
 5     Q.   So it looks, doesn't it, according to Mr Buchanan, as if
 6          Bell Pottinger and Digitalis were both on the look-out
 7          for information concerning Mr Azima by August 2016?
 8     A.   Yes, I'm not sure that's a fair summary and I'm not sure
 9          what --
10     Q.   I'm sure you know where this line of questioning is
11          going, Mr Gerrard.
12     A.   I absolutely know, but --
13     Q.   You're a bright chap.  You know where it's going --
14     A.   I know where it's going, but --
15     Q.   And you're now trying to qualify --
16     A.   No, no, I'm not.
17     Q.   -- what your client has said in order to try to
18          fashion --
19     A.   No, I think Mr Buchanan is talking about Azima in the
20          round because I was present at the Bell Pottinger
21          meetings, I think, and I certainly was present in the
22          meeting with Dechert.  Dechert -- we also reported to
23          Dechert our concerns and it was a much more -- it wasn't
24          about Farhad Azima as such, but when you told a story
25          Azima was involved.  But the focus was, "There is going
```

1          to be a campaign against the client, Dechert, me", etc.

2          No one focused on Mr Azima, but Mr Azima was part of the

3          story.  That's my -- that's my recollection of those

4          discussions.

5   Q.   And that was the focus also for Mr Page's work as well,

6          as you understood it, was it?

7   A.   I don't think I was there for any discussions with

8          Mr Page, but the way Mr Buchanan was briefing people,

9          including Andrew Frank, was that there was this

10         blitzkrieg coming.  It was going to be driven by

11         Dr Massaad.  No one expected Dr Massaad emails flying

12         around.  They expected emails on Dechert, they expected

13         emails on me, they expected emails on RAK.  That's what

14         people were looking for.  But the briefing that was

15         given was of the wider story.  That's what was there

16         when I had the meeting with Bell Pottinger.  That was

17         the meeting we had with Mr Frank.  I wasn't there for

18         the Page meeting.

19   Q.   What about Digitalis?

20   A.   I wasn't there for the Digitalis meeting.

21   Q.   If you go to page {Day4/173:1}, you will see that the

22         questioning ran on of Mr Buchanan, starting at line 1.

23         "Question:  And what did you ask Mr Page in that

24         regard?"

25   A.   Sorry, where are we now?

```
 1   Q.  At the top, line 1.  The answer was:
 2           "Answer:  I asked him to keep his ear out to see
 3       whether he came across any adverse media or the
 4       beginnings of any adverse media on the internet."
 5   A.  Yes, and that's exactly what I expected --
 6   Q.  And that's what you're describing now, is it?
 7   A.  Yes, exactly, and that is what I understood, and that is
 8       exactly what we reported to the main board of Dechert:
 9       there was a problem coming down the track, there was an
10       adverse media programme aimed at a number of people,
11       including me, and we needed to be ready to deal with it.
12       That was why Andrew Frank and others were preparing to
13       be able to respond to this adverse press campaign.
14   Q.  And the questioning ran on.
15           "Question:  Adverse media relating to ...?"
16       And then Mr Buchanan answered:
17           "Answer:  Adverse media relating to Ras Al Khaimah,
18       the Ruler, Dechert and myself."
19   A.  Precisely.
20   Q.  And then a leading question was asked:
21           "Question:  And was that what you were asking
22       Bell Pottinger to look out for?"
23       And Mr Buchanan said?
24           "Answer:  Yes, it was.
25           "Question:  And Digitalis?"
```

1           And he said:

2           "Answer:  [Yes] and Digitalis."

3           Can you see that?

4     A.   Yes.

5     Q.   So on that account it looks as if what Mr Page had been

6          asked to look out for is the same thing as

7          Bell Pottinger and Digitalis had been asked to look out

8          for, and that's your evidence, I think, isn't it,

9          Mr Gerrard?

10    A.   Yes, but I also said --

11    Q.   Thank you.

12    A.   I also said -- am I allowed to answer that?

13    Q.   You said "Yes".  I thought that might be an answer.

14    JUDGE LENON:  Well, he can carry on.

15    MR LORD:  All right.

16    A.   Thank you, my Lord.  I also said that Mr Buchanan has

17         a habit of explaining things in the round, so he will

18         have mentioned -- he will have told the story.  So the

19         end result will have been that there's a media campaign

20         coming down the track, Ras Al Khaimah, Dechert, etc, but

21         he will have put it into context by, if you like, that

22         last bit on the Page report, that Farhad was involved,

23         Dr Massaad was involved.  That was the way -- he had

24         a habit of putting things into context.

25    Q.   But it looks as if, if that account is right, what

```
 1              Mr Page had been asked to keep an eye out for was the
 2              same or very similar to what Bell Pottinger and
 3              Digitalis had also been asked to keep an eye out for.
 4      A.      Yes, I would have -- yes.  I have no idea, I wasn't
 5              there, but the issue I was taking with the previous --
 6              I'm sorry, you've asked me a question.
 7      Q.      You give very long answers to every single question.
 8              All I asked you was whether or not --
 9      A.      I think --
10      Q.      I asked you whether the compass of the work -- from that
11              evidence, from your client, whether or not the scope of
12              the reconnaissance which Mr Page was doing seems to be
13              the same as Bell Pottinger and Digitalis on
14              Mr Buchanan's evidence.
15      A.      I disagree because the reference you initially showed me
16              was about looking out for Farhad Azima.  All I said was
17              that that's not my understanding, and you've now brought
18              me to the correct reference that I understood was the
19              general, "Look out for this".
20      Q.      And so, as you understand it, Mr Page and Digitalis and
21              Bell Pottinger were all looking out for the same thing?
22      A.      Well, I wasn't there for all the briefings, but, as
23              I said to you, Mr Buchanan had a habit of explaining the
24              whole thing, the Page bit, who was involved, but the
25              bottom line was, "Look out for adverse media in respect
```

1           of His Highness, RAK", etc, etc.  That's what he was

2           doing.

3                The transcript you showed me earlier seemed to

4           suggest, as far as Bell Pottinger was concerned, that

5           they were to look out for Farhad Azima.  That was what

6           I was taking issue with, whereas this one is what

7           I understood to be correct.

8    Q.   So you're happy with the evidence -- or the description

9           that's given on page {Day4/174:1}?  Is it 174?  What's

10          the reference?

11   MR TOMLINSON:  My Lord, the witness has already said three

12          or four times that he doesn't know what Stuart Page or

13          Digitalis were told and he's been asked again and again

14          whether he can confirm what they were told.

15   MR LORD:  I don't think that's a fair criticism, my Lord.

16          I've been trying to establish very simply what

17          Mr Buchanan, as the client, said were the retainers of

18          these various people at the time, pointing to

19          Mr Buchanan's own evidence in court.

20   MR TOMLINSON:  That's not something he can cross-examine

21          this witness about.

22   JUDGE LENON:  It seems to me we've covered this point quite

23          thoroughly.

24   MR LORD:  It's right, isn't it, Mr Gerrard, that there's no

25          evidence that Bell Pottinger came across the hacked data

1           online before Mr Page did?

2    A.    I don't believe so.

3    Q.    No evidence of them coming across it at the same time at

4           all, is there?

5    A.    No.

6    Q.    The only evidence of any RAK agent or consultant who had

7           come across the hacked data on the web whilst working

8           for RAK or RAKIA is Mr Page, isn't it?

9    A.    I think it was Mr Halabi.

10   Q.    One of Mr Page's contacts?

11   A.    Yes, Mr Halabi.

12   Q.    And none of the other agents or consultants who were

13          working at that time for RAK or RAKIA, like

14          Bell Pottinger or Digitalis, came across the material

15          themselves, did they?

16   A.    I've already said they didn't.

17   Q.    No, and that's despite the fact that, I think on your

18          evidence, they were all looking -- Bell Pottinger,

19          Digitalis and Mr Page were all looking for the same

20          thing, which was news about the campaign rather than

21          material specific to Mr Azima?

22   A.    Well, I don't know what they plugged in.  All I -- I'll

23          repeat again.  When Mr Buchanan, in my presence -- he

24          would tend to tell the overview, if you like the Page

25          sort of summary, and then would say, "So we understand

1   there's this blitzkrieg coming down the track and it's

2   going to be focused on ..." what you have on page 173

3   at 6 {Day4/173:6}.

4    So I have no idea -- so, for example, I've no idea

5   who was plugging in what, but certainly no one found the

6   report -- the link other than Mr Halabi.

7 Q. And it's right, isn't it, that the websites which led

8   Mr Page and Mr Halabi to this treasure-trove, they were

9   in fact boasting about exposing Mr Azima, weren't they?

10 A. Yes, that's true.

11 Q. They weren't actually boasting about information in

12   relation to any campaign against RAK or RAKIA, were

13   they?

14 A. I don't believe they were.

15 Q. Do you know how the hacked data -- Mr Azima's online

16   data -- was first analysed on behalf of RAK or RAKIA and

17   are you at liberty to give any evidence about that?

18 A. I think it's already in the witness statements,

19   isn't it?  It's in my witness statement.

20 Q. I take it that you can be asked about that?

21 A. Well, it's in my witness statement.

22 Q. There's no privilege issue; is that right?

23 A. It's in my witness statement.

24 Q. Just who did it and when and how?  How did that process

25   unfold?  Who did it?  You?  Did you go somewhere and

 1          look at an archive?  What happened?

 2     A.   Sorry, what's the question?  I thought the question was

 3          what process did I undertake to get these things

 4          downloaded.

 5     Q.   When the hacked data had been downloaded --

 6     A.   Oh, when it had been downloaded.  Okay.

 7     Q.   After it had been downloaded --

 8     A.   Sorry.  You weren't clear.

 9     Q.   -- and it had been, if you like, officially brought into

10          RAKIA's possession --

11     A.   Yes, absolutely, yes.

12     Q.   I don't want you to answer something if there's going to

13          be a privilege objection which applies, but are you at

14          liberty to explain to his Lordship the way in which that

15          hacked data was in fact analysed?

16     MR TOMLINSON:  My Lord, the question is ambiguous because if

17          it's -- if the question is, "Can you explain the process

18          by which it's done, the way?", doubtless that's by

19          electronic searches and so on and this witness may or

20          may not be able to answer it.  If it's a question about

21          who then tried to work out what the documents meant and

22          what their legal implications were, then that's

23          obviously privileged.

24     MR LORD:  Mr Gerrard, I think I'll move on in view of that

25          privilege point being taken, and I'd like to ask you,

1   please, about the way in which this material was

2   downloaded from the internet on behalf of RAKIA, if

3   I may.

4    Could you go to {H10/251} please?  You've said in

5   your witness statement that you I think reached out --

6   that's your word, I think -- to Mr del Rosso as part of

7   this downloading process.

8 A. Yes, I apologise for that term.  It's working in an

9   American law firm for too long, my Lord.

10 Q. It's not a particularly felicitous phrase.

11 A. No.

12 Q. But if you go to {D/7/5} at paragraph 19, you say:

13    "After my initial call with Stuart Page, I decided

14   to reach out to Nick del Rosso."

15    Now "reach out" tends to be a bit of a fudged

16   expression, Mr Gerrard, masking a more precise

17   description.  So why did you decide to in effect ask

18   Mr del Rosso to take over this matter?

19 A. I wasn't asking him to take over.  I considered what our

20   options were and I was worried about the fact that

21   Farhad Azima appeared to have ex -- or was current, I've

22   no idea -- CIA connections.  I'd come across a gentleman

23   called Mr Chris Swecker who was a lawyer -- is

24   a lawyer -- and was the deputy director of the FBI, and

25   I wanted to seek his counsel as to did he know

1          appropriate people who were beyond repute and were

2          capable of undertaking this task.

3              I discussed that also with Nick del Rosso and the

4          name -- gosh, I've forgotten the name of the company

5          that did it.  NTi?  NTi.  The name "NTi" came forward.

6          So it was speaking to Nick del Rosso as to, "Can I speak

7          to your lawyer, please?", and that's how it came about.

8     Q.   It's right, isn't it, that there had been investigations

9          into Dr Massaad and his activities for at least

10         18 months by now?

11    A.   That's correct.

12    Q.   And there had been quite a lot of monitoring of the

13         internet over that time, hadn't there, on behalf of RAK

14         or RAKIA?

15    A.   Over what time?

16    Q.   Well, let's say during 2016, let's say.

17    A.   I don't -- I wasn't aware of monitoring of the internet.

18    Q.   And this particular piece of information caused -- well,

19         if you go to {H10/251}, which I think I was going to ask

20         you about, and go to {H10/251/2}, you can see that

21         Mr del Rosso gets in touch with Mr Swecker of -- can you

22         see Mr Swecker?

23    A.   No.  Where are we?

24    Q.   "Chris" on August 9, 2016.

25    A.   Yes.

```
 1   Q.   You see what's said there.  Have you seen this email
 2        before, Mr --
 3   A.   No, I haven't.
 4   Q.   Do you want to read it then, please?
 5   A.   Yes.  (Pause)   Yes, I've read it.
 6   Q.   You can see that by 9 August 2016 and presumably as
 7        a result of your reaching out to Mr del Rosso,
 8        Mr del Rosso was recording here the proposal to retain
 9        NTi to carry out this downloading exercise.  Can you
10        see?
11   A.   Yes, well, this isn't my email, but that's what I see.
12   Q.   No, I'm just -- that's not your email.  And it was going
13        to be set up, wasn't it, through VMS -- that's --
14        Mr del Rosso was effectively setting this up for you at
15        this point?
16   A.   Yes, yes, he was certainly -- he was certainly dealing
17        with the -- on a daily basis with NTi and Chris Swecker,
18        yes.
19   Q.   And he was proposing to retain NTi --
20   A.   Correct.
21   Q.   -- to do the downloading?
22   A.   Correct.  That's what we'd agreed.
23   Q.   This was quite a formal and substantial arrangement that
24        was being put in place by RAKIA, wasn't it, in order to
25        download the material that Mr Halabi had apparently
```

1      found?

2  A.  Well, we had no idea at this stage, my Lord, how

3      substantial it was.  I didn't know whether there were

4      ten emails or 10,000 emails.  So frankly, at this stage,

5      particularly me anyway -- no doubt an expert could have

6      told you immediately -- but at this stage I had no idea

7      as to the extent of the material on the web, no idea at

8      all.

9  Q.  Well, you see, Mr Gerrard, the puzzling thing here is

10     that this degree of arrangement is set in place to

11     download this material seemingly before anyone on the

12     RAKIA side of things has actually accessed the site to

13     see what it in fact contains.

14 A.  Correct.

15 Q.  You see, Mr Gerrard what I suggest to you -- I'll ask

16     you first: had this sort of arrangement been put in

17     place for any other potentially exciting bits of online

18     discovery in relation to Mr Azima or was this the first

19     occasion when this sort of arrangement was put in place?

20 A.  This -- we did try to get involved downloading the

21     Panama Papers, but that was unable -- we couldn't do

22     that and so we had to wait like everyone else, later.

23     This was the first time anything had come up on the

24     internet unannounced, as it were, so I don't really

25     understand why you're surprised about this.

```
 1    Q.  Well, it seems a bit puzzling that Mr Halabi,
 2        a journalist, reports some links to BitTorrent sites and
 3        says he hasn't accessed it and you set in train the
 4        offices of VMS, NTi, to get an ex-FBI internet expert to
 5        do the downloading.  It just seems like a sledgehammer
 6        to crack a nut, Mr --
 7    A.  Actually, I don't think it is.  If I was to go to the
 8        Big Four, that might be a sledgehammer to crack a nut.
 9        But these were people who were American and
10        understood -- were very able and I thought would manage
11        the process on Chris Swecker's view, and I think he was
12        right.
13    Q.  The reason is, Mr Gerrard, I suggest to you, that you
14        knew by the time of this alleged discovery through
15        Mr Page what was actually comprised within the hacked
16        data, didn't you?
17    A.  I didn't, my Lord.
18    Q.  And you knew it contained confidential and privileged
19        material from Mr Azima's email records, didn't you?
20    A.  I certainly assumed that it was going to because it
21        looked like a hack.
22    Q.  And that's why you put in place this significant
23        operation to download the material because you already
24        appreciated its value to RAK and RAKIA, didn't you?
25    A.  I didn't appreciate its value, but I knew it was going
```

1            to involve confidential information for sure.

2        JUDGE LENON:  Would that be a convenient moment?

3        MR LORD:  Yes, my Lord.  Sorry.  I apologise.  Yes.

4        (3.19 pm)

5                              (A short break)

6        (3.25 pm)

7        MR TOMLINSON:  My Lord, can I just check on the timetable

8            the position because I have Mr Halabi and Mr Page in

9            court.  Mr Halabi was expecting to catch a flight

10           tomorrow lunchtime, but that looks like it might not be

11           possible now.  Perhaps Mr Lord could just indicate when

12           he thinks he's likely to finish with this witness and

13           then go on to Mr Halabi so I can probably release them

14           both from court today if ...

15       MR LORD:  I think I'll be another 45 minutes with this

16           witness, my Lord, probably about 4.10/4.05.

17       MR TOMLINSON:  My Lord, I think with re-examination that

18           probably means that they can be released today.

19       MR LORD:  I agree.

20       JUDGE LENON:  Yes.

21       MR TOMLINSON:  If we finish by happenchance early, then

22           we'll have to rise early.

23       JUDGE LENON:  What about Mr Halabi?

24       MR LORD:  Sorry?

25       JUDGE LENON:  What about tomorrow?

```
 1    MR LORD:  Tomorrow is Mr Halabi.

 2    JUDGE LENON:  Yes.  How long do you think that's going to

 3       take?

 4    MR LORD:  I think probably about a couple of hours, I would

 5       think.  Maybe an hour and a half.

 6    MR TOMLINSON:  Well, my Lord, we'll factor that into the

 7       flight booking.

 8    JUDGE LENON:  Yes, thank you.

 9    MR LORD:  It won't be more than two hours even on my

10       estimate.

11          May it please your Lordship, Mr Gerrard, I'm going

12       to ask you about your involvement with the actual

13       discovery of the hacked data now, if I may, please.

14          If you go to your witness statement, please, at

15       {D/7/4}, at paragraph 17 you refer to a conversation or

16       conversations with Mr Page.  Can you see that?

17    A.  Paragraph 17?

18    Q.  Paragraph 17, yes, Mr Gerrard.

19    A.  Yes.

20    Q.  You see what you say there?

21    A.  Yes.

22    Q.  And you give evidence that you spoke to Mr Page around

23       that time.

24    A.  Yes.

25    Q.  It looks as if, from that paragraph, you think you may
```

```
 1          have had a second call with Mr Page shortly after the
 2          first one.
 3     A.   No, I think I only had one call.
 4     Q.   With Mr Page, right?
 5     A.   With Mr Page.  I think the way it is -- and forgive me
 6          if the statement isn't clear, my Lord -- I had a call
 7          from -- I'm pretty sure of this -- I had a call from
 8          Mr Buchanan first, who had apparently had a call from
 9          Page, and Buchanan said, "Please call Neil", which he
10          did -- or I called him.  I'm not sure which, but that's
11          when Mr Page and I spoke.
12     Q.   So you think that you probably only had one call with
13          Mr Page?
14     A.   It says there -- sorry -- "... shortly afterwards and
15          then later on we had a second call."  Yes, yes, that's
16          right.  We only had one call that day.  The second call
17          I think was later on.
18     Q.   How much later on?
19     A.   There was a call from Mr Buchanan that said that he'd
20          been speaking to Page who -- he didn't quite understand
21          what was going on or he wasn't very clear, could I give
22          Page a call, which I did, and Mr Page was talking about
23          he thought he knew where the hack had come from, from
24          the UAE.  I said, "How?  Why?"  I wasn't very --
25          I didn't really understand what he was saying, and that
```

1           was it.

2    Q.    Can you go to paragraph 18, please, of your statement,

3           at {D/7/5}?

4    A.    Yes.

5    Q.    You say this:

6               "On the first call [that's the first call with

7           Mr Page] there was discussion of some links (I believe

8           there were two but I cannot clearly remember) ..."

9               Can you see that?

10   A.    Correct, yes.

11   Q.    You say:

12              "Stuart Page gave me the details [to] the link(s)."

13              Can you see that?

14   A.    Yes.

15   Q.    So your evidence I think is that in that first

16          conversation with Mr Page he gave you the details of two

17          links; is that right?

18   A.    Link or links, yes.

19   Q.    Well, is it one link or two links?

20   A.    I genuinely can't remember.

21   Q.    Presumably, Mr Gerrard, this is the sort of thing that

22          you'd be likely to jot down in your daybook?

23   A.    Yes, but it -- I don't think it's there because I've

24          looked for it because I've been looking for the link.

25          I've obviously put it down on a piece of paper.  And the

```
 1            reason why I think I've written it down is, knowing
 2            Mr Page, he's unlikely to be able to send it to me by
 3            email because -- I don't think I've ever had an email
 4            from Stuart Page.  Texting it would be impossible.  So
 5            I assume he must have dictated it to me over the phone
 6            and I'll have written it down.
 7    Q.      Isn't the daybook the most obvious place for you to
 8            record?
 9    A.      Yes, it is, and unfortunately it's not always with me,
10            and I don't know where I was when I took the call.  But
11            it's not in my daybook.
12    Q.      Does your daybook record you having a call with Mr Page
13            at or around this time?
14    A.      No, it doesn't.  I won't necessarily put every single
15            call in my daybook.
16    Q.      Could you go to {H10/246} please?  Sorry -- yes,
17            {H10/246}.  You can see that this is 9 August 2016.
18    A.      Yes, I haven't seen this email before.
19    Q.      You can see that things are being put into place by
20            9 August, aren't they, 9 August 2016?
21    A.      Yes, things are being put in place, yes.
22    Q.      If you go to {H10/251}, you can see the way it develops.
23            Go to {H10/251/2}.  You've read this email already
24            today.  Mr del Rosso wrote on 9 August 2016 --
25    A.      I'm not there yet.
```

 1   Q.  You don't have to read it all again because you read
 2       it --
 3   A.  I might want to.  251, yes?  Which part of the email?
 4   Q.  Well, shall I tell you which part and then it will
 5       become clear?
 6   A.  Yes, please.
 7   Q.  Mr del Rosso is writing to Mr Swecker on 9 August 2016.
 8   A.  Yes.
 9   Q.  He says:
10           "I've spoken to Rich Garcia [he is at NTi] and
11       agreed that you will instruct his company on this
12       matter."
13   A.  No, I'm sorry, I'm not on the right page.  Thank you
14       very much.  Oh, this one, yes.
15   Q.  "I've told him that as recently as last week -- we were
16       advised by researchers that a deep web search indicated
17       that data relating to Farhad Azima was on ... site ...
18       thepiratebay.org/torrent ... and we'd initially like to
19       learn exactly what is there.  In addition, over this
20       past weekend, we were told that another site ...
21       monova ... also held either the same or additional
22       information on Azima and indications that there may be
23       further sites with more information.  I'm not sure if
24       the deep web is the same as the dark web, but I'm sure
25       NTi will know."

```
 1              Can you see that?

 2   A.   Yes.

 3   Q.   So his Lordship can take it, can't he, Mr Gerrard, that

 4        by 9 August 2016 these two sites -- piratebay and

 5        monova -- seem to have been identified and the links

 6        obtained on the RAKIA side of things?

 7   A.   Yes.

 8   Q.   Where you see "as recently as last week", "last week",

 9        the Friday would be --

10   A.   Yes, I take issue with that because I only got the

11        information on the 9th.  I don't know when Mr Halabi got

12        it, but I would have -- I didn't ask when we found the

13        information so I don't know where Mr del Rosso gets that

14        from.

15   Q.   So you think that you only got this information on

16        the 9th --

17   A.   Well, I know I got the information on the 9th and I know

18        I passed that on.  I don't know when Mr Halabi got it.

19        I didn't ask, "Oh, how long have we had this

20        information?"  I'd assumed that it was fairly promptly

21        after we found it, but -- so -- and I certainly didn't

22        tell Mr del Rosso when we got it.  So I don't know where

23        he's got that date from.

24   Q.   And how do you know that it was 9 August when you spoke

25        to Mr Page?
```

```
 1    A.   Because I've got an email from him somewhere in my
 2         bundle saying that I spoke to him on the 9th --
 3         referencing that he spoke to me on the 9th.  Yes,
 4         I think so.
 5    Q.   You got an email from Mr Page?
 6    A.   Or there's an email -- I'm pretty sure I've seen an
 7         email --
 8    Q.   There's no email.
 9    A.   Isn't there?  I'll just check.
10    Q.   Just find the document you're thinking about.
11    A.   Where are the ...?  Sorry.
12    Q.   You see, in your witness statement, you say -- you say
13         in your witness statement in paragraph 17 {D/7/4} --
14         we've been to it already this afternoon:
15             "I do not remember exactly when, but in early
16         August 2016 ..."
17             And so it runs on.
18    A.   Okay.
19    Q.   You're not giving a date there.
20    A.   No, I'm not, but I know that it was very early August,
21         as in that week.
22    Q.   Right.  So could it have been as early as 5 August,
23         then?
24    A.   No, I'm pretty sure I will have called him either
25         the 8th or the 9th, looking at the emails.  I can't --
```

```
 1              I can't imagine I'll have called him mid the week before
 2              and he started moving on things.  I regarded this as
 3              urgent and I'm sure I've seen an email which suggests
 4              that he'd just spoken to me, to one of these other
 5              gentlemen.  Anyway ...
 6      Q.   Right, well, his Lordship has your evidence on that.
 7              You think 9 August was when you --
 8      A.   8 or 9 August is when I think I spoke to him.  It could
 9              have been over the weekend, but I doubt it.
10      Q.   Because it looks from this email, doesn't it, as if
11              Mr del Rosso thinks the discovery was perhaps as early
12              as Friday, 5 August, doesn't it?
13      A.   That's certainly what he says.
14      Q.   Yes.  And he describes a two-pronged process, doesn't
15              he, where the first website is found last week and then
16              over the weekend another site has come to light.  That's
17              what he's describing, isn't he?
18      A.   Yes, but I think he's wrong.  I think I gave him one or
19              two links.  I don't remember a second phone call to him
20              until much later.
21      Q.   It was you, wasn't it -- it was you who put Mr del Rosso
22              on to this matter, wasn't it?
23      A.   Yes.
24      Q.   So he's likely, isn't he, to have got his information
25              from you?
```

1    A.   Yes.

2    Q.   So can you explain why he's described what he has in

3         that big paragraph at {H10/251}?  Can you give an

4         explanation for why he describes something happening on

5         5 August and then something over the weekend, if this

6         has all come from you?

7    A.   No.

8    Q.   Your evidence is that you discovered it on 9 August?

9    A.   No, my evidence is in early August.  I happen to think

10        it was the 8th or the 9th, but I may be wrong.  But

11        early August is my evidence.  I don't think it was --

12        I don't think I'd have sat on it for over a week or half

13        a week or whatever.

14   Q.   No.  Could you go to {H10/258}, please?

15   A.   Yes.

16   Q.   This is 15 August.

17   A.   Yes.

18   Q.   You said:

19             "I've had another call from Stuart ..."

20   A.   Yes.

21   Q.   But that's after the emails I've just taken you to from

22        Mr del Rosso.

23   A.   That's correct.

24   Q.   You see what that says.  Can you see that?

25             If you go to {H10/257}, you see the full thread.

```
 1            You see your email --

 2    A.   Sorry, what number?

 3    Q.   {H10/257}.

 4    A.   Yes.

 5    Q.   You see your email of 15 August 2016 to Mr del Rosso:

 6                "Nick,

 7                "I've had another call from Stuart ..."

 8                That's Stuart Page, is it?

 9    A.   That's correct.

10    Q.   "... who confirms again that there is a website on FA.

11         He seems to think it's been generated from a UAE

12         source."

13    A.   Yes.

14    Q.   "I've asked for details.  He said he would try and get

15         them to me.  Can you undertake a search for it?"

16    A.   Yes.

17    Q.   Did you ask Mr Page for details?

18    A.   I assume so.

19    Q.   There's no evidence of any details being supplied from

20         Mr Page, is there, to you in response to what you've

21         said here?

22    A.   What, to Mr del Rosso?

23    Q.   You said, "I've asked for details".

24    A.   Yes -- no, I appreciate that.

25    Q.   Sorry, I thought you were asking -- I thought this meant
```

1         you had asked Mr Page for details.   I'm sorry.

2    A.   I thought I was asking for details about the UAE source.

3    Q.   And would you have jotted down in your daybook the fact

4         of these further -- any further calls in this matter?

5    A.   No.

6    Q.   In other words, if you had another call with somebody or

7         there was some -- you know, "need details on source",

8         wouldn't you jot --

9    A.   No, these were short conversations which I don't think

10        I'd -- I might have done, but I don't think I would have

11        done.

12   Q.   And then you see that Mr del Rosso responds:

13            "Hi Neil.

14            "Okay -- following up on our last conversation

15        regarding Stuart's findings, I instructed NTi to search

16        and recover what may be on them ..."

17   A.   Yes.

18   Q.   "... that's underway and I'm sure they'll try to analyse

19        where the sites came from."

20   A.   Yes.

21   Q.   This is 15 August, isn't it?

22   A.   Yes.

23   Q.   We've seen that the downloading operation was put in

24        place on 9 August, haven't we?

25   A.   Yes.

```
 1    Q.   And it was well underway by the time of the 15th,

 2         wasn't it?

 3    A.   I don't know the ins and outs.  I think it took quite

 4         a time to set it up and start the process.  I don't

 5         think it was that straightforward.

 6    Q.   So it's puzzling, isn't it, that Mr del Rosso is

 7         apparently informing you of the fact of this NTi

 8         downloading when it's already been going on for several

 9         days?

10    A.   Well, I knew it had.  He told me.

11    Q.   If we read on, Mr del Rosso says this:

12             "If Stuart can provide you the site addresses he is

13         finding we may be able to avoid duplicating efforts.

14         How does he know it was set up in the UAE?"

15    A.   Correct.

16    Q.   "I expect we'll get initial results this week."

17             And you responded:

18             "Okay, thanks.  No idea why he says it emanates from

19         the UAE.  I will ask."

20    A.   Yes.

21    Q.   So the way you'd left it with Mr del Rosso on 15 August

22         is that you were going to go and try to obtain answers

23         to various queries that he'd raised.  That's right,

24         isn't it?

25    A.   What it says is I'm going to ask why Stuart says it
```

```
1              emanates from the UAE.

2    Q.   Did you ever do that?

3    A.   Yes.

4    Q.   And who did you ask?

5    A.   Stuart.

6    Q.   Stuart Page?

7    A.   Yes.

8    Q.   Did you phone him up again?

9    A.   Yes.

10   Q.   You had his number, did you?

11   A.   Yes.

12   Q.   And when was this conversation?

13   A.   I'm -- I don't know.  I'm guessing it would be the same

14        day.

15   Q.   And what did he tell you?

16   A.   I didn't -- well, by the time I asked him, he -- and, by

17        the way, this is round about the same time that

18        Jamie Buchanan called me to say, "I don't understand

19        what's going on".  When I spoke to him, I think he'd

20        changed his mind that it might not be from the UAE and

21        he didn't -- frankly, I'm not very familiar with IT,

22        etc, it didn't make much sense to me and I don't think

23        he fully understood either.

24   Q.   And did you relay this to Mr del Rosso?

25   A.   Yes, I did.
```

```
 1    Q.   How did you relay it?

 2    A.   I'll have phoned him up.

 3    Q.   Can you see your response at the top of page

 4         {H10/257} --

 5    A.   Sorry.  Say that again.

 6    Q.   At {H10/257} you've responded to Mr del Rosso's email on

 7         15 August that says "Hi Neil".

 8    A.   Yes.

 9    Q.   You've said:

10            "Okay, thanks.  No idea why he says it emanates from

11         the UAE.  I will ask."

12    A.   Okay.

13    Q.   I think you've given evidence now that you probably went

14         off and spoke to Mr Page, what, quite shortly after

15         this?

16    A.   I'd have thought so.

17    Q.   And got back to Mr del Rosso that day, in all

18         likelihood?

19    A.   I would have thought so.

20    Q.   So that would have been 15 August, wouldn't it?

21    A.   Yes, I would have thought so.

22    Q.   And then if we go to {H10/263}, you can see that two of

23         the same emails in that last thread are there.  There's

24         your email of 15 August and there's Mr del Rosso's

25         response of 15 August.  Can you see?  Can you see that?
```

```
 1    A.   I am looking.  If you give me a time to read it.

 2         (Pause)   Yes.

 3    Q.   And at the top of that page, {H10/263} -- yes, you're

 4         right to look back because you seem to respond again to

 5         Mr del Rosso's 15 August email, but this time you're

 6         responding on 16 August 2016 and you're responding

 7         slightly differently.

 8    A.   Yes.

 9    Q.   You're now saying, "Okay.  Will ask him for details" --

10    A.   Well, it's the following day.

11    Q.   -- when in the previous response you say:

12         "Okay, thanks.  No idea he says why it emanates from

13         the UAE.  I will ask."

14    A.   But it's also -- isn't it also the following day?

15    Q.   Yes.

16    A.   It's a different email.  So I've got one on the 15th of

17         the 8th saying -- have I? -- I'll chase it up, which

18         is --

19    Q.   No, you've got -- Mr Gerrard, you've got the same email

20         from you on 15 August.

21    A.   So on 15 August I say:

22         "No idea.  I'll ask."

23         And then the following day I say:

24         "Okay.  [I] will ask him for details."

25    Q.   So the point I'm putting to you is there's the same
```

1       email from you to Mr del Rosso and the same email back

2       from him on these two pages, but on {H10/257}, on the

3       15th, you say:

4           "Okay, thanks.  No idea why he says it emanates from

5       the UAE.  I will ask."

6  A.  Yes.

7  Q.  And you've given evidence that you think that shortly

8       after then, on that day, you'd have spoken to Page and

9       got back to del Rosso, so that deals with 15 August.

10      And then we get on to {H10/263}, which is the next day,

11      16 August, when you send the response back to

12      Mr del Rosso by email that we see there set out:

13          "Okay.  Will ask him for details."

14  A.  Yes.

15  Q.  Now on your evidence you've already got back to

16      Mr del Rosso by this stage.  You wouldn't have forgotten

17      that by the time you came to write the email at

18      {H10/263}, would you, Mr Gerrard?

19  A.  Well, I don't understand this at all, but I seem to be

20      replying to his 15 August.

21  Q.  What I suggest you're doing here, Mr Gerrard, is you are

22      creating a paper trail at {H10/263}, aren't you?

23  A.  What, "Okay.  Will ask him for details" is the paper

24      trail?

25  Q.  Yes.

```
 1    A.   I've no idea what that's about.

 2    Q.   Thank you.

 3    A.   And, no, I was not creating a paper trail.

 4    Q.   But you can give no explanation for why you appear to

 5         have sent this response at {H10/263} back in

 6         circumstances where you've already responded and had

 7         a call --

 8    A.   No, I thought I'd already responded -- I said I could --

 9         I would have thought I'd have got back to him as quickly

10         as possible.  Quite why I would email again and say,

11         "Okay.  Will ask him for details", I just do not know.

12         Maybe he said, "Where is it?"  I've no idea.  But it

13         doesn't make any sense to me.

14    Q.   And if we go, please, to an email that you received on

15         16 August 2016 at {H10/262}, you got this email from

16         Mr Buchanan on 16 August, didn't you?  So the same day

17         as that rather puzzling email response of yours, you got

18         this email from Mr Buchanan, didn't you, Mr Gerrard?

19    A.   Yes.

20    Q.   And it was sent to Mr Frank and Mr Handjani, copied to

21         you.

22    A.   Yes.

23    Q.   And Mr Buchanan has given evidence that in this email he

24         appears to be breaking the news of the discovery of this

25         hacked material.
```

```
 1    A.   Yes.

 2    Q.   And he's accepted that he can't fully explain that

 3         because obviously this was 16 August and there's been

 4         a good week to ten days of work on this material before

 5         the date of this email of his.

 6    A.   Well, he's not breaking the news to me.  He's breaking

 7         the news to Andrew Frank and Amir Handjani.

 8    Q.   Yes.  And if we go to paragraph 23 of your first witness

 9         statement at {D/7/6} --

10    A.   Sorry, what paragraph?

11    Q.   {D/7/6}, paragraph 23.

12    A.   Yes.

13    Q.   -- you refer to this email of 16 August from

14         Mr Buchanan, and you say at the end of paragraph 23:

15              "I note that Jamie Buchanan said in that email that

16         he would get the link but I believe I already had it by

17         then."

18    A.   Yes.

19    Q.   You can't explain the way in which Mr Buchanan wrote to

20         you on 16 August, can you?  You can't explain the terms

21         of that email from him.  It seems wrong, doesn't it?

22    A.   I think I've already pointed out that I had a phone call

23         from Jamie Buchanan on the 15th, where he was talking

24         about Stuart Page and Stuart Page was, in his words,

25         rattling on about UAE.  He may or may not have had
```

1     another link.  I don't know.  But that's what he was
2     talking about.
3         I -- he asked me to phone up, I did phone up.  I'm
4     afraid I couldn't make head or tail of why Mr Page
5     thought it was the UAE.  And I will have -- and I think
6     what's happening there is Mr Buchanan probably hasn't
7     told the other two and is now telling them, and I say,
8     "Well, I've already got the link".
9         He actually says, "I have asked Neil to have a team
10    start reviewing" -- we'd already started it -- "as
11    a matter of urgency."  So this is a belated, "Gentlemen,
12    this is going on.  We're onto it" -- is the way
13    I interpreted his email.
14  Q.  You see, Mr Gerrard, I suggest to you that you knew
15    by August 2016 that RAKIA had already procured this
16    confidential internet information on Mr Azima.
17  A.  And if you don't mind me asking, how had we procured
18    that?
19  Q.  And you know -- and therefore you knew by the time of
20    this August discovery that it was in fact a charade
21    designed to bring that hacked data out into the open so
22    that RAKIA could then begin to take advantage of it.
23  A.  That's not true, my Lord.
24  Q.  And that explains why these emails don't actually hang
25    together and why they don't tell a consistent and

```
 1             regular story, isn't it, Mr Buchanan?
 2    A.   It's Mr Gerrard.
 3    Q.   Mr Gerrard.
 4    A.   That's not true, my Lord.
 5    Q.   What's the link that you're referring to in paragraph 23
 6         of your witness statement at {D/7/6}?
 7             "I note that Jamie Buchanan said in that email that
 8         he would get the link but I believe I already had it by
 9         then."
10             What link are you referring to there?
11    A.   Whatever links Mr Page had given me, whether it was the
12         one or two.
13    Q.   I'm going to ask you now about human rights matters,
14         please.
15    A.   Yes.
16    Q.   Final area.  Could you turn up, please, the document at
17         {G/26.3/1}?  Have you seen this Amnesty report before,
18         Mr Gerrard?
19    A.   No, I have not.
20    Q.   Amnesty is a reputable international organisation,
21         isn't it?
22    A.   It certainly is.
23    Q.   And it's concerned with human rights abuses?
24    A.   It is.
25    Q.   And it endeavours to try to remedy those around the
```

```
 1          world?

 2     A.   It does.

 3     Q.   And are you telling his Lordship that you've never seen

 4          this report before?

 5     A.   I haven't.

 6     Q.   Not even in preparing for this case?

 7     A.   Not even in preparing for this case.

 8     Q.   Right.  So if I -- you see the heading:

 9               "'There is no freedom here'.  Silencing dissent in

10          the United Arab Emirates ..."

11               Can you see that?

12     A.   I can.

13     Q.   If you go to {G/26.3/5}, can you see the introduction?

14          Just read the first paragraph to yourself.

15     A.   20. ...?

16     Q.   {G/26.3/5}.  The quote:

17               "Westerners come here ..."

18     A.   What date is this report?

19     Q.   November 2014.

20     A.   And the quote is 2009, yes.  I read the quote.  I've

21          read the quote.

22     Q.   And you'd understand, wouldn't you -- or do you

23          appreciate that there are real concerns as to human

24          rights within the UAE, including RAK?

25     A.   I think there were definitely concerns with the UAE
```

1          generally, but recently I think things have improved.

2          If you read the World Justice Report, which is the

3          latest report, it ranks the UAE 19 out of 126 countries.

4          That clearly isn't perfect, but it's certainly a big

5          improvement.

6     Q.   Can I ask you, please, about your involvement in

7          relation to Shahab Izadpanah, please?

8     A.   Yes.

9     Q.   Do you know that person?

10    A.   I do.

11    Q.   Can you tell his Lordship who they are?

12    A.   Shahab Izadpanah is a person we were investigating in

13         Ras Al Khaimah.  He was accused -- and in fact has been

14         convicted in absentia -- for bribing government

15         officials; in fact, the head judge of the Ruler's court.

16    Q.   And what's been your involvement in that matter, tell

17         his Lordship, please.

18    A.   I investigated that matter alongside local lawyers.

19    Q.   And when did you do that?

20    A.   A good question.  I can't remember the date, but it was

21         probably 2014/2015.  I'm sorry, I can't remember.

22    Q.   And were these criminal investigations and prosecutions?

23    A.   They were -- well, nothing starts as criminal.  There

24         was the enquiry, which is what I was part of, but it

25         ended up as a criminal one, yes.

```
 1    Q.  And what's your sort of qualification or entitlement to
 2        assist with criminal prosecutions or investigations in
 3        Ras Al Khaimah?  What sort of position do you have in,
 4        if you like, the prosecuting or criminal firmament that
 5        allows you to get involved with that?
 6    A.  I have been undertaking criminal law, defending criminal
 7        law, indeed partly prosecuting it in the early DTI days
 8        since my qualification, so in excess of 20-odd years.
 9    Q.  Were you a prosecutor?  Are you an official prosecutor
10        or investigator within the --
11    A.  I am a -- well, you don't have to be an official
12        prosecutor.  At the time I was an agency prosecutor for
13        the DTI --
14    Q.  In RAK?  I'm looking at RAK.
15    A.  No, I will come to -- you asked me what experience I've
16        got.
17    Q.  No, I didn't.  I asked you --
18    A.  You did.
19    Q.  I'm sorry.  It was my fault.
20    A.  Okay.
21    Q.  I don't ask you what your qualifications are
22        historically.  In most countries criminal and
23        prosecuting matters are undertaken by official
24        prosecuting bodies.
25    A.  I see, yes.
```

 1   Q.   And you're a partner at Dechert and you're working on
 2        investigations for RAK.
 3   A.   Yes.
 4   Q.   And you're based in London.
 5   A.   Yes.
 6   Q.   And you're not from the UAE.
 7   A.   I'm not.
 8   Q.   So what would entitle you to involve yourself with what
 9        are criminal investigations and then prosecutions and
10        convictions of someone like Shahab Izadpanah?
11   A.   Well, I wasn't involved in the prosecution.  I was
12        involved in the gathering of information and evidence,
13        which we then submitted to the prosecution.
14   Q.   And who were you working for when you were doing that
15        information-gathering?
16   A.   RAKIA.
17   Q.   Could you go, please, to {H7/294.08}?  Have you seen
18        this document before, Mr Gerrard?
19   A.   We're not there yet, I'm afraid.  (Pause)   I don't
20        think I have, no.  May I read it?  How much -- crikey.
21   Q.   Just read paragraph 2, please.
22   A.   Gary Berntsen of DENX.
23   Q.   Yes, do you know who he is?
24   A.   He says he's the CEO of DENX.
25   Q.   And do you know who DENX is?

```
 1    A.   I came across emails from Shahab Izadpanah's laptop --
 2         I think it was a laptop -- where DENX offered removal
 3         services or something.
 4    Q.   When did you come across emails -- when did you have
 5         possession of Shahab Izadpanah's laptop and why?
 6    A.   Why ...?  As part of the investigation we asked for it.
 7    Q.   Who asked for it?
 8    A.   The local lawyers.
 9    Q.   Who were they?
10    A.   I've already said it once.  Al Tamimi.
11    Q.   Did they confiscate his laptop?
12    A.   They asked for it.
13    Q.   He just handed it over, did he?
14    A.   Initially, yes.
15    Q.   And did he consent to having his laptop looked at in
16         this way?
17    A.   Yes, I believe so.  I wasn't there.
18    Q.   So you had been looking at Mr Shahab Izadpanah's
19         emails --
20    A.   So I came across --
21    Q.   For the record --
22    A.   Sure.
23    Q.   -- you have had access to Shahab Izadpanah's emails on
24         Shahab Izadpanah's laptop; that's right, isn't it?
25    A.   I believe that's right.  Laptop or computer, I'm not
```

 1          sure which.

 2     Q.   Thank you.  And roughly when was that?

 3     A.   No, it might not have been his laptop.  It may have been

 4          his computer in his company which was within RAK --

 5     Q.   Right.

 6     A.   -- so I'm not sure where we got the information.

 7     Q.   You said "laptop".

 8     A.   I did say "laptop", but I'm not sure where we actually

 9          got it from.

10     Q.   And you can see what's said in paragraph 2 in relation

11          to -- it's really your involvement, Mr Gerrard.  Can you

12          focus on what's said there in relation to you?

13     A.   In paragraph 2?

14     Q.   Yes.  I'll read it out to you for the record:

15              "Mr Izadpanah detailed the expropriation of his

16          business by RAK authorities, on behalf of RAK Ruler ...

17          He then provided additional information of a United

18          Kingdom Lawyer Neil Gerrard from the law firm

19          Dechert ..."

20     A.   Sorry, I'm not -- oh, you've moved -- you're down there.

21     Q.   Yes, I'll keep going if I may for the transcript:

22              "... from the law firm Dechert and a former

23          United Kingdom Policeman James Buchanan interviewed then

24          interrogated Mr Izadpanah in Dubai where they attempted

25          to extort $7.5 million from Mr Izadpanah, on behalf of

 1        the RAK, under the threat of incarceration in the RAK."
 2            All right?  Can you see that?
 3   A.   Yes.
 4   Q.   Is it right that you and Mr Buchanan interviewed and
 5        then interrogated Mr Izadpanah in Dubai?
 6   A.   No, it's wrong, and indeed, as hopefully you've seen,
 7        Mr Buchanan isn't a policeman.  This is wrong on many
 8        accounts.
 9   Q.   Did you in fact interview Mr Izadpanah yourself?
10   A.   I did.  I interviewed him with one of my colleagues and
11        someone from the law firm.
12   Q.   And where did that take place?
13   A.   That actually took place in RAK.
14   Q.   And whereabouts in RAK?  In a prison or the Palace?
15   A.   Dechert's offices.
16   Q.   And what was the purpose of that interview?
17   A.   The purpose of the interview was to ask him about our
18        concerns.  He was invited to attend, he did, and he
19        brought who we thought was his lawyer, but turned out to
20        be a colleague or representative or whatever.
21        Unfortunately that gentleman left after about half an
22        hour/an hour.
23   Q.   And when was this interview?
24   A.   I can't remember, but there's a record of it.
25   Q.   And would there be a record in your daybook?

```
 1    A.   No, because I was conducting the interview and asking
 2         questions and putting documents to him, so there will
 3         not be.  But there's a record of the interview which one
 4         of my colleagues will have written down and indeed was
 5         viewed subsequently by the SRA --
 6    Q.   So there will be a record in there?
 7    A.   There's a record of it.  The SRA investigated this and
 8         held that there was no ...
 9    Q.   Right.  Did Mr Hughes of Dechert interview
10         Shahab Izadpanah on any occasion to your knowledge?
11    A.   I'm not -- I don't know.  I can't remember.
12    Q.   Can you go to {H7/294.08/2}, please?  Can you go over
13         the page, beginning at paragraph 4.
14    A.   Do you mind if we just slow down on the reading bit
15         because this is a document I haven't seen before and
16         I'd like to take time over it if you're going to ask
17         questions.
18    Q.   Thank you for doing that because I missed out
19         paragraph 3, so thank you for doing that.  Go back to
20         paragraph 3 at {H7/294.08/1}, please.  Starting, "Of
21         significant interest ..."  Can you see that?
22    A.   Yes.
23    Q.   Can you read paragraph 3, please?
24    A.   Yes.  (Pause)
25    Q.   Have you read that, Mr Gerrard?
```

1    A.   I have.

2    Q.   Is it right, as this memorandum records, that you --

3         because I think it's you they're referring to there --

4         offered Mr Izadpanah clemency if he would implicate two

5         other individuals, Dr Massaad and Karam Al Sadeq, in

6         this way?

7    A.   I don't believe we did.

8    Q.   Might you have done, though?

9    A.   I think I might have -- I was -- we were certainly

10        asking for information, but I don't think we were in the

11        position to give clemency.

12   Q.   Do you think you might have said, "If you can help us

13        with Dr Massaad and Mr Al Sadeq, it will be easy for you

14        in relation to any collateral damage that might happen

15        in a criminal sphere"?

16   A.   That would be a matter for a prosecutor to determine.

17   Q.   Can go to paragraph 4, please {H7/294.08/2}?

18   A.   Yes.

19   Q.   Can you see what is there said?  Can you see that?

20   A.   I'm reading.  You want me to read paragraph 4?

21   Q.   Yes, please.

22   A.   Lovely.  (Pause)

23            Yes, I've read it.

24   Q.   I think you referred earlier today to you having

25        interviewed Mr Al Sadeq, didn't you, Mr --

1    A.   That is correct.

2    Q.   Do you think you may have interviewed him along the

3         lines set out in paragraph 4, rather than in accordance

4         with PACE, or not?

5    A.   Definitely not, and, as I said, there will be a record

6         of that.  Furthermore -- let me come to the point ...

7         (Pause)

8              I've lost it.  Yes, as far as I'm concerned, I don't

9         recognise the allegations that she, on behalf of her

10        husband, was making.

11   Q.   Did you interview Mr Al Sadeq's wife as part of your

12        investigation here?

13   A.   I don't think we did, but I do know she attended

14        the Palace to talk to His Highness.

15   Q.   What was that about?

16   A.   About her husband.

17   Q.   Can you go to {H7/248.07} please?  Can you see that

18        email of 15 March 2015?  Can you see that?

19   A.   I'm afraid we're not there yet, my Lord.  (Pause)

20        Thank you.

21   Q.   This was an email from Mr Behre on --

22   A.   So this is an email I haven't seen before so I'll need

23        time to read it if I may.

24             Which -- all of it?

25   Q.   The first three lines.

1   A.   At the top?

2   Q.   "To give you a bit more context ..."  (Pause)

3   A.   Yes, I've read it.

4   Q.   Is it right that you did threaten Mr Al Sadeq's wife --

5   A.   That could not be further from the truth, my Lord.

6   Q.   -- and that you said the things to her that are reported

7        here, threatening jail of her husband?

8   A.   Nothing could be further from the truth, my Lord.

9   Q.   And will there be a record of any interview you had with

10       Mr Al Sadeq's wife?

11  A.   I -- you said "interview".  I've already said I don't

12       think we interviewed her --

13  Q.   Right.

14  A.   -- and there would hardly be a note of discussions with

15       His Highness.  She was pleading clemency and --

16       absolutely the right thing to do.

17  Q.   Do you think, Mr Gerrard, that you have a tendency to

18       get a bit carried away when you're investigating matters

19       for clients in these sorts of contexts --

20  A.   No, I don't believe I have.

21  Q.   -- and to adopt a rather overly muscular approach to

22       your investigations --

23  A.   I don't think I do.

24  Q.   -- that could amount to -- certainly could come across

25       as threatening or menacing to the person being

1            investigated?

2     A.   I hope not.  I don't believe I do, my Lord.

3     Q.   Could you be shown {G/34/109} please?  Have you seen

4          this document before, Mr Gerrard?

5     A.   No.

6     Q.   It's an email of 13 September 2014 from Mr Bustami to

7          a number of people within RAK, but copied to

8          Gavin Watson.  He's a partner of yours, isn't he?

9     A.   Ex-partner.

10    Q.   Ex-partner.

11    A.   But he was at the time, yes.

12    Q.   He was at Decherts, was he, at this time?

13    A.   Yes.

14    Q.   And it's copied to you as well.  Can you see,

15         "Neil Gerrard"?

16    A.   Yes.

17    Q.   Do you want to just read it to yourself, please?

18    A.   Please.  (Pause)   Yes, I've read it.

19    Q.   Mr Buchanan agreed that enlisting the support of

20         a government and threatening imprisonment in order to

21         pressurise him into settling a dispute was an improper

22         thing to do.  Do you agree with that observation of his?

23    A.   In relation to -- well, it's not in the email here.

24         I don't understand why I'm being asked to agree with

25         a comment that I've no idea what context it was in.

1   Q.   All right.  Well, I'll move on.  Do you think there's

2        anything wrong with what's being suggested in this

3        email?

4   A.   Well, I didn't write the email, but when I read it,

5        I didn't see any problems with it.

6   Q.   Thank you.  Could I ask you, please, to go to

7        {G/26.27/1}, which is a copy of particulars of claim in

8        a claim brought by ENRC against the Serious Fraud

9        Office.  Can you see that?

10  A.   I do, my Lord.

11  Q.   And you can see -- you're familiar with this dispute,

12       aren't you, Mr Gerrard?

13  A.   All too familiar, my Lord.

14  Q.   And you can see what's set out in the introductory

15       pages.  ENRC are complaining, aren't they, that the SFO

16       improperly expanded the scope of its investigation into

17       ENRC, and that came about as a result of your breach of

18       confidence in other breach of fiduciary duty.  That's

19       what's alleged, isn't it?

20  A.   Yes, they're claiming a lot of things.

21  Q.   Can you see who -- at {G/26.27/62} -- who settled this

22       pleading?  Can you see?  It's been settled by five

23       counsel -- can you see that? -- two leading counsel and

24       three junior barristers.

25  A.   Yes.  I also see that the statement of truth is signed

1        by one of the suspects who's currently under criminal

2        investigation.

3   Q.  And you know, don't you, Mr Gerrard, that for counsel to

4        settle pleadings alleging fraud or the like, they have

5        to have reasonable credible material, don't they, in

6        front of them -- don't they?  It's a rule of conduct,

7        isn't it?

8   A.  Well, it depends on how you define "reasonable".  At the

9        same time you will see on the defence a plethora of

10       counsel signing that one as well, and if I can just say

11       for the record that the SFO, Dechert and myself

12       vehemently deny these allegations and I, for one, relish

13       the opportunity of defending this in court next year,

14       my Lord.

15  Q.  Would you go to {G/26.27/39} please?  At paragraph 29.1

16       it's alleged that you or Dechert acting by you, "...

17       acting against ENRC's interests, in breach of the

18       Retainer and in breach of fiduciary duty".  Can you see

19       that, Mr Gerrard?

20  A.  Yes, I can.

21  Q.  Then a number of respects are set out, and (a):

22       "Mr Gerrard leaked confidential and privileged

23       material to The Times and took great care to disguise

24       his involvement in this flagrant breach of duty: see

25       paragraph 11.6 above."

```
 1              Can you see that?

 2    A.   See 11.6?

 3    Q.   See 11.6 above.

 4    A.   Yes.

 5    Q.   If we go to 11.6 -- that's at {G/26.27/9} --

 6    A.   27/9?

 7    Q.   It's page 9 of this document.

 8    A.   Yes.

 9    Q.   -- you see what there's alleged against -- that you did.

10    A.   Yes.

11    Q.   What do you have to say about those matters?  Do you

12         deny all of them?

13    A.   I deny all of them.  I would like to make the point that

14         Mr Findlay was an employee of ENRC, and the allegation

15         is that I gave an employee of ENRC material to leak,

16         which I deny.  Mr Findlay -- I won't go any further.

17    Q.   Can you go back to paragraph 29.1 of the pleading, so

18         that's page 39 of this document {G/26.27/39} at 29.1(b):

19              "Mr Gerrard leaked confidential and privileged

20         material to the SFO ..."

21    A.   Denied.

22    Q.   And then (c):

23              "Mr Gerrard conducted himself as aforesaid at the

24         Chelsea Brasserie: see paragraph 11.12 above."

25              Can you see that?
```

```
1    A.   Yes, denied.

2    Q.   If we go to 11.12, that's at page --

3    A.   My diary doesn't even record me as being there, but

4         anyway, denied.

5    Q.   Well, yes, I'm sure -- page 12 {G/26.27/12} --

6    A.   Page 12.

7    Q.   Is that your desktop, is it, or your diary?  Your diary.

8             Could you go to 11.12, please, the paragraph.

9    A.   Sorry, you have to say that again.  We're going too

10        quickly.

11   Q.   Page 12, paragraph 11.12 of this pleading:

12            "In August 2011 ..."

13            Can you see that?

14   A.   Yes.

15   Q.   "Mr Gerrard met Messrs Findlay and Trevelyan at the

16        Chelsea Brasserie on Sloane Square.  As he approached

17        the table, he rubbed his hands and said 'right boys, I'm

18        in rape mode'; he also stated that he was planning to

19        'screw these fuckers ...' for millions of pounds."

20   A.   Yes, I deny it, I wasn't there and my diary confirms

21        I wasn't there, but that's for another day.

22   Q.   So your evidence -- your evidence will be that these

23        gentlemen are making up this allegation?

24   A.   That is my evidence.

25   Q.   Could you go to {G/26.25} please?
```

```
 1    A.   Yes, this is my particular favourite.

 2    Q.   This is an article that appeared in the Lawyer Monthly,

 3         isn't it?

 4    A.   It is.

 5    Q.   You see what's there set out.  There's reference here,

 6         isn't there, to what's said to be an alleged

 7         whistleblower letter -- isn't there?

 8    A.   Correct.

 9    Q.   And that's at {G/26.11/1}.

10    A.   Yes.

11    Q.   I'm sure you've read that letter before.

12    A.   Many times.

13    Q.   And what's your response to that letter?

14    A.   I think it's a remarkable letter.  If it were true, it

15         means that I'm in a conspiracy with the

16         Deputy Prime Minister, two directors of the Serious

17         Fraud Office, several members of the SFO.  It also

18         identifies all these alleged clients, none of which

19         I have ever acted for.  So, in short, this is complete

20         rubbish.

21    Q.   Can you explain why you would have been victimised or

22         persecuted in this way, Mr Gerrard?

23    A.   Yes, I think I can.

24    Q.   Why is that?

25    A.   Well, with the greatest of respect, that's part of my
```

```
 1            defence going forward.

 2      Q.    Right.  Do you think that you're a man who tends to make

 3            enemies along the way?

 4      A.    Well, normally, no, but I've been in practice 20-plus

 5            years and RAK and this matter have certainly blotted

 6            that copy book.

 7      Q.    Could you be shown finally {G/9.2}, please.  {G/9.2/7},

 8            please.

 9            Have you got G/9.2 --

10      A.    No, I haven't.  My Lord, I'm being rushed here.  Sorry,

11            where am I looking?

12      Q.    This is a statement -- the eighth statement of

13            Ms Lucy Ward filed in these proceedings.  Could you just

14            read paragraphs 23 and 24?  Have you not seen this

15            statement before, Mr Gerrard?

16      A.    No.

17      Q.    Could you read paragraph 23 that's set out there,

18            please?

19      A.    Yes.  (Pause)

20            How long do you want me to go on for?  The whole

21            section?

22      Q.    Well, yes, if you like.  (Pause)

23      A.    This is the first time I've seen this email that they're

24            referring to.

25      Q.    If you go to paragraph 26 {G/9.2/9}, you can see what
```

```
 1            Ms Ward says there, please.  These emails apparently
 2            arrived in an envelope at Dechert's offices.  Can you
 3            see that?
 4    A.   Yes.
 5    Q.   If you don't know about this, Mr Gerrard, then I won't
 6            take it up with you any more.
 7    A.   All I know -- I was travelling -- that there was --
 8            first of all I had some emails from -- I can't remember
 9            who now, I think one of my American colleagues and
10            someone else, that they'd apparently received an
11            envelope -- an anonymous envelope, I'm not sure -- and
12            I emailed my PA to say, "Have I got one?", and she said,
13            "Yes" -- no, she didn't say "Yes".  It had already been
14            identified by one of the team and they'd already
15            isolated it.  So I've never opened the envelope, I've
16            never seen the email.
17    Q.   And in the Mikadze dispute in Georgia, Dechert also
18            received certain documents through the post, anonymously
19            through the post, didn't they?
20    A.   It was addressed to me.
21    Q.   And can you explain how that came about?  Do you have
22            any idea why people were sending you things anonymously
23            in the post?
24    A.   I can explain the circumstances, my Lord.  I had an
25            envelope addressed to me.  In it was -- I can't remember
```

1    whether it was one or two pages -- what I took to be

2    Russian.  Obviously I don't read Russian.  I sent it to

3    our Georgian office and asked him to translate it for

4    me.  He confirmed it was actually Russian.  It could

5    have been Kazakh or Russian.

6         He over the phone said, "Look, it looks like an

7    internal document from Mr Mikadze's lawyers", and we

8    concluded it had been sent to me by mistake.  I asked my

9    Dechert partner to -- in Georgia to call the lawyers,

10   say that we had this document and was it a mistake, and

11   they said it was and so we destroyed the document on our

12   system.

13   Q.  Finally, Mr Gerrard, I think I put this to you, but

14       I put it to you that you knew or you know that RAKIA

15       procured the illegal access to Mr Azima's emails.  I put

16       that to you.

17   A.  That is not true.

18   Q.  And that they did so as part of a campaign to go after

19       and ruin him.

20   A.  That seems like an incredibly elaborate exercise.  It's

21       certainly -- it's just not true, my Lord.

22   MR LORD:  Thank you, Mr Gerrard.

23   MR TOMLINSON:  My friend being two and a half hours over his

24       estimate, I'm now left with five minutes to re-examine

25       Mr Gerrard.

1           My Lord, I don't want to have to bring him back

2       tomorrow, but if I go slightly over the time,

3       your Lordship will forgive me.

4   JUDGE LENON:  That's fine.

5               Re-examination by MR TOMLINSON

6   MR TOMLINSON:  Mr Gerrard, you were stopped by Mr Lord when

7       you were dealing with an SRA complaint that was made

8       about the conduct of Dechert in -- I think you said that

9       that concerned the conduct of Dechert in RAK in relation

10      to -- well, who was it in relation to?  Do you remember?

11  A.  Shahab Izadpanah.

12  Q.  Do you remember what the SRA said in response to that

13      complaint?

14  A.  Yes, they said there was no evidence at all to

15      substantiate the claim --

16  Q.  Have you ever --

17  A.  -- having investigated it.

18  Q.  Have you ever taken on the role of prosecutor in RAK, in

19      other words run a prosecution, formulated charges,

20      anything of that sort?

21  A.  No, not at all, my Lord.

22  Q.  Have you ever interfered with the prosecution process in

23      RAK?  Have you put pressure on prosecutors, tried to

24      make them make decisions in particular ways, anything of

25      that sort?

```
 1    A.   Not at all, my Lord.

 2    Q.   Have you ever sought to cover up torture activities in

 3         RAK?

 4    A.   My Lord, I've never seen torture in RAK.  Had I seen it,

 5         not only would I have been appalled, but I would have

 6         reported it.

 7    Q.   Were you involved in the orchestration of illegal

 8         detentions in RAK?

 9    A.   Absolutely not, my Lord.

10    Q.   I want you to understand -- I'm not sure whether this

11         was clear, but, Mr Gerrard, when you were being asked

12         about the "View from the window" {H9/106} document

13         which -- do you remember that? -- the document --

14    A.   I do.

15    Q.   -- that Mr Frank sent to you?  And the case was being

16         put to you that what had happened was that some time

17         before January 2016 you had had access to illegally

18         hacked emails of Mr Azima -- do you follow?

19    A.   I do.

20    Q.   -- and on the basis of those emails you had told

21         Mr Frank that Mr Azima was engaged in fraud; yes?  And

22         it was a result of that access to the illegally hacked

23         emails and that conversation that Mr Frank had written

24         that document.  Is there any truth in any of that?

25    A.   Absolutely not, my Lord, and I think if there was any
```

1   truth in that, wouldn't you have seen a lot more

2   evidence of that illegally obtained material floating

3   around?  Can you point to one document that suggests

4   that's the case?

5  Q. I now want to ask you about the attendance note at

6   {H10/226}.  This is the one that you've been taken to --

7   you were taken to at some length by Mr Lord.  Page

8   {H10/226/2}, please.  We have there the paragraph,

9   paragraph 10.

10    I wanted to first ask you about the first line.

11   What were you referring to there?

12  A. In my meeting with Khater Massaad's lawyer, Kirby Behre,

13   where I think I referred to the lengthy meeting we

14   had -- he was the first lawyer who had agreed to be

15   walked through the substantial material we had at the

16   time -- bizarrely he threatened Mr Buchanan and I -- or

17   really our client, I suppose -- that if we were to

18   pursue this course of events, there would be mutually

19   assured destruction, which I took to mean that both my

20   client and Dr Massaad would be mutually destructed.

21  Q. And what was your response to that in the meeting?  How

22   did you -- having mentioned that was his view, how did

23   you respond to that to Mr Azima?

24  A. To Mr Kirby Behre?

25  Q. No, because I'm talking now about the meeting on --

```
 1   A.  Oh, sorry.

 2   Q.  -- of 16 July.  You noted you said to those present,

 3       presumably, that he'd referred to "mutually assured

 4       destruction", but what was your -- how did you explain

 5       what you thought about that?

 6   A.  Well, I just -- I'd explained to Farhad that I didn't

 7       think that sort of comment was going to help at all and

 8       that it was inconsistent with what we were all trying to

 9       achieve.

10   Q.  And what did you say was the likely result if

11       prosecutions went ahead?

12   A.  Well, that nothing was going to affect His Highness, but

13       if prosecutions went ahead there was going to be -- the

14       collateral damage was going to occur.

15   Q.  And what did you mean by that?

16   A.  What I meant was that, once you start the ball rolling,

17       once you start getting the prosecutions involved, these

18       things take a life of their own.

19   Q.  And then I want to ask you about the last two sentences

20       of this paragraph.  What did you mean by the references

21       to the Dana Jets database, the RAK Ceramics database and

22       Sheeba Nair's emails?

23   A.  I was trying to get across to Dr Massaad that, you know,

24       we had or we thought we had a considerable amount of

25       evidence and that this -- you know, this wasn't going
```

1        away.

2           As I tried to explain previously, the frustration

3        was he was completely ignoring the problem, my Lord.  He

4        wouldn't engage.  He wouldn't even allow his lawyers to

5        talk to him about the issues.  He just seemed to think,

6        "I'll ignore it and it will go away".  That was the

7        frustration that we all had, including, I think,

8        Mr Azima.

9           So -- and indeed he sacked Mr Kirby for talking to

10       us and being walked through the issues.  So I was trying

11       to get across that we would -- "There was no point in

12       sitting in your little bubble and ignoring these issues.

13       Please engage with us".  That's the point I'm trying to

14       get across.

15  Q.  At this distance in time, do you remember who

16       Sheeba Nair was?

17  A.  Yes, Sheeba Nair was Kirby -- sorry, Sheeba Nair was the

18       secretary at RAK Ceramics -- private secretary -- of

19       Dr Massaad.

20  Q.  Could you now look at, please, {H10/229}?  You were

21       asked some questions about this email and in particular

22       it's -- I'm looking here at the -- it's about halfway --

23       well, it's the penultimate substantial paragraph of the

24       email from Mr Buchanan to Mr Azima, the one that begins,

25       "To be absolutely clear ..."  Do you see that?

1   A.   Yes.

2   Q.   And you were asked about the last sentence, which is

3        referring to you:

4            "All he [that's you] did was raised questions as to

5        HeavyLift.   In a previous meeting he asked you about

6        Eurasia Hotel Holdings."

7   A.   Yes.

8   Q.   Can you just look, please, at the transcript of Day 3 --

9        this is Mr Buchanan's evidence -- page 169.

10       {Day3/169:1}.

11           This is Mr Lord asking Mr Buchanan about this very

12       same email, and at line 13, in relation to the reference

13       to HeavyLift, it's being said that this must come from

14       the hacked materials, and you see his response at

15       line 13.

16  A.   Yes.

17  Q.   Then if we go, please, on to the next page

18       {Day3/170:11}, at line 11, his answer there.

19  A.   Yes.

20  Q.   Were you aware of an investigation concerning the

21       shareholding in HeavyLift and how the transactions had

22       taken place between HeavyLift and RAK Airways and other

23       RAK entities?

24  A.   Yes.

25  Q.   And was that what you were referring to at the meeting

```
 1            with Mr Azima on 16 July?
 2       A.   Yes, I think the point I was referring -- it was the
 3            shareholding.  They were -- RAK had the majority
 4            shareholding and yet they played no part at all in
 5            HeavyLift, either its accounts, signing off bank
 6            accounts, board meetings, nothing at all, and those
 7            attempts that were made by RAKIA to -- or Dr Massaad
 8            anyway, to put people in, they were sacked after several
 9            months.  That was the point I was trying to make.
10       Q.   Finally, Mr Gerrard -- I may have covered this already,
11            but perhaps I haven't and it's important to be clear --
12            did you -- I think the allegation is made against you
13            that you exercised some kind of judicial, prosecutorial
14            or governmental functions in RAK when you were working
15            for RAKIA.  Did you exercise any such functions?
16       A.   Zero functions.  It was a similar function to what
17            happens here.  A client -- if they have
18            a whistleblower -- brings in investigative lawyers or
19            accountants.  They review the situation and then advise
20            the client as to what to do about it, either litigate,
21            report to the authorities.  A DPA -- deferred
22            prosecution agreement -- is exactly that, and that's the
23            role that we were playing within RAK, and at all times
24            we were working with local lawyers, my Lord.
25       Q.   Did you have any functions in overseeing prisons or
```

1           dungeons in RAK?

2     A.   Well, I haven't seen a dungeon, but I didn't oversee

3           prisons or dungeons, no.

4     MR TOMLINSON:  My Lord, unless your Lordship has any

5           questions.  I'm sorry I've over-run by five minutes.

6     JUDGE LENON:  Have you finished?

7     MR TOMLINSON:  I have, my Lord, yes.

8     JUDGE LENON:  Thank you, Mr Gerrard.

9     MR TOMLINSON:  And, again, if this witness could be

10          released.

11    JUDGE LENON:  Of course, yes.  So 10.30 tomorrow hopefully.

12    MR TOMLINSON:  Yes.

13    (4.37 pm)

14          (The hearing adjourned until 10.30 am on Wednesday,

15                          29 January 2020)

16

17

18

19

20

21

22

23

24

25

1                              INDEX

2                                                    PAGE

3      MR NEIL GERRARD (continued) ..........................1

4           Cross-examination by MR LORD (continued) .........1

5           Re-examination by MR TOMLINSON .................187

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25